

RECEIVED
SDNY PRO SE OFFICE

2023 OCT 30  AM 10: 20

# IN THE UNITED STATES DISTRICT COURT FOR

# THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS SHELDON BREWER, Individually<br>1210 City Pl, Edgewater, NJ 07020,<br><br>and on Behalf of All Others Similarly Situated<br><br>Plaintiffs, | Civil Action No: |
| v. | |
| **Known Federal Defendants:** | **DEMAND FOR JURY TRIAL** |
| William Burns<br>Director<br>Central Intelligence Agency<br>Washington, DC 20505<br>(505) 855-6744, | |
| Christopher Wray<br>Director, Federal Bureau of Investigation<br>935 Pennsylvania Avenue, NW<br>Washington, District of Columbia 20535-0001<br>202-324-3000, | |
| Merrick Garland<br>Attorney General of the United States<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br>202-514-2000, | |

Avril Haines
Director of National Intelligence
Office of the Director of National Intelligence
1201 New York Avenue NW. Suite 500
Washington, DC 20005,

Mr. Lloyd Austin
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000
703-571-3343,

Dr. Stefanie Tompkins
Director, Defense Advanced Research Projects
Agency
675 North Randolph Street
Arlington, VA 22203-2114
(703) 526-6630,

Alejandro Mayorkas
Secretary, Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528-0075
202-282-800,

Kimberly Cheatle
Director, United States Secret Service
245 Murray Ln SW - BLDG T-5
Washington, DC 20223
202-406-5708,

**Known State and Local Defendants:**

City of New York
Attention: Georgia Pestana
Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212-356-1000,

City of New York Police Department
Ernest F. Hart

Deputy Commissioner for Legal Matters
Attention: PALS Unit
One Police Plaza
New York, New York 10038
646-610-5400,

Patrick J. Callahan
Colonel, State Police
State of New Jersey
P.O. Box 7068
West Trenton, NJ 08628
609-882-2000,

John Bilich
Chief of Security
Port Authority of New York and New Jersey
Police Department
Four World Trade Center
150 Greenwich St
New York, NY 10006
201-239-3500,

Anthony Cureton
Sheriff, Sheriff's Department
County of Bergen
2 Bergen County Plaza
Hackensack, NJ 07601
201-336-6000,

James Tedesco
County Executive County of Bergen, New
Jersey
One Bergen County Plaza
5th Floor, Rm 580
Hackensack, NJ 07601-7076
201-336-6000,

County of Maricopa County, Arizona
c/o Maricopa County Attorney
225 West Madison Street
Phoenix, AZ 85003,

Paul Penzone
Sheriff, Maricopa County Sheriff's Department
550 West Jackson Street
Phoenix, AZ 85003
602-876-1000,

**Known Other Entity Defendants:**

Acme Markets Inc.
c/o: The Corporation Trust Company
830 Bear Tavern Road
West Trenton NJ 08628

Daniel Weiner
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004,

Walmart Inc.,
Wal-Mart (China) Investment Co., Ltd.
702 SW 8th Street
Bentonville, AR 72716,

Costco Wholesale Corporation
999 Lake Drive
Issaquah, WA 98027,

The Kroger Co.
1014 Vine Street
Cincinnati, OH 45202,

PPG Industries Inc.
One PPG Place
Pittsburgh, Pennsylvania 15272,

Establish Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Dominick & Dickerman LLC
c/o Corporation Service Company

251 Little Falls Drive
Wilmington, DE 19808,

WeFunder Admin, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Advisors, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder BD, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder, Inc.
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Portal LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Portfolio, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder SPV, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

Blackpool Group, Inc.
c/o Jonathan Cross
401 E Las Olas Blvd.
Ste. 1400

Fort Lauderdale, FL 33301,

The Shefford Group, Inc.
c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Shefford & Associates, LLC
c/o Jonathan Cross
3980 Premier Drive Suite 110
High Point, NC 27265,

Shefford Capital Partners, LLC
c/o: Jonathan Cross
2255 Glades Rd 324A Boca Raton, FL 33431,

Fractal Advisors LLC
c/o Mr. Michael Roznowski
9308 Lee Court, Leawood, KS 66206,

Cornhusker Capital
c/o Reginald McGaugh
1545 North 18th ST
Omaha, NE 68110,

Banco Advisors, LLC
c/o Greg Smith
16100 N 71st St Ste 140,
Scottsdale, AZ, 85254,

Insight Network Spain
c/o: Mr. Don Keiser
Calle Antina 22 Primera Planta, 03130,
St. Pola, Comunidad Valenciana, España.
Teléfono: +34 96 541 17 58,

Madison Street Capital Advisors, LLC
c/o: Charles Botchway
105 W Madison Street, 12th Floor
Chicago, IL 60602,

New America Lending, LLC
c/o: David Choate Hughes
2812 Pat Tillman Drive

Springfield, Illinois 62711,

Richard A. Miller Consulting, LLC
c/o Richard A. Miller
15 Avery Street
Tunkhannock, PA 18657,

Sallyport Commercial Finance, LLC
c/o Steven N Kurtz, Esq.
15303 Ventura Blvd, Ste 1650
Sherman Oaks, CA  91403,

Sole Source Capital LLC
c/o: The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington DE 19801,

CFO Search, Inc.
c/o: Michael Maggard
9602 Kewanee
Lubbock, TX 79424,

Adamson Brothers LLC
c/o: Legalinc Corporate Services Inc.
651 N Broad St Ste 201
Middletown DE 19709,

Adamson Brothers, LLC
c/o Mr. Andy Altahawi
205D Chubb Ave Ste 240
Lyndhurst, NJ  07071,

Adamson Brothers Corp
c/o Mr. Andy Altahawi
116 Scarlet Oak Lane
Paramus, NJ 07652,

Adamson Brothers Inc
c/o Mr. Andy Altahawi
2423 SW 147th Ave #706
Miami, FL 33185,

Adamson Brothers Inc
c/o Mr. Andy Altahawi

12 N State Rt 17
Paramus, NJ 07652-2644,

Adamson Brothers, Inc.
c/o Delaware Corporations LLC
1000 N. West St., Ste 1501
Wilmington, DE 19801,

Adamson Brothers Financial Corp
c/o Harvard Business Services, Inc.
16192 Coastal Highway
Lewes, DE 19958,

Ranch Creek Partners, LLC
c/o JD Kritser
19020 N.E. 84th St.
Redmond, WA 98053,

Crossroads Financial LLC
c/o Lee Haskin, CEO
6001 Broken Sound Pkwy
Suite 620
Boca Raton FL 33487,

Bibby Financial Services, Inc.
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805,

Axial Networks, Inc.
c/o Peter Lehrman
902 Broadway, 19TH Floor
New York, NY 10010,

Technology Sales Leads, Inc.
c/o National Registered Agents, Inc
155 Federal Street, Suite 700 2nd Floor
Boston MA 02110,

Engleman Associates, Inc.
aka SoftSelect Systems
c/o: Mark Engleman
607 East Reserve Street
Vancouver, Washington 98661

360-699-6150,

Loeb & Loeb, LLP
c/o Mitchell Nussbaum
Vice Chairman
345 Park Avenue
New York, NY 10154
212-407-4159,

Raymond F. Sullivan, LLC
c/o: Raymond Sullivan
Attorney
10440 Little Patuxent Parkway, Suite 900
Columbia, MD 21044,

Assure Group International, LLC
c/o Alexander Gibbs
Ste 2000
1401 Mercantile Ln
Largo MD 20774,

ABT Trading Inc.
c/o Registered Agents Inc.
7901 4TH Street North
Ste 300
St. Petersburg, FL 33702,

DC International LLC
c/o Phillip G. Daleuski
1471 Dewar Dr Ste 147
Rock Springs, WY 82901,

Consumerbase LLC dba Exact Data
c/o CT Corporation System
208 S. LaSalle ST, Ste 814
Chicago, IL 60604,

Tradekey.com, doing business in the United
States through:
Orbit Technologies LLC
264 Hemlock Terrace
Teaneck, NJ 07666,

Weblink.in Pvt. Ltd.

33 and 33A Rama Road
Industrial Area, Shivaji Marg
New Delhi, India,

Foshan Shunde XinJianHan Trading Co, Ltd
Room 201, Building G, Shunde Creative
Industrial Park, No#41 Dailiang Feng Xiang
Road, Shunde District FoShan City,
GuangDong, PRC 528300,

ENVOTEC, a Pakistani web development
company paid through Freelancer.com,

Vendorco, whose legal entity name and service
address are currently blocked by defendant
computer hack from access, most probably by
Defendants,

EGM, whose legal entity name and service
address are currently blocked by defendant
computer hack from access, most probably by
Defendants,

**Known Individual Defendants:**

William Burns, individually
fka Patrick Heffron
c/o: Central Intelligence Agency
1000 Colonial Farm Road
Langley Virginia 22101

Andrew Weissman, individually
fka Lyle Whiteman
c/o: New York University School of Law
40 Washington Sq. South
New York, NY 10012,

Charles Rosenberg, individually
fka Chuck LeFevre, William Drumm
c/o: Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004,

Unknown federal agent individually
fka Dewey Turner
c/o: FBI Manhattan Field Office

26 Federal Plaza, 23rd Floor
New York, NY 10278-0004,

Unknown federal agent individually
fka Michael Maggard
9602 Kewanee
Lubbock, TX 79424,

Unknown federal agent individually
fka Dean T. Smith (Auburn, CA),
c/o: Geoffrey O. Evers
Evers Law Group, A.P.C.
641 Fulton Avenue, Suite 200
Sacramento, CA 95825,

Unknown federal agent individually
fka Andrew Altahawi
2423 SW 147th Ave #706
Miami, FL 33185,

Unknown federal agent individually
fka Michael Callahan
c/o: Dominick and Dickerman LLC
1700 East Putnam Ave Suite 202
Old Greenwich, CT 06870,

Unknown federal agent individually
fka Mark Gross
c/o: Westmark Capital
437 Madison Avenue, 24th Floor
New York, NY 10022,

Unknown federal agent individually
fka Marc Chalom
6 Oak Bend Rd
West Orange, NJ 07052,

Mr. Joseph Arpaio, fka Greg Crossgrove
12808 Vía Del Sol
Fountain Hills, AZ 85268,

Other Unknown Federal and Other Police
Powers Agents, known as:
Akshay Seth,
Al Thani, Sheikh Jassim Bin Hamad Bin Jabor,

Alexander Vindman fka Paul Yarbrough,
Alice Cheng,
Andrew Cardone,
Andrew Kunsak,
Andy Altahawi,
Ari Melber fka Wes Lewis,
Bob Huskey,
Brad Kumin,
Bradford Rossi,
Brandon Hutchison,
Charles Jackson,
Conrad Ross,
Daniel Krewson,
Daniel Lonergan,
Daniel Weiner,
Darrell C. Pray,
David Choate Hughes,
David Keller,
David Wyly,
Don Keiser,
Doug Petersen,
Frank Maughan,
Gerald Cornwell,
Gerald Newman,
Glen Garrison,
Greg Smith,
Jacob Krempel,
Jason Pankowski,
Jason Waseman,
Jasper Van Brakel,
Jay Carter,
Jim Rhodes,
Joanne Labelle,
Joel Gottesman,
John Atruso,
John Vangchhia,
Jon Nickless,
Jonathan Cross,
Jose Merced,
Kristine J. Volk,
Larry R. Cook,
Laura Akoto,
Lawrence Summers fka Roger Penner,
Lino Belli,
Lisa Rubin fka Michelle Yarbrough,

Lori Alvarez,
Marinka Modderman,
Michael Castro,
Michael Henderson,
Michael Kurgan,
Michael Strasser,
Michael Babcock,
Michael Larson,
Michael Roznowski,
Norelle Dean,
Paul Shaffer,
Paul Smith,
Peter Grubstein,
Peter LeBlond,
Phil Daleuski,
Piotr Pregner,
Ray Kovonuk,
Raymond J Sullivan,
Raymond Poon,
Reginald McGaugh,
Richard A Miller,
Robert Bestwick,
Robert Finkelstein,
Robert Hibbs,
Robert Miller,
Robert Saul,
Robert Swain,
Roger Stone fka David Moller,
Ron McCormick,
Sam Sanders,
Selwyn Gordon,
Stephen M. Breyer fka Jack Sackville-West,
Steve McDonald,
Steve Poindexter,
Susan Walker,
Tessina Painter,
Vito Perillo,
Walter Haberer,
William Reed,
William Tarazewich,
Yoshiyuki Higaki,
Zach Sease,
Zoe Schumaker,

John Does (unknown number),

Defendants.

**Procedural Notes to District Court and Process Servers (USMS):** The website used by the Lead Plaintiff to develop process service addresses for this Complaint (Spokeo.com) has likely been hacked and/or spoofed by Defendants to obstruct proper service to defendant addresses for non-governmental defendants named herein.

These tampering and obstructive processes by Defendants have been encountered in a wide variety of online information sources over time and may lead to inaccuracies in certain elements of this Complaint and in exhibits derived from sources other than the Lead Plaintiff. These inaccuracies are the sole responsibility of the Defendant(s) who so engage using their police powers and essentially unlimited resources to discredit the Lead Plaintiff. As with whistleblower complaints, these inaccuracies ought to be regarded by this Court as elements of part of Defendants' pattern of obstruction, tampering, retaliating offenses they are under 18 USC §§ 1503, 1505, 1506, 1512, 1513, 1962, as documented in this Complaint at RGTS-3, 5, 6, 11, 12, and 13.

This case is complex and extensive as it relates primarily to an illegal secret intelligence weapon system development program run against US persons by Defendant United States, which developed this illegal bioweapon system through a program of illegal human experimentation and restrained those unwitting victims in involuntary servitude by its sustained pattern of racketeering offenses against those unwitting US persons. A Table of Contents is shown on pages 18 through 30. The text of the Complaint begins on page 31.

**Note On Conventions Used Throughout This Complaint:**

    **i. Defendant United States:** The term "Defendant United States" is used herein to refer to the departments and agencies of the United States organized in the Article II Executive branch of government and thereby subject to the direct and/or indirect authority of the President of the United States. "Defendants" and "defendants" herein refer to any and all defendants. The specific organization(s) and individual(s) involved in a specific act or set of acts are not necessarily readily discernible to the Plaintiffs due to the nature of undercover operations of police powers and intelligence agencies and departments, as further described at paragraphs 698-700. Thousands of organizations located in tens of thousands of places in the United States have over 1 million personnel with "top secret" clearances and are known to participate in national security and intelligence operations, operating at times outside the rule of law. The names of some agencies are classified, and contractual relationships are purposefully obscured.

    **ii. State and Local Police Powers Defendants:** Approximately 18,000 state and local police powers organizations have over 700,000 officers. Police powers and intelligence personnel involved in the acts and violations herein operate undercover locally to the Plaintiffs and also operate remotely using technology, as do their partners, allies, informants, and others. Hence, they are identified as part of the more general class known herein as "Defendants" or "defendants." **"Defendants" and "defendants"** also include various officers, contractors, agents, licensed and unlicensed private individuals and members of the general public both organized and unorganized who have acted at times in violation of law and/or in coordination with public officials.

    **iii. Headings, Page Numbering, Tables, Interline Exhibits:** Section headings are for convenience only and do not make legal arguments. Paragraphs are numbered by section, and

some paragraph numbers in these sequences are not used in the document. Page number references relate to the RED colored page number at the bottom of each page. Interline Exhibits which present certain key evidence of participation and of conspiracy are found throughout the Complaint. Table 1, a timeline of certain key events, begins at complaint page 105 and is numbered with paragraph references 1-xxx. Table 2, an expanded timeline relating to Lead Plaintiff, begins at LP Evidentiary Exhibits page 12023 and is numbered with paragraph references as 2-xxxx throughout the complaint.

**iv. Exhibits:** Approximately 12,000 pages of exhibits are filed with this initial complaint and identified as LP Evidentiary Exhibits. Most exhibits can be located by the RED page number at the bottom of each page. Emails can be located by the <u>date of the email</u> in YYMMDD format since they are filed in LP Evidentiary Exhibits in date sequence. The short title of each email relates to the Lead Plaintiff's principal contact's name and the subject matter of the email, not necessarily the topic indicated in the subject line of the specific email. The emails submitted are a curated sampling of key emails and do not indicate the volume of total emails which are related to the specific contact or the subject.

**v. Compendium, Table of Contents:** A compendium which includes the name and brief description of selected key entities and individuals, listings of selected key emails, documents, disbursements in both date and alphabetic orders is filed at LP Evidentiary Exhibits pages 934-1075. It is helpful in locating relevant documents in the various volumes of initial evidence submitted with this filing.

**vi. Continuing Fraudulent Concealment - Evidence Currently Obstructed by Defendants:** Crucial evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff email accounts. Virtually all emails from 180304 through 200709 are blocked and

inaccessible to Lead Plaintiff throughout the preparation of this Complaint. This greatly impacts the Plaintiffs' ability to completely address many of the claims presented herein, and to present additional claims within normal statutory time limitations. It is but one stark example of the extensive pattern of fraudulent concealment of racketeering acts and conspiracy by these defendants over many decades, with Defendant United States, most specifically FBI and CIA, as the leading pattern abuser of this obstructive practice, see paragraphs 30-72 and Interline Exhibits 14-17 herein.

For convenience of reference throughout this Complaint, the Table of Contents on the next page lists the RED color page number at the BOTTOM of each page.

[Intentionally left blank.]

## COMPLAINT TABLE OF CONTENTS

| PARA | ITEM (Use RED numbers at the bottom of each page for all references in this Complaint and for all LP Evidentiary Exhibits page references) | PAGE |
|---|---|---|
| | **COMPLAINT** | |
| 1 | ***Three Basic Claims – Illegal Bioweapon, Racketeering Conspiracy, Direct Threats to Life*** | 31 |
| 2 | One Unalienable Right – Government was Formed to Secure Rights, Not to Inflict Injury | 33 |
| 3 | ***First, an Illegal Bioweapon-*** CIA Succeeds Where Nazi and CIA Drug Experiments Failed | 35 |
| 6 | CIA Runs Illegal Medical Experiments on Americans For Five Decades - FBI Collaborates | 36 |
| | ***Interline Exhibit 1:*** Defendant CIA's Failed MKUltra Mind Control Program Continues as BRMT | 39 |
| 9A | ***Second, a Racketeering Conspiracy -*** CIA and FBI Have Conspired and Built an Associated-In-Fact Enterprise Which Overflows With Depravities | 41 |
| 9G | ***Third, Direct Threats to Life*** | 43 |
| 9W | Justice or Just Us? Unalienable Rights or Bad Faith Acts Hidden as State Secrets | 50 |
| | ***Interline Exhibit 2:*** Indirect Verbal Threat and Subsequent Lethality Events (second half of 2022 only) | |
| | A. Indirect Verbal Threat in NYC on July 17, 2022 | 52 |
| | B. Follow-On Mass Casualty Attempt Near NYC on Sep. 11, 2022 | 53 |
| | C. Follow-On Indirect BRMT Assisted Assault in NYC Park on Sep. 17, 2022 | 54 |
| | D. Follow-On Vehicle Rundown Sequence in NYC and Bergen County, NJ on Nov. 18 and 19, 2022 | 56 |
| | E. Fifth, A Report Is Made, Met As Always With No Response, Only Official Silence | 57 |
| 10 | Summary of Laws and Treaties Violated by United States and Co-Conspirators | 58 |
| 14 | Human Brains are Commanded by Illegal BRMT External Hijacking | 63 |
| 21 | Illegal BRMT Bioweapon Operates Like Other Remote Offensive Weapon Systems | 67 |
| 30 | Illegal Deployment of BRMT is Fraudulently Concealed by Continuing RICO Conspiracy | 71 |
| 38 | ***Knowing Creation, Continuation, and Fraudulent Concealment Make Plaintiffs' Prima Facie Case for One Unalienable Right – To Be Free From Government Inflicted Injury*** | 74 |
| 40 | NO History of DOJ Justice for Executive Branch Institutional Class Crimes Against US Persons | 76 |

| | | |
|---|---|---|
| 44 | Immediate Action Required to Avoid Destruction of Evidence Identifying Victims | 76 |
| | **Defenses Are Defeated by Defendants' Own Bad Faith Acts and Fraudulent Concealments** | |
| 47 | A. Defendant United States is a Serial Offender of Laws and Ratified Treaties Which are Law | 79 |
| 55 | B. Defendants' Own Actions Defeat State Secrets Defenses | 82 |
| 57 | C. Defendants' Own Actions Defeat Qualified Immunity Defenses | 84 |
| | **Civil RICO Time Bars are Equitably Tolled by Defendants' Systematic Fraudulent Concealments** | |
| 66 | *A.* Fraudulent Concealment by Defendants Invokes Equitable Tolling Cited in *Rotella* | 92 |
| 67 | B. Diligent Pursuit of Claims by Lead Plaintiff Continues in the Face Of Long-Running Fraudulent Concealment by Defendants | 94 |
| 71 | C. Lead Plaintiff's Injuries Are Representative of Injuries to the Class of Plaintiffs | 102 |
| 73 | ***Denton* and *Nietzke* Precedents Command Discovery Of Novel Claims, Even If Imperfectly Claimed, In In Forma Pauperis Pro Se Litigation** | |
| | *Table 1: Botched Cover-Up, Threats, and Lethality Attempts* | 105 |
| | Paragraph 1-010 | 110 |
| | Paragraph 1-020 | 115 |
| | Paragraph 1-030 | 119 |
| | Paragraph 1-040 | 122 |
| | Paragraph 1-050 | 124 |
| | Paragraph 1-060 | 126 |
| | *Table 2: Extended Timeline - see LP Evidentiary Exhibits page 12023* | |
| | **PARTIES** | |
| | **Plaintiffs** | 129 |
| | Lead Plaintiff | 129 |
| | Large Class of Similarly Situated Plaintiffs Not Yet Identified | |
| | A. Mere Recognition of BRMT is Immensely Difficult for Victims | 130 |
| | B. Myriad Challenges to Identify Members of the Class of Injured Plaintiffs | 130 |
| | C. Scale of Research, Development, and Deployment Expenditure is Vital Clue to Likely Number of BRMT Victims | 132 |
| | D. Estimated Size of Plaintiff Class | 133 |
| | **Defendants** | |
| | Known Federal Defendants, Official Capacity | 137 |
| | Known State and Local Defendants | 142 |

| | | |
|---|---|---|
| | Known Entity Defendants, Including Police Powers Cover Operations | 146 |
| | Individual Defendants, Including John Does, and J Does Acting Outside Official Capacity | 160 |
| 300 | **JURISDICTION AND VENUE** | |
| 304 | **FACTS – BRMT, Racketeering, and Key Injuries** | 170 |
| 306 | Origins of BRMT Lie In Defendant CIA's Deadly MKUltra Mind Control Program and Dachau Human Medical Experiments Tried at Nuremberg | 170 |
| 312 | Lead Plaintiff's Experiences With Various Classes of Defendants' Criminal Offenses Under Color of Law – A Sampling | 172 |
| 312 | A.  Lead Plaintiff's Personal Life Continually Manipulated and Episodically Destroyed | 172 |
| 315 | B.  Lead Plaintiff's Personal Finances and Assets Repeatedly Subjected to Forced Liquidation | 174 |
| 315 | *Interline Exhibit 3:* Redmond Residence – Added Rear Landscaping 14,000 Square Feet | 174 |
| 316 | *Interline Exhibit 4:* Kirkland Residence - Rebuilt and Added 60% Square Footage Enlargement | 175 |
| 318 | C.  Lead Plaintiff's Professional Life and Commercial Enterprises are Repeatedly Defrauded and Destroyed | 176 |
| 321 | D.  "National Security" Pretexting of Lead Plaintiff by Defendant United States Accelerated After 9/11 Attack | 178 |
| 325 | E.  Defendants Malicious Acts Against Lead Plaintiff AGAIN Extend to Torturous Acts | 178 |
| 328 | *Interline Exhibit 5:* A Sample WinnettOrganics Organic Vegetable Arizona Business Plan | 180 |
| 329 | *Interline Exhibit 6:* $100,000 From Fake Investor Dean T. Smith | 182 |
| | *Interline Exhibit 7:* Fraudulent Financings: Adamson Brothers fake FBI Private Placement and S-1 Consume $40,000, Raise $0 | 183 |
| | *Interline Exhibit 8:* Kroger Corporate Email Account Hides True Identity | 184 |
| | *Interline Exhibit 9:* Walmart WinnettOrganics Produce Supply Contract Meeting at Bentonville, AR Home Office | 185 |
| | *Interline Exhibit 10:* WinnettOrganics Organic "Produce Consultant" is Defendant Joseph Arpaio, Convicted Serial Civil Rights Violator as Sheriff, Maricopa County, Arizona | 186 |
| | *Interline Exhibit 11:* Lead Plaintiff Sued in Civil Complaint For Alleged Misuse of Funds Provided In Police Powers Entrapment Operation | 188 |
| | *Interline Exhibit 12:* Lead Plaintiff Starts New Enterprise - Sheldon Beef Example Business Plan | 189 |
| | *Interline Exhibit 13:* Cover Page of Sheldon Beef Sales Contract Signed With Defendant Wal-Mart (China) Investment Co., Ltd., a Walmart | 190 |

| | Inc., subsidiary | |
|---|---|---|
| | *Interline Exhibit 14:* August 2021 58th Anniversary MLK "I Have A Dream" Speech Lincoln Memorial Permit Allegedly Cancelled by Organizer – FALSE FOIA Response to Cover First Amendment Violation | 191 |
| 331 | **NYPD and FBI Coordinate Cover-Up of Human Trafficking, Pre-Texted Investigations** | 192 |
| | *Interline Exhibit 15:* Defendant NYPD Assists Defendant FBI Coverup - Confirms FBI's Pretexted Terror "Investigation," on Sep. 3, 2021, Then Denies Existence of Records on Sep. 15, 2021 | 197 |
| | *Interline Exhibit 16:* Defendant FBI Then Sends Its Own Coverup Liar Letter on September 30, 2021 | 199 |
| | *Interline Exhibit 17:* Defendant Department of Justice Inspector General Declines Investigation of Defendant FBI and Ignores Lead Plaintiff's Follow-Up | 201 |
| 343 | A. Defendants' Lethality Attempts on Lead Plaintiff Have Occurred Repeatedly Over Four Decades | 207 |
| 344 | B. Defendants Accelerated Their Pace of Threatening Behaviors, Severe Injury, and Lethality Attempts in 2021-2023 | 208 |
| 349 | C. Defendants' Actions Evidence Consciousness of Guilt | 213 |
| 352 | D. FBI and CIA Abuse International Intelligence Powers and Their Relationships With Foreign Intelligence Agencies | 214 |
| 354 | E. Defendants' Current Abuses of Plaintiffs Use BRMT on US Persons and Others | 215 |
| 361 | **Persistent Patterns of Government Abuses in US History Validate These Extraordinary Allegations** | 218 |
| 362 | *Interline Exhibit 18:* Lead Plaintiff's Psychological Fitness | 219 |
| 364 | *Interline Exhibit 19:* Relevant Categories of Defendant DARPA Projects | 220 |
| 367 | **Direct Evidence of Injuries to Lead Plaintiff Convicts Prima Facie Case** | 221 |
| | **Plaintiffs' Injuries – Individuals and Entire Class** | 223 |
| 369 | A. Lead Plaintiff's Injuries are Representative and Stand in for Injuries Likely Sustained by Entire Class | 223 |
| 374 | B. Injuries and Intrusions of BRMT Refined Over Time | 229 |
| 376 | C. BRMT Direct Impacts On Innocent Victims | 230 |
| | **Strong Likelihood of Future Injuries to Plaintiffs and Risks to the Public Require Prompt Court Action** | |
| 379 | A. Systematic Administrative Failures To Identify and Correct Abuses | 231 |
| 389 | B. Defendant DOJ's Repetitive Failures to Administer Criminal and Civil Justice on Behalf of Victims | 235 |
| 401 | C. Conflicts of Law Favor Plaintiffs | 238 |

## CASE LAW CITATIONS KEY

|  | Page |
|---|---|
| *Marbury v. Madison*, 1 Cranch 137, 163, 2 L. Ed. 60 (1803) | 86 |
| *United States v Reynolds*, 345 U. S. 1 (1953) | 32, 33, 61, 82, 83, 91, 92, 94, 134 |
| *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) | 85, 138 |
| *United States v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979) | 92, 95 |
| *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) | 32, 62, 84, 91, 99, 137, 248, 510, 580 |
| *Nietzke v Williams*, 490 U. S. 319 (1989), | 102 |
| *Denton v Hernandez*, 504 U.S. 25 (1992) | 102 |
| *Klehr v. A. O. Smith Corp.*, 521 U.S. 179 (1997) | 93, 95 |
| *Rotella v. Wood*, 528 U.S. 549 (2000) | 92, 93 |
| *Lozano* v. *Montoya Alvarez*, 572 U.S. 1 (2014). | 93 |
| *Riley v. California*, 573 U.S. 373 (2014) | 34 |
| *Egbert v. Boule*, 596 U.S. 482 (2022) | 86 |
| *Boechler* v. *Commissioner*, 596 U. S. ___, ___ (2022) | 93 |
| *Arellano v. McDonough*, 598 U.S. ___ (2023) | 93 |

## COMPLAINT TABLE OF CONTENTS (continues)

| 500 | **FACTS – Illegal BRMT Human Experimentation and Racketeering: Pattern Offenses and Injuries** (Fact patterns known as subcounts herein) | 240 |
|---|---|---|
| 503 | Compendium, glossary at LP Evidentiary Exhibits pages 934-1075 | |
| **Lethality Attempts (LETHL subcount offenses)** | | |
| 504 | *LETHL-1 Lethality Attempts*: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – mid 1980s | 250 |
| 505 | *LETHL-2 Lethality Attempts*: Washington State BRMT Induced Falls, 1990-2005 | 251 |
| 506 | *LETHL-3 Lethality Attempts*: Washington State BRMT Induced Suicide Ideation 2003-2005 | 253 |
| 507 | *LETHL-4 Lethality Attempts*: Inciting Public Vigilantism, 2004-2023 | 254 |
| 508 | *LETHL-5 Lethality Attempts*: New Jersey BRMT Induced Suicide Ideation 2008-2010 | 255 |
| 509 | *LETHL-6 Lethality Attempts*: New Jersey Cliffside Park BRMT Falls 2008- | 256 |

| | 2010 | |
|---|---|---|
| 510 | *LETHL-7 Lethality Attempts*: BRMT Staircase Falls and Attempts in New Jersey and New York 2008-2022 | 257 |
| 511 | *LETHL-8 Lethality Attempts*: New Jersey, Hackensack, BRMT Fall, 2017 | 258 |
| 512 | *LETHL-9 Lethality Attempts*: California, BRMT Induced Extreme Eye Watering, 2017 | 259 |
| 513 | *LETHL-10 Lethality Attempts*: New Jersey, Edgewater Bedroom BRMT Falls, 2019 | 260 |
| 514 | *LETHL-11 Lethality Attempts*: Website Hacks to Eliminate or Delay Covid Vaccination, 2020 | 261 |
| 515 | *LETHL-12 Lethality Attempts*: New Jersey Edgewater BRMT Falls, 2021-2022 | 262 |
| 516 | *LETHL-13 Lethality Attempts*: New Jersey North Bergen Hospital Fall, 2021 | 263 |
| 517 | *LETHL-14 Lethality Attempts*: New York Metro North Mass Casualty Attempt, 2022 | 264 |
| 518 | *LETHL-15 Lethality Attempts*: New York Morningside Park BRMT Fall, 2022 | 266 |
| 519 | *LETHL-16 Lethality Attempts*: New York New Jersey North Bergen Vehicle Rundown Sequence, 2022 | 266 |
| 520 | *LETHL-17 Lethality Attempts*: Programmed Health Collapse, 2023 | 268 |
| **Illegal Human Experimentation - BRMT Brain Hijacking Abuses (HEXP subcount offenses)** | | |
| *Biological and Medical Invasions - Torture* | | |
| 521 | *HEXP-1 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Induced Torture, Washington State 2003 | 270 |
| 522 | *HEXP-2 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts 2006 | 274 |
| 523 | *HEXP-3 Illegal Human Experimentation*: Biological and Medical Invasions - BRMT Induced Torture, New Jersey 2009 | 276 |
| 524 | *HEXP-4 Illegal Human Experimentation*: Biological and Medical Invasions - Short Cycle BRMT Torture Sequences 2023 | 278 |
| *Orchestrated Personal and Intimate Relationships* | | |
| 525 | *HEXP-5 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated Romantic Interests Using BRMT Oxytocin Manipulation, Generally | 280 |
| 526 | *HEXP-6 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With First Spouse, Lynne 1979-1988 | 282 |
| 527 | *HEXP-7 Illegal Human Experimentation*: Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With Second Spouse, Jeanette 1988-2005 | 283 |
| 528 | *HEXP-8 Illegal Human Experimentation*: Personal and Intimate | 285 |

| | | |
|---|---|---|
| | Relationships - Orchestrated Romantic Interests, Induced Fake Relationship, Marinka 2008 | |
| 529 | *HEXP-9 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fake Relationship, Laura 2014-2018 | 286 |
| 530 | *HEXP-10 Illegal Human Experimentation:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fake Relationship, Gia 2019-2020 | 287 |
| ***Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness*** | | |
| 531 | *HEXP-11 Illegal Human Experimentation:* Biological and Medical Invasions - Orchestrated Romantic Interests, BRMT Induced Erectile Dysfunction 2008, 2020 | 288 |
| 532 | *HEXP-12 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Orchestrated Personal Movements and Activities | 289 |
| 533 | *HEXP-13 Illegal Human Experimentation:* Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation | 291 |
| 534 | *HEXP-14 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses | 292 |
| 535 | *HEXP-15 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Forced Public Urination Sequence, 2023 | 294 |
| 536 | *HEXP-16 Illegal Human Experimentation:* Biological and Medical Invasions - BRMT Public Flash Temper Hack, 2023 | 295 |
| 537 | *HEXP-17 Illegal Human Experimentation:* Biological and Medical Invasions – Food Borne Illnesses 2008-2010, 2018-2023 | 296 |
| **National Security Pretexting and Entanglements (NSEC subcount offenses)** | | |
| 538 | *NSEC-1 National Security Frauds:* Purposeful Family Assignment and Entanglement in National Security Matters, Lifetime | 298 |
| 539 | *NSEC-2 National Security Frauds:* Classified Equipment Pretexting 1972-1986 | 301 |
| 540 | *NSEC-3 National Security Frauds:* Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP, MI-6, MI-5, London Metropolitan Police, UK 1990-1994 | 303 |
| 541 | *NSEC-4 National Security Frauds:* Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack and Subsequent Domestic Sabotage Campaign | 306 |
| 542 | *NSEC-5 National Security Frauds:* Human Trafficking, Pretexting, Abuse of Allies in Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK 2007 | 315 |
| **Individual Rights Violations and Conspiracies (RGTS subcount offenses)** | | |
| ***Entrapments, Illegal Searches and Willful Blindness*** | | |
| 543 | *RGTS-1 Rights Violations:* Entrapment and Incrimination Attempts, Stevens Pass 1980s (review para G for applicability) | 318 |

| 544 | *RGTS-2 Rights Violations:* Illegal Searches, Hacking, and Harassing, Oregon Interstate Commerce Trip 2021 | 319 |
| 545 | *RGTS-3 Rights Violations:* Bad Faith Acts – Federal Police Powers Abuses of Legal Processes | 323 |
| 546 | *RGTS-4 Rights Violations:* Willful Blindness - US Attorney Offices, DOJ Headquarters | 329 |
| 547 | *RGTS-5 Rights Violations:* Illegal General Searches, Continual Monitoring | 330 |
| 548 | *RGTS-6 Rights Violations:* Privacy and Quiet Enjoyment | 331 |
| 549 | *RGTS-7 Rights Violations:* Biological and Medical Invasions - Access to Ethical Basic Health Care | 333 |
| | ***Direct Interferences in Personal and Intimate Relationships*** | |
| 550 | *RGTS-8 Rights Violations:* Personal and Intimate Relationships - Orchestrated Romantic Interests, Arranged In-person Contacts | 334 |
| 551 | *RGTS-9 Rights Violations:* Personal and Intimate Relationships – Blocked and Spoofed Access to Dating Sites 2004-2005, 2007-2008, 2011-2014, 2018 to present | 335 |
| 552 | *RGTS-10 Rights Violations:* Personal and Intimate Relationships – Orchestrated Romantic Interests, Fake Dates 2004-2005, 2008, 2019-2020 | 336 |
| | ***Hacking, Harassment, Disinformation, Abuse of Official Records*** | |
| 553 | *RGTS-11 Rights Violations:* Illegal Searches, Hacking, and Harassing, Computer Technology | 339 |
| 554 | *RGTS-12 Rights Violations:* Blocking Information Access and Supplying Deliberate Disinformation | 340 |
| 555 | *RGTS-13 Rights Violations:* Misuse of Official Records and Mispersonation, Dubai 2015 | 341 |
| | **Racketeering – (RICO subcount offenses)** | |
| | ***Racketeering - Thefts and Takings Targeted at Personal Assets*** | |
| 556 | *RICO-1 Racketeering Violations:* Human Trafficking, Involuntary Servitude, and Investigative Entanglements – Blocking All Employment and Personal Business Investments from Deloitte (1979) through Establish (2008) | 342 |
| 557 | *RICO-2 Racketeering Violations:* Theft and Takings -Financial Resources, Blocking All Personal Employment Opportunities 1986 to present | 350 |
| 558 | *RICO-3 Racketeering Violations:* Theft and Takings - Financial Resources, Establish Theft of Compensation 2008 | 352 |
| 559 | *RICO-4 Racketeering Violations:* Theft and Takings - Financial Resources, Theft of Funds and Services, Cliffside Park Apartment Renovations 2008 | 354 |
| 560 | *RICO-5 Racketeering Violations:* Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment 2008-2011 | 355 |
| 561 | *RICO-6 Racketeering Violations:* Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses 1993-2022 | 358 |
| 562 | *RICO-7 Racketeering Violations:* Theft and Takings -Financial Resources, | 362 |

| | Banking System Manipulations | |
|---|---|---|
|  | ***Racketeering – Personal Color of Law Entrapment Attempts*** |
| 563 | *RICO-8 Racketeering Violations:* Theft and Takings - Credit and Credit Access Hacks | 363 |
| 564 | *RICO-9 Racketeering Violations:* Illegal Searches, Hacking, and Harassing– Tax Software Hack EITC Entrapment Attempt 2021, 2022 | 365 |
| 565 | *RICO-10 Racketeering Violations:* Sole Source Fraudulent Financing with Ironwood Tax Loss Self-Exculpatory Offset Attempt | 366 |
|  | **Racketeering – Targeted at Small Business and Enterprise (RICO subcount offenses)** |
|  | ***Racketeering - Thefts and Takings*** |
| 566 | *RICO-11 Racketeering Violations:* Theft of Receivables, Check Frauds 1990 to present | 370 |
|  | ***Racketeering - Fraudulent Financings*** |
| 567 | *RICO-12 Racketeering Violations:* Fraudulent Financial Services – Ex-CIA Northern Africa Case Officer 1992-1995 Alliance | 372 |
| 568 | *RICO-13 Racketeering Violations:* Fraudulent Financial Services – Ex-CIA Latin America Case Officer 2013-2015 | 374 |
| 569 | *RICO-14 Racketeering Violations:* Fraudulent Financings and Loans - NYC Broker/Investor 2011-2017 | 376 |
| 570 | *RICO-15 Racketeering Violations:* BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution 2014-2015 | 378 |
| 571 | *RICO-16 Racketeering Violations:* False Personation – NYC Forbes 200 Captive Corporate Investment Firm 2013-2017 | 381 |
| 572 | *RICO-17 Racketeering Violations:* Fraudulent Investor Personation - Investments and Loans 2015-2022 | 382 |
| 573 | *RICO-18 Racketeering Violations:* Fraudulent Investor Personation and Investments 2015-2020 | 384 |
| 574 | *RICO-19 Racketeering Violations:* Fraudulent Financings – Private Placement and Public IPO 2015-2017 | 386 |
| 575 | *RICO-20 Racketeering Violations:* Fraudulent Financings, International CFIUS Pretexting 2015 | 388 |
| 576 | *RICO-21 Racketeering Violations:* Fraudulent Financing Fees Supporting Fraudulent Sales Opportunities 2018 | 390 |
| 577 | *RICO-22 Racketeering Violations:* Fraudulent Financing Fees 2018 | 391 |
| 578 | *RICO-23 Racketeering Violations:* Fraudulent Financial Services – Domestic Debt Broker 2018 | 391 |
| 579 | *RICO-24 Racketeering Violations:* Fraudulent Financial Services - International Debt Broker 2015-2016 | 392 |
| 580 | *RICO-25 Racketeering Violations:* Fraudulent Financial Services – Mid-Market Investment Bank 2016-2017 | 394 |

| 581 | *RICO-26 Racketeering Violations:* Fraudulent Financial Services - International Financial Services Institution 2016-2017 | 395 |
| 582 | *RICO-27 Racketeering Violations:* Fraudulent Financial Services – Wall Street Investment Bank 2015-2021 | 396 |
| 583 | *RICO-28 Racketeering Violations:* Fraudulent Financings and Representation, Online Referral Services 2015-2018 | 405 |
| 584 | *RICO-29 Racketeering Violations:* Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses 1986 to 2022 | 407 |
| 585 | *RICO-30 Racketeering Violations:* Commercial Frauds: Fraudulent Financings and Litigation - Auctus v. Cornhusker 2019 | 427 |
| 586 | *RICO-31 Racketeering Violations:* Fraudulent Financings, Online Platform 2021 | 429 |
| **Racketeering – Fraudulent Sales Leads** | | |
| 587 | *RICO-32 Racketeering Violations:* Fraudulent Sales Leads 2002-2004 | 431 |
| 588 | *RICO-33 Racketeering Violations:* Fraudulent Sales Lead Solicitation Services 2021 | 432 |
| 589 | *RICO-34 Racketeering Violations:* Fraudulent Sales Lead Solicitation Services 2021 | 433 |
| 590 | *RICO-35 Racketeering Violations:* Fraudulent Sales Lead Development Services 2017 | 433 |
| 591 | *RICO-36 Racketeering Violations:* Fraudulent Sales Lead Development Services 2017 | 435 |
| 592 | *RICO-37 Racketeering Violations:* Fraudulent Sales Opportunities, International 2020-2021 | 435 |
| 593 | *RICO-38 Racketeering Violations:* Fraudulent Sales Opportunities, Domestic 1985-2022 | 438 |
| 594 | *RICO-39 Racketeering Violations:* Fraudulent Sales and Marketing Representation 2019-2021 | 446 |
| **Racketeering – Dishonest Professional Services** | | |
| 595 | *RICO-40 Racketeering Violations:* Dishonest Professional Services, Web 2021-2022 | 449 |
| 596 | *RICO-41 Racketeering Violations:* Dishonest Professional Services, Legal 1986-2005 | 450 |
| 597 | *RICO-42 Racketeering Violations:* Dishonest Professional Services, Legal 2014-2021 | 452 |
| 598 | *RICO-43 Racketeering Violations:* Dishonest Professional Services, Maricopa County AZ Sheriff Arpaio as Consultant 2014-2017 | 455 |
| 599 | *RICO-44 Racketeering Violations:* Dishonest Professional Services, Employees, Recruiters, Various Positions 2011-2022 | 464 |
| 600 | *RICO-45 Racketeering Violations:* Dishonest Professional Services, Employees, Recruiters, Logistics 2015-2021 | 468 |

| 601 | *RICO-46 Racketeering Violations:* Dishonest Professional Services, Employees, Sales | 470 |
|---|---|---|
| 602 | *RICO-47 Racketeering Violations:* Dishonest Professional Services, Employees, CFO and Controller | 472 |
| 603 | *RICO-48 Racketeering Violations:* Dishonest Professional Services, Employees, Controller 2018 | 475 |
| *Racketeering – Fraudulent Production Asset Sales* | | |
| 604 | *RICO-49 Racketeering Violations:* Fake Production Asset Purchase Options, Professional Services 2015-2021 | 476 |
| 605 | *RICO-50 Racketeering Violations:* Fake Production Asset Purchase Options, AZ 2015-2017 | 484 |
| 606 | *RICO-51 Racketeering Violations:* Fake Production Asset Purchase Options, OR, ID, TX 2015-2021 | 487 |
| 700 | **CLAIMS FOR RELIEF** | 492 |
| | *AA. Physical and Emotional Injuries* | |
| 701 | 1  Attempted Murder | 493 |
| 702 | 2  Attempted Manslaughter | 503 |
| 703 | 3  Conspiracy To Murder | 504 |
| 704 | 4  Soliciting Crime Of Violence | 505 |
| 705 | 5 Bioweapons and Bioweapons Delivery Systems Prohibited | 506 |
| 706 | 6 Posse Comitatus - Use Of Military To Violate Constitutional Rights | 507 |
| 707 | 7 Conspiracy to Torture | 509 |
| 708 | 8 Torture – Mental and Physical Abuse | 511 |
| 709 | 9 War Crimes Against Civilians - Torture | 512 |
| 710 | 10 Assault | 519 |
| 711 | 11 Aggravated Battery | 520 |
| 712 | 12 Violent Crimes In Aid Of Racketeering Enterprises - Terrorism | 522 |
| 713 | 13 Interference With Interstate Commerce By Threats Or Violence | 523 |
| 714 | 14 Tampering With Consumer Products – Conspiracy Against Rights | 524 |
| | *BB. Income, Property, and Reputation Injuries* | |
| 715 | 15 Peonage | 525 |
| 716 | 16 Involuntary Servitude – Thirteenth Amendment | 526 |
| 717 | 17 Forced Labor | 527 |
| 718 | 18 Sexual Abuse | 528 |
| 719 | 19 Frauds - Mail | 529 |
| 720 | 20 Frauds – Electronic Mail | 530 |
| 721 | 21 Frauds - Wire | 531 |
| 722 | 22 Fraud And Related Activity - Computers | 532 |

| 723 | 23 Attempts And Conspiracy - Mail Fraud | 533 |
|---|---|---|
| 724 | 24 Attempts And Conspiracy – Scheme To Defraud of Honest Services- Mail, Wire, Email | 534 |
| 725 | 25 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | 535 |
| 726 | 26 Property Rights and Illegal Takings - Fifth Amendment | 536 |
|  | *CC. Personal and Constitutional Rights Injuries* |  |
| 727 | 27 Racketeering - Monetary Benefit From Unlawful Activity; | 538 |
| 728 | 28 Civil Rights - Conspiracy Against Rights | 541 |
| 729 | 29 Civil Rights Generally - Deprivation of Rights Under Color of Law | 542 |
| 730 | 30 Civil Rights Generally - Federally Protected Activities | 543 |
| 731 | 31 Involuntary Servitude, Intentional Discrimination in Employment | 545 |
| 732 | 32 Civil Rights - Deprivation of Rights, Fourteenth Amendment – Equal Protection | 546 |
| 733 | 33 Civil Rights - Deprivation of Rights Under Color of Law Fourth Amendment - Searches and Warrants | 548 |
| 734 | 34 Searches Exceed Authority, Malicious Procurement, Without Warrant. | 549 |
| 735 | 35 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | 551 |
| 736 | 36 False Information and Hoaxes In Furtherance of BRMT Torture and Theft | 553 |
|  | *DD. Threats, Retaliation, and Negligence Injuries* | 554 |
| 737 | 37 Negligence: Failure To Protect | 555 |
| 738 | 38 Negligence: Failure To Supervise | 556 |
| 739 | 39 Negligence: Failure To Train | 558 |
| 740 | 40 Negligence: Failure To Report, Misprison of Felony | 559 |
| 741 | 41 Tampering With Witness | 560 |
| 742 | 42 Retaliating Against Witness | 560 |
| 743 | 43 Prohibited Activities - Pattern Of Racketeering Acts | 561 |
| **800** | **PRAYER FOR RELIEF** |  |
| 801 | Declaratory Judgment | 563 |
| 802 | Order Reversing Conflict Of Law | 563 |
| 803 | Emergency Order Providing Immediate Injunctive Relief | 564 |
| 805 | Permanent Injunctive Order | 565 |
| 807 | Order Of Forfeiture | 566 |
| 808 | Monetary Damages Award | 567 |
| 809 | Compensatory Damages For Individual Injuries | 568 |
| 810 | Compensatory Damages For Defendants' Business, Commercial, And Entrepreneurial Injuries | 577 |

| | | |
|---|---|---|
| 811 | Compensatory Damages For Defendants' Business, Commercial, And Entrepreneurial Civic Participation Rights And Benefits Injuries | 578 |
| 812 | Additional Statutory Damages And Remedies | 579 |
| 813 | Costs And Damages | 579 |
| 814 | Punitive Damages | 580 |
| 815 | Reasonable Costs, Expenses, And Fees | 580 |
| | **JURY DEMAND** | 580 |
| | **REQUEST FOR APPOINTMENT OF COUNSEL** | 581 |
| | **SIGNATURE** | |

[Intentionally left blank.]

## COMPLAINT

**Three Basic Claims – Illegal Bioweapon, Racketeering Conspiracy, Direct Threats to Life**

1. This Complaint arises on three basic claims against Defendant United States and its co-conspirator Defendants which demand the attention of and action by this Court – (i) an illegal bioweapon developed using internationally prohibited and unconstitutional medical experiments on unwitting US persons, (ii) a racketeering associated-in-fact enterprise which fraudulently conceals the illegal program and sustains involuntary servitude of the victims, and (iii) repeated lethality attempts intended to remove the victims as witnesses, to wit:

*First, an Illegal Bioweapon*, Defendant United States has and does illegally deploy and operate Brain Remote Management Technology ("BRMT" herein), a neuroscience-based brain hijacking system (summarized at paragraphs 12-17 below) against US persons. This type of biomedical technology has not previously been publicly available, so it is completely unfamiliar to nearly everyone. A relatively unsophisticated beneficial medical device based upon the same neuroscience principles emerged publicly for the first time in human history in July 2022. FDA approved human trials of this device are described at paragraph 15. BRMT is a bioweapon used against people, it is not beneficial, it is not controlled by the user, and it functionally partially controls its victim by hijacking and abusing that person without their knowledge or consent. BRMT is a malign, illegal, and internationally prohibited bioweapon developed by Defendant United States using field medical experiments on unwitting human subjects without their consent. A monstrous intrusion by our federal government on human autonomy and free will, this offensive biological weapon violates (i) the Constitutional rights of its involuntary victims, (ii) 18 USC § 175, (iii) the 1972 Bioweapons Treaty and four other international treaties, and (iv) Title 42 Chapter 21 Civil Rights, among others. The massive scope of Defendant Untied

States and its mostly unwitting co-conspirator violations are summarized in paragraph 10. As an illegal system, BRMT also violates (v) the "state secret" privilege mandate that any assertion of "state secrets" privilege be "**not inconsistent with law**." *United States v Reynolds,* 345 U. S. 1, 12 (1953), discussed at paragraph 53. Simply put, BRMT is illegal in the United States because hijacking a human brain with a bioweapon is illegal everywhere under both U.S. law and international treaties ratified by the United States.

*Second, a Racketeering Conspiracy*, Defendant United States and its co-conspirator Defendants, named and as yet unidentified, have and continue to engage in (vi) an associated-in-fact enterprise of RICO racketeering acts, including, without limitation, involuntary servitude, forced labor, human trafficking, and other prohibited acts under 18 USC § 1962 and in (vii) an expansive pattern of violations of human, Constitutional, and civil rights under 18 USC §§ 241, 242, and 42 USC §§ 1981, 1985; against Lead Plaintiff and this class of Plaintiffs, which conspiracy perpetuates the illegal biomedical experimentation, and causes direct, immediate, and continuing harm to these Plaintiffs. These illegal acts (viii) violate the "good faith" standard mandated for asserting "qualified immunity" in *Harlow v. Fitzgerald, 457 U.S. 800* (1982), discussed at paragraph 57, causing each individual defendant, named and yet-to-be named herein, to be directly and personally liable for their knowing bad faith acts.

*Third, Direct Threats to Life,* these acts of (i) illegal human experimentation and brain hijacking without consent by an illegal bioweapon and (ii) creation and perpetuation of an associated-in-fact racketeering enterprise, by these Defendants has been, is, and will be (ix) threats to life, liberty, rights, and the rule of law, against the Lead Plaintiff, against this entire class of Plaintiffs, and prospectively against the legal and constitutional rights of all US persons so long as this Court allows these acts to continue. Absent direct and explicit prohibition by this

Court, this long-running pattern of abuses and injuries will continue. Regardless of any obfuscation by defendants' claims of "state secrets," classification status, or other alleged privilege, these acts against US persons and others directly and immediately imperil each and every victim's life and liberty. Defendants' actions must be ordered immediately halted. The carefully researched facts and fact patterns in this Complaint make this five decade long pattern of Defendants' misconduct plain and obvious to all, despite the strenuous attempts of these Defendants to fraudulently conceal their unprincipled abuse of the state secret privilege, hide behind classification schemes, and continue their illegal abuses of this class of plaintiffs.

***One Unalienable Right*** – **Government was Formed to Secure Rights, Not to Inflict Injury**

2. The Declaration of Independence declares in its second paragraph the very reason for any government to exist at all:

> *"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--**That to secure these rights, Governments are instituted among Men**, deriving their just powers from the consent of the governed.....*"

2A. *"unalienable Rights"* - With its plainly abusive illegal BRMT bioweapon and illegal biomedical experiments on humans (violating 18 U.S.C. § 175), and the associated-in-fact racketeering enterprise it illegally operates under color of law (violating 18 U.S.C. § 1962), all while hiding behind "state secrets" which are NOT privileged under law, as the privilege only protects lawful "state secrets" (*United States v Reynolds,* 345 U. S. 1, 12 (1953) at Footnote 4), Defendant United States, acting in concert with co-conspirator defendants has, by its direct and plain physical and virtual acts against these plaintiffs through its BRMT brain hijacking and through its computer-based suite of predicate acts of fraud, seized without due process:

(i) "their persons, houses, papers, and effects," (violating the *Fourth Amendment,* 1791);

(ii) their freedom to make their own judgements about their own decisions (violating basic human rights and the Constitution);

(iii) their freedom to choose their loved ones beyond their family of origin (violating basic human rights and the Constitution);

(iv) their freedom to freely enjoy equal protection in their normal daily activities, ranging to interstate commerce (violating the *Fourteenth Amendment,* 1868); and

(v) their freedom from involuntary servitude (violating the *Thirteenth Amendment,* 1865).

2B. Defendant United States and it's co-conspirators have seized things which are profoundly more important to liberty than these plaintiffs' personal cell phone data without a warrant - which seizure by itself violates the fundamental Fourth Amendment principle in *Riley v. California,* 573 U.S. 373 (2014). **Defendant United States has seized our very lives, our humanity, and our dignity for its depraved abuses of the People it is sworn to protect.**

2C. THAT IS THESE DEFENDANTS' PATTERN OF PRACTICE. Each and all these defendants acted knowingly, purposefully, jointly, and severally in creating and perpetuating their conspiracy to act against the constitutional interests of the People, including these plaintiffs; and with the explicit intent to fraudulently conceal their actions; all entirely outside the Constitution, laws, and treaties of the United States of America for more than five decades.

2D. AND THIS IS THESE PLAINTIFFS' PRIMA FACIE CASE AGAINST DEFENDANT UNITED STATES and its co-conspirators – First, an illegal bioweapon; Second, a racketeering conspiracy; and Third, direct threats to life, "unalienable Rights" destroyed prima

facie. Knowing. Willful. Perpetual. All fraudulently concealed by these federal and other police powers, their virtually unlimited resources relative to their individual victims, and by their fraudulent concealment, abusing state secrecy under color of law to wield their malignant sword and shield.

***First, an Illegal Bioweapon* - CIA Succeeds Where Nazi and CIA Drug Experiments Failed**

3.  BRMT is a neuroscience and technology platform based mind control (brain hijacking) illegal bioweapon and bioweapons delivery system which violates 18 U.S.C. § 175 and the 1972 Bioweapons Treaty signed by the United States. It is illegally developed and deployed by Defendant United States through secret abusive medical experiments on human beings, (the fellow citizens they are sworn to protect), and our brains in field experiments without the consent of the victims, just as at Dachau. BRMT has been developed with long-running direct abuses of unwitting US persons, effectively using these victims as live laboratory rats, including the Lead Plaintiff. See LP Evidentiary Exhibits pages 6645-6699 explaining basics of the brain and neuroscience, then LP Evidentiary Exhibits pages 1-10 explaining the illegal BRMT bioweapon, then the first early stage private sector beneficial device on the same neuroscience principles which is in FDA approved human trials from July 2022 at LP Evidentiary Exhibits pages 11-25.

4. Development of this BRMT illegal biological offensive weapons system began in the 1970s and continues today at the cost of billions for neuroscience research and for remote technology platform development. Neuroscience has progressed much more rapidly in recent years due to the advances in medical technology tools such as functional MRIs used to further the understanding of biochemical brain function. Other technology platform advances provide similar benefits. Supercomputers are uncommon but used daily in stock trading and other

common commercial pursuits. Some of the same types of space-based remote technology platforms which support BRMT have been used to direct the planting of 15,000 to 20,000 corn seeds per minute within one-third of an inch across millions of acres every spring for over a decade. Still others reside on your cell phone for high speed data communications.

5. The same neuroscience principles used illegally in BRMT provide beneficial medical uses for progressive brain diseases like ALS and relieve spinal cord disabilities. But these commercial developments did not begin until around 2012. An early stage antilog to BRMT (opposite in effect) beneficial medical device, a much less advanced system used to treat, has been approved for FDA human trials after only $70 million of commercial investment (see Synchron at paragraph 15, see also LP Evidentiary Exhibits pages 1-55). This developing fact pattern was very carefully hidden, fraudulently concealed by technology hacks by defendants from the Lead Plaintiff until 2021 to limit his possible discovery while illegal BRMT development and abuses continued without consent, as they still do.

**CIA Runs Illegal Medical Experiments on Americans For Five Decades - FBI Collaborates**

6. CIA illegal BRMT biomedical experimentation and deployment began in the 1970s as Defendant United States' straight line continuation of its failed illegal CIA MKUltra drug dosing from 1953 to 1973. MKUltra was itself the straight line continuation of years of drugging experiments in the Nazi's Dachau Concentration Camps. Set up a few weeks after Hitler's rise to Chancellor in 1933, the Dachau camps housed political, ethnic, and religious prisoners through the end of World War II in Europe in May 1945. As the first of twelve Nuremberg Trials, seven of these Dachau doctors were sentenced to death, nine to long prison sentences, and seven were acquitted, see *US v Karl Brant* et al, in the Nuremberg trail record from November 21, 1946 and

August 20, 1947. Nonetheless, some Nazi Dachau "medical doctors and researchers" were secretly brought to the United States by CIA and the State Department as part of Operation Paperclip between 1945 to 1959. Defendant United States then employed these Nazis in secret labs to pursue intentional illegal drugging and other internationally prohibited "medical research" on Americans and Canadians.

7. CIA used the Dachau expertise of these doctors as the springboard for its mind control research, Defendant CIA purchased and illegally deployed 100 million LSD doses against US and Canadian citizens and soldiers through more than 140 projects. Its collaboration with Defendant United States Army's Bioweapons Lab made CIA the world's largest drug dealer for nearly two decades. MKUltra projects illegally drug dosed unwitting civilians and soldiers, then permitted those drug-impaired hallucinating victims to return immediately and unsupervised to normal activities. These negligent practices endangered, injured, and killed both hallucinating program victims and other innocent people. Police reports show that LSD drug-impaired people are at least as dangerous as any other impaired person. Lacking normal social inhibitions, hallucinating people act as perpetrators and/or victim of assaults, homicides, rape, motor vehicle accidents, and all other forms of public mayhem and disruption. CIA delivered the drugs and watched the resulting mayhem, never interfering or telling others, hidden behind "state secrets" and "national security."

8. As CIA ramped up the MKUltra program in 1953, Frank Olson, a contract researcher formerly with the US Army Bioweapons Lab, raised legal and ethical concerns as the program began. Soon after, he was secretly drugged with LSD and isolated from his family for "safety." Nine days later, likely thrown semiconscious ten stories from a New York City hotel room he

shared with the MKUltra Program Director's personal assistant, he died on a sidewalk across from Penn Station in New York City around 2AM on November 28, 1953.

8A. President Ford and CIA Director Colby formally apologized to Olson's family in 1975 for that 1953 death under CIA Director Helms, based upon the findings of a Commission headed by Vice President Rockefeller. A 1994 exhumation and forensic autopsy led nine of ten members of the autopsy team to conclude Frank Olson's death resulted from blunt-force trauma to the head and injury to the chest which occurred before Olson fell ten stories to the sidewalk at 2AM. The Lead Plaintiff's efforts to expose the BRMT program have been met with similar hostility and threats in and around New York City, including from FBI and CIA, among others. See Interline Exhibit 2 for several recent visual and verbal threats and indirect physical violence attempts designed to appear as naturally occurring events or even as mass casualty events. Other attempts across time are documented in the Lethality Attempts series in this Complaint.

[Intentionally left blank.]

***Interline Exhibit 1:*** **Defendant CIA's Failed MKUltra Mind Control Program Continues as BRMT**



## The CIA's Secret Quest For Mind Control: Torture, LSD And A 'Poisoner In Chief'



During the early period of the Cold War, the CIA became convinced that communists had discovered a drug or technique that would allow them to control human minds. In response, the CIA began its own secret program, called MK-ULTRA, to search for a mind control drug that could be weaponized against enemies.

MK-ULTRA, which operated from the 1950s until the early '60s, was created and run by a chemist named Sidney Gottlieb. Journalist Stephen Kinzer, who spent several years investigating the program, calls the operation the "most sustained search in history for techniques of mind control."

Some of Gottlieb's experiments were covertly funded at universities and research centers, Kinzer says, while others were conducted in American prisons and in detention centers in Japan, Germany and the Philippines. Many of his unwitting subjects endured psychological torture ranging from electroshock to high doses of LSD, according to Kinzer's research.

"Gottlieb wanted to create a way to seize control of people's minds, and he realized it was a two-part process," Kinzer says. "First, you had to blast away the existing mind. Second, you had to find a way to insert a new mind into that resulting void. We didn't get too far on number two, but he did a lot of work on number one."

**CIA has never renounced its mind control goal.** (Source:
https://www.npr.org/2019/09/09/758989641/the-cias-secret-quest-for-mind-control-torture-lsd-and-a-poisoner-in-chief. See full text at LP Evidentiary Exhibits pages 9679 - 9685.)

8B.  CIA's MKUltra was an epic failure, never coming close to achieving mind control. It was finally shut down in 1973. The evidence identifying the victims it impaired or destroyed, and its failure to achieve its malignant objective, were destroyed in a never prosecuted government coverup. The CIA Director was sent out of the country a few months later to be Ambassador to Iran, out of sight and out of mind, as Nixon demanded resignations across the board to obscure this and other illegal fact patterns by clearing his administration for his second term. But the mind control objective remained an active program at CIA and among the DOD military defendants named herein (see LP Evidentiary Exhibits pages 11937-12022 for a very few examples of their directly relevant weapons research programs).

9.  CIA's MKUltra replacement is the prohibited BRMT program. This type of bioweapons platform was banned in April 1972 by the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, just as the BRMT program was being initiated. BRMT was an internationally prohibited weapon even before it was developed and deployed by Defendant United States. By the late 1970s, BRMT was a crude weapon which directly manipulated brain hormones using nearby frequency tuned devices. These devices stimulated hormones such as melatonin for sleep, adrenaline for alertness and hyper-vigilance, and oxytocin for love. See lethality subcount LETHL-1 herein for its direct and near-lethal application to Lead Plaintiff. A fifty year ultra-secret program of illegal biomedical abuses of BRMT, the internationally banned and illegal bioweapon, this is the **first** of these plaintiffs' three basic claims.

***Second, a Racketeering Conspiracy*** **- CIA and FBI Have Conspired and Built an**

**Associated-In-Fact RICO Enterprise Which Overflows With Depravities**

9A. CIA Director Stansfield Turner walked past the completely ignorant Lead Plaintiff

with an intent knowing stare in the rotunda of the East Building of the National Gallery of Art in

the Spring of 1979, as Turner examined one of his unwitting human medical experiment victims.

At the time, the Lead Plaintiff was being handled in the field under a team headed by a BRMT

program executive, Jack Sackville-West, then an undercover operative later known as Stephen

M. Breyer in his role in the federal courts of the United States.

9B. FBI was aware then, and has continually collaborated with CIA, since the beginning

of these illegal human medical experiments in the 1970s under Richard Nixon, to hijack and

control the minds of American citizens with BRMT, the illegal bioweapon.

9C. Lead Plaintiff joined the Board of Trustees of Puget Consumers Cooperative (PCC)

in the early 1980s. At one of the first Board meetings Lead Plaintiff attended, Lyle Whiteman,

the PCC General Manager asked Board Chair Hilde Birnbaum to show Lead Plaintiff her arm.

She did. It carried a tattoo engraved somewhere around her eighth birthday, soon after her family

had been removed from civilian life to a Nazi death camp. All her other family members

perished in the death camp. She survived because she was selected to be a child subject of human

medical experiments by Nazi doctors.

9D. Lead Plaintiff did not know, as he looked at that tattoo, that he was also already

secretly being used by CIA for this same class of medical experiments on humans, being used as

a human guinea pig in the development of the illegal bioweapon he knows as BRMT. This time it

was by CIA beginning in the 1970s, rather than Nazis from the 1930s through World War II,

when it ended with justice - the Nuremberg Doctor Trials of 1946-1947 prosecuted by the US and other allies.

9E. Lead Plaintiff also did not then know the actual identity of Mr. Whiteman. In September 2023, as fraudulent concealment was finally unmasked through a lucky break, he finally came to understand that Whiteman is actually Andrew Weissman. Mr. Weissman, posing as Lyle Whiteman. was then an FBI agent directly engaged in co-opting the food cooperative as part of a domestic spying and enterprise wrecking program which FBI continued well into this century, more than fifty years after its illegal Cointelpro was exposed in 1971. Congress did enact reforms in the 1970s to prevent these illegal activities. But these reforms were functionally ignored, they simply did not work. Mr. Weissman later became FBI General Counsel under FBI Director Robert Muller.

9F. FBI's "Chuck LeFevre" came to Seattle soon after Lead Plaintiff's introduction to the Nazi tattoo on Hilde Birnbaum's arm. LeFevre arrived from Anchorage (likely an undercover role run from the FBI Anchorage field office) to run NutraSource, a natural foods wholesaler funded primarily by PCC member equity dollars and formed out of the wreckage of three natural foods companies in the Seattle, Washington area, themselves likely also wrecked by FBI. By forming this wholesaler using private sector funds contributed by PCC member equity investments in the food cooperative and their food purchases, FBI could directly spy on all the food cooperatives and buying clubs throughout the Pacific Northwest, while using funds being paid as executive compensation to those FBI embedded managers by the members, and by using member funds as they saw fit in their embedded management roles, not just on PCC members and staff. Mr. LeFevre is actually Charles "Chuck" Rosenberg, a now retired FBI, later DOJ official. This RICO conspiracy, and FBI's illegal use of embedded managers using private sector

unappropriated funds to operate this conspiracy against rights and against private enterprises, are the **second** of plaintiffs' three basic claims.

### *Third, Direct Threats to Life*

9G. Lead Plaintiff and his wife Lynne survived a BRMT double homicide attempt in British Columbia (details in subcount LETHL-1) using a cell phone device in the trunk of his car, alongside his then wife, Lynne, during the mid-1980s as described in LETHL-1 and RGTS-1. Lynne worked for US West New Vector Group at the time this cell phone was installed in Lead Plaintiff's car. Soon after the installation, US West purchased the CIA/FBI cover operation which had installed the specific cellular phone system used for LETHL-1 in the Lead Plaintiff's vehicle. That cover operation vehicle cell phone installation company was run at the time by Robert Swain, a serial adulterer who within two years divorced his own fourth or fifth wife to marry the Lead Plaintiff's oxytocin overdosed former wife (the co-victim of the attempted murder) about 90 days after the Lead Plaintiff's divorce from Lynne was finalized in 1988. Defendant United States had previously run a murder entrapment attempt at the Stevens Pass Ski Resort described at RGTS-1 during this same period.

9H. Defendants Weissman and Rosenberg, both then deep cover FBI agents operating as illegally embedded executives in private companies funded primarily by a natural foods cooperative, Puget Consumers Coop (PCC), were the key figures at PCC (Lyle Whiteman, General Manager) and NutraSource (Chuck LeFevre, CEO) throughout this period. They interacted at length with the Lead Plaintiff in Board meetings and other professional endeavors beginning around 1983. Two others from the CIA soon joined them in surreptitiously operating against the Lead Plaintiff.

9I. CIA and FBI continued their prominent role in Lead Plaintiff's life. As these events unfolded in the 1980s into the 1990s, two other defendants appeared in the Lead Plaintiff's life, a Deloitte manager and a local OB/GYN doctor. The manager, known as David P. Moller, was actually a CIA commercial cover agent who ran CIA's South Africa ATM spying project in Johannesburg from the Seattle office of Deloitte around 1984, using this as his commercial cover at that time. Lead Plaintiff worked unwittingly in the Deloitte Seattle cover operation from August 1979 (starting there about five months after CIA Director Turner's National Gallery of Art walk-by described at 9A above) until mid-1986. Then the Lead Plaintiff received his first ever negative performance review from the Seattle Deloitte office's newly designated local consulting managing partner, Michael Henderson. He left soon after (nudged out by the negative performance review) to join Moller at a technology company known as LazerSoft, which was developing a system to digitalize and archive business records using laser technology (actually just another technology spying project intended for US and international use with IBM mainframes).

9J. Lead Plaintiff joined LazerSoft in Summer 1986. Soon thereafter, Moller was orchestrated from the company by other management team members interacting with the Board for Moller's faked "termination." Lead Plaintiff then became CEO, a transition which would become very typical over the next fifteen years in one unwitting cover leadership position after another at various cover operations in the Seattle area. Board member Patrick Heffron raised most of the needed funds for the company to continue its operations. Heffron was then known as an obstetrician/gynecologist with a practice in Kirkland, Washington, but is now known to be neither the CIA field executive in charge of the secret BRMT bioweapon illegal human experiments program used against Lead Plaintiff and other members oof this class of plaintiffs.

9K. A lucky break in September 2023 led the Lead Plaintiff to uncover this entire series of mysterious cover identities (see Woman on the Stairs at WSU and Lt. Colonel George Bivens at LP Evidentiary Exhibits pages 11630 and 11639) and Defendant United States' long-running pattern of fraudulent concealment. Lead Plaintiff was then finally able to unmask the missing identities he had been looking for since beginning his forensic review of the entire history of the illegal BRMT program and racketeering offenses in 2021.

9L. William Burns, the current CIA Director was the doctor known as Pat Heffron, the OB/GYN doctor and LazerSoft funder, in the late 1980s and early 1990s. David Moller is Roger Stone, the political operative and consultant associated with the Republican Party opposition operations from Nixon through Trump. Other institutional and individual defendants also appeared in the late 1980s and early 1990s. These FBI and military personnel were known to Lead Plaintiff as his extended family (see subcount NSEC-1), assigned as their part of the involuntary servitude envelopment process undertaken by Defendant United States. Larry Summers, later President of Harvard and Treasury Secretary, was known as Roger Penner during his brief tenure at Deloitte Seattle, where Lead Plaintiff was employed from 1979 to 1986.

9M. Lead Plaintiff was an uncle to about a dozen children among several of the individual defendants from 1990 until his divorce from his second wife in 2005. Defendants Melber, Vindman, and Rubin are among the FBI, DOJ, and military services government officials who were then known to Lead Plaintiff as extended family members from 1990 through 2005. Their current listed biographical ages are an element of the background legends which have subsequently been built to minimize the possibility of an identity match (a common technique for manufacturing new identities for deep cover operatives) - but their physical appearances are completely consistent with positive identifications and normal aging.

9N. Lead Plaintiff's business was wrecked by FBI in the early 2000s to move him out of Washington state. Harvard President Summers (fka Roger Penner, paragraph 9N) helped human traffick Lead Plaintiff to Boston during 2005. Then, after nearly two years of homelessness in Boston, Lead Plaintiff was again human trafficked to New Jersey in August 2007 by FBI's Rosenberg. Rosenberg reappeared as the principal trafficker in this new role as William Drumm, the General Manager of Establish in Fort Lee, NJ. After ten months of fraudulent employment by this FBI cover company, Lead Plaintiff was terminated in June 2008, weeks after being "requested" to make an impossible $25,000 investment in Establish that these FBI personnel knew he could not possibly make. A faked female relationship was also terminated at this time to maximize personal stress on the Lead Plaintiff, a practice he now recognizes as customary tradecraft.

9O. FBI's Establish was Lead Plaintiff's last permitted employment. He has never been able to work again despite his best efforts to regain employment in 2008 and several attempts to start a business from 2012. He was even rejected for a night stocking clerk job in a grocery store around 2016 by another undercover agent then posing as an Assistant Store Director at a Ramsey, NJ Shop Rite. The series of food companies he tried to start were funded, promised funding, and/or promised sales contracts by FBI, by cooperating police powers cover entities, and by private companies such as Costco, Walmart, and Kroger, were destroyed by these Defendants between 2012 and 2022. FBI Sacramento orchestrated a civil lawsuit against the Lead Plaintiff in 2019 (individual defendant Dean T. Smith) after he failed to wrongfully use the proceeds of about $200,000 invested and loaned during that enterprise wrecking sequence (see Eastern District of California case 2:19-cv-01918-TLN-DB). A British Columbia condo tax loss scheme of just over $6,000 related to Lead Plaintiff's 2005 divorce suddenly popped up eighteen years

later in 2023, contrived by the FBI's Manhattan (individual defendants Turner, Rossi) and Amarillo (individual defendant Maggard) field offices to attempt to offset and cause a default on an FBI funded fake $6,000 personal loan used in one of their long series of racketeering schemes to interfere with interstate commerce against the Lead Plaintiff's attempted and wrecked organic protein startups, generally known as Winnett Perico, Sheldon Beef, and Gannett Peak Ranch. These racketeering elements all became clear to Lead Plaintiff in September 2023 after decades of fraudulent concealment as undercover police powers operations.

9P. These co-conspirator defendants, likely including regional and local police powers, were also running local sex entrapment attempts online in 2011-2014. They then stole about $14,000 of cash welfare grant funds and Social Security retirement finds from the Lead Plaintiff using BRMT boosted oxytocin to fraudulently extract these funds in an online dating scheme between 2014 and 2018. During 2019, these sex traps again returned to real life (just as they had been run in 2004-2005 but with the obvious tinge of overt racism in the dating prospects who were allowed through as the screened-in dates), in a series of about 15 fake dates were paid by Lead Plaintiff, and a follow-on fraudulent romance which was orchestrated in 2020 into 2021. From that point forward all online contacts with dating prospects have ended in failure and no in-personal contact through any online source has ever resulted in any face-to-face meeting.

9Q. During his forensic review in October 2023, Lead Plaintiff noted three possible encounters with a former FBI Director Robert Muller morphological comparable. This is not a positive identification but will require disclosure by Defendant United States through the discovery process. The first possible morphological comparable interaction noted during the forensic review was in Spokane at the Sackville-West residence as the fiancé of Karen, one of the Sackville-West children in the 1970s while Stephen Breyer was known to Lead Plaintiff as Jack

Sackville-West, parent of Bill, who posed as Lead Plaintiff's college friend. The second was at Pacific Pipeline, a book wholesaler and FBI domestic spying operation in Kent, Washington used against Pacific Northwest retail bookstores in the mid-1990s while that morphological comparable posed as its Vice President - Sales. The third occurred during Lead Plaintiff's false employment at Establish, while consulting on a fake software selection project which FBI orchestrated in 2007-2008 at PPG Headquarters in Pittsburgh, PA in its Paint and Coatings Division. That individual was slated to become the new senior officer for global operations in the Paint and Coatings Division. That division, which is now 100% of sales since the glass business was sold off beginning in 2008, was supposedly being moved out of the downtown Pittsburgh PPG headquarters to a suburban location, a very unlikely sequence given the size and importance of that division to PPG. At least the last two of the three interactions would have required Muller facial disguises as his face is well known to the general public. Lead Plaintiff's limited contact with this morphological comparable in the 1970s, then known as Karen's fiancé "Denny," is too vague to be determinative.

9R. This possible fake PPG project interaction with "Muller" code name at PPG not recalled, was likely a final FBI backcheck for their internal security purposes. Thereafter, Defendant United States and its co-conspirators, having detached the Lead Plaintiff from his tell-tale medical records in Washington state, (which would later be routinely destroyed with the passage of time after they were not transferred to New Jersey as requested by mail by the Lead Plaintiff in late 2007) could proceed with the next phase of their planned operation.

9S. Events have unfolded much more rapidly since 2007 than the same patterns had progressed while the Lead plaintiff resided in Washington state before December 23, 2005. Since the possible Muller interactions during the fake PPG project in Pittsburgh during FBI's Penn

State sexual abuse investigations there in 2007-2008, (individual defendant Kovonuk arranged a sidebar with the Penn State football team at a downtown Pittsburgh hotel reception they held during the PPG project), Defendant United States and co-conspirator actions against Lead Plaintiff have rolled out as follows:

(a) torture to suicide ideation for the second time in late 2008-2010, then

(b) involuntary civil confinement from October 2010 to April 2011, forcing the dropping under the duress of civil confinement of a June 2010 federal civil case, then

(c) a potentially fatal fall in a local New Jersy hospital in April 2021, then

(e) BRMT induced choking incidents in early 2022, a verbal threat delivered behind the back at a rented facility theater performance in New York City in July 2022, followed by three lethality attempts in quick succession from September 11 to November 19, 2022, then

(f) a health collapse narrative construction attempt using BRMT against the Lead Plaintiff's colon and heart (with medical collaborators) which has unfolded in 2023. This sequence is detailed throughout this Complaint, most particularly including, without limitation, the LETHL Lethality Attempts series.

9T. FBI knew of CIA's illegal mind control program (BRMT) and directly collaborated in its abuses of US persons from the very beginning. It has and does use these same victims of CIA's illegal medical experiments as its own victims in involuntary servitude and other depraved acts. It still covers its tracks with racketeering, lethality, and criminal entrapment attempts. Defendant United States' most recent financial entrapment attempt (Ironwood at RICO-10) was completed in May 2023, and health collapse and short cycle torture events (LETHL-17 and HEXP-4) continue in October 2023 as this case is being written.

9U. A display of willful blindness by the Department of Justice has continued through a long series of direct contacts by the Lead Plaintiff with personnel who were then or later in the FBI and in offices of the U.S. Attorney for the Western District of Washington, Department of Justice Headquarters, in the District of New Jersey, the District of Columbia, the Eastern District of New York, and the Southern District of New York between the 1970s and 2023 – more than fifty years later – which negligence both supports and perpetuates Defendant United States' willful fraudulent concealment.

9V. All these malign actions have been fraudulently concealed for five decades as "state secrets" involving "national security" while Defendant United States has dragged other co-conspirators into their elaborate plot which abuses process in its continuing fraudulent concealment to delay and deny justice by:

(i)     disposing of documentary evidence by mail fraud, acts of time destroying physical evidence such as medical records, by on-going inculpation and entrapments, and

(ii)    orchestrating and using naturally appearing "accidents," such as a hospital fall in April 2021, a mass transit express train derailment attempt on an MTA Hudson Line passenger train just as the sun was setting on September 11, 2022, (LETHL-17) to destroy eyewitnesses to their godawful truth.

These direct threats to life are the **third** of these plaintiffs' three basic claims.

**Justice or Just Us? Unalienable Rights or Bad Faith Acts Hidden as State Secrets**

9W. Justice or Just Us? That is the question at hand as this court considers these three basic claims against Defendant United States and its institutional and individual co-conspirators in this matter. Do We, the People have:

(i)     "unalienable Rights" for which "….Governments are instituted among
Men, deriving their just powers from the consent of the governed…." OR

(ii)    Bad faith acts of predators hiding behind "state secrets, national security,
and qualified immunity" while continuing to masquerade as the People's
government and protector just as they did in MKUltra and Cointelpro?

[Intentionally left blank.]

***Interline Exhibit IE 2***: **Indirect Verbal Threat and Subsequent Lethality Events**

For July 17 through November 19, 2022 only, other lethality attempts at LETHL-1 through 17



## IE 2A. First, An Indirect Verbal Threat –

An unknown male voice behind me delivers an indirect verbal threat, (what are we going to do with you or a phrase very similar), during intermission as I remain in the front row of this small theater. Since the set up on entry was quite familiar, including a single tall white female in her late 30s to early 40s sitting alone in the two seat row directly ahead on entry to the theater (classic tradecraft), and there had been previous in-house production where I was likely the only guest, all others being police powers personnel and friends, this was a deliberately set up scenario and sequence and an in-house production for the specific purpose of delivering the indirect verbal threat at intermission.

**IE 2B. Second, A Mass Casualty Attempt On A MTA Hudson Line Express Train –**
Approximate area of attempted express train derailment on September 11, 2022. Train collision with tree is heard as the tree's remains bang against the car where I am seated, several cars behind engine occurs at approximately 7:15 pm as the train travels south at 50 to 60 mph into the just set sun (sunset was at 7:11pm). Initial eye adjustment from light to dark requires about 5-8 minutes, so the train engineer's night vision was limited at the time of the collision and potential derailment. There was no wind, rain, or excess moisture to account for a natural tree fall at this particular time, indicating careful planning for maximum effect. Hundreds of passengers and crew were on board this prime time Sunday evening return to NYC. The four track mainline is adjacent to the Hudson River, in this approximate area:



A view of the typical railroad mainline in this area. The southbound express track is second from left, about twenty feet from the Hudson River on the far left:



**IE 2C: Third, A BRMT Assault in Morningside Park, NYC follows –** where I somersault tumble on a granite staircase six days later on September 17, 2022 at 7:29 pm (sunset was at 7:01pm):



The path I walked from a very brightly lit taco restaurant at 109th and Morningside Drive to the southwest corner of Morningside Park. Red restaurant on the right is where I purchased a meal. It has very bright fluorescent lighting. The distance from this restaurant to the Morningside Park entry below is 250 feet, about 45-50 seconds to adjust from very bright light to a very dark path which is shielded from other area lighting by a heavy tree border. A typical adjustment period from bright task lighting to moonless nighttime darkness is about 5 to 8 minutes, according to most sources.



Despite this bright light abrupt transition to dark of night partial night blindness, I successfully negotiated the first four sets of darkened stairs before BRMT was used. Then, my head was forced upright, looking ahead rather than down to see the next lead step and my

walking pace was quickened just prior to my somersault tumbling fall on the set of stairs shown below:



Area street lighting here is old fashioned lantern style low intensity electric lighting with a dense canopy of leaves on the trees in mid-September. The overhead path lights were off, deliberately so. Sunset had happened at 7:00 pm, and "West Side Story" was due to start at 7:30pm. The BRMT commanded somersault tumbling fall occurred at 7:29 pm with the following representative injuries – head injury, potential concussion, injuries to hands and knees:



**IE 2D. Fourth, A Vehicle Rundown Sequence In New York City and North Bergen, NJ**

A vehicle rundown sequence occurred after dark on November 18 and 19, 2022: First in New York City on November 18, 2022. See the Google street views below: W 21st St from 8th Avenue, looking east at top, west at bottom, with images captured in August 2022. Note the streetlights on the right side of street (top), on left side of street (bottom). Both this street and W 22nd Street were completely dark with no streetlights operating as I walked along 8th Avenue to and from the West 23rd Street subway station to, then from a theater production on West 20th.





Then in North Bergen, NJ the following night, November 19, 2022, part two of this vehicle rundown threat sequence occurs in the Walmart Parking Lot, North Bergen, NJ is used to complete this vehicle rundown sequence after dark. BRMT again freezes my head, this time

looking toward a Wendy's restaurant entry door as a distant white sedan accelerates out of my left peripheral vision to a panic stop, then its final stop about 5 feet short of striking me.



## IE 2E. Fifth, A Report Is Made, Met As Always With No Response, Only Official Silence

An excerpt from my September 19, 2022 letter to SDNY is shown below (see the full text in the December 2021 to present series at LP Evidentiary Exhibits pages 786-793):

RE: Defendants' Continuing Lethality Threats and Attempts; Clarification on September 16, 2022 Letter from total to partial evidence destruction

Good day –

Latest physical incident in the focal area involving me:

9/17/2022 7:29pm SW corner Morningside Park, NYC – tumble on staircase about midway down to ballfield level. Full somersault from top of flight of stairs, landed on backside about halfway down flight. No lighting on that southwest stairs pathway with extended landings and a sequence of steps from street level down to ballfield level, screened from all area ambient lighting by dense tree cover so it was extremely dark. All other streetlights and park lights were operating at the time. West Side Story, Spielberg movie, shown outdoors on Ballfield 1. Injuries include scrape and hematoma on left side immediately below hair line and on left cheek, left hand (outside) scrape at left side of left wrist, left hand (palm) scrape at base above wrist, sore thumb, torn pants left knee, bloody left knee scrape, moderately sore knee and hip left side, scrape on right hand at base of thumb, small scrape on right side tip of right index finger, sore lower back muscles mostly on left side. It is unclear if my attention was BRMT frozen in a head up position instead of looking down at stairs at the moment of step (a normal distance stride of the left foot on flat ground) which led to loss of balance with only back half of foot landing on top stair, though that is best recollection of that moment foot, but also possible my eyes were BRMT closed immediately prior to the tumble. Notes made at 11:35pm 9/17/2022. Accompanying photos taken at 8:40 AM 9/18/2022 and left hand 2 (thumb area on back of hand) at 10:10AM. Also, moderately sore neck noted on morning of 9/18/2022.

Page 1 of 3

9V. FBI was attracted during the 1950s Red Scare to the Lead Plaintiff's family of origin. As military service conscientious objectors, they practiced a non-conventional Quaker style home-based religion, known among those faithful as the "Truth." Two agents parked their black four-door sedan outside the Lead Plaintiff's grandfather's dairy farm in the early 1950s to watch a small group of families file in for a 10:00 A.M. Sunday morning testimony and song meeting. Continuing our questions from paragraph 9W above, do We, the People have:

    (iii)    A Constitution which secures "unalienable Rights" through the good faith acts of the federal executive, OR

    (iv)    simply a pretty parchment for historical display at the National Archives while bad faith "state secrets" programs enroll some among us in involuntary servitude as subjects of Dachau style human medical experimentation and racketeering abuse behind a screen of "national security" for which we are designated upon federal executive fancy, whim, or a perceived personal offense against some federal official?

    (v)    This Court MUST answer - through due process, or We, the People have neither "unalienable Rights" nor due process – We, the People, are nothing more than the involuntary subjects of a secret police state.

10. Defendant United States continues today to illegally develop and operate succeeding generations of BRMT in violation of US law and of international treaties it has sponsored, negotiated, and ratified, and having force of law throughout the United States. Defendant United States fiercely defends its on-going cover-up as, together with its co-conspirators, it continues to violate:

(i) the *United Nations Charter* and *Universal Declaration of Human Rights*, (effective in force - EIF 1948),

(ii) *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,* (EIF 1975),

(iii) *International Covenant on Civil and Political Rights* (EIF 1976),

(iv) *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (EIF 1987),

(v) *Geneva Convention relative to the protection of civilian persons in time of war* (EIF 1949), under the 2001 AUMF (115 Stat. 224 PL 107-40 September 18, 2001) in violations of 18 USC § 2441 (grave breaches of Geneva Convention Article 3),

(vi) the *Constitution of the United States of America* (EIF June 21, 1788), and its *First, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth* (section 1) amendments (EIF 1790, 1865 – 13th, 1868- 14th),

(vii) 18 USC § 175 prohibiting bioweapons and bioweapons delivery system development and use, and 18 USC §178(2) development and delivery of toxin prohibited, which imposes penalties unto death against offenders,

(viii) 18 USC § 1385 posse comitatus violations by elements of US Department of Defense and the named military services defendants herein through their use of active duty military personnel against civilian US persons in a secret operation including, without limitation, by the National Reconnaissance Office, US Space Force, and its

predecessor US Air Force, through their technical support and provisioning of classified supercomputer systems, satellite communications systems, and enhanced precision location systems,

(ix) 18 USC §§ 1581, 1584, 1589, prohibiting involuntary servitude, forced, peonage, and human trafficking for same,

(x) 18 USC § 1962 patterns of racketeering acts, in violation of the Racketeering Influenced and Corrupt Organizations Act, which Defendant Department of Justice has itself used to criminally prosecute various government and private associated-in-fact enterprises, conspiracies to and patterns of racketeering acts since 1970,

(xi) 18 USC § 2331 prohibiting terrorism, which imposes penalties unto death against offenders

(xii) 18 USC § 2340A prohibiting torture, which imposes penalties unto death against offenders,

(xiii) 18 USC §§ 241, 242, and 42 USC § 1981 prohibiting conspiracies to and deprivations of civil rights, and

(xiv) together with other co-conspirator Defendants, literally three and one-half dozen sections of Title 18, Civil Rights chapter 21 of Title 42, and myriad state statutes across numerous states, as specifically cited at each of the 42 Claims for Relief in the Complaint, which are comprised of thousands of explicit violations of the relevant statutes cited therein, all these offenses being perpetrated against the Lead plaintiff alone.

10A. The Lead Plaintiff is notably not the sole litigant here, rather he is simply one representative member of a class of US persons secretly and involuntarily enrolled victims of federally perpetrated crimes. Each and every one of these victims is entitled to their "unalienable Rights," federal constitutional rights and protections. Instead each and every one has been lifetime enrolled without their consent in federal involuntary servitude to experience crimes at the hands of those sworn to protect, just as the unwitting victims of 100 million doses of CIA's LSD, and the millions of victims of FBI's Cointelpro violence experienced from the 1950s to the 1970s at the hands of this same lawless federal executive, which operate as scofflaws without practical checks and balances, in the knowing refuge of national security and DOJ's tacit permission structure for institutional criminal offenses. All this is documented in this Complaint and in predicate act and other documentary evidence herein.

11  Under our system of "unalienable" Constitutional rights, ratified treaties, federal statutes, and the controlling case law, *United States v Reynolds* 345 U.S. 1 (1953), these defendants lack any valid legal right to assert "state secrets" privilege or "qualified immunity" as valid defenses. Defendants' criminal acts against rights, their medical experiments on humans without consent, and their racketeering acts against these victims are all violations of the stricture in *Reynolds* cited at footnote 4: 5 U.S.C. § 22, which requires all Defendants' acts be "not inconsistent with law" to sustain any claim they would make of "state secrets" privilege. Defendants' have clearly and profoundly violated all these elements of the rule of law, and fraudulently concealed, tacitly permitted, aided, and abetted this on-going five decade pattern of prohibited, criminal, and illegal acts. These acts have and do pose a clear and present danger to any and all US persons which these Defendants may wish to entangle in their corrupt pattern of racketeering acts, civil rights violations, and prohibited BRMT bioweapon acts, abuses, and

injuries. There is no privilege of lawless immunity extended to any institutional defendant, federal or otherwise, under our Constitution.

11A. Further, the individual defendants hereto, both named and to be discovered, have jointly and severally engaged in a long-running pattern of bad faith acts. Their knowing bad faith acts systematically disqualify any and all individual claims of "qualified immunity" under *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) and other federal case law. As stated in *Harlow*, each individual defendant must "first show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He must then demonstrate that he was discharging the protected function when performing the act for which liability is asserted" ....as.... "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Defendant United States' agents acting here, among whom was (i) a FBI agent who later became FBI General Counsel, (ii) a government employee of DOJ or CIA who later became an Associate Justice of the Supreme Court, and (iii) included a substantial number of other licensed attorneys in various FBI and DOJ operations as identified elsewhere, would most surely have known, and who have and had an explicit sworn duty to protect.

12. BRMT is a classified and heretofore unknown type of legally prohibited weapons system. Other technologically complex systems unknown to the public have and do operate secretly for decades beyond their first use in military and intelligence applications before becoming known to the general public. The GPS system on your smartphone was a classified top secret system which operated from the first generations of satellites in the 1960s for military

ship, bomber, and fighter navigation. Military stealth technology was unknown to the commercial pilots who spotted these aircraft flying alongside their own at night from the F-177 fighters first flight in 1981 until November 1988. Pulse jet technology, spotted by the Lead Plaintiff in daylight flight over prohibited airspace in western Utah in early 2008, is still classified and unknown to the general public. We begin our exploration of the novel and illegal BRMT system with a basic explanation of the secret bioweapon itself, its evolution and operation, and of the modern bioweapon delivery system, which is an integrated system of ground and space technologies it exploits to act illegally on US persons, effectively hijacking our brains and central nervous systems as unwitting and non-consenting victims.

13. Here are a few historical paradigms for the skeptics who need further convincing of the possibility of this sort of weapon's mere existence– northwest Wyoming's thermal geysers, mud pots, and boiling springs were dismissed from around 1807 until the 1850s as the fantasies of a drunken and delusional man and of those who followed him. After the invention of photography in 1839, an official expedition was sent to the region in 1871, including both a photographer and the artist Thomas Moran. The following year, this near fifty year fantasy yarn of a drunken, delusional man became the world's first national park, now visited by about 3.5 million people each year.

**Human Brains are Commanded by Illegal BRMT External Hijacking**

14. The illegal BRMT bioweapon is intended, designed, and acts to excite or suppress production of common human brain chemistry (biological compounds such as hormones) which are extraordinarily important to the proper functioning of the human mind and body, including to human exercise of free will in decision-making. See a summary description of BRMT at LP

Evidentiary Exhibits pages 1-10 and brief examples of the extraordinarily broad array of adverse effects of BRMT bioweapon operations directly experienced by the Lead Plaintiff from the 1980s to the present at LP Evidentiary Exhibits pages 181 – 181C. Other examples are included throughout this Complaint.

15.  Grossly oversimplified, the adult human brain is a six to eight pound biochemical manufacturing and processing plant filled with neurons and glial cells. Neurons are the "thinking and acting" cells which interact biochemically to form thoughts and send messages to other neurons to complete that thought or command a specific action. Neurons communicate across synapses, which are the cell membrane gaps across which neurons send biochemical messages to communicate through the adjacent neuron cell's membrane into the adjacent neuron cell itself for a further biochemical reaction, such as commanding your right index finger to strike a key on your cell phone keypad. Glial cells are the neurons' servants and guardian cells which regulate the local environment, keeping it sanitary, supplying needed chemicals (oxygen, trace compounds, and so forth), and guarding against biological viruses and other intruders to support this network of billions of neurons. Neuronal networks (simplified here as nerves) carry messages across the brain for further processing, and to other parts of the body, such as muscles and organs to coordinate walking, breathing, swallowing, talking, operating a car, and so forth.

16.  The brain operates consciously (experienced, for example as thought and speech) and unconsciously (experienced without thought in regulated and monitored functions like breathing, adjusting eye focus, moving the head, and so forth). Boundaries between conscious and unconscious actions are not clear cut, of course, as we know from observing ourselves and each other in various situations, such as observing voluntary and involuntary changes in expression

and body language, and sudden awareness of normally ignored body system through nervous system signals such as pain or shortness of breath. See LP Evidentiary Exhibits pages 6645-6685 for a basic explanation of neuroscience – the science of the brain and nervous system.

17. The prohibited BRMT bioweapon and bioweapon delivery system is an offensive weapon born in the 1970s, which operates outside law as an offensive weapon, a computer to brain weapon to hijack human brains. As a weapon, it is antilog (opposite in function) to beneficial medical devices (brain-to-computer interfaces) which are controlled by the user's brain. First we consider the beneficial medical uses of these types of technologies - brain-to - computer interfaces. Then we'll pick up the illegal brain hijacking BRMT bioweapon again.

18. Over the past decade private companies have invested a few hundred million dollars to develop medical devices, relatively crude commercial brain-to-computer interfaces which use the same neuroscience-based principles of operation for beneficial uses controlled by the user as the prohibited BRMT brain hijacking bioweapon uses against Defendant United States' chosen unwitting victims such as this class of US person plaintiffs. These early stage commercial prototype devices began being tested in humans with FDA approval in 2021 in pioneering medical treatments of brain injuries, diseases, and other biological and biochemical disorders, such as ALS and Parkinson's disease. Synchron, a pioneering New York City-based medical device company received FDA permission for the first ever implant of a brain-computer interface device, which was performed in July 2022 for a patient suffering from ALS after investing $70 million to this point. An Elon Musk company, Neura-Link, is investing $100 million of Musk's money to develop this type of technology into commercial medical products.

Other companies are developing brain-computer interfaces to control artificial limbs, among other medical uses.

19. These "miraculous" commercial medical breakthroughs benefit from hundreds of millions of dollars of applied medical research, mostly over the past decade. See LP Evidentiary Exhibits pages 11-139 filed herewith. BRMT has benefitted from tens of billions of dollars of secret research over fifty years, and by its integration with other hundreds of billions of dollars of stealthy military technologies developed alongside BRMT. As a result, BRMT is vastly more capable, well exceeding the capabilities of the relatively primitive "miraculous" early stage private sector breakthrough devices now in their first two years of FDA approved human trials.

20. BRMT, the computer to brain bioweapon, operates in precisely the opposite manner as the beneficial medical devices described above. Rather than assisting the person to perform some operation or create more favorable brain or body function (such as ALS tremor and other symptom suppression), the prohibited BRMT bioweapon hijacks the victim's brain for the BRMT operator's remote command and control, prohibited under 18 USC § 175(a) to produce 18 USC § 175(b) detrimental and toxic levels of biological compounds. The prohibited BRMT bioweapon uses its prohibited remote bioweapon to deliver precisely addressed energy (similar to an x-ray or radio wave which is also a form of energy, though with different wavelengths than BRMT – simply put, at different power levels and pulse rates) which directly injure the brain remotely, by penetrating the skull to a particular region or point in the brain or central nervous system, and delivering and/or suppressing the biological compounds in the brain used to maintain function, and to think and/or act, effectively unnaturally manipulating toxic effects in the brain and central nervous system. This is the same type of act as a hijacker would take to

assume command of a car, airplane, or ship - but without the conscious awareness of the person being hijacked, as they cannot detect this activity, it seems entirely natural to the victim.

**Illegal BRMT Bioweapon Operates Like Other Remote Offensive Weapon Systems**

21.  Using the modern, ground base enhanced, classified version of a top secret space-based military technology from the 1960s, the bioweapon delivery system streams a string of carefully timed commands to precise points in the brain. Here are two more notes to the skeptic – (i) a version of this precision location technology much more capable than that 1960s top secret military system plants 15,000 to 20,000 corn seeds per minute within one-third of an inch of their planned location as it has for the past decade. It's also on your smartphone – its GPS. The ground based location accuracy enhancement of BRMT is the precisely located nearest cell phone tower. (ii) Worried about head movements during BRMT command transmission? Ground-based location enhancement and predictive analytics add the precision required to adjust to head movements like normal wobbling, walking, driving and so forth. The speed of light (186,000 miles per second) takes care of the rest - the signal can be adjusted as needed within 0.2 seconds – about half the blink of an eye, if needed.

22.  This BRMT bioweapon delivery system uses a wave (directed energy just like any other signal) to force a precise and involuntary biochemical reaction at a specific location or sequence of locations in the brain. This stimulates a particular brain location (analogous to a particular room in a house in the particular neighborhood of a town) by addressing a specific carefully identified address or set of addresses in a very specific and carefully timed sequence to generate a particular thought, a particular action or set of actions, such as thought, speech, or movement.

23.  The prohibited BRMT bioweapon and bioweapon delivery system has benefited from decades of research and tens of billions in legally prohibited " state secret" government funding, just like other weapons systems. For example, the third generation of stealth bombers was just rolled out by the Air Force. Using other available technologies which adapted for its use (such as space-based digital signaling platforms used for other military purposes such as encrypted communications, precision location, and routine navigation), the prohibited BRMT bioweapon is operated remotely from a secured location just like any armed drone aircraft since around 2005, and as many other modern weapons systems and surveillance systems operate daily. Precision location technology and speed of light transmission rates are used so no direct contact between the supercomputer-based BRMT weapon, the BRMT bioweapon delivery system (using a space-based platform and locally corrected signal) is required. No implant is needed  as the precision focused energy commands a specific sequence of biochemical actions in the brain.

24. No notice, no device, no consent is required due to this illegal act being performed behind the "state secret" curtain under the same tacit permission structure used for all forms of illegal acts against victims. And the victim is completely unaware of prohibited BRMT commands as they enter through the skull totally unnoticed into the brain. Just like Covid sneaks through your airway to infect the lungs – BRMT wreaks its form of havoc and mayhem on the unsuspecting victim. In summary, the prohibited BRMT weapon's computer generated signals (which are focused energy like an x-ray, ultrasound, or radio wave) penetrate the skull, hack the brain's natural biochemistry at very specific locations in very precisely times sequences, and directly energize neurons (brain and nerve) cells to orchestrate any conscious or unconscious human action, such as moving limbs, altering body rhythms, changing mood, thought, speech, or

action (such as falling asleep or becoming hypervigilant), inducing mental illness, and all manner of other havoc through the brain and central nervous system.

25.  Since a single supercomputer installation can easily manage three quadrillion (3 million billion) calculations per second, a single instance of the prohibited BRMT bioweapon can send literally billions of digital commands per second, carefully timing these sequences of hijacking commands with extraordinary precision, and potentially commanding multiple victims simultaneously just like an old-fashioned marionette show (or a bunch of malign Muppets). This careful timing and sequencing activate various brain addresses as necessary to achieve the desired hijacked result. The hijacked BRMT victim is completely unaware of these external signals which command the thought or action. This hijacking is experienced by the victim as the completely normal brain function it appears to be. Simply put, everything about these thoughts, actions, and body functions seems quite normal - except that they did not originate inside the brain of the victim, they were commanded from the outside by a remote operator.

26.  Once a brain or central nervous system pattern is identified, and the command sequence to command that pattern is tested to confirm repeatability and reliability to generate a particular precise result in the hijacked victim, BRMT system artificial intelligence can take over and perform further prohibited medical experiments on the victim – testing, mapping and refining myriad tiny variations of that original command sequence to gradually learn to orchestrate other targeted acts. Over time, the command signal sequences needed to hijack and command nearly any thought and/or action desired by the BRMT operator, can be accumulated by the supercomputer's memory into a catalog of commands. The operator then simply has to

organize these commands to achieve the desired results – be they benign or deadly. Just like the high-level command you use to manage the apps and functions on a smartphone.

27.  The BRMT bioweapon operator (i) uses a computer control device to issue human understandable command sequences to the supercomputer, which (ii) translates them to machine understandable language, for (iii) transmission through the BRMT bioweapon delivery system, using common remote communications capabilities to (iv) communicate with a remote device, which then (v) aims and physically delivers a precise command sequence to a precise location, to (vi) cause and create a particular biochemical reaction – thought, movement, etc., in the victim's brain .Location accuracy is typically enhanced by a location error correction device near the BRMT victim - a cell phone tower works for this ground-based enhancement as its location is very precisely known.

28.  Through this entire process, the BRMT operator interacts with the prohibited BRMT bioweapon and delivery system just like an Air Force or CIA drone operator sitting at a computer console in the United States. That drone operator uses live imaging, digital mapping resources, and/or field derived intelligence to seek out and identify the desired target, then fire a Hellfire missile into the rear window of the target's SUV through the billowing cloud of dust on a dirt road in Afghanistan, or anywhere else on earth. The operator chooses when to push the button, the technology delivers the weapon precisely on target.

29.  Since it is a globally prohibited weapon operated in secret and against US persons, among others, the prohibited BRMT bioweapon and bioweapon delivery system has long been and is today an obviously illegal clear and present danger to its unwitting victims. BRMT operators can freely act on the victim's brain to directly alter human breathing patterns, heart

rate, and other basic bodily functions – accelerating them or halting them entirely. BRMT operators can alter a person's state of consciousness directly and switch it off or on at any time for any length of time, inducing sleep, a lethal fall, or a motor vehicle crash. BRMT operators can alter moods and thought patterns. For good or ill effect, and the victim is none the wiser for being hijacked. The BRMT operator only needs to impact the brain and central nervous system in particular, the body already takes care of everything else anyway, so the victim is not a total robot, "only" a hijacked person under the command and control of another. Kidnapped for all intents and purposes, for the use of another person, without even knowing it is happening.

**Illegal Deployment of BRMT is Fraudulently Concealed by a Continuing RICO Conspiracy**

30.  The prohibited BRMT bioweapon and bioweapon delivery system is used as an offensive weapon against the Lead Plaintiff and others to, for example, halt (victim consciousness), trip (victim's feet down the stairs), distract (victim injures themselves or can be struck by a vehicle), and harm (drive while asleep over a 100 foot sea cliff). Each of these experiences have been and continue to be the result of direct BRMT intervention against the Lead Plaintiff, though he did avoid, albeit barely, the double homicide attempt to induce an unplanned (at least by the Lead Plaintiff) sea cliff descent of 100 feet or more on a narrow British Columbia, Canada highway with no guardrail at 50 or 60 miles per hour in the early 1980s. See LETHL-1 herein.

31.  Defendants have and do engage, direct, and act both individually and as an associated-in-fact enterprise to (a) conspire and secretly force and perpetuate victims' on-going involuntary servitude and forced labor; (b) destroy victims' marriages and families; (c) induce

fraudulent and exploitive personal relationships; (d) destroy businesses, and business and personal finances; (e) engage in continuing conspiracies to enmesh victims in legal entanglements and Defendants' criminal "investigations" for the purpose of endangering and entrapping direct victims including the Plaintiffs; and (f) to use Plaintiffs as a conduit to gather and analyze intelligence, in otherwise illegal operations. These and other criminal and civil violations of the rights of victims, including Plaintiffs, have and may continue throughout the victims lifetime, as they have and continue in the case of the Lead Plaintiff.

32.  These malign acts of Defendants include (a) attempted lethal "accidents," assassination and endangerment efforts; (b) attempted mass casualty events; (c) human trafficking of victims to police jurisdictions known for their pattern of civil rights violations, corruption, and abuse of lethal force; (d) efforts to entrap and incarcerate, including sustained efforts to cause victims such as Plaintiffs to act out violently so Plaintiffs can be arrested and incarcerated; (e) abusing Plaintiffs' brain biochemistry with BRMT to create anxiety, panic, torturous physical and mental abuse patterns, and mental illness; (f) inducing physical illness through food and other poisonings and deprivation of needed vaccines and medications; and (g) endangering Plaintiffs by discrediting and destroying the victims' reputations, leading at times to vigilante acts against the Plaintiffs by others.

33. Lead Plaintiff's direct evidence, derived from decades of personal experience with Defendants' violations under law, is fully sufficient to prove a prima facie case with regard to the Defendants' violations under federal law, state statutes, and under the statutory effects of international treaty obligations in the *International Covenant on Civil and Political Rights* and the *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or*

*Punishment*. There are 43 Claims For Relief of violations and injuries incorporating numerous chapters of Title 18 and Title 42 Chapter 21 Civil Rights of the United States Code. Each Principal (triable) Count is supported by one to over ninety fact patterns (known herein as subcounts), each of those incorporating from one to thousands of predicate acts, each of which is dispositive and individually representative of myriad other such violations across five decades against the Lead Plaintiff alone. The total number of such acts and violations against all Plaintiffs across five decades is currently unknown.

34. To continue to conceal their violations of human, Constitutional, ratified treaty, and legal rights of Plaintiffs and to sustain their cover-up of the prohibited BRMT bioweapon program against US persons, Defendant United States, and its witting and unwitting co-conspirators, have and do engage in ever more aggressive intimidation, injury, and lethality attempts on Lead Plaintiff. For example, they use their massive budgets, manpower, and co-conspirators to create a series of natural appearing scenarios for accelerated 2022 assassination attempts, see Interline Exhibit 2 and Table 1.

35. The intensity of Defendants' lethality attempts on Lead Plaintiff has grown as Defendants' long series of criminal acts has been forensically reverse engineered and exposed by the Lead Plaintiff in writing through approximately 30 letters and exhibits to the US Attorney for the Southern District of New York from December 2021 to November 2022, including several copied or addressed to the Attorney General of the United States.

36. Several more such letters to SDNY have followed in 2023, including the identifications therein of former DOJ officials present in the New York area as principals, perpetrators, and enablers. But systemic executive branch violations of law are not pursued by DOJ. For example, neither CIA's MKUltra nor FBI's Cointelpro ever resulted in even one

criminal charge against anyone in the Executive branch, despite two decades of criminal acts against US persons. The Lead Plaintiff has found no examples of criminal prosecutions for poisonings, for germ spraying of US cities, and for a myriad of other constitutional violations undertaken over decades by the United States against its own citizens. None. Banana republic stuff.

37.  Criminal acts, and abuses which violate treaties to gain global advantage, are at the root of the BRMT systems creation. Perhaps these facts explain the complete lack of DOJ contact which would normally result from high veracity reports of criminal activity.

### *Knowing Creation, Continuation, and Concealment Make Plaintiffs' Prima Facie Case for One Unalienable Right – To Be Free From Government Inflicted Injury*

38.  Three principal elements of Defendants' actions are needed to fully satisfy and are legally sufficient under law to prove the Lead Plaintiff's prima facie case against the Defendants:

a) *voluntary creation of risks* to plaintiffs by Defendants,

b) *voluntary continuation and conspiratorial actions* by Defendants in harming rights, business, and property, despite their clear and contrary legal duty to protect, and

c) *willful and completely voluntary actions which perpetuate and conceal* the actions of Defendants.

39. These elements are fully met in this case. The Complaint and accompanying evidence demonstrate beyond reasonable doubt that Defendants knew and/or should have known that:

a.  Defendants have knowingly and definitively created the risks which resulted in the Lead Plaintiff's harm from BRMT and their related conspiratorial acts and have failed to cease and desist or otherwise mitigate the injuries they cause. Direct evidence as shown at LP Evidentiary Exhibits pages 237-865, and over 10,000 pages

documenting predicate acts and direct acts as filed by Lead Plaintiff herewith, will be further supported by millions of pages of additional evidence on discovery.

b. Defendants with intelligence and police powers at all levels of government have a well-established legal duty under law to protect from harm. Defendants explicitly harmed and continue to harm the personal relationships, personal finances, income, businesses, property, and physical and mental health of Lead Plaintiff and other Plaintiffs. Defendants United States, Central Intelligence Agency, Federal Bureau of Investigation, New York Police Department, Maricopa County (AZ) Sherriff's Department, and Joseph Arpaio, the former Maricopa County Sheriff, have each been found civilly and/or criminally liable for violations of individual rights and liberties. See LP Evidentiary Exhibits pages 237-367, police powers and intelligence services patterns of practice, including relevant Congressional findings on CIA and FBI.

c. These completely voluntary actions of Defendants to perpetuate and conceal include a sweeping variety of violations of law, such as wire fraud and mail fraud; fraudulent investments as pretext for perpetuation of involuntary servitude; deliberate harm to interstate commerce, business, and property; aggravated assaults, numerous attempts to injure or murder; other direct and indirect violence including physical abuse, psychological abuse; and BRMT brain hijacking. A few dozen of these incidents, comprising thousands of legal injuries, are included in the facts and specific predicate acts evidence in more than 11,000 pages of LP Evidentiary Exhibits filed herewith.

**NO History of DOJ Criminal Prosecutions of Executive Branch Institutional Class Crimes Against US Persons**

40.  The fourth fundamental issue requiring this Court to urgently address the three claims above is an unyielding truth about the historical pattern of unequal administration of justice in these United States:

> Lead Plaintiff finds no record the Defendant United States has ever, in the entire history of the United States of America, acted criminally against collective and wide-spread abuse of police powers by its own federal departments and agencies.

As a result, Defendant United States has developed a tacit permission structure in its intelligence and police powers operations by systematically abusing the principles of "state secrets" and "national security" to engage in a long series of programmatic abuses and coverups of its own violations of the Constitution, of ratified international treaties, and of the laws of the United States of America, against a wide variety of individuals, groups, and sovereign bodies, both within and outside the United States of America.

41.  The prohibited BRMT bioweapon and bioweapon delivery system (prohibited by 18 USC § 175) has been used by Defendant United States against Plaintiffs for approximately five decades. This is more than three times longer than Defendant FBI's infamous Cointelpro (15 years) organized nationwide program of felonies against Constitutional and civil rights; and more than two times longer than Defendant CIA's MKUltra (20 years) criminal LSD distribution and surreptitious dosing program were actively pursued by Defendant United States, likely as America's largest single illegal drug dealer of that time. Both those programs required physical

interactions with the victims. Both programs involved tens of thousands to hundreds of thousands of specific felony violations of USC Title 18.

42. BRMT does not require any direct interaction with any victim, including any member of the class of injured Plaintiffs, so deployment, acts of abuse, and violations are vastly simpler. The supercomputer systems used in BRMT deployment perform three quadrillion operations per second (3,000,000,000,000) to deliver billions of BRMT biochemical brain hijacking instruction sequences each second. The scope of BRMT violations against the Plaintiffs vastly exceeds, likely by hundreds of thousands to billions of felonious events, the combined violations of Cointelpro and MKUltra.

43. Lead Plaintiff's historical and current experience and the sampling of evidence herein document Defendants' continuing pattern of criminal and civil violations of rights which involve illegal biomedical hijacking (BRMT), various financial and other frauds, asset stripping, destruction of relationships and inducement of fraudulent relationships, deprivation of benefits, and other abuses intended by Defendant United States and its co-conspirators to sustain victims' penury, mental instability, and to cover up and perpetuate the "state secret" BRMT program against the People, the very US persons which Defendants with intelligence and police powers are sworn to protect. These offenses and violations as elements of the "state secrets" pattern of operation of the prohibited BRMT bioweapon program commenced in the early 1970s and continue as this Complaint is written.

**Immediate Action Required to Avoid Destruction of Evidence Identifying Victims**

44. Time is of the essence as Defendants' efforts to suppress evidence, tamper with witnesses and evidence, and to retaliate against and intimidate, and even to eliminate witnesses,

are on-going. For example, evidence has already been destroyed by acts of Defendants against the Lead Plaintiff's current personal computer, and suppressed, including an old hard drive filled with evidence dating to the 1990s and recovered but no longer in his possession, and paper files dating from the early 2000s evidencing prior acts of Defendants which was disposed of on BRMT command in 2018. Other documents may have already been destroyed by Defendants, continuing their past pattern of practice in other programs, such as MKUltra, to evade and obstruct justice, and to evade accountability.

45. There is also direct documentary evidence presented herein that such obstructive actions have already been undertaken within at least two Defendant's police powers organization, Defendant City of New York Police Department (NYPD) during the 12 days between the initial denial of the Lead Plaintiff's Freedom of Information Law request on September 3, 2021, which acknowledged information and denied access; and a subsequent Appeal Denial Letter on September 15, 2021, which stated no information could be located after a diligent search. Defendant FBI promptly followed that action with their own "liar letter" to the Lead Plaintiff on September 30, 2021. See this sequence at Interline Exhibit 15-17.

46. Defendant United States has a similarly dismal record of compliance with laws regarding retention of evidence which may inculpate its departments and agencies. Criminal destruction of evidence collected by Defendant CIA in MKUltra from 1953 to 1973 was never prosecuted. That CIA Director was promoted to Ambassador. Defendant DOJ failed to prosecute Defendant FBI, one of its own police powers agencies, for systemic abuses including FBI's funding and directing a violent White supremacist militia. FBI Director Hoover and other sworn agency personnel directed, ordered, and committed an extensive nationwide pattern of felonies in

Cointelpro between 1956 and 1971, including violent violations of the Constitutional, civil, and human rights of US citizens. These are just two examples of known long-running systemic criminal abuse and prejudicial self-exculpation including obstruction of justice by Defendant United States against US citizens, as documented by Congress.

**Defenses Are Defeated by Defendants' Own Bad Faith Acts and Fraudulent Concealments**

A. **Defendant United States is a Serial Offender of Laws and Ratified Treaties**

47.  The Court must not lose sight of this critical fact - Defendants' physical and virtual violations of individual liberty and rights frequently incorporate simultaneous BRMT hijacking of human free will and autonomy, and creation of a psychologically coercive environment. Using basically unlimited budgets, the Defendants, such as Defendant United States and Defendant NYPD, conduct BRMT hijackings in public places, developing scenarios specifically intended to create oppressive physical and psychological impacts for the targeted victim(s) in that moment. These stage-managed scenarios, including their carefully managed settings and sequences of physical and psychological circumstances and BRMT bioweapon brain hijacking, can overwhelm the ability of the individual BRMT hijacking victim to choose for themselves a wise and reasonable course of action in the moment.

48.  Lead Plaintiff has experienced these provocations many times over the past twenty years in public places in the state of Washington, in Boston, Massachusetts, in New Jersey, Pennsylvania, California, Arizona, and in New York state and New York City, among many others. Lead Plaintiff has also voiced BRMT-driven intents and potential actions which he ethically opposes in practice, strenuously avoids, and has never undertaken. The clear and obvious goal of the perpetrators, these Defendants, was and is to cause the victim, any one of the

class of Plaintiffs, to act out in public in a violent, incriminatory, or self-destructive way in reaction to a visible provocation and/or BRMT bioweapon driven brain hijacking.

49. Through this creation of artificial physical, psychological, and BRMT driven virtual circumstances, Defendants seek to turn the actual victim of the BRMT hijacking at that moment into the active perpetrator of a violent or fraudulent act against themselves or others, perhaps an innocent third party such as passerby, or a target specifically selected by Defendants, or even the hijacked individual themselves as the victim of what is seemingly their own act, the act of a third party, or a deadly police powers act justified by what those officers or agents perceive to be a threat to themselves or others in that moment. Local police powers operators may harm, or arrest and detain, the supposed perpetrator who acted physically or fraudulently, but involuntarily, against the apparent victim. Independent witnesses then verify this violent or fraudulent act by the hijacked BRMT victim in court.

50. The true perpetrator, the BRMT bioweapon hijacker acting remotely, is nowhere to be found – perhaps thousands of miles away, just like the drone pilot in a missile strike in Afghanistan or Iraq. No trace of the remote BRMT bioweapon hijacking remains in the victim's brain or at the crime scene. The waveforms used to hijack the actual BRMT victim's brain and central nervous system, which can completely control the thought, voice, and action of the moment, simply disappear, their energy transformed into the brain biochemical reaction which generates that thought, act, or motion - just as radio waves are translated into sound and vanish once received. Thus, the BRMT remote operator's contrived bioweapon commands fraud, injury, or death, delivered through a hijacked victim, against themselves or any third party, leaving not a single public trace. The perfect crime, never to be solved.

51. The scope of these Defendants' criminal and civil violations include systemic abuse under color of law by police powers operations, failure to protect, negligent supervision, and continuing violations of Constitutional, civil, and human rights which are allegedly guaranteed to Plaintiffs by and under the United States Constitution, ratified international treaties, and laws.

52. Defendants' offenses against US persons and other innocents are extraordinarily grave, and particularly so when the Defendants' crimes are committed through BRMT managed Plaintiffs against the Plaintiff themselves or a third party. Defendant United States is fully capable of and has deployed the full BRMT toolset, including remote bioweapon hijacking, and ordinary criminal techniques, under color of law for the systematic, though not as yet lethal, destruction of the Lead Plaintiff and doubtless others in this class of Plaintiffs.

53. Deployment of the formidable array of BRMT bioweapon and other police powers tools under color of law is not based upon due process, upon rights, or upon law, any more than the selection of MKUltra or Cointelpro victims has been in the past. It is based upon arbitrary bureaucratic whim and operates unchecked outside the rule of law - but within the sphere of "state secrets" in a malicious manner never intended by our Founders or the Courts.

54. Simply put, Plaintiffs exist under this individual and collective peril which destroys free will and imperils the very definition of freedom itself because of the actions of Defendant United States and its co-conspirators. Virtually none of the Plaintiffs who are part of this class have ever known or have any reason to currently know of their victimization by BRMT brain hijacking at the hands of the Defendant United States and its co-conspirators. Numerous Plaintiffs may not comprehend the underlying technology, methods, and purposes for which they were and are manipulated by Defendants in ways which usurp and directly contravene

protections of individual rights allegedly guaranteed by our Constitution and laws. Lead
Plaintiff's experiences documented and described herein provide only a modest sampling of
predicate acts over about one third of the BRMT program's life. While representative, they do
not fully incorporate the broad array of BRMT biomedical abuses and violations undertaken by
Defendant United States against this class of Plaintiffs across time, space, and international
boundaries.

### B. Defendants' Own Actions Defeat State Secrets Defenses

55.  Defendant United States is not entitled, nor are other Defendants entitled to, any
valid assertion of "state secrets" protection, nor to "qualified immunity," as all these injuries and
offenses were undertaken by these Defendants in their ordinary, daily, and self-proclaimed scope
of agency, despite their sophisticated legal institutional knowledge that these institutionally
tacitly permitted patterns of practice have been and are well outside their Constitutional and legal
scopes of authority. The utter invalidity of any asserted "Government privilege against court-
ordered disclosure of state and military secrets," is obvious from the language in *United States v
Reynolds* 345 U.S. 1, 12 (1953), at

> "Footnote 4*) 5 U.S.C. 22*: "The head of each department is authorized to prescribe
> regulations, **not inconsistent with law**, for the government of his department, the
> conduct of its officers and clerks, the distribution and performance of its business, and the
> custody, use, and preservation of the records, papers, and property appertaining to it." Air
> Force Regulation No. 62-7 (5) {b} provides: "Reports of boards of officers, special
> accident reports, or extracts therefrom will not be furnished or made available to persons

outside the authorized chain of command without the specific approval of the Secretary of the Air Force."

55A.  The BRMT bioweapon and bioweapon delivery system violates (i) 18 USC § 175 (prohibited bioweapons and bioweapon delivery system), (ii) 18 USC § 178(2) (creates a toxin in humans), (iii) 18 USC § 1385 (posse comitatus) as it is deployed directly against US persons using military assets and personnel in the operation of technology components of the BRMT bioweapon delivery system, (iv) is a prima facie violation of the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, and (v) violates *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, as it has been and is used in violation of 18 USC § 2340 (torture).

55B.  The profound hypocrisy and unquestionable legal invalidity of any assertion of "state secrets" privilege under *United States v Reynolds* 345 U.S. 1 (1953), is obvious based upon Defendant United States' comprehensive and systematic suite of violations - for fifty years - of all these aforementioned US laws and ratified international treaties having force of law under our Constitution. Defendant United States promulgated, negotiated, proclaimed to all nations and peoples of the earth in a three capitals global signing ceremony, and duly ratified in 1972, the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, as it simultaneously engaged in, and as it continues to engage in, a duplicitous campaign to develop, deploy, and operate the very form of bioweapon and bioweapon delivery system which it and other nations

explicitly agreed to prohibit by this treaty, and has and does use this prohibited bioweapon and bioweapon delivery system against its own people, and others.

56.  The technologies used in the prohibited BRMT bioweapon delivery system are classified and are commonly used in military and intelligence operations for other purposes. There is no need for their detailed technical specifications nor alternative and legally permissible operational purposes or uses to be disclosed. Slightly less sophisticated versions of each and every technological element of the BRMT bioweapon system – including its supercomputers, software, artificial intelligence, precision location, satellite communication; as well as neurology, biology, and medicine - are used daily in common, peaceful commercial operations from shipping to farming to medical devices, and for entertainment and information access purposes by children around the world, among others. And analogous lethal weapons systems which use these same technologies are currently in use in offensive operations by the CIA and military to operate drones, fire missiles, and effect other lethal consequences to targets very frequently under the world-wide authority of the 2001 authorization for the use of military force of September 16, 2001.

## C.  Defendants' Own Actions Defeat Qualified Immunity Defenses

57.  "Qualified immunity" is a valid affirmative defense only if articulated by government officials and employees, including officers, agents, and other employees **in good faith acts.** In *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), the Supreme Court clearly articulated the standard which Defendants must meet to validly claim "qualified immunity" at IV B:

> "Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo,* 446 U. S. 635 (1980). [Footnote 24] Decisions of

this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland, 420 U. S. 308, 420 U. S. 322* (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically, the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury. . . ."

58. As these are not good faith acts of illegal bioweapon operation, racketeering offenses, and other injuries and offenses under color of law, these persons are individually liable as identified herein and through the discovery process, for their actions which have injured these plaintiffs. The Supreme Court has made this principle plain and obvious as Justice Brennan wrote for the Court on the seizing of a person absent the basic principles of due process under the Fourth Amendment in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 392, 397 (1971):

......at 392

"Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free

from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' *Bell v. Hood*, 327 U.S., at 684, 66 S.Ct., at 777 (footnote omitted); see *Bemis Bros. Bag Co. v. United States,* 289 U.S. 28, 36, 53 S.Ct. 454, 457, 77 L.Ed. 1011 (1933) (Cardozo, J.); *The Western Maid*, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922) (Holmes, J.).

......at 397

"'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' *Marbury v. Madison*, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 390—395, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment."

59.  In *Egbert v. Boule*, 596 U.S. 482 (2022), the Supreme Court wrote that an alternative statutory remedy scheme is sufficient to foreclose such claims against individual immunity of these individual defendants. However, there is no statutory alternative form of remedy provided nor has one ever been proposed by Defendant United States whatsoever for these plaintiffs. Its agents and officers have and do act knowingly and have and do explicitly chose to directly entangle these plaintiffs in national security matters while directly violating the Thirteenth Amendment rights of each and every plaintiff in the entire class. This pattern of practice is clearly demonstrated herein by:

(i) repeated entanglements in national security, to wit NSEC-1 lifetime through NSEC-5 2007,

(ii) through a series of non-verbal visual leaks subsequent to those specific subcounts, as if national security is intended to be abused by the clever and nefarious, while acting as public officials, as a personal immunity shield and get-out-of-personal-liability free card, when they knowingly violate the unalienable rights of US persons, and

(iii) by the extraordinarily pervasive invasions of the Lead Plaintiff's life and rights in each and all respects, to and including, for example, their direct in the moment intrusion into sexual function during intimate relations using BRMT (HEXP-11).

Rather than propose any form of statutory remedy scheme, Defendant United States has persistently declined to make any answer of any kind at any time. Lead Plaintiff has communicated these injuries and the extent of this secret program directly by mail and by personal hand delivery to the Executive Office of the President, to other federal defendant departments and agencies, most particularly to the Department of Justice in New York City, in Washington, D.C. and Washington state, in writing on over forty occasions with no reply on any occasion. When pressed with a FOIL request under New York state freedom of information laws, Defendant NYPD first answered accurately if not fully on September 3, 2021 (Interline Exhibit 15). Twelve days later, it officially lied in coordination with FBI which issued soon thereafter issued its own official lie on September 30, 2021 (Interline Exhibit 16). The DOJ Assistant Inspector General for Investigations declined any interest in the matter (Interline Exhibit 17). All outstanding 2021 FOIA request responses were spiked after two responses both containing outright lies (Interline Exhibit 14 and LP Evidentiary Exhibits pages 507, 537-541) so no claim can be made against any such information. A letter to the US Attorney for SDNY, CIA IG, and

DOJ IG on July 15, 2022 documenting this FOIA suppression fact pattern is at LP Evidentiary Exhibits pages 508-541.

60. That is the sum total of the remedy proposed by Defendant United States. Nothing. It is silent. Individual federal defendants are sophisticated persons particularly educated in the laws of the United States, including the former General Counsel of FBI, and knew, should have known, and could reasonably be expected to know, that they and other participants were injuring, abusing, and violating the rights of plaintiffs under color of law, and/or with malicious intent, yet entered, agreed, participated in, and continued to participate, together with other Defendants, in one or more 18 USC § 1962(a), (b), (c) associated-in-fact enterprises, and engaged in conspiracy or conspiracies under 18 USC § 1962(d) in, with, and among one or more associated-in-fact enterprises, participated in those enterprises' broad patterns of racketeering acts and civil rights violations, as documented in the thousands of specific violations incorporated herein and, subject to discovery, likely engaged in numerous additional acts, violations, and injuries through their active participation and/or their explicit and knowledgeable failures to protect, all under color of law.

61. These acts were knowingly planned, conspired, and conducted by these persons and entities using knowledge developed through their color of law abuses of their official positions, and/or their access to confidential information, and/or their willful failure to reasonably consider the actual good faith patterns of conduct of the plaintiffs, and/or in willful disregard of rights and of the law in which they are particularly trained and experienced, and which any reasonable person would expect these Defendants to recognize and comprehend their purposeful and wrongful acts, thereby voiding any claim to be acting in accordance with the standards of conduct and/or state of mind required to make good faith invocation(s) of qualified immunity.

Rather, these Defendant persons and entities acted as if they were exempt from and above the law in their direct management and/or operational participation in and/or support of Defendants' long-running associated-in-fact enterprise(s), and/or in the repetitive patterns of long-cycle and short-cycle racketeering acts, injuries, and destruction by those associated-in-fact enterprises on plaintiffs, including without limitation all qualifying acts, injuries, and violations cited under 18 USC § 1961 herein.

62. These same Defendants further engaged in and/or engaged other participants in their conspiracies, acts, violations, and injuries of rights in violation of 42 USC §§ 1981 equal rights, and/or § 1981(a) intentional discrimination in employment, and § 1982 property rights, and § 1985 conspiracy, and § 1986 failure to prevent, and § 1994 peonage, and the pattern of fraudulent concealment at paragraphs 66-70 below. All these acts were and are willful and knowing acts, violations, and injuries, undertaken with malicious intent to deliberately violate, harm, injure, and exploit these plaintiffs to benefit their associated-in-fact enterprises and to personally benefit themselves and their close associates, relatives, and friends from these injuries. The acts and injuries by these Defendant are not entitled to the protections of qualified immunity as they were and are untaken as willful violations of rights and law and were and are undertaken with malicious intent to injure these plaintiffs.

63. These sophisticated individual defendants and Defendant United States, could reasonably be expected to know, and did know, that this BRMT bioweapon and bioweapon delivery system explicitly violates the human, civil, and Constitutional rights of this entire class of plaintiffs as to all elements of law at paragraph 10 including, without limitation, explicit provisions of 18 USC § 175(a): **"Whoever knowingly develops, produces, stockpiles,**

**transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."**

64. As defined at 18 USC § 178(2), **"toxin means the toxic material or product of .... animals....a recombinant or synthesized molecule, whatever their origin and method of production, and includes – any....biological product that may be engineered as a result of biotechnology produced by a living organism; or... any...biological product..."** The BRMT bioweapon is intended, designed, and operates to produce excessive or deficient quantities of endogenous (naturally occurring) biologically based chemicals, such as dopamine (neurotransmitter), nitric oxide (circulatory effects), and glutamate (neurotransmitter). The presence or absence of these biological compounds are toxic through their out-of-natural balance effects which produce a wide variety of symptoms such as halted breathing, disrupted consciousness, heart attack, depression, suicide ideations, involuntary body movement (pull a trigger when not naturally intended by the victim), mental illnesses of varying degree, and deep sleep (while operating a vehicle or equipment), among other symptoms and illnesses. These imbalances also have long-term disabling effects when induced in persistently excessive or suppressed amounts, such as in Alzheimer's, ALS, intellectual disabilities, and other permanent disabilities.

65. Only this Article III Court stands in the breach between Defendant United States acting with its co-conspirator Defendants continuing their pattern of bad faith acts both

institutionally and individually, and each and every individual citizen, group, or religion which they may disfavor, financially and/or physically injure, or even destroy or kill, all while these Defendants protect themselves from Constitutional due process, rightful sanctions, and other consequences under their individual and pattern color of law abuses:

    a.   Defendants' "state secret" abuse using the internationally prohibited BRMT bioweapon and bioweapon delivery system, violating 18 USC § 175 and *United States v. Reynolds* (1953),

    b.   Defendants' on-going pattern of racketeering acts used to conceal, among other crimes and injuries, decades long patterns involuntary servitude, torture, and lethality attempts, some of which already cross generations of American families, violating 18 USC § 1962,

    c.   Defendants' abuse of *de facto* "privileges," immunities which effectively protect bad faith acts undertaken by officials and their co-conspirators, as tacitly granted by Defendant DOJ's continuous and uninterrupted 153 year history of failure to pursue federal executive branch institutionally committed crimes against the American people, which these Defendants are *de jure* sworn to protect and defend with their very lives and existence, and which tacit grant of immunity these amoral and immoral Defendants have and do use to systematically exploit and durably violate the human, Constitutional, and civil rights of US persons, violating 42 USC § 1981, 18 USC §§ 241, 242, and *Harlow v Fitzgerald* (1982), among others,

d. Defendants' torturous acts and patterns of acts and injuries violating 18 USC §
2331, terroristic and predatory abuses of US persons violating 18 USC § 2340,
and their intertwined pattern of such predatory abuses in grave Article 3 war
crimes from September 18, 2001 to the present, violating 18 USC § 2441.

## Civil RICO Time Bars are Equitably Tolled by Defendants Systematic Fraudulent Concealments

66. A four year statute of limitations for most civil RICO claims was established in
*Rotella v. Wood*, 528 U.S. 549 (2000), but with critically important equitable tolling exceptions.
Defendant United States, including CIA, FBI, DOJ, and military services, have and do abuse the
"state secrets" privilege to engage in a systematized program of illegal acts which violates the
conditions for its lawful use established in *United States v Reynolds* 345 U.S. 1, 12 (1953),
thereby broadly invoking equitable tolling. The specific circumstances of each element of
equitable tolling by fraudulent concealment are described in this section. Quoting further from
*Rotella* and other guiding case law on civil RICO claims statute of limitations equitable tolling:

> *Rotella* **at 555, 556:**
>
> **"We are unconvinced that for statute of limitations purposes a plaintiff's ignorance
> of his legal rights and his ignorance of the fact of his injury or its cause should
> receive identical treatment. That he has been injured in fact may be unknown or
> unknowable until the injury manifests itself; and the facts about causation may be
> in the control of the putative defendant, unavailable to the plaintiff or at least very
> difficult to obtain.** The prospect is not so bleak for a plaintiff in possession of the critical
> facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy
> of the latter. There are others who can tell him if he has been wronged, and he need only
> ask." *Quoted from United States v. Kubrick*, 444 U.S. 111, 122, 100 S. Ct. 352, 62
> L.Ed.2d 259 (1979)
>
> *Rotella* **at 560, 561**: "It is not that we mean to reject Rotella's concern about allowing
> "blameless ignorance" to defeat a claim, *Urie v. Thompson*, 337 U.S. 163, 170, 69 S. Ct.
> 1018, 93 L. Ed. 1282 (1949); we simply do not think such a concern should control the
> decision about the basic limitations rule. In rejecting pattern discovery as a basic rule, we

do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, see *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946), and **where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty, complementing *Federal Rule of Civil Procedure* 11(b)(3).** See ibid.; see generally *Klehr,* 521 U.S., at 192–193, 117 S. Ct. 1984 (noting distinctions between different equitable devices). **The virtue of relying on equitable tolling lies in the very nature of such tolling as the exception, not the rule."**

### *Federal Rules of Civil Procedure 11(b)(3)*

"the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;"

### *Klehr v. A. O. Smith Corp.*, 521 U.S. 179 (1997) at 183, 194, 195:

"We limit our consideration of the question to the context of civil RICO. In that context, we conclude that "reasonable diligence" does matter, and a plaintiff who is not reasonably diligent may not assert "fraudulent concealment.""

### *RICO - Congressional Intent PL 91-452 October 1970*

"(a) The provisions of this title [enacting this chapter and amending sections 1505, 2516, and 2517 of this title] shall be liberally construed to effectuate its remedial purposes."

### A. **Fraudulent Concealment by Defendants Invokes Equitable Tolling as Cited in** *Rotella*

### *Arellano v. McDonough*, 598 U.S. ___ (2023)

"Equitable tolling "effectively extends an otherwise discrete limitations period set by Congress." *Lozano* v. *Montoya Alvarez*, 572 U.S. 1, 10 (2014). In practice, it "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Ibid.* The doctrine "is a traditional feature of American jurisprudence and a background principle against which Congress drafts limitations periods." *Boechler* v. *Commissioner*, 596 U. S. ___, ___ (2022) (slip op., at 8). Consistent with this jurisprudential backdrop, we presume that federal statutes of limitations are subject to equitable tolling. *Irwin* v. *Department of Veterans Affairs*, 498 U.S. 89, 95–96 (1990). The *Irwin* presumption, however, is just that—a presumption. It can be rebutted, and if equitable tolling is inconsistent with the statutory scheme, courts cannot stop the clock for even the most deserving plaintiff. *John R. Sand & Gravel Co.* v. *United States*, 552 U.S. 130, 137–138 (2008); *United States* v. *Beggerly*, 524 U.S. 38, 48–49 (1998)."

**B. Diligent Pursuit of Claims by Lead Plaintiff Continues in the Face Of Long-Running Fraudulent Concealment by Defendants**

67. Defendants' comprehensive pattern of actions to conceal and cover up the entirety of the BRMT brain hijacking and racketeering crimes has been and is fraudulent concealment, which gives rise to equitable tolling, the critical exception to the four year statute of limitations for civil racketeering which finds *Rotella* is consistent with the statutory scheme described by Congress and the liberal construction they sought in enacting RICO.

68. Lead Plaintiff has been diligent in pursuing his claims. Defendant United States has abused the "state secrets" privilege under color of law to engage in a persistent pattern of fraudulent concealment since the inception of the BRMT brain hacking program. *United States v Reynolds* 345 U.S. 1, 12 (1953) clearly states that all activities which operate under this privilege must comply with federal law, "Footnote 4: 5 U.S.C. 22: … not inconsistent with law…" Defendants forfeited this privilege from the first day of their violations and are directly responsible for all injuries due to criminal and civil violations of existing US law and ratified international treaties. The BRMT program and related pattern of racketeering acts used to cover up its existence violate 18 U.S.C. §§175, 1962, and a sweeping array of other federal laws, ratified treaties, and the Constitution, as described throughout this Complaint.

69. Defendants have consistently engaged in a pattern of fraudulent concealment which tolls the statute of limitations since the beginning of their secret pattern of BRMT brain hijacking development and deployment, and the accompanying involuntary servitude throughout this illegal program, to wit:

> **"We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be**

**in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.** *Quoted from United States v. Kubrick*, 444 U.S. 111, 122, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979).

See related fraudulent concealments by defendants at a. through f. below, noting the vital issue of who inflicted these RICO injuries. See also related fraudulent concealment by defendants at g. through k. below which precluded access to vital information and obstructed evidence required to properly prepare litigation.

**"We limit our consideration of the question to the context of civil RICO. In that context, we conclude that "reasonable diligence" does matter, and a plaintiff who is not reasonably diligent may not assert "fraudulent concealment.""** Quoted from Klehr v. A. O. Smith Corp., 521 U.S. 179 (1997) at 194, 195.

See diligent efforts by Lead Plaintiff to defeat defendants' fraudulent concealment by defendants principally using the eleven methods at a. through j. below:

a. ***Fraudulent Concealment: Human Trafficking and Homeless Duress*** - Being completely unaware of both the BRMT brain hacking system and the already long-running but slowly evolving racketeering injuries pattern beginning about 1972, Lead Plaintiff filed a Federal Tort Claims Act (FTCA) claim with the United States in September 2005 regarding only the extremely financially damaging and psychologically coercive police powers field operations he was experiencing in 2002-2005. In September 2005, Lead Plaintiff hand delivered the FTCA claim in Washington, D.C. due to the repeated failures of mail and express services to complete deliveries to DOJ, EOP, and others at that time. No reply was ever received. Within 120 days of those hand deliveries in DC, he was rendered homeless by the pattern of defendants' actions from 2002-2005. This fraudulent concealment, and the period of confinement in the form of enforced homelessness

and complete instability of shelter by defendants' actions, tolled the statute of limitations.

b. ***Fraudulent Concealment: Human Trafficking and Homeless Duress*** - Lead Plaintiff was then human trafficked by defendants' actions to Boston and homelessness in December 2005. This fraudulent concealment, and the period of confinement in the form of enforced homelessness and complete instability of shelter by defendants' actions, tolled the statute of limitations.

c. ***Fraudulent Concealment: Human Trafficking and Duress*** - In August 2007, Lead Plaintiff was again human trafficked unbeknownst to him, to false employment in an FBI cover operation. He was prejudicially terminated in June 2008, soon after a knowingly impossible to meet demand that he invest $25,000 in the failing company as related by his boss. It was impossible for the Lead Plaintiff to establish the conditions of his false employment and confinement at that time. This fraudulent concealment and the period of enforced confinement, in the form of human trafficking, false employment, and housing in an FBI or other federal agency "safe" house apartment, again tolled the statute of limitations.

d. ***Fraudulent Concealment: Human Trafficking and Involuntary Confinement*** - Lead Plaintiff has continued diligent pursuit of his broadened claims by incorporating the BRMT brain hacking program injuries in filing in federal district court in the District of New Jersey in 2010, Civil No. 10-3204 (SDW). Within 100 days of that filing, defendants' actions again rendered Lead Plaintiff homeless, then in civil confinement for six months thereafter. Lead Plaintiff was only released after he voluntarily dismissed the case due to the impossibility of pursuing the

matter in the civil confinement conditions created and perpetuated by defendants. Defendants coordinated throughout this period to act functionally as captors, using civil law to retain Lead Plaintiff in a locked facility indefinitely. New Jersey law does not allow hospitals to release a person when they no shelter to return to. Further, Lead Plaintiff was denied even the right to move to a homeless shelter during this period. Release to alternate was only permitted after the dismissal, though the Ramsey, NJ location where he was placed had already been vacant for approximately 12 months. This fraudulent concealment, and the period of confinement in the form of enforced civil confinement by color of law abuses of New Jersey law, again tolled the statute of limitations.

e. *Fraudulent Concealment: Extreme Mental Abuse and Torture* - Defendants engaged in three distinct periods of extreme mental torture and other mental cruelty which disabled the Lead Plaintiff to the point of suicide ideation in 2003-2004 and in 2008-2010. These periods of extraordinary duress imposed by the United States in Kirkland, Washington, Boston, Massachusetts, and Fort Lee, New Jersey, described at RICO-3, RICO-4, and RICO-5 herein further tolled the statute of limitations as they severely limited the mental reasoning of the Lead Plaintiff and restricted his ability to pursue due diligence throughout these periods of extreme torturous duress. Lead Plaintiff is found to be among the 10% most emotionally stable persons in independent psychological tests at Interline Exhibit 18 and LP Evidentiary Exhibits pages 190-236.

f. *Fraudulent Concealment: False Personation* - The critical facts which established the identities of the plaintiffs in this matter were not known to Lead

Plaintiff until September 2023, when Lead Plaintiff was able to identify several prior false identities of eight current and former CIA, FBI, DOJ, and military officials, among others at LP Evidentiary Exhibits pages 11630-11640,

(i)     Stephen Breyer (fka Jack Sackville-West, Spokane, WA), a former Supreme Court Associate Justice;

(ii)    Andrew Weissman (fka Lyle Whiteman, PCC General Manager), actually a former FBI agent, then General Counsel;

(iii)   (iii) William Burns (fka Pat Heffron, posing as OB/GYN physician) a former CIA BRMT project manager or executive;

(iv)    Roger Stone (fka David Moller, Deloitte manager), a former CIA commercial cover officer for a South Africa banking system spying project,

(v)     Charles Roseberg, a former affiliate CEO from approximately 1983 to 1996 (fka Chuck LeFevre, CEO NutraSource), then hiring manager in 2007-2008 (fka William Drumm, GM Establish) actually former FBI/DOJ official Chuck Rosenberg, who now appears as legal analyst on MSNBC,

(vi)    Ari Melber (fka Wes Lewis) and Lisa Rubin (fka Michelle Yarbrough), two former faked family members from approximately 1990 through 2005, past FBI/DOJ agents and/or officials who also appear on MSNBC,

(vii)   (v) Alexander Vindman (fka Paul Yarbrough), a former Army officer who posed as a brother-in-law in the U.S. Air Force from approximately 1990 through 2005. All used false identities at the time of their fraudulent interactions with the Lead Plaintiff.

During September 2023, the Lead Plaintiff was also finally able to identify
other perpetrators with connections to CIA, including its current Director William
Burns, an investor in a cover company used by CIA to exit Roger Stone, a former
CIA commercial cover officer, from his involvement in CIA's South Africa ATM
project in 1984-1986, and to perpetuate Lead Plaintiff's involuntary servitude.
These bad faith actors directly injured the Lead Plaintiff with their actions and
failures to act while actually employed by CIA, FBI, DOJ, and the United States
armed forces at those times. These bad faith acts (see bad faith acts defined in
*Harlow v. Fitzgerald, 457 U.S. 800* (1982) at paragraph 57) and the actual
identities of the perpetrators were fraudulently concealed from the Lead Plaintiff
beginning in the 1980s and continuing until September 2023. Fraudulent
concealment tolls the statute of limitations on all these defendants' bad faith acts.

g. ***Fraudulent Concealment: Blocking and Concealment of Critical Information
Sources*** - Defendants definitively blocked the awareness of the Lead Plaintiff to
knowledge about brain-to-computer interfaces in web searches at all times until
2021. These commercial antilog devices are based upon the same medical,
neuroscience, and scientific principles as the legally prohibited bioweapon and
bioweapon delivery system, a computer-to-brain weapon. Given the novel nature
of this prohibited bioweapon system, knowledge of such devices functionally kept
the Lead Plaintiff in purposeful ignorance from at least 2012 when Synchron was
formed to commercially exploit this science and technology. Since no such system
has ever before been known to the general public, it would be nearly impossible
for the Lead Plaintiff to have been able to establish the veracity of the existence of

an illegal antilog system. This fraudulent concealment by defendants tolls the
statute from the time of the original federal court complaint in the District of New
Jersey until 2021. These specific web search interferences were fraudulent
concealment which again tolled the statute of limitations.

h.  ***Fraudulent Concealment: Blocking and Concealment of Critical Experts*** -
Defendants definitively precluded the Lead Plaintiff from due inquiries to experts
with knowledge of neuroscience. Defendants blocked all email communications
with neuroscience experts in university and other institutional settings in 2021. See
P-34. These email interferences were fraudulent concealment which again tolled
the statute of limitations.

i.  ***Fraudulent Concealment: Systematic Blocking of All Federal FOIA and Privacy
Act Responses Coordinated With Other Defendants*** Limiting Preliminary
Discovery - Defendants have and do engage in a comprehensive FOIA blockade of
all information from federal departments and agencies, coordinated with a FOIL
blockade by Defendant NYPD which has been underway since 2021. This severely
impacted Lead Plaintiff's forensic analysis of the total fact pattern since that time.
See a coordinated example at Interline Exhibits 15-17, also see LP Evidentiary
Exhibits pages 508-541. These coordinated FOIA and FOIL violations of law are
fraudulent concealment which again tolls the statute of limitations for all prior
actions of relevant agencies and departments.

j.  ***Fraudulent Concealment: Systematic Blocking on Lead Plaintiff's Computer*** -
Defendants continue to block access to critical information on the Lead Plaintiff's
computer to this day, including all interstate commerce business-related emails

from March 4, 2018 through July 9, 2020. This prevents the entire series of predicate acts by these defendants during that period from being included in the racketeering injuries to Lead Plaintiff. These coordinated violations of law, which block key case evidence, are fraudulent concealment which again tolls the statute of limitations for all prior actions of relevant agencies and departments.

k. ***Fraudulent Concealment: Systematic Blocking and Technology Hacking*** -
Defendants have and do engage in various forms of continued harassment, including deliberate hacking of documents during and after preparation, falsification of statute and case law information sourced online, the hacking and disabling of computer printers, and other technical blocking and interferences noted in 11727-11907 throughout the process of preparing litigation for this court. These coordinated violations of law are fraudulent concealment which again tolls the statute of limitations.

70. This entire set of patterns of fraudulent concealment is consistent with the pattern of practice found by the Senate Intelligence Committee in 1975 related to activities of FBI and CIA. Further, it is consistent with the pattern of practice of the intelligence community against the Senate Intelligence Committee during 2014 as the Senate was conducting its inquiry into illegal torture practices of CIA, as reported by Senator Diane Feinstein, its Chair. This further substantiates these agencies practices against the Lead Plaintiff as consistent with their other contemptuous patterns of practice including hacking, intimidation and retaliation against both U.S. persons and against a separate branch of government which is constitutionally mandated to conduct oversight.

### C. Lead Plaintiff's Injuries Are Representative of Injuries to the Class of Plaintiffs

71. As described at Complaint paragraphs 12-17, paragraphs 369-378, and LP Evidentiary Exhibits pages 1-10, it is virtually impossible to detect the modern version of BRMT used in brain hijacking since it uses very discrete doses of energy which are very discretely targeted to hijack various brain functions. It is improbable that other injured members of this class would even have been aware of their injuries since the technology is unprecedented and operated secretly from about 1972 in a progression of forms from locally present to remote operations. Even if the Lead Plaintiff is denied certain claims due to the running of the statute of limitations, which the Lead Plaintiff does not admit, these injuries and patterns of injuries from BRMT and racketeering have injured others in the class who would have no awareness of their injuries.

72. CIA's MKUltra operated in secret for two decades and was not known even to members of CIA outside the program during that entire period. FBI's Cointelpro similarly operated in secret and was only uncovered because of citizen activism. Both programs engaged in surreptitious violent acts and injuries to people without their knowledge or consent. BRMT and the accompanying racketeering have likewise been unknown and concealed by color of law abuses of the "state secrets" privilege.

### *Denton* and *Nietzke* Precedents Command Discovery Of Novel Claims, Even If Imperfectly Claimed, In In Forma Pauperis Pro Se Litigation

73. Supreme Court case law commands that discovery occur in an adversarial proceeding before this Court to examine this Complaint. *Denton v. Hernandez*, 504 U.S. 25, 27, 32-34 (1992), at 27:

"In *Neitzke* v. *Williams,* 490 U. S. 319 (1989), we considered the standard to be applied when determining whether the legal basis of an *in forma pauperis* complaint is frivolous

under § 1915(d). The issues in this case are the appropriate inquiry for determining when an *in forma pauperis* litigant's factual allegations justify a § 1915(d) dismissal for frivolousness, and the proper standard of appellate review of such a dismissal. "

...... at 32-34 (emphasis added):

"As we stated in Neitzke, a court may dismiss a claim as factually frivolous only if the facts alleged are "clearly baseless," 490 U. S., at 327, a category encompassing allegations that are "fanciful," id., at 325, "fantastic," id., at 328, and "delusional," ibid. As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them. **An in forma pauperis complaint may not be dismissed, however, simply because the court finds the plaintiff's allegations unlikely. Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be "strange, but true; for truth is always strange, Stranger than fiction."** Lord Byron, Don Juan, canto XIV, stanza 101 (T. Steffan, E. Steffan, & W. Pratt eds. 1977).

Although Hernandez urges that we define the "clearly baseless" guidepost with more precision, we are confident that the district courts, who are "all too familiar" with factually frivolous claims, Neitzke, supra, at 328, are in the best position to determine which cases fall into this category. Indeed, the statute's instruction that an action may be dismissed if the court is "satisfied" that it is frivolous indicates that frivolousness is a decision entrusted to the discretion of the court entertaining the in forma pauperis petition. We therefore decline the invitation to reduce the "clearly baseless" inquiry to a monolithic standard.

Because the frivolousness determination is a discretionary one, we further hold that a § 1915(d) dismissal is properly reviewed for an abuse of that discretion, and that it was error for the Court of Appeals to review the dismissal of Hernandez's claims de novo. Cf. Boag v. MacDougall, 454 U. S. 364, 365, n. (1982) (per curiam) (reversing dismissal of an in forma pauperis petition when dismissal was based on an erroneous legal conclusion and not exercise of the "broad discretion" granted by § 1915(d)); Coppedge, supra, at 446 (district court's certification that in forma pauperis appellant is taking appeal in good faith, as required by § 1915(a), is "entitled to weight"). In reviewing a § 1915(d) dismissal for abuse of discretion, it would be appropriate for the Court of Appeals to consider, among other things, **whether the plaintiff was proceeding pro se,** see Haines v. Kerner, 404 U. S. 519, 520-521 (1972); **whether the court inappropriately resolved genuine issues of disputed fact,** see supra, at 32-33; **whether the court applied erroneous legal conclusions**, see Boag, 454 U. S., at 365, n.; **whether**

**the court has provided a statement explaining the dismissal that facilitates "intelligent appellate review," ibid.; and whether the dismissal was with or without prejudice."**

74. Defendants CIA and FBI have engaged in well-documented patterns of novel practice (illegal drugging and civil rights violence to name but two) outside law over many decades. These defendant institutions have resisted Congressional reforms and repeatedly engaged in widely known scofflaw behaviors. As of 2023, fifteen years of continuing Section 702 violations and 45 years of continuing FISA violations are but two of many well-known current public examples of FBI misconduct. CIA did so as the world's largest drug dealer to US persons in the 1950s to 1970s in its MKUltra illegal LSD public drugging campaign. FBI did so with Cointelpro, a violent federal police powers campaign it ran across the entire United States against the rights and lives of individual citizens, political groups, and religious denominations from 1956 until it was discovered by a citizen burglary in 1971. The US military sprayed US cities with chemicals claimed to be non-toxic at the time but perhaps not so considered in later times.

75. Novel claims against Defendant United States must be considered objectively for the fact patterns they present, whether or not the underlying technology is known and understood to the general public at the time of the novel claim, and whether the rationale comports with any known moral, ethical, or legal standard of conduct - or does not comport with any such standard. Past experience and known fact patterns about these specific formally code-named, funded, and long-running patterns of prior illegal conduct by Defendant United States, discovered by individual citizens, by the media, and by Congress, demonstrate the imperative that novel claims must be examined clearly and impartially under due process.

76. The patterns in this Complaint have persisted for more than fifty years. They require objective, dispassionate examination, and trial by jury in this Court.

77. Paragraphs 77 through 99 are reserved.

*Table 1:* **Botched Cover-Up, Threats, and Lethality Attempts**

| Dates denoted as (YYMMDD) | Events specifically directed at Lead Plaintiff are noted in italics below | Location |
|---|---|---|
| *1-001*<br><br>*Severe injury or death risks begin in the late 1970s and continue into the present.* | **A.** *BC Sea-to-Sky Highway early afternoon near death melatonin overdose during driving adjacent to unguarded sea cliff is first known BRMT lethality attempt on a summer vacation return in the 1980s.*<br>**B.** *An order to drive from Sacramento to San Francisco for a project meeting in extremely dense morning fog occurred in the first quarter of 1984.*<br>**C.** *A series of statue falls which could result in injury or death began in the early 1990s, including while climbing a ladder to the roof of the Kirkland residence, walking a mountain trail on a solo hike in the early 2000s, other incidents in Washington state and continued in New Jersey into 2008. A statue fall type incident from bed, striking the head on a nightstand during the fall is noted about 6 months and again about 18 months after the fall by a doctor at the Bergen Community College Dental Hygiene Clinic, Paramus, NJ, as noted in their medical records.*<br>**D.** *A series of high risk trip and fall incidents on stairs or into vehicle traffic, and similar high risk incidents begin in 2019 and* | |

| | | |
|---|---|---|
| | *continue through 2021.*<br><br>**E.** *Incidents with lethal potential accelerate in 2022. These include (1) BRMT induced choking while alone, (2) hospital fall with potential to penetrate right temple in April, (3) mass casualty potential involving an express train to New York City traveling 50-60 mph at sundown on September 11, (4) somersault fall on September 17, and (5) simulated vehicle rundown sequence on November 18-19 all occur in the months following the first ever indirect verbal threat delivered in New York City on July 16, 2022. Many of these and prior injurious and potentially lethal incidents occur on City of New York municipal property and require direct coordination between Defendant City of New York, Defendant NYPD, and Defendant United States BRMT induced brain hijackings to implement.* | |

| | | |
|---|---|---|
| 1-002<br><br>1953 -1973 Precursor programs of Defendants CIA and Army criminally use drugs to bio-medically abuse US and Canadian citizens | *As MKUltra begins in 1953, a contract researcher turned whistleblower "falls" from the window of Room 1018A in the New York City Statler Hilton hotel room he shares with a Defendant CIA chemist and personal assistant to the Program Manager Sidney Gottlieb, who reports directly to CIA Director Richard Helms. (See LP Evidentiary Exhibits pages 9679-9696.)* | |
| 1-003 | *The whistleblower, Frank Olson, a well experienced senior researcher, and former Army Bioweapons lab manager, dies on the sidewalk below, directly across from Penn Station a few hours before these two roommates are supposedly taking a train to Washington, DC the next morning to disclose the program's existence and the whistleblower's moral trepidations about surreptitious dosing of civilians and soldiers without their knowledge and consent with senior managers.* | |
| 1-004 | *Over the next twenty years, nearly 100 million doses of LSD will be secretly given without consent, resulting in unknown death, injury, mayhem, and violence to these unknowing drugged individuals and innocent bystanders before the evidence is destroyed in 1973, obstructing criminal and civil justice for these millions of CIA felonies.* | |

| 1-005 | Defendant CIA's MKUltra mind control program originates directly from Nazi drug experimentation on political and ethnic prisoners in the Dachau Concentration Camp system. The Dachau system began incarcerating political and ethnic prisoners under martial law about 6 weeks after Hitler became Chancellor of Germany. As World War II was ending, Defendants CIA (OSS is renamed CIA in 1947) and Army, and the Department of State collaborate to bring 1,600 Nazi doctors, scientists, and engineers to America and employment by Defendant United States and various labs and institutes, including those used for its covert research and development operations. Several Nazi doctors are deployed as Defendant CIA initiates MKUltra. | Various interstate locations in 44 states, particularly including WA, CA, MA, NJ, and NY. International locations visited physically as listed above. Various countries in North America, Latin America, South America, Africa, Europe, Asia, Southeast Asian Island nations, and Australia as corresponding commercial customers and suppliers through 2022. |
| 1-006

1972-2002 overview | MKUltra's managers and team members, ranging from doctors to sex workers, illicitly and illegally administer 100 million doses of LSD to US and Canadian citizens and soldiers. Defendant United States does not renounce the MKUltra goal of mind control as it publicly ends MKUltra in 1973 because of third party exposure. BRMT secretly begins around this time, discontinuing the thoroughly discredited and sometimes deadly method, while retaining the program mind control objective and the illegal surreptitious methods which violate the Constitution, ratified international treaties and the law.

While the actions are completely unrecognized as the direct responsibility of Defendant United | |

|  | *States and its RICO co-conspirators on any level by the Lead Plaintiff until years after the 9/11/2001 attacks, Defendant United States has already sustained domestic and international intelligence and national security pretexting against the Lead Plaintiff for decades.* |  |
|---|---|---|

| 1-007 | *Around 1972 at age 16, Lead Plaintiff is involuntarily enrolled in the BRMT program. BRMT is the biomedically driven successor program to Defendant CIA's MKUltra mind control project.* | |
| 1-008 | *In Spring 1979, Lead Plaintiff is surreptitiously visited by Defendant CIA's Director Stansfield Turner (a retired Navy Admiral). Turner, not then recognized by Lead Plaintiff, makes a National Gallery East Building rotunda cameo walk-by appearance and strong extended eye contact with Lead Plaintiff on a weekday early afternoon as the Lead Plaintiff makes his first visit to Washington, DC on the way back to college from his MBA recruiting interview with GTE, a telecommunications and manufacturing conglomerate headquartered in Stamford, CT.* | |
| 1-009 | *Lead Plaintiff experiences a DC gun in the back daylight robbery (now known as simulated) near the hostel where he stays, from which he simply walks off as soon as the street intersection crosswalk light permits. This likely occurs earlier the same day as CIA Director Turner does his cameo, though the exact timing is not recalled.* | |
| 1-010 | *Shortly after Lead Plaintiff's MBA program graduation, he is employed in August 1979 at Haskins and Sells (later known as Deloitte, Haskins & Sells, DHS, then Deloitte), an international accounting and consulting firm with 16,000 US employees. Defendants FBI and CIA use Lead Plaintiff, usually indirectly* | |

*and always without his knowledge or consent, either as part of or in the same consulting office as, commercial cover intelligence acquisition (domestic spying and investigations, and international spying), including the Longacres Racetrack chemist murder investigation; Imperial Manufacturing (marine survival suits), Bremerton, WA; Saudia Airlines enterprise information system; South Africa banking system ATM network; Republic of Palau information system, funded by US Department of interior before independence); PGE Portland, OR; Puget Sound Power and Light. All these 1980s projects are strategic information systems commercial cover intelligence access projects- domestic and international spying, some legitimate, some Constitutional violations of the Fourth Amendment, though none are recognized by Lead Plaintiff for their actual intent at the time – that will come many years later in the early 2020s.*

| | | |
|---|---|---|
| *1-011* | *Lead Plaintiff is the only person on the sidewalk on the north side of the old federal courthouse in Seattle, WA during the morning transit of a federal domestic terror suspect to a federal court appearance through a secure basement parking entrance to the courthouse in an unmarked three vehicle convoy on vacant streets in the early 1980s while walking to his car one morning. This was most likely the first federal court appearance of Christopher Boyce in late August 1981, after being recaptured. Boyce was an escapee who had been convicted of selling satellite technology secrets to Russia.* | *Representative clients: Sea-Trust Bank, Seattle, WA; SuNSEC-Trust Bank, Miami, FL; Rainier Bancorporation, Seattle, WA; Bank Administration Institute, Washington, DC; Federal Deposit Insurance Corporation, Washington, DC; City of Bellevue, WA; Legislative Transportation Committee, State of Washington, Olympia, WA; Amfac Distribution, Folsom, CA; Westin Hotel, Seattle, WA; Hilton Hotel, Salt Lake City, UT; City of Tacoma, WA; Pierce County, WA; San Francisco, CA School District; Buffalo, NY School District; Spring, TX School District.* |
| *1-012* | *These terror themed and national security "state secrets" themed cameos will recur repeatedly in an ever accelerating and escalating fashion in both domestic (nationwide) consulting and engineering projects involving missile, satellite, and nuclear technologies, and in friendly allied countries (including the UK and Canada) over the next four decades as this timeline and Complaint clearly and unmistakably demonstrate.* | |
| *1-013* | *Eventually the Lead Plaintiff himself becomes the object of these terrifying cameos and scenarios, beginning in 1996 and accelerating in the Summer 2001, about 90 days before the 9/11/2001 attacks, then dramatically accelerating in their aftermath. This pattern of acts, violations, and injuries is driven by these Defendants. Defendant United States leads ever more aggressive pretexting, criminal acts, and other color of law violations against Lead* | |

| | |
|---|---|
| | *Plaintiff. One must simply follow the evidence to comprehend this inevitable, prima facie conclusion.* |
| 1-014 | *Defendants United States motive: Hiding a prohibited weapon system which violates US and international law and five ratified treaties - the BRMT bioweapon and bioweapon system used to victimize the Lead Plaintiff, and a currently unknown number of other victims. 18 USC § 175 and the 1972 Bioweapons Treaty, among others.* |
| 1-015 | *Lead Plaintiff is also referred by a DHS consulting administrative assistant to and volunteers as, a Board of Trustees member and later as Chair, of a consumer organic and natural foods grocery cooperative. This coop was formed by and has activist members who are domestic intelligence targets of FBI, such as civil rights, anti-war, and non-conforming lifestyle activists. FBI also co-opts the executive leadership at this and other consumer retail grocery cooperatives in California. FBI may also engineer the bankruptcy of three Seattle, WA area wholesale grocery companies to assemble a more amenable platform for its broader spying on other retail cooperatives, though this is not yet confirmed, and further discovery is required.* |

| | | |
|---|---|---|
| 1-016 | *These techniques were common practice at Defendant FBI, even including the use of violent militias against similar activists, throughout the Cointelpro program into the 1970s. Notably, Whitey Bulger was managed by Defendant FBI's Boston Field Office beginning in 1975. He ran the Winter Hill Gang, personally committed 11 murders and was complicit in 8 more before he fled Boston after being tipped off by Defendant FBI in 1994.* | |
| 1-017 | *In the early 1990s, Lead Plaintiff is bounced through two environmental services firms. Both are likely used to investigate environmental law violations and other contractor frauds and public corruption (public contract payoffs). The first company, purchased and majority owned by Plaintiff, is wrecked by denial of government benefits (SBA contractor bonding), forcing Lead Plaintiff into personal Chapter 7 bankruptcy. The second company is used to entangle the Lead Plaintiff in international intelligence involving CSIS and MI-6, likely to facilitate more intrusive direct spying on the Lead Plaintiff, a US person, conducted by those services for their American "cousins."* | *Alliance Environmental representative customers: Snoqualmie High School; Bellevue High School; Sedro Woolley High School; Mortenson Construction, Sea-Tac Airport B, C, D Concourse Expansion; Bates-VocationaLETHL-Technical School; all in the State of Washington.* |

| 1-018 | In the mid-1990s, Lead Plaintiff is placed at Pacific Pipeline a book distribution firm in Kent, WA on a referral from a commercial cover informant or agent is CEO of the wholesale consumer cooperative founded by Puget Consumers Coop and two partners. This book wholesaler, Pacific Pipeline, is used by Defendant FBI to spy on booksellers in the Pacific Northwest and nationally before it too is wrecked, a few months after Lead Plaintiff attempts and is rebuffed from a buyout to preserve and expand the company. | Pacific Pipeline Representative customers: Barnes & Noble, Costco, Crown Books, hundreds of independent booksellers operating individual retail stores in Washington, Oregon, and Alaska. |
|-------|-------|-------|
| 1-019 | Lead Plaintiff's buyout was intended to provide independent booksellers more competitive muscle to compete with Amazon and national bookselling retail chains. A collaborative marketplace system, which would precede but be similar to that now innovation now used by Amazon and Walmart, but with each retail bookseller have their own distinct online identity and access to 108,000 titles they were unable to stock at their retail location. Since this did not match up with Defendants' objectives to perpetuate involuntary servitude, forced labor and BRMT development and deployment in future years, this buyout is sabotaged in the cradle by agents of Defendant United States. | |
| 1-020 | Defendant United States begins an earnest years-long effort to directly enmesh Lead Plaintiff directly in a wide variety of matters which are closely and tangentially related to national security beginning in his next human trafficked employment at | |

| | | |
|---|---|---|
| | *CNA Industrial Engineering, just as that company, a captive engineering services intelligence support enterprise, kicks off its engineering design and equipment implementation for construction of the massive Boeing/Air Force Delta IV heavy lift rocket factory in Decatur, AL.* | |
| 1-021 | *This pattern of Defendant United States placing the Lead Plaintiff in and then wrecking its commercial cover operations continues in the late 1990s with CNA Industrial Engineering with the Air Force Delta IV rocket assembly plant design and construction for Boeing, several projects involving aerospace and space technologies, and a transitional project for a CIA commercial cover officer who manages a domestic corporate commercial arts distribution project before his return after six months to his foreign deployment.* | |
| 1-022 | *Prior to Lead Plaintiff's arrival, CNA is used for domestic intelligence gathering on "Japanese Miracle" companies Sony, Sega, Nintendo as they entered the US market – domestic intelligence and national security issues.* | |

| | | |
|---|---|---|
| 1-023 | *Lead Plaintiff runs or manages engineering and information technology project managers and teams on technology and engineering projects which design, develop, and deploy systems at, among others, domestic international airports in Washington and Alaska; a non-destructive testing company for nuclear power plants, aerospace equipment, and other sensitive technologies in civilian and military use; as well other companies of interest to domestic and international intelligence operations, into 2002.* | *Representative clients:*<br><br>*Boeing/Air Force, Decatur, GA - Delta IV rocket assembly plant engineering*<br>*And material handling equipment installation*<br><br>*Zetec, Issaquah, WA – ERP selection for nuclear power and aerospace non-destructive testing services*<br><br>*Hughes Satellite Division – Torrance, CA satellite failures analysis* |
| 1-024 | *In the aftermath of the 9/11/2001 intelligence failures which failed to exploit known leads to prevent this attack, the Defendant United States and its co-conspirators will use massively expanded funding and overreaching and illegal abuses of powers to expand this national security pretexting of Lead Plaintiff into the terrorism domain, leading to extremely dangerous, torturous, and near deadly outcomes for the Lead Plaintiff between 2002 and 2022 at the hands of these and other Defendants.* | *Sea-Tac International Airport – baggage systems design and installation*<br>.<br>*HomeGrocer.com, Bellevue, WA - regional distribution facilities in WA, OR, CA* |

| 1-025 | During an escorted pre-project tour (in late Spring or early Summer 2002) of several docks area maintenance buildings for an upcoming engineering study CNA Industrial Engineering, is to conduct, one team member and Lead Plaintiff are left standing unescorted next to tarp-covered nuclear submarine pump for about 10 to 15 minutes. This is a very serious violation of shipyard rules for visitors with no security clearance, as this pump is very highly classified nuclear propulsion technology. | Puget Sound Naval Shipyard – nuclear sub and aircraft carrier maintenance facility, Bremerton, WA

Anchorage International Airport - baggage Systems for terminal expansion and modernization, Anchorage, AK |
| --- | --- | --- |
| 1-026 | US Marines have shoot-to-kill orders to protect sensitive nuclear technology, as Lead Plaintiff is reminded during pre-tour briefing. Lead Plaintiff experiences BRMT pushes (urges) to lift the green tarp which covers the pump and shipping pallet it rests on, but resists these impulses at the time, in fear of life and well-being. The tour occurs on a weekday during normal work hours for 15,000 employees. Besides the five to six person escort team, only about a dozen total personnel are seen in the entire shipyard work area the day of the tour. | |
| 1-027 | After Labor Day 2002, lethality efforts and other programmed harms by Defendants take a dramatic turn for the worse and continue accelerate since that time into 2022, when they are accelerated still further. Lead Plaintiff fails to recognize this on-going pattern of lethality efforts until a durable sequence of recognizable visual threats begins around 2004. Lead Plaintiff fails to recognize this | |

| | | |
|---|---|---|
| | *on-going pattern of lethality efforts until a durable sequence of recognizable visual threats begins around 2004.* | |
| *1-028* | *Direct visual threats are delivered to Lead Plaintiff periodically from approximately late 2004 through 2005 in this favored hangout. For example, a taller medium build White male in his late 30s to early 40's, with the appearance of a federal undercover police powers officer or agent, makes a distinct gun-like point and hold finger and thumb motion suggestive of a behind the ear mob style execution hit in the nearly empty Beach Café bar in early evening.* | *Beach Café and Bar, Kirkland, WA* |
| *1-029* | *This progression of visual threats and other coercive psychological operations gradually becomes more and more threatening, prompting his flight December 23, 2005 from the Seattle, WA area to Boston, MA to protect family, loved ones, and friends from these predators seeking them out to pressure Lead Plaintiff by enmeshing them in some entrapment or intimidation effort.* | |
| *1-030* | *This seemingly voluntary relocation by Lead Plaintiff is actually human trafficking. Using a sequence of threats of violence and simultaneous place of safety pretexting (basically good-cop bad-cop psychological operations teamed with BRMT enhancement, then unrecognized), Defendants deploy BRMT and psychological operations to direct their human trafficking of Lead Plaintiff to Boston, MA, and homelessness in 2006-2007.* | |

| | | |
|---|---|---|
| 1-031 | *Lead Plaintiff's further human trafficking to the New York City area in 2007 is remove him from his medical records and other records from by their normal destruction from non-use, and to place him in the location where Defendants have the most elaborate array of human and technical assets, and collaborative police powers operations, to manage the Lead Plaintiff's desired destiny.* | |
| 1-032 | *After ten months of fake employment at Establish in Fort Lee, NJ, Lead Plaintiff is subject to torturous treatment for the better part of two years, leading to a second suicide ideation. Days after Lead Plaintiff files a Complaint in Newark federal district court on June 23, Defendants orchestrate a second brief homeless period, then deprive him of homeless services, leading a crisis and six months of Soviet-style confinement in a mental institution from October 2, 2010 to March 31, 2011.* | |
| 1-033 | *In 2021-2022, Lead Plaintiff diligently works to reverse engineer the BRMT biomedical and technology system, its development and increasing sophistication over its 50 year history, and the key perpetrators of this criminal RICO and rights conspiracy. Defendants respond to these efforts to secure justice by dramatically accelerating their collaborative harassment and their sequence of lethality, intimidation, and tampering attempts in northern NJ and the greater New York City area.* | |
| 1-034 | *A regional commuter express train is sabotaged by a tree on the tracks at* | |

| | |
|---|---|
| | *sundown on September 11, 2022. This potential mass casualty incident, a derailment which could lay the train on its side at high speed, occurs on Sunday evening while hundreds of people, including Lead Plaintiff, are returning to NYC on an express train traveling at 50-60 mph. accident.* |
| 1-035 | *Defendants continue their attempts to intimidate and/or assassinate the Lead Plaintiff after this train derailment effort. Defendants openly use City of New York municipal property, Defendant NYPD personnel, and other co-conspirators, including other police powers in the region in these efforts as they continue their attempts to intimidate, severely injure, and/or assassinate Lead Plaintiff.* |
| 1-036 | *These practices mimic those in outdated assassinations manuals, which include techniques such as giving the appearance of or driving a subject to suicide; arranging an apparently natural fall of 75 feet or greater; just as the one which "befell" the whistleblower in Room 1018A of the Statler Hilton, across the street from New York City's Penn Station, near the beginning of MKUltra in 1953. This whistleblower might have saved countless lives lost and other destruction of US and Canadian citizens and soldiers over the next 20 years. He simply never got the chance.* |
| 1-037 | *Defendants' obvious and transparent goal is to evade accountability yet again and to perpetuate their "state secrets" cover-up of systematic criminal abuse of US persons and* |

| | | |
|---|---|---|
| | *other innocents by Defendant United States BRMT bioweapons and bioweapon delivery system. These acts are simply the current generation of "final solutions" by Defendants as directly inherited from their conduct in the MKUltra era and as inspired by the Nazi's Dachau human experimentation and exploitation which preceded it.* | |
| *1-038* | *A non-exhaustive list of example Incidents in 2021 and 2022 are described in greater detail below. This period corresponds directly with the most diligent reverse engineering effort and the sequence of communications attempted by the Lead Plaintiff with the Department of Justice and its Inspector General's Investigations Division in Washington, DC, and with its US Attorney for the Southern District of New York, as well as the federal District Court for the District of Columbia.* | |
| *1-039*<br><br>*210304, 210412* | *Two colonoscopies are required due to bowel cleanout failure on the first attempt. Blocking caused by BRMT forced continuous muscle closure of bowel exit which continues into late 2022. During recovery from the 210412 colonoscopy, Lead Plaintiff experienced another in the series of statue falls. Near miss of penetration of right temple, a weak point on the skull, on the roller stand base of a hospital bed tray.* | *Palisades Medical Center, North Bergen, NJ* |
| *1-040*<br><br>*Beginning December 6, 2021 (211206)* | *Letters connecting prior CIA commercial cover activities, FBI, Secret Service, Maricopa County Sheriff Joseph Arpaio, NYPD, and other police powers agencies and members of the private sector* | *Attempted mail and email deliveries to various rights-related entities fail, so delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |

| | | |
|---|---|---|
| | *professional community, as well as national political figures to (1) KKK Act of 1871 Constitutional and civil rights abuses, (2) RICO pattern of racketeering activities, delivered to SDNY.* | |
| 1-041<br><br>220516, 220613, 220617 | *Letters - Details of precursor tradecraft signaling related to US Airways flight 1549 (LaGuardia to Charlotte, NC, with BRMT bird ingestion, dual engine flameout, and emergency landing in Hudson River) are delivered to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| 1-042<br><br>220617 | *Letter -Details of reasonably probable BRMT related precursor agitation noted in letter based upon media accounts of high profile NYC subway murder to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| 1-043<br><br>220621 | *Delacorte Richard III faked outside violence with simulated undercover response from in theater crowd.* | *Delacorte Theater, Central Park, New York City* |
| 1-044<br><br>220712 | *Capital One ACH security breach demonstrates the perpetrators have the ability to modify account numbers in the transmission process between Capital One web site on my personal computer, Wells Fargo and CapitalOne for $8 payment. System security has been demonstrably compromised by this hack.* | *Noted online at residence and in letter sent to CapitalOne on July 15, 2022 via US mail.* |
| 1-045<br><br>220716 | *First ever indirect verbal threat delivered to me by male voice from behind during intermission at 1+1 play on July 16, 2022.* | *Chain Theater Mainstage, New York City* |
| 1-046<br><br>220718 | *Letter - Current threat environment including 1+1 incident on 220716 and tradecraft processor behaviors indicating possible homicide included in two letters to SDNY. Tradecraft precursor behaviors are suggestive of motive and of intent to also indirectly threaten this person's other closely related individuals. See Interline Exhibit 2.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| 1-047 | *Letter – A prominent person in New* | *Delivered by hand to SDNY building* |

| | | |
|---|---|---|
| *220718* | *York City suffers injuries which are inconsistent with the accidental method of death described in the media reports the Lead Plaintiff is able to access. A tradecraft frontrunner event witnessed by Lead Plaintiff is reported to SDNY.* | *entry Security checkpoint at St. Andrews Plaza.* |
| *1-048*<br><br>*220720* | *Letter - Current threat environment further clarification and prior similar pattern and practice letter to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| *1-049*<br><br>*220725* | *Letter regarding prior suppression of web searches related to brain-computer interfaces and relationship to BRMT to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| *1-050*<br><br>*220801* | *Letter to SDNY regarding mass casualty incidents and tradecraft signaling related to (1) May 2004 Bio-Lab Conyers, GA warehouse fire 5.5 months before 2004 election and (2) US Airways 1549 (LGA departure to Hudson River emergency landing) on January 15, 2009, five days before Bush 43 leaves office January 20, 2009 at Obama inauguration. Transmit letter regarding mass casualty incidents' timing, and regarding durable ties to national political figures on the right to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| *1-051*<br><br>*220810* | *Letter - Morphological comparables possible identifications across time and personal timeline letters to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| *1-052*<br><br>*220812* | *Letter - ACH system hack of account number by perpetrators in payment system between my Wells Fargo web account and CapitalOne letter to SDNY. Further likely morphological comparables and pickets letter to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |
| *1-053*<br><br>*220819* | *Letter - Recurrent morphological comparables letter to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza* |
| *1-054*<br><br>*220901* | *Letter - Potential indirect and victim impacts letter to SDNY. Commercial leads letter to SDNY.* | *Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza.* |

| 1-055<br><br>220909 | Letter - Biolab Conyers, GA 2004 warehouse chlorine and phosgene gas arson indicated fire analysis transmitted to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
|---|---|---|
| 1-056<br><br>220911 | MTA Metro North Hudson Line - tree "falls" to impede three of four rail tracks including both northbound tracks and the southbound express track immediately after sundown. Train engine and several following passenger cars are impacted by tree debris, but the mass of the upper story branches of this tree which partially block the southbound express track is insufficient to cause a derailment. Train speed estimated in the range of 50 to 60 mph prior to collision with tree's upper story branches and successful rapid stop. Based upon braking behavior and noises I heard while seated 3 or 4 cars behind engine, Engineer had noted tree a about five to seven seconds prior to collision and made rapid stop but was not able to avoid contact with upper story tree branches. Transition from daylight to darkness likely made tree more difficult for engineer to see in time to avoid as eyes were likely adjusting from sunlight to darkness and view ahead was by headlight only. | Zero wind day, light rain earlier in the day, tree likely mature at 120 feet tall or thereabouts. Improbable as a natural event given the surrounding circumstances, height of tree and its adjacency to right of way. |
| 1-057<br><br>220916 | Letter - Lethality Risks letter detailing Hudson Line incident above and history of prior incidents is transmitted to SDNY. Evidence tampering letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-058<br><br>220917 | Morningside Park indirect assault occurs. Full somersault on third or fourth sets of steps on purposely darkened walk from southwest corner down to baseball field. | Morningside Park, New York City |
| 1-059<br><br>220919 | Morningside Park indirect BRMT assisted assault incident report transmitted to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |

| | | |
|---|---|---|
| *1-060*<br><br>*220923* | *Phone number for Addy, a past contact of prior personal interest, and supplied to SDNY in a July 5, 2022 letter is used by an unidentified person or entity to deliver a health care related business voice mail from Braven Health, my health plan provider, to me.* | *Noted in cell phone recent calls log. Call occurs on my birth date.* |
| *1-061*<br><br>*221016* | *Defendants manipulated cut and paste commands in MS-Word on personal computer to attempt to delete three counts from draft Complaint: (1) witness tampering, (2) witness retaliation, and (3) misuse of official documents. Manipulation caught during review which was undertaken due to prior experiences with document tampering by Defendants.* | *See enclosed incident report for details.* |
| *1-062*<br><br>*221108* | *Identify indications of tampering with SDNY delivered letters on my personal computer. SDNY folders containing letters and enclosures are missing from that subdirectory, but copies exist in my LP Evidentiary Exhibits subdirectory being used for civil litigation preparation at this time. Evidence of time gaps in accessibility to business accounts emails between 180304 and 200709 noted, though access appears to be currently blocked rather than those emails being deleted. Evidence of extensive missing email conversation strings related to certain individuals and entities outside of this blocked period was also noted.* | *Noted in document comparisons across subdirectories and folders.* |
| *1-063*<br><br>*221109* | *A version of this tabulation of Lead Plaintiff letters to DOJ, and the simultaneous acceleration of Defendants' threats and incidents between December 12, 2021 and November 8, 2022 is mailed to DOJ and SDNY.* | |
| *1-064* | *Electric scooters travel on* | |

| | | |
|---|---|---|
| *221118* | *deliberately darkened one-way streets in the wrong direction on 21st and 22nd Streets while Lead Plaintiff walks the west sidewalk of 8th Avenue between 23rd Street subway station to an Atlantic Theater event on West 20th Street. No other traffic is on these streets in either direction. As Lead Plaintiff returns to the subway, car traffic is flowing in the proper direction.* | |
| *1-065*<br><br>*221119* | *An afternoon trip to NYC is followed by a Walmart 88th Street shopping trip in North Bergen, NJ. Various people block and impede while shopping (rather typical) and there is a honey trap and loud customer scenario with child emulation of adult loud phrasing run while standing in the customer service line (also quite typical in Lead Plaintiff's experience). Upon exiting Walmart, cross parking lot diagonally to drive in front of Wendy's fast food. Compact white car about 150-200 feet north in the drive aisle in front of Wendy's. Determine no threat of collision and cross. The car rapidly but quietly accelerates after my head turns forward and right to Wendy's entrance, so the vehicle is not in my peripheral vision. The car rapidly decelerates in the last moments and comes to a final stop about 5 feet to my left.* | |
| *1-066* | *BRMT freezes my head looking forward and right toward entrance as car approaches rapidly from left. Also am unable to move quickly out of the car's path due to BRMT dictating walking pace. About 15 minutes later, I encounter a male appearing to vomit into men's restroom sink on my entry. Balance of trip relatively* | |

| | | |
|---|---|---|
| | *uneventful to City Place via bus, light rail, bus. A reasonable interpretation using my two decades of known experience with tradecraft strongly suggests this is a vehicle rundown threat sequence over two days. As before, it is intended to intimidate a key witness to Defendants' prior criminal acts and to perpetuate their long-running cover-up.* | |
| *1-067*<br><br>*2023, various dates* | *Tampering, hacking, harassment, actual threats to health, and health issues suddenly arising which had not previously been a matter of concern by those same health professionals, tax related cover up and entrapment attempts have continued throughout 2023. See LP Evidentiary Exhibits pages 11645-11670, 11696, 11697, 11704-11707, 11710-11726, 11727-11749, 11750-11759, 11871-11886, 11887-11907, 11908-11921, 11931-11936.* | *Multiple reports of incidents, including threats to health and life, have been reported to U.S. Attorney – SDNY between 2021 and the present time. There has been no return contact from SDNY or any other federal police powers agency to those reports, except denials as to all records from FBI and a series of no interest letters from DOJ IG, all in 2021. See Interline Exhibits 16-17. All outstanding FOIA requests have also remained unanswered since 2021, with no status changes since that time.* |

## PARTIES

### I.    <u>Plaintiffs</u>

100.   Dennis Sheldon Brewer, Lead Plaintiff, is an involuntary servant of Defendant United States' BRMT program, who was enrolled in BRMT development and deployment without consent while a minor child, selected as a member of a targeted family and religious group. The BRMT program, an unimaginably intrusive program which directly contravenes the very purpose for which the United States was created "inalienable Rights," was fraudulently concealed from him as its direct victim, while Defendant United States developed BRMT's capabilities by hijacking the Lead Plaintiff's brain and those of others for its human experiments and his involuntarily servitude to Defendant United States, to and including numerous attempts on life by Defendant United States. A personal statement and comprehensive profile of the Lead Plaintiff is provided at LP Evidentiary Exhibits pages 140-236. Brewer is a resident of Edgewater, New Jersey.

### <u>Other Plaintiffs</u>

101.   As with its direct lineal predecessor program, MKUltra, there is an extremely high probability BRMT has been used to abuse thousands of innocent US persons and others around the world over the past fifty years. The class of Plaintiffs likely includes a broad class of the general public who have been and/or are presently directly injured US persons and indirectly injured by these Defendants. The basis of this class size estimate is described in the Class Allegations motion. Plaintiffs and their rights have been injured in a wide variety of ways, or even incarcerated or killed, as a result of the actions of the Defendants and their co-conspirators.

102.   The Lead Plaintiff's direct knowledge of likely BRMT brain hijacking victims includes only a very small number of the Plaintiffs likely injured as a result of the actions of the

Defendants and their co-conspirators. Plaintiff class members very likely include members of the Lead Plaintiff's own family of origin, his two former spouses and their children, members of his extended family, as well as friends, former girlfriends, and others not identifiable at this time. Since BRMT leaves no direct evidentiary traces for its victims or nearby witnesses, other forensic means will be required, including production of Defendant United States' computer and operator log records.

**Large Class of Similarly Situated Plaintiffs Not Yet Identified**

103. The identities and specific extent of injuries of virtually all members of the class of injured Plaintiffs is currently only known to those Defendants directly responsible for the management and operation of the prohibited BRMT program and system over the past five decades. Key reasons for this reality are the extreme difficulty to detect the modern version of BRMT, a lack of public awareness due to the unique nature of the system, and the protection afforded by "state secrets" to Defendant United States.

**A. Mere Recognition Of BRMT is Immensely Difficult For Victims**

104. The primary reasons the Lead Plaintiff was eventually able to unravel BRMT and reverse engineer the entire development sequence is because of:

1.     Defendants' repeated abuses and manipulations, some of which are impossible for the human mind to produce on its own such as the guillotine sensation across the neck described at paragraph 335(e), and others physical and verbal manipulations by BRMT which provided direct responses to contradict a verbal or non-verbal assertion by the Lead Plaintiff. This is very sloppy tradecraft but highly effective confirmation to the Lead Plaintiff as it could only have been provided directly by the Defendant United States' BRMT operators.

2.     Eventual recognition of the long cycle sequences of adverse outcomes to Lead Plaintiff provided the insights needed to reverse engineer the stages of BRMT's development and its increasing sophistication over the decades.

3.     Defendant United States field operations personnel, who functionally trained the Lead Plaintiff in tradecraft without intending to do so, left the occasional breadcrumb clue from the time he was in high school (first glimpse of a satellite/cell phone in a brief case near Greenwater, WA in 1972), graduate school ("Keep in touch, I like to know famous people" a completely mystifying statement at the time by one of his college professors, Dr. Paul Shaffer), and as a consultant ("A physician invented a cure for which there was no disease, his assistant caught the cure and died," by John Hagopian, National Community Banking Senior Manager at Deloitte, on the Federal Deposit Insurance Corporation project and Lead Plaintiff's co-instructor for Bank Administration Institute seminars).

4.     Those few key insights, combined with Lead Plaintiff's unique range of experiences in (a) many kinds of government (legislative, executive, department, agency, bureau, office) and private sector operations (startups to global leaders), (b) his systems development and integration project experience, and (c) his relatively unusual combination of systems design, technology literacy, and science background, were critical to his eventual insight that BRMT was even possible, to understanding the functional concealment of BRMT, and grasping operant conditioning with, and magnification of, its effects by psychological associations and coercion during Defendants' malign field operations.

5.    Lead Plaintiff used the methodical process of hypothesis development, researching, and testing, widely known as the scientific method, to eventually understand BRMT. This methodical approach and the forensic reverse engineering which followed is how the Lead Plaintiff came, with great difficulty, to understand and integrate his long chain of experiences which helped reverse engineer BRMT and its wide range of adverse impacts. Then Lead Plaintiff had to research the neuroscience basics of brain function, and reverse engineer the system components required to implement the BRMT system for remote operation on a global scale. BRMT is explained in summary at LP Evidentiary Exhibits pages 1-10.

**B.  Myriad Challenges To Identify Members Of The Class Of Injured Plaintiffs**

105.  Most other Plaintiffs in this class who are similarly situated would find it virtually impossible to detect BRMT hijacking intrusions. BRMT signals penetrate the skull and hijack the natural biochemistry of the brain at specific addresses, so the nerve sensation, thought, speech, or action feels entirely normal to the BRMT victim. Since there is no need for the BRMT operator to be anywhere near the victim, the visual clues normally present with any normal police powers operation are simply not there. Neither the victim nor any police powers officer or agent would detect prohibited BRMT operation during or after a BRMT sequence. There are simply no clues.

106.  The BRMT signal sequence travels virtually anywhere in the world from a supercomputing center through a global constellation of satellites owned and managed by Defendant United States to the BRMT victim in the blink of an eye. No local trace of the BRMT

hijacking remains as the energy of the BRMT hijacking instruction is the stimulus which the brain uses to create the biochemical reaction, which is the thought, act, verbalization, etc.,.

107.  It is also very difficult for US persons educated from childhood to believe in the concepts of free will and liberty as guaranteed by our Constitution to even conceive of such a monstrous program conducted by Defendant United States against its own children, adults, families, anyone. But Defendant United Sates has done this to US persons before. MKUltra and Cointelpro ran from the 1950s into the 1970s entirely in secret until a burglary, press reports, Congressional hearings and a Presidential Commission in the 1970s. There were no criminal consequences for any of the Executive branch participants in these illegal acts of violence and rights abuses against citizens. So, the practice simply continued, and the laws written to reform these practices at the time were ignored. BRMT and the accompanying racketeering program are the result of that continuing willful disregard of the rule of law by Defendant United States, primarily CIA and FBI.

108. Even if an unidentified member of the class of BRMT hijacked plaintiffs were able to understand it is possible for Defendant United States to conduct this kind of indifferent and depraved abuse against a US persons, they would still need many repetitions of BRMT induced behaviors which are well outside their normal range of behaviors to catch a glimmer of this biological and behavioral hijacking by Defendant United States. And their typical first instinct would naturally be to blame themselves, rather than any malicious intimate intervention.

109.  This type of violence, the biochemical hijacking of the human brain, has never been experienced in the two million year history of human beings, much less at the hands of a supposedly democratic government, proclaiming itself to be the shining light of democracy to the world. So, why would a reasonable person even suspect it? It was simply never possible.

**C. Scale of Research, Development, and Deployment Expenditure Required Is Vital Clue to Likely Number Of BRMT Victims**

110. Accomplishing the current highly sophisticated stage of prohibited BRMT bioweapon development has been extremely expensive and daunting, probably requiring secret expenditures on a scale similar to developing the first nuclear weapons, or to engineering the first orbits of the Earth by U.S. astronauts. It certainly took vastly more effort to develop BRMT n secret than it did to drugging victims with 100 million purchased doses of LSD during MKUltra, which used a drug already developed by a Swiss pharmaceutical company.

111. Both history and the fifty year experience of the Lead Plaintiff make it very highly probable that many other innocent Americans and other innocent persons have been victimized and violated by Defendant United States, perhaps to and including their natural appearing death, permanent disability, or incarceration. This reality and the evidence presented here provide strong circumstantial evidence that the Defendants' violations of human, civil, and Constitutional rights have been and likely continues to be on a scale which is nearly incomprehensible.

**D. Estimated Size of Plaintiff Class**

112. BRMT's total class of Plaintiff victims is currently known only to the protected executives, managers, and operators hiding behind their delusional belief in "state secrets" for a prohibited program which violates the *United States v Reynolds,* 345 U. S. 1, 12 (1953) standard (paragraph 53) of acting within the law. who authorized and conducted these criminal violations of rights and coordinated with other Defendants in field operations. To provide some context for the Lead Plaintiff's estimated range of Plaintiffs, we below consider Defendant CIA's MKUltra and Defendant FBI's Cointelpro programs, then attempt to estimate the likely range of potential Plaintiffs in the class.

113. MKUltra directly impacted millions of people over twenty years (1953-1973). Though most records were destroyed by Defendant CIA to obstruct justice and hide the program's injuries from the American people and Congress, the ten year CIA brothel drugging project alone likely involved well over 650,000 contacts. There were more than 140 other projects conducted under the MKUltra program umbrella while the 100 million LSD doses and untold mescaline doses were administered by what was then likely the world's largest drug dealer, Defendant CIA's MKUltra, operating against US and Canadian citizens and soldiers. The total US population in that era grew from 155 million in 1953 to over 205 million in 1973.

114. Cointelpro was another program of comparable scale of Defendant United States. The FBI, which is Defendant DOJ's largest police powers agency, operated as a White Supremacist police powers organization and a co-conspirator with and funder of violent far right radical extremists over 15 years (1956-1971) to violate the constitutional and civil rights of American citizens across the entire United States. It also funded and directed a violent far-right White Supremacist militia group. While FBI's activities were focused most intensely on people like Dr. Martin Luther King, Junior, SNCC leaders like John Lewis, Malcolm X, and other prominent leaders and activists, its impacts were felt broadly in the Black community and among anti-war activists of the time. The confidential files detailing prime targets and measures to be taken were burgled by activists from a tiny two-person FBI office in Media, PA in March 1971, so the program was obviously very wide-spread across the United States. The Black population alone grew from about 16.5 million in 1956 to 23.6 million in 1972, though the impact was more widespread as Cointelpro's FBI agent and paid informant infiltrations, operations, and sabotage included acts against people of color, anti-war activists, alternative lifestyle advocates, and other "fringe" persons and groups who promoted ideas, notably including many now mainstream and

well accepted concepts and rights. These "fringe" groups included many majority Whites (such as non-mainstream Christian evangelicals, like my grandparents who were openly surveilled by Defendant FBI), and other ethnicities.

115.  To calculate the potential number of BRMT victims, we must consider (1) BRMT's fifty years of direct and indirect malign impacts ranging from lethal events to perversion of justice to systematic manipulation of free will for the benefit of another; (2) the extreme difficulty any US person or other innocent would have in detecting and confirming that their own brain is being biochemically hijacked by the BRMT bioweapon and bioweapon delivery system; (3) the incredible 3 quadrillion operations per second computing power of a single supercomputer installation – Defendant United States has dozens of supercomputer centers; and (4) the ability of Defendant United States communication, satellite, and precision location technologies to reach sub-pinpoint locations (likely ranging as small as 5,000 nanometers or so in the brain, around the size of a single cell in a human body which typically has about 37 trillion cells) virtually anywhere on the globe with a stream of BRMT biochemical hijacking instructions within 0.3 seconds after transmission (about one short eyeblink).

116.  Over fifty years to date, it would have been possible to impact every single citizen of the United States for literally hours of BRMT hijacking over the course of each year, though the Lead Plaintiff is confident these acts and the related pattern of racketeering acts of Defendants were restricted to some select minority of the total population. Assuming the development cycle proceeded very slowly in the early stages (1970s and 1980s) and each new generation of the technology took two to three years to troubleshoot and correct flaws in the BRMT bioweapon itself before field deployment using the BRMT bioweapon delivery system, it is likely the number of US persons who are injured direct Plaintiff victims is quite large as

shown at the Class Allegations motion submitted with this Complaint. This estimate relies on currently unverifiable assumptions due to "state secrets." Defendant United States must be forced by this Court to produce this information to determine the actual identities of the Plaintiffs and the precise duration and extent of injuries to all Plaintiffs. In the absence of such a remedy, the Constitution is itself, for all practical intents and purposes a moot document of no particular significance, as it is only a matter of funding, to deliver this bioweapon by, for, and on behalf of Defendant United States to any and all US persons at any future point for any reason or no reason whatsoever based upon Presidential order or, simply, arbitrary bureaucratic whim with no regard for due process. Our country's history informs this view, including, without limitation, Cointelpro and MKUltra, which demonstrated the power of "state secrets" and functionally unimpeded bureaucratic or Presidential whim in light of Defendant Department of Justice's durable and repeated unwillingness to criminally prosecute such violations, thereby providing an unparalleled Executive branch permission structure.

## II.    **Defendants**

117. This action is brought against government officials, named at paragraphs 118 through 126, in their official capacity, and their successors and assigns. Federal Defendants below, which may include as yet unidentified departments and agencies, are known collectively as Defendant United States in this Complaint, since they operate in secret, never identifying themselves. Most other police powers Defendants in this litigation operate in this fashion nearly all the time as well. Some non-governmental Defendants are known and specifically identified. Several federal officials are also named in their personal capacity as individual Defendants named below, in accordance with personal liability for bad faith acts under *Harlow* (paragraph

57, and Fourth Amendment violations under *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

**Known Federal Defendants, Official Capacity**

118. Mr. William Burns is Director, Central Intelligence Agency headquartered in Vienna, VA with field offices in the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Mr. Burns was formerly known as Patrick Heffron, a physician who practiced in Kirkland, Washington, and while in that identity was directly and personally involved in illegal BRMT medical experimentation on humans and in the cover-up related injuries committed in interstate commerce against Lead Plaintiff from at least 1986 to 1992. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

119. Mr. Christopher Wray is Director, Federal Bureau of Investigation, an agency of the Department of Justice, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing

to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

120. Mr. Merrick Garland is Attorney General of the United States, manages the U.S. Department of Justice, headquartered in Washington, DC, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used, without limitation, Department of Justice, Federal Bureau of Investigation, United States Marshals Service, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives, malignly exploited national security laws and regulations through its National Security Division and other operations of the Department, and used other departmental and subordinate agency personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights both jointly and severally in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff. Defendants engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States' BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

121. Ms. Avril Haines is Director, Office of the Director of National Intelligence, with agencies, operations, and personnel throughout the United States and the world, a nexus for

substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers,

confidential informants, and contractors, wrongful investigations lacking cause under color of

law, assets and myriad frauds and violations of civil rights in acting against, threatening, and

retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant

engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT

and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary

servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other

defendants and severally acted to harm Lead Plaintiff and most probably other unidentified

plaintiffs.

122.    Mr. Lloyd Austin is Secretary, Department of Defense, headquartered in Arlington,

VA, with departments, agencies, operations, and personnel throughout the United States and the

world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military

officers and personnel, facilities, contractors, undercover and other agents, officers and

confidential informants, wrongful investigations lacking cause under color of law, assets and

myriad frauds and violations of civil rights in acting against, threatening, and retaliating against,

and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead

Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering

conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions

and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and

severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

123.    Dr. Stefanie Tompkins is Director, Defense Advanced Research Projects Agency

headquartered in Arlington, VA with field offices and personnel throughout the United States, a

nexus for substantial acts against Lead Plaintiff. Defendants used personnel and contractors,

private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

124. Mr. Alejandro Mayorkas is Secretary, Department of Homeland Security, headquartered in Washington, DC with agencies and field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

125. Ms. Kimberly Cheatle is Director, United States Secret Service, an agency of the Department of Homeland Security, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers, confidential informants and contractors, wrongful investigations lacking cause under color of

law, assets and myriad frauds and violations of civil rights in acting against, threatening, and

retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly. Defendants

used undercover and other agents, officers and confidential informants, wrongful investigations

lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting

against, threatening, and retaliating against, and in failing to protect Lead Plaintiff both

separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of

Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated

Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith

actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most

probably other unidentified plaintiffs.

      126.  John Doe defendants include federal intelligence and police powers operations,

public and private entities, groups, associations, and individual persons. Unknown public entities

include a variety of governments, their departments, agencies, and special purpose entities in

various states and in other nations.

**Known State and Local Defendants**

      127. City of New York, Attention: Georgia Pestana, Corporation Counsel, New York

City Law Department, New York, a political subdivision of the State of New York, a nexus for

substantial acts against Lead Plaintiff. Defendants used municipal assets and property,

undercover and other officers, wrongful investigations lacking cause under color of law, assets

and myriad frauds and violations of civil rights in acting against, threatening, and retaliating

against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their

fraudulent role as part of Defendant United States BRMT and racketeering conspiracy.

Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures

to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

128.   City of New York Police Department, Attention: Ernest F. Hart, Deputy Commissioner for Legal Matters, PALS Unit, One Police Plaza, New York, New York, a Department of the City of New York, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

129.   Colonel Patrick J. Callahan, State Police, State of New Jersey, West Trenton, NJ, a department of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used officers, wrongful investigations lacking cause under color of law, assets and myriad frauds in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

130. Mr. John Bilich, Chief of Security, Port Authority of New York and New Jersey Police Department, New York, NY, an agency of the Port Authority of New York and New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

131. Bergen County Sheriff's Department, Attention: Sheriff Anthony Cureton, Hackensack, NJ, an agency of the County of Bergen, a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

132. County of Bergen, Attention: Mr. James Tedesco, County Executive, Hackensack, New Jersey, a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations

lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

133. County of Maricopa County, Arizona, Attention: Maricopa County Attorney, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

134. Maricopa County Sheriff's Department, Attention: Sheriff Paul Penzone, Phoenix, AZ, a department of the County of Maricopa, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead

Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

135. John Doe defendants include state and local police powers agencies and departments, public and private entities, groups, associations, and individual persons. Unknown public entities include a variety of governments, their departments, agencies, and special purpose entities in various states and in other nations.

**Known Entity Defendants, Including Police Powers Cover Operations**

136. The series of entities identified at this paragraph are likely nearly all police powers cover entities illegally used by police powers and intelligence agencies and departments for (i) broad-based illegal general searches, (ii) to disrupt the personal and business affairs of illegally targeted persons and groups including private enterprise, and (iii) to sustain the associated-in-fact enterprise against this class of plaintiffs including, without limitation, the pattern of involuntary servitude injuries to this class of plaintiffs including to the Lead Plaintiff. For this reason, these entities are not individually identified as defendants upon filing and are subject to discovery for the purpose of determining liability for injuries they were used by various defendants to cause and create to this class of plaintiffs. The entities, as listed and/or described at the following paragraphs, are not listed here to avoid excessive repetition, and are subject to the discovery process as to each and every governmental defendant listed herein to discover their true nature and intent with regard to injuries to this class of plaintiffs:

    i.    HEXP-5 trough HEXP-10

    ii.    NSEC-1 through NSEC-5

    iii.    RGTS-2, RGTS-3, RGTS-7 through RGTS-10

iv.    RICO-1 through RICO-51

137. Albertsons Companies, Inc. through its wholly owned subsidiary(ies) Acme Markets, Inc. 1013755 and/or Acme Markets, Inc. 2112922, is a corporation with a retail location at 481 River Road, Edgewater, NJ. Its retail location was used to supply spoiled refrigerated foods to Lead Plaintiff from suppliers in various states, including spoiled milk, spoiled produce, and spoiled prepared meat products. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

138. Walmart Inc., its subsidiaries, including Wal-Mart (China) Investment Co., Ltd., Bentonville, AR headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

139. Costco Wholesale Corporation headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly

with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

140. The Kroger Company, Blue Vine, OH offices, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

141. PPG Industries Inc. headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

142. Establish Inc. human trafficked and employed Lead Plaintiff in New Jersey, and on false projects at Defendants PPG Industries Inc., Pittsburgh, PA, and Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

143.  Dominick & Dickerman LLC New York City offices, personnel, and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

144.  WeFunder, including all entities listed as Defendants in caption above, personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

145.  Blackpool Group, Inc., Shefford & Associates, LLC, Shefford Capital Partners, LLC,  The Shefford Group, Inc., which generally shared common personnel as principals and officers, were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

146. Fractal Advisors LLC is an LLC with offices in KS. Its members, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

147. Cornhusker Capital is a corporation with offices in NE. Its officers, personnel, and email addresses were used to present and conduct financing and contract frauds, litigation frauds, and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

148. Banco Advisors, LLC is an LLC with offices in AZ. Its members, personnel, and email addresses were used to present and conduct financing, sales, and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expenses, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures

to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

149. Insight Network Spain is a corporation with offices in NY. Its officers, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including in-person meetings, wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

150. Madison Street Capital Advisors, LLC is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

151. New America Lending, LLC  is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct financing, sales, marketing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly

perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

152. Richard A. Miller Consulting, LLC is an LLC with offices in PA. Its members, personnel, and email addresses were used to present and conduct financing, sales, marketing, and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

153. Sallyport Commercial Finance, LLC is an LLC with offices and/or personnel doing business in CA. Its members, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

154. Sole Source Capital LLC is allegedly an LLC with offices in California, though more probably a cover operation used by FBI Manhattan field office in its collaboration in the elaborate entrapment scheme described at RICO-9 and RICO-10 herein. Its facilities, members, personnel, and email addresses were used to present and conduct financing and contract frauds

and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

155. CFO Search, Inc. is allegedly a corporation with an office in Lubbock, Texas, though more probably a cover operation used by FBI Amarillo field office in its collaboration in the elaborate entrapment scheme described at RICO-9 and RICO-10 herein. Its facilities, members, personnel, and email addresses were used to present and conduct financing, executive search, sales, marketing, and contract frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

156. Adamson Brothers Corp is a corporation with offices in NJ and FL;  Adamson Brothers Inc. is a corporation with offices in NJ and FL; Adamson Brothers, Inc. is a corporation with offices in NJ and FL; Adamson Brothers Financial Corp is a corporation with offices in NJ and FL; . Adamson Brothers LLC is an LLC with offices in NJ and FL; Adamson Brothers, LLC is an LLC with offices in NJ and FL. These entities are most likely police powers cover operations which share common officers and/or members, and personnel, and whose email

addresses were used to present and conduct financing, sales, and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

157. Ranch Creek Partners LLC is an LLC with offices in WA. Its managing member, personnel, and email addresses were used to fraudulently misrepresent itself as an interested investor and engage in other fraudulent acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

158. Crossroads Financial LLC is an LLC with offices in FL. Its members, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

159. Bibby Financial Services, Inc. is a corporation with offices in GA. Its offices, officers, personnel, and email addresses were used to present and conduct financing and contract frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

160. Axial Networks, Inc. is a corporation with offices in NY. Its officers, personnel, and email addresses were used to present and conduct financing, sales, and marketing frauds and other acts, including in-person meetings, wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

161. Technology Sales Leads, Inc., Boston, MA headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

162. Engleman Associates, Inc., formerly known aa SoftSelect Systems, headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff, and as part of a plan to entrap Lead Plaintiff for providing services in Iran, a country subject to an embargo by Defendant United States at the time. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

163. Loeb & Loeb, LLP headquarters, personnel, and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

164. Daniel Weiner, an attorney licensed in New York, knowingly engaged in mispersonation by misrepresenting himself as an employee of Arlon Group LLC. Arlon Group was supposedly a subsidiary which was formed to invest the proceeds of the sale of Continental Grain Company headquartered in New York, New York. Arlon email accounts were used by this Defendant as part of a series of interstate financing and contract frauds against Lead Plaintiff. Mr. Weiner was actually the Chairman of the Litigation Department at Hughes Hubbard and Reed, New York, NY misrepresenting himself as an Arlon employee. Defendant engaged with

Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

165. Raymond F. Sullivan, LLC, Attorney, was introduced by Charles Jackson, allegedly a now deceased alumni of Defendant CIA. As allegedly a former investigator for Defendant Department of Homeland Security Customs and Border Protection, used email, phone, and in-person meetings to functionally provided intelligence to Defendant United States on interstate commercial activities and on personal information provided by Lead Plaintiff as an involuntary subject of the BRMT program operated by this Defendant at all times throughout. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

166. Assure Group International, LLC is a corporation with offices in MD. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

167. ABT Trading Inc. is a corporation with offices in FL. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

168. DC International LLC is an LLC domiciled in WY. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

169. Consumerbase LLC dba Exact Data is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith

actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

170. EGM is an entity whose records are currently blocked from access by a defendant computer hack which renders the specific identity name of this defendant inaccessible to the Lead Plaintiff as this Complaint is prepared. Records exist and are listed in an index of emails in the compendium at LP Evidentiary Exhibits page 1074, so this information was deliberately blocked by defendants for fraudulent concealment after the compendium entry was made. Its officers and/or members, personnel, and email addresses were used in interstate commerce to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

171. Tradekey.com is an entity allegedly based in Pakistan doing business in the United States through Orbit Technologies LLC, 264 Hemlock Terrace, Teaneck, NJ 07666. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

172. Weblink.in Pvt. Ltd. Is a limited company in New Delhi, India with offices at 33 and 33A Rama Road, Industrial Area, Shivaji Marg, New Delhi, India. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce. Defendant engaged with Lead Plaintiff in their fraudulent role as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by actions and failures to act. Defendant, as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

173. John Doe defendants include public and private entities, groups, associations, and individual persons. Unknown public entities include a variety of governments, their departments, agencies, and special purpose entities in various states and in other nations.

**Individual Defendants, Including John Does, and J Does Acting Outside Official Capacity**

174. Mr. William Burns, identified here in his personal capacity while employed by the United States, engaged in bad faith acts, is Director, Central Intelligence Agency headquartered in Vienna, VA. Mr. Burns was formerly known as Patrick Heffron, a physician who practiced in Kirkland, Washington, and while in that identity was directly and personally involved in illegal BRMT medical experimentation on humans and in the cover-up related injuries committed in interstate commerce against Lead Plaintiff from at least 1986 to 1992. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

175. Andrew Weissman, a former FBI and DOJ official, while known as Lyle Whiteman, General Manager Puget Consumer Coop, is identified here in his personal capacity. While

employed by the United States, engaged in bad faith acts, Mr. Weissman harmed Lead Plaintiff

through his participation in Defendant United States' BRMT and racketeering program.

Defendant engaged with Lead Plaintiff in his roles as PCC General Manager and Board member

of NutraSource from approximately 1983-1986 as part of Defendant United States BRMT and

racketeering conspiracy. Weissman knowingly perpetuated Lead Plaintiff's involuntary servitude

by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other

defendants and severally acted to harm Lead Plaintiff and most probably other unidentified

plaintiffs.

176. Charles "Chuck" Rosenberg identified here in his personal capacity while employed

by the FBI and DOJ, engaged in bad faith acts, acted in his undercover role Chuck LeFevre,

CEO of NutraSource, Seattle, Washington which illegally spied in Pacific Northwest food

cooperatives while he resided in Washington state in the 1980s, and as Mr. William Drumm, a

resident of NJ and General Manager of Establish, Fort Lee, NJ, acted individually and in

conspiracy with others in fraudulently misrepresenting himself and others as authentic officers,

employers, and fellow employees of Lead Plaintiff at Establish, Inc and fraudulently presented

project sales, project consulting services, and corporate offices, plants and other facilities, in the

illegal human trafficking, fraudulent employment, forced labor, illegal termination, and thefts of

commissions and compensation against Lead Plaintiff, and used wire and email fraud and

interstate travel in the furtherance of their pattern of human trafficking, forced labor, and other

myriad frauds in interstate commerce. Defendant, in his personal capacity as a bad faith actor,

acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably

other unidentified plaintiffs.

177. Most probably a current or former FBI official in New York, while known as Dewey Turner, an employee of Sole Source Capital, is identified here in his personal capacity. While employed by the United States, engaged in bad faith acts, Mr. Turner harmed Lead Plaintiff through his participation in Defendant United States' BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his role as a financier to promise and never deliver financing for a project in interstate commerce as part of Defendant United States BRMT and racketeering conspiracy. Turner knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

178. Most probably a current or former FBI official in Amarillo, Texas, while known as Michael Maggard, is identified here in his personal capacity. While employed by the United States, engaged in bad faith acts, Mr. Maggard harmed Lead Plaintiff through his participation in Defendant United States' BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his role as a recruiter to recruit a CFO for interstate commerce in a fraudulent scheme and to lend funds in interstate commerce as part of an entrapment attempt by FBI as part of Defendant United States BRMT and racketeering conspiracy. Maggard knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

179. Most probably a current or former FBI official, while in his role as Mr. Dean T. Smith, a resident of Auburn, California, as an individual and acting in concert with others, invested funds for his own accounts, trust accounts, and entities, and as a nominee for unknown

other persons and entities to perpetrate and perpetuate various investment, lending, financial,

wire, email, bank and other financial frauds, sourcing, supply, sales, marketing frauds from 2015

to the present, and in litigation fraud and misrepresentation, all in interstate commerce. Smith is

identified here in his personal capacity. While employed by the United States, engaged in bad

faith acts, Smith harmed Lead Plaintiff through his participation in Defendant United States'

BRMT and racketeering program. Smith knowingly perpetuated Lead Plaintiff's involuntary

servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly

with other defendants and severally acted to harm Lead Plaintiff and most probably other

unidentified plaintiffs.

180. Most probably a current or former FBI official, while in his role as Mr. Andrew

Altahawi, a resident of NJ and/or FL, acted individually and in conspiracy with others, in

fraudulently misrepresenting himself and others as performing sourcing, sales, and marketing

services for Lead Plaintiff and related business entities, and used wire and email fraud in the

furtherance of these frauds and dishonest services in interstate commerce. Altahawi is identified

here in his personal capacity. While employed by the United States, engaged in bad faith acts,

Altahawi harmed Lead Plaintiff through his participation in Defendant United States' BRMT and

racketeering program. Althawi knowingly perpetuated Lead Plaintiff's involuntary servitude by

his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other

defendants and severally acted to harm Lead Plaintiff and most probably other unidentified

plaintiffs.

181. Most probably a current or former FBI official, Mr. Michael Callahan (also possibly

formerly known as Bob Ross at WSU Perham; Dennis Zook at Amfac Distribution; Pacific

Pipeline CEO Dennis last name not recollected; Zetec CEO; Jay Carter at Liberty West; and

Steve McDonald at Establish), likely a resident of NJ employed at times in the State of New

York, acted individually and in conspiracy with others in fraudulently misrepresenting himself

and others as performing sourcing, sales, and marketing services for Lead Plaintiff and related

business entities, and used wire and email fraud in the furtherance of these frauds and dishonest

services in interstate commerce. Defendant is identified here in his personal capacity. While

employed by the United States, engaged in bad faith acts, Defendant harmed Lead Plaintiff

through his participation in Defendant United States' BRMT and racketeering program.

Defendant engaged with Lead Plaintiff in his role as an investment banker at Dominick and

Dickerman as part of Defendant United States BRMT and racketeering conspiracy. Defendant

knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his

personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to

harm Lead Plaintiff and most probably other unidentified plaintiffs.

182. Most probably a current or former CIA official, most recently known as Mr. Mark

Gross, while employed by the United States and in his previous roles as Michael Cunha (WSU

Resident Assistant Perham Hall in 1974-1975); Unknown Name (as likely PSNS tour leader in

2002); David Keller (Liberty West in Maricopa County, AZ in approximately 2014-2015); and

Mark Gross (Dominick and Dickerman, then Westmark Capital, from approximately 2017 to

2021), a resident of NJ or NY employed at times in the State of New York, acted individually

and in conspiracy with others in fraudulently misrepresenting himself and others as performing

sourcing, sales, and marketing services for Lead Plaintiff and related business entities, and used

wire and email fraud in the furtherance of these frauds and dishonest services in interstate

commerce. Defendant is identified here in his personal capacity. While employed by the United

States, engaged in bad faith acts, Defendant harmed Lead Plaintiff through his participation in

Defendant United States' BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his role as an investment banker at Dominick and Dickerman as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

183. Most probably a current or former FBI official, Mr. Marc Chalom, a resident of NJ, acted individually and in conspiracy with other individual and interstate Defendants, known and unknown, in the theft of services, property, equipment, financial and other assets of Lead Plaintiff at an apartment building he owns at 282 Palisade Avenue, Cliffside Park, NJ, and used wire and email fraud and interstate travel in the furtherance of the pattern of human trafficking, forced labor, theft, and other myriad frauds in interstate commerce. Defendant is identified here in his personal capacity. While employed by the United States, engaged in bad faith acts, Defendant harmed Lead Plaintiff through his participation in Defendant United States' BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his role as the fake landlord in a federal "safe" house residence used to control Lead Plaintiff, as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

184. Most probably a current or former FBI official, Mr. Conrad Ross, a resident of NJ and NC, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as authentic officers, employers, and fellow employees of Lead Plaintiff at Establish,

Inc and fraudulently presented project sales, project consulting services, and corporate offices, plants and other facilities, in the illegal human trafficking, fraudulent employment, forced labor, illegal termination, and thefts of commissions and compensation against Lead Plaintiff, and used wire and email fraud and interstate travel in the furtherance of their pattern of human trafficking, forced labor, and these other myriad frauds in interstate commerce. Defendant is identified here in his personal capacity. While employed by the United States, engaged in bad faith acts, Defendant harmed Lead Plaintiff through his participation in Defendant United States' BRMT and racketeering program. Defendant engaged with Lead Plaintiff in his role as an employer at Establish, Fort Lee, NJ, as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other defendants and severally acted to harm Lead Plaintiff and most probably other unidentified plaintiffs.

185. Mr. Joseph Arpaio, both as Sheriff of Maricopa County, AZ and as an individual, acted individually and in conspiracy with others, impersonated a fresh produce industry consultant, Greg Crossgrove, and used email, phone and in-person meetings, and organized a team of false employees for Lead Plaintiff's companies engaged in interstate commercialization of organic produce, organic beef, and other products to major retailers, including Defendants Costco Wholesale Corporation, Walmart, Inc and subsidiaries, and The Kroger Company and subsidiaries, among others. Defendant engaged with Lead Plaintiff in his fraudulent role as a consultant to Winnett Perico, Inc., as part of Defendant United States BRMT and racketeering conspiracy. Defendant knowingly perpetuated Lead Plaintiff's involuntary servitude by his actions. Defendant, in his personal capacity as a bad faith actor, acted jointly with other

defendants and acted severally to harm Lead Plaintiff and most probably other unidentified plaintiffs.

186. Unknown federal agents, some of which are identified by their known cover and current public names in the caption, and other John Doe Police Powers Defendants of unknown number. These unidentified defendants include other police powers officers, agents, employees, and officials of named and not yet identified defendant agencies and departments, as well as of police unions, and related private entities, groups, associations, and individual persons, including, without limitation, unknown officers, agents, contractors, successors and assigns of governmental entities who are also currently unknown to be identified during discovery. Defendants knowingly perpetuated Lead Plaintiff's involuntary servitude by their actions. Defendants, in their personal capacity as bad faith actors, exceeded their legal authority under law, acted jointly with other defendants and acted severally to harm Lead Plaintiff and most probably other unidentified plaintiffs under color of law.

187. John Does of unknown number. John Doe defendants include other unidentified private entities, groups, associations, and individual persons, including, without limitation, unknown officers, agents, contractors, successors and assigns of governmental entities who are also currently unknown to be identified during discovery. Defendants knowingly perpetuated Lead Plaintiff's involuntary servitude by their actions. Defendants, in their entity and/or personal capacity as bad faith actors, exceeded their legal authority under law, acted jointly with other defendants, and acted severally to harm Lead Plaintiff and most probably other unidentified plaintiffs under color of law.

188. 188 through 299 are reserved.

## JURISDICTION AND VENUE

300.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1333, and 18 U.S.C. §§ 1962(a) through 1962(d) inclusive over Plaintiffs' claims, and over the federal and ratified international treaty claims and related conflicts of law which arise under and pursuant to the laws and Constitution of the United States.

301.  This Court has jurisdiction over Plaintiffs' state statutory and common law claims because they are so closely related to the federal and international treaty claims conducted by an associated-in-fact enterprise of all Defendants which arose and arise out of the collective and individual acts of Defendant United States and its co-conspirator Defendants in their collective and individual acts and unconstitutional conduct against Lead Plaintiff and others in nearly all states (44 in the Lead Plaintiff's case alone) and from the extra-territorial actions of officers and agents of Defendant United States and of foreign intelligence and police powers departments and agencies. It also has jurisdiction over violations of state statutes because those offenses are directly intertwined with and arise from the original violations by Defendant United States both separately, as elements of, and within the pattern of conspiracy to commit and within the pattern of racketeering activity conducted in conspiracy with other Defendants.

302.  Venue is proper in this Court pursuant to the above named statutes because executive decisions, operation, and management of the associated-in-fact enterprise and other substantial conduct giving rise to Plaintiffs' claims have occurred in the Southern District of New York since at least 2007 at the executive direction of Defendant United States through its myriad intelligence and police powers operations based in the City of New York, including specific acts and injuries by agents in the FBI's Manhattan, New York City field office and the prejudicial field operations of Defendants City of New York Police Department, Port Authority

of New York and New Jersey Police Department within the Southern District of New York. Numerous other defendant police powers operations, and numerous individual defendants in their current roles, are also based in and around the Southern District of New York.

303. This Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(a) through § 1965(d) inclusive, and pursuant to Fed. R. Civ. P. 4(k)(1)(C) and Fed. R. Civ. P. 4(k)(2)(B), because they and their agents caused injuries to Plaintiffs through their conspiracy in acts and omissions originating in, or having an effect in, the Southern District of New York.


[Intentionally left blank.]

## FACTS – BRMT, Racketeering, and Key Injuries

304.  The complete pattern of facts is complex, spans a considerable period of time, and can only be understood by (1) reviewing the entirety of the Lead Plaintiff's statement at LP Evidentiary Exhibits pages 140-189; (2) considering the patterns of practices of Defendant United States and its other co-conspirator Defendants at LP Evidentiary Exhibits pages 237-367; (3) reviewing the Lead Plaintiff's letters to the US Attorney for the Southern District of New York at LP Evidentiary Exhibits pages 368-793; (4) reviewing other explicit evidence shown in the balance of LP Evidentiary Exhibits; and (5) understanding the technologies and tradecraft practices which undergird Defendants' prohibited BRMT bioweapon and bioweapon delivery system as described in LP Evidentiary Exhibits pages 6645-6884.

305.  Once that is complete, a reasonable understanding of the extraordinarily broad scope of the Defendants' malign actions, violations, and fraudulent concealment against Plaintiffs can begin to be comprehended. The Lead Plaintiff alone has experienced every form of outcome save incarceration, permanent injury, or death, though Defendants have also earnestly engaged with intent to arrange those outcomes for the Lead Plaintiff. It is extremely probable those, and similar, disastrous outcomes have been experienced by other members of the class of Plaintiffs.

## Origins of BRMT Lie In Defendant CIA's Deadly MKUltra Mind Control Program and Dachau Human Medical Experiments Tried at Nuremberg

306.  The Defendants' original violations of human, civil, and constitutional rights arise from a technologically and neurologically driven mind control program intended as the successor program to the failed CIA/ARMY MKUltra LSD and mescaline drugging programs, which itself arose out of a Nazi drugging program experimenting on prisoners in the Dachau Concentration

Camp system, which itself was established for political and ethnic prisoners of Adolph Hitler's Third Reich from 1933 to 1945. Nazi doctors and medical researchers were secretly brought to the United States to work for Defendant United States on these matters between 1945 and 1959.

307. As documented by the U.S. Senate (see LP Evidentiary Exhibits pages 237-271, 6885-7466), from 1953 through 1973, MKUltra violated the rights of US and Canadian citizens, by illegally and without consent while secretly administering one hundred million (100,000,000) doses of LSD and untold doses of mescaline to unknowing civilians and soldiers without their consent. These unwitting drug dosed victims were never medically screened and were allowed to participate in all normal activities while under the influence of these drugs, such as driving and operating machinery, presenting immediate danger to themselves and to the public.

308. MKUltra likely included the murder of an insider whistleblower in 1953 as the program was ramping up, and undoubtedly resulted in deaths of unwittingly drugged citizens and soldiers, as well as innocent bystanders who drove the same roads or were injured or killed by drugged and hallucinating participants. CIA destroyed nearly all the MKUltra program evidence as the program ended in 1973, obstructing justice so the true costs of the death, injuries, and mayhem resulting from the program will never be unknown.

309. Over the past five decades, participation in actions against BRMT (as it is named by the Lead Plaintiff) victims has been steadily expanded to involve numerous domestic police powers operations, political and commercial connections of knowledgeable insiders, and a number of allied intelligence operations such as the United Kingdom's MI-6 and Canada's CSIS as co-conspirators.

310. Some of these Defendants are named Defendants and the identities of others are not yet known, including some potential defendants or agents of defendants who may have appeared

in various scenarios over many decades. The true extent, including the precise date of initiation

of human, civil, serial RICO, and other rights violations, and the duration of the conduct by any

specific named or unknown Defendant, cannot be reasonably ascertained by the Plaintiffs

without extensive discovery. But Defendants' associated-in-fact enterprise has engaged in

systematic and increasingly frequent lethal attempts (see examples at LP Evidentiary Exhibits

pages 774-785 and Table 1 herein) to rid itself of the most visible participant, the Lead Plaintiff,

as described in this Complaint. Defendants have doubtless caused harm to many other innocent

and unwitting people throughout the United States across the five decades that BRMT has

operated to date.

311. Unlike MKUltra, we do not even know the number of times these BRMT brain

hijacking instructions have been administered over the past fifty years. Given the accelerating

pace of technological change and the speed of today's computer and communications

technologies, we can be confident it has been far greater than the 100 million times MKUltra

would have illegally provided the LSD doses it purchased from a Swiss pharmaceutical

company. A single supercomputer installation of today can process three quadrillion instructions

(3,000,000,000,000) per second. Defendant United States owns dozens of these supercomputer

installations throughout its military, intelligence, police powers, and civilian agencies.

**Lead Plaintiff's Experiences With Various Classes of Defendants' Criminal Offenses Under Color of Law – A Sampling**

### A. Lead Plaintiff's Personal Life Continually Manipulated and Episodically Destroyed

312. Lead Plaintiff's personal life has been dominated by BRMT since at least his

attendance at Washington State University beginning in 1974. This BRMT dominance may

extend to his high school years beginning in 1970 at Decatur High School, a specialized high

school in the Federal Way School District, Federal Way, WA which graduated only 83 students

in its first graduating class and was spun out of another high school in the district three years

before the Decatur High School building was even completed in 1973, months after the Lead

Plaintiff's high school graduation. Around 350-400 students were in each graduating class of the

other two high schools in the district at that time.

313.   Since that time into the present, BRMT has been ever present, as have minders

assigned by Defendant United States and posing as roommates, friends, fellow employees,

romantic interests, realtors, bankers, and in other roles intended to provide Defendant United

States' BRMT program management with continuous awareness and extremely powerful

influence over many life choices. This included the carefully contrived selection of his second

wife, and perhaps even his first wife. Since that time, dozens of fake police powers dates have

been cycled through the Lead Plaintiff's life in 2005, 2008, and 2019-2021.

314.   In late 2004 and 2005, Lead Plaintiff was subjected to a series of approximately 15

to 20 online dates in the Seattle and Portland areas with Defendants' undercover police powers

personnel. This pattern of personal interference, including online romance scams, hacking of

online dating sites, and fraudulent matches with police powers personnel and police powers

assignees has continued since late 2007 in the New Jersey/New York City region. While the

overall New Jersey/New York City area population is about 15% Black, more than 90% of Lead

Plaintiff's dates were Black females, a sure sign of police powers screening and selection of the

dates which were able to respond to online matching invitations from the Lead Plaintiff, a White

male. Except for two female agents or officers of Defendants, these outing lasted no more than

two dates, mostly just one. Color of law honey trap sting operations have also been run on the

Lead Plaintiff on city streets, shops, parks, performance venues, subways, buses, and all other

public places in New York City for approximately seventeen years, with accelerated intensity from November 2018 to the present in New York City on virtually every visit there.

### B. Lead Plaintiff's Personal Finances and Assets Repeatedly Subjected to Forced Liquidation

315.  Lead Plaintiff substantially improved five residences over the past 40 years, ranging from modest remodels and interior renovations to extensive landscaping to complete rebuilds and 60% square footage additions. Upon completion of each of these improvements, Defendant United States contrived a life event which forced the liquidation of these assets to a third party. Both divorces and indirectly forced removal due to financial or other circumstances "occurred" soon after those renovations and rebuilds were fully completed. The properties sold or were re-rented very quickly, indicative of Defendants' insider knowledge and advantage. Violations of Lead Plaintiff by Defendants have over time resulted in forced liquidation of all assets on multiple occasions, including the first family home he and his wife purchased for $184,340 around the age of 30 as shown below:

*Interline Exhibit 3:* **Redmond Residence – Added Rear Landscaping 14,000 Square Feet, Added In-ground Sprinklers Front and Rear Covering 28,000 Square Feet, Renovated Front Planting Beds**



17026 NE 133rd St, Redmond, WA 98052

**$1,866,388**     **4**    **2.5**    **2,800**
Redfin Estimate    Beds    Baths    Sq Ft

**Is this your home?**

Claim this home to track its value and nearby sales activity

316. Lead Plaintiff's second family home was liquidated after about ten years of labor and investments to rebuild from the back fence line to the front sidewalk. This second family home started as the reverse floor plan of the house first shown below. This house is on a lot which shares a southeast lot corner with Lead Plaintiff's second home and fronts on a neighboring street. Lead Plaintiff rebuilt its reverse floor plan twin as shown in the second set of photos below (all three photos are from Redfin.com on October 13, 2022),

*Interline Exhibit 4*: **Kirkland Residence -Rebuilt and Added 60% Square Footage Enlargement**





317.  All of Lead Plaintiff's material possessions except for one rolling suitcase, and boxes left at his sister's house (nearly all of which were subsequently donated and likely collected by Defendant police powers personnel posing as charity workers for yet another illegally pretexted search and subsequent distribution to favored persons), were forfeited when Lead Plaintiff left Seattle for Boston in 2005. This cycle of physical possessions and improvements forfeiture was repeated again when Lead Plaintiff was removed from the apartment he furnished and improved in Cliffside Park, NJ in October 2010, shortly after filing litigation in Newark federal court and then forced into a psychiatric hospital for six months of confinement. After leaving the hospital in 2011, he lived in shared housing in Ramsey, NJ, and again spent considerable personal funds to furnish new furniture and appliances to a tired, outdated apartment, and within four months furnished a new residence yet again in 2018 as he was moved to Edgewater, NJ.

## C.  Lead Plaintiff's Professional Life and Commercial Enterprises are Repeatedly Defrauded and Destroyed

318.  Frauds and litigation have been used in each and every commercial enterprise of the Lead Plaintiff throughout his career to manage and control his professional path. Shortly before Lead Plaintiff graduated his MBA program in 1979, he returned to his university from a Spring Break recruiting trip to GTE in Stamford, CT, by detouring through Washington, DC. Then CIA Director Turner went out of his way, unknown at that time to the Lead Plaintiff, to surreptitiously and silently greet the Lead Plaintiff in the East Building rotunda at the National Gallery of Art. The moment stuck in the Lead Plaintiff's mind and was reverse engineered by Lead Plaintiff using visual memory in 2021.

319.  In 1979, Lead Plaintiff was tracked into a consulting career at an international accounting and consulting firm with 16,000 US employees and partners, Deloitte (then known as Haskins & Sells) in Seattle, WA by a referral from his university advisor. There he met and became friends with the FBI agent husband of his audit manager, and, though unknown at the time, with CIA commercial cover officers and alumni contractors who worked on key projects in South Africa and Saudia Arabia which doubled as intelligence acquisition assets of US intelligence. He replaced one CIA contractor/commercial cover officer, David P. Moller the project manager on the South Africa banking system ATM project, at his next career move (assignment). He then moved on to a series of markedly unsuccessful business ventures and employment, each one impaired or destroyed by (a) substantial contract frauds; (b) money collections frauds; (c) malicious litigation strategies; (d) money-losing purposeful overstaffing of enterprises, (e) failed (purposely sabotaged) projects; (f) deprivation of government benefits enjoyed by the predecessor owners and immediately removed upon his assumption of ownership or control; and (g) carefully pre-texted involvement in national security projects and assets from 1995 onward at an engineering firm working on engineering and information technology projects for various rocket, satellite, and nuclear technology related projects and companies.

320.  Perhaps intending to accentuate the psychological shock of the next  programmed collapse into suicide ideation followed by homelessness as conducted by Defendants, Lead Plaintiff was allowed to be selected during the early 2000s as the volunteer regional Chair for the northwestern United States of AeA, the preeminent technology trade association representing Microsoft, Intel, Hewlett Packard and other multinational and smaller technology firms in Washington, DC and many state capitols. While there, he worked directly with Washington Governor Locke's staff and was asked by the Governor's Chief of Staff to accept a key

appointed volunteer position as Chair of the state's Higher Education Coordinating Board. He also worked with key Democrat and Republican legislative leaders on higher education access and a variety of other state policy issues. See LP Evidentiary Exhibits page 10780.

### D. "National Security" Pretexting of Lead Plaintiff by Defendant United States Accelerated After 9/11 Attack

321. After the terrorist attacks of 9/11/2001, Lead Plaintiff's life become markedly worse as CIA, FBI and other federal agencies were rewarded with greater powers for their notable failures in the months preceding the attack. In 2002, Lead Plaintiff left CNA Industrial Engineering, formed a new enterprise Allegent, LLC dba Performa, which failed after Defendants actions involving, as in times past, check fraud, compensation fraud, and litigation expenses, combined with other fraudulent police powers color of law actions including commercial sales frauds were used to destroy this consulting partnership under color of law. During this period, Lead Plaintiff was systematically abused by Defendant United States' torturous use of BRMT brain hijacking and psychological operations to force him to the point of suicide ideation, after which he was forced to quickly sell the home he had worked for years to improve in order to avoid foreclosure. When his funds ran out in late 2005, he was eventually forced into homelessness. More details are included in Table 2-0024, 0060, 0077, 0084, 0088-0097. Through this torturous process, Defendants again stripped Lead Plaintiff's assets.

322. Fleeing by Defendants' design as detailed at Table 2-0105 to 2-0115 to the next pretexted destination, Boston, on December 23, 2005 to avoid the possibility of adverse acts being directed at other family members to entrap the Lead Plaintiff, homelessness ensued in early 2006 when his remaining funds were exhausted. After seventeen months of homelessness in Boston he was next human trafficked in August 2007 to 10 months of involuntary servitude

and forced labor in faked employment at Establish, Fort Lee, NJ on two interstate projects. Lead Plaintiff performed a faked Sales and Operations Planning software selection project, ostensibly for PPG's Paint and Coatings Division at PPG headquarters in Pittsburgh, PA. He then "developed" and performed a faked project for Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA. See LP Evidentiary Exhibits pages 8351-8352, 10305-10310, 10311-10364. The PPG project sequence included a tangential Pittsburgh hotel evening cameo with the Pitt Football team at one of their public fundraising meet and greets which coincided with Defendant FBI's investigation of the Pitt football assistant coach child sex scandal in late 2007-2008.

323.  During this period, he was also placed under a carefully pretexted national security color of law investigation for terrorism by a Joint Terrorism Task Force in the New York City/New Jersey area and its own much greater intelligence and police powers operations in the region. Defendant United States has a much greater concentration of intelligence and police powers assets and a closely collaborating set of police powers agencies, such as Defendants Bergen County Sheriff, Port Authority of New York and New Jersey Police, New York State Police, New Jersey State Police, and City of New York Police Department, some of whom have long histories of rights violations and extensive use of deadly force. A trip to London also dragged MI-6 into the mix again as Defendants had in Seattle in 1993-1994.

324.  Defendant United States was the initiator of this entire sequence, was its pretexter from 1972, deliberately entangled Lead Plaintiff in national security, and was fully aware at all times that there was no basis in law for this suspicion nor for the highly intrusive and perpetual "investigations" but purposefully failed to act to quash and in fact fully participated in spreading disinformation to others in police powers agencies and the general public, conspired with and participated fully and knowingly in these perpetual pretexted "investigation" of the Lead Plaintiff

plainly desiring an "extinction event" to rid itself of a visible "problem" citizen and the prime

witness to this and other Constitutional and human rights crimes and violations of these

corrupted police powers organizations and their series of associated-in-fact enterprises.

### E. Defendants Malicious Acts Against Lead Plaintiff AGAIN Extend to Torturous Acts

325.   During late 2008 through the first months of 2010, Defendants again engaged in

extreme and continuous BRMT biochemical abuse of Lead Plaintiff's brain chemistry. This

abuse altered the Lead Plaintiff's brain biochemistry to the point of a second suicide ideation and

included extended periods of physically torturous actions, muscle spasms, and sleep deprivation

using BRMT very aggressively; a Secret Service drive-by of the Presidential limousine; removal

of a supposed terrorist from his seveNSEC-unit apartment building by FBI; and other efforts to

induce psychological and physical fear.

326.   Upon completing his second attempted legal complaint, this time to the Federal

District Court in Newark in June 2010, his apartment was rented out from under him to a third

party and he was forced back into second episode of homelessness. The following day, the

combination of stresses landed the Lead Plaintiff in a locked mental hospital ward for six

months. He was deemed "schizophrenic" and, early in the initial involuntary stay, placed in a

padded cell with unexplained medications administered by a needle to his buttocks while held by

two orderlies on at least two occasions. Lead Plaintiff continued his search for work, using a

social worker's computer for the permitted 15 minutes per day during his last three months at

this facility. These internet searches were also blocked by Defendants, as they continue to do to

this day,

327. The ten months at Establish have been his only permitted source of earned income

from 2002 (age 51) to the present (2023, age 68). All subsequent efforts, even as a night stocker

at a Ramsey, NJ grocery store, have been blocked as have most personal contacts. Essentially, Defendant United States and its racketeering co-conspirators intended this as a final trip for the Lead Plaintiff – this time to the garbage disposal. Despite Lead Plaintiff's repeated diligent search efforts since August 2008, Defendants have employed mail fraud, wire fraud, and other acts to preclude all further employment, force the Lead Plaintiff to exhaust the five year limit on public assistance and live on Social Security retirement. His personal life has been similarly impacted and constrained as described above and in Table 2 from 2-0150 through the end under the column "Destroy Families and Personal Relationships..."

328.  As shown below in Interline Exhibits 5-13, despite their sworn Constitutional and legal obligations, Defendants have for years engaged in conspiracy against rights, frauds and injuries to the Lead Plaintiff, directly interfered in interstate commerce, including corporate agricultural production for sale to large international retail companies, attempting to supply foreign entities with agricultural products, seeking farming land and enterprise purchases across state lines, attempting to raise financing in state, across state lines, and in other countries, making personal use of out of state websites to purchase commercial and personal goods and supplies and commercial and personal services. See fifty examples directly related to interstate commerce at subcounts RICO-1 through RICO-50. See also LP Evidentiary Exhibits pages 140-189, 380-386, 616-765, 1076-6094, 8233-10613, for thousands of further examples. Additional examples prior to 2008 are currently in the hands of Defendants, and certain records from 2018 through 2020 are blocked from Lead Plaintiff's access at this time.

*Interline Exhibit 5*: Sample WinnettOrganics Organic Vegetable Arizona Business Plan

**Winnett Perico,
Inc.
Arizona Operations**



**Business Plan**

*Interline Exhibit 6:* **$100,000 From Fake Investor "Dean T. Smith"**



Redacted Per Court Rules

329. Agency Sourced Funds Used to Seed Finance WinnettOrganics Startup: Note this check is signed by a person named "Cook," the name used by the "owner" of CNA Industrial Engineering, Inc., one in a series of former intelligence acquisition platform "network capture" Defendant United States cover employers of the unwitting Lead Plaintiff which engaged in compensation fraud, forcing the Lead Plaintiff to waste financial resources on litigation expense, delaying legally due compensation, and damaging personal credit.

330. These compensation thefts by network capture employers, as well as forced compromises of legally due sums to various businesses owned or managed, and deprivation of benefits such as access to SBA performance bonding and loan guarantees, have cost the Lead Plaintiff literally millions of dollars in lost revenue and at least hundreds of thousands of dollars in personal income over his active twenty year career. Further, the Lead Plaintiff was "network captured" by Defendant United States for involuntary servitude between 1979 and 2002, limiting his income and resulting in repeated continuity of employment issues, access to fair market compensation and other career and business opportunities available to all under law. No work has been permitted to Lead Plaintiff by Defendants since 2002, except for ten months of fake employment at Establish in New Jersey.

***Interline Exhibit 7:*** **Fraudulent Financings: Adamson Brothers Fake Private Placement Memorandum and SEC S-1 Consume $40,000, Raise $0**

Name of Offeree _____
Copy Number _____

**WINNETT PERICO, INC.**
a Colorado Corporation

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

Shares of Common Stock
Price Per Share $5.50
Maximum Offering $22,000,000 (4,000,000 Shares)
Minimum Offering $11,000,000 (2,000,000 Shares)
Minimum Investment $49,500.00 (9,000 Shares)

**THESE ARE SPECULATIVE SECURITIES WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE SHARES. SEE "RISK FACTORS."**

**THE SHARES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION SET FORTH IN THE ACT. THE SHARES HAVE NOT BEEN REGISTERED WITH ANY STATE SECURITIES AUTHORITIES IN RELIANCE ON EXEMPTIONS FROM SUCH REGISTRATION. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE RISKS INVOLVED. THE SHARES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF AN INVESTMENT IN THE SHARES FOR AN INDEFINITE PERIOD OF TIME.**

| | Sale Price | Selling Commissions[1] | Proceeds to Company |
|---|---|---|---|
| Per Share | $5.50 | $0.55 | $4.95 |
| Minimum | $11,000,000 | $1,100,000 | $9,900,000 |
| Maximum | $22,000,000 | $2,200,000 | $19,800,000 |

Consultant Founder

**ADAMSON BROTHERS CORP**
**The Date of this Memorandum is September 20th, 2015**

_____
[1] The footnotes represent the maximum amount of the 10% of the State minimum subscription for any Investor.
[2] Broker-dealer receiving a 10% of the gross proceeds from the sale of the shares in this offering payable to Adamson Brothers Corp, the $0 consultant founder.

See also LP Evidentiary Exhibits pages 6095-6223, 8288-9901 for further documents and pages 1076-6094 for emails, all evidence of Defendants' interferences with interstate commerce from 2008 to present. This lack of results while consuming scarce financial resources is completely consistent with other pattern evidence of fraudulent financing activities inside defendants' network controlling lead plaintiff's personal and professional life, including in interstate commerce in each commercial endeavor both as an employee and as an entrepreneur.

*Interline Exhibit 8*: Kroger Corporate Email Account Hides True Identity of Defendant Personnel

---

**Dennis Brewer**

---

| | |
|---|---|
| **From:** | Krempel, Jacob A - jacob.krempel@kroger.com> |
| **Sent:** | Wednesday, October 5, 2016 9:12 AM |
| **To:** | dennis_brewer@winnettorganics.com |
| **Cc:** | Merced, Jose F |
| **Subject:** | FW: Organic Fresh Foods |

Hi Dennis-

Jose (Buyer) and myself (Category Manager) handle our Fresh Organic business, and are open the week of November 7th to meet with you. Give us a couple options on date/times that you would prefer and we will get back to you with our availability.

Thanks,

*Jake*

**Jacob Krempel | Produce Category Manager**
**Kroger Co. | 1014 Vine Street Cincinnati OH. 45202**
☎(office): 513-562-5794 | ✉(email): **Jacob.Krempel@Kroger.com**

*Interline Exhibit 9:* **Walmart WinnettOrganics Produce Supply Contract Meeting at Bentonville, AR Home Office**

From: Ronald G. McCormick [mailto:Ron.Mccormick@walmart.com]
Sent: Wednesday, January 11, 2017 12:29 PM
To: Ashley Kilgore <Ashley.Kilgore@walmart.com>
Cc: Julia Moore <Julia.Moore@walmart.com>; Dennis Brewer <dennis_brewer@winnettorganics.com>; Laura Himes <Laura.Himes@walmart.com>; Dan Irwin <Daniel.Irwin@walmart.com>
Subject: PLEASE SCHEDULE RE: Winnett Organics Strategic Partnership

Ashley, please send this planner

Title: **Winnett Organics Collaboration**
Purpose: To consider ways that Walmart and Winnett could work together to increase organic acreage and availability to meet future demand.
Time: 1:00 – 2:30 February 21st
Required: Shawn Baldwin, Ron McCormick, Laura Himes, Dennis Brewer, CEO WinnettOrganics, Inc. (dennis_brewer@winnettorganics.com (623) 207-520-549-6245
Optional: Michael Cochran, Mike Hancock, Yoshie Fuji, Jeff Thorpe, Victor Velage, and Dan Irwin.
Details:

- Dennis may want additional people from his company to join.
- Please schedule a WebEx and meeting room...I believe Dennis is coming in person, but other may wish to call in.
- We will want to show a PowerPoint so an enabled room is needed.
- Don't let the optional attendee's calendars be an issue because this Julia is holding this time on Shawn's calendar.
- Please include the agenda below without the parenthetical notes.

**Agenda**

- Introductions
- WinnettOrganics, Inc. Overview (Updated deck needed from Dennis)
- How Walmart sources and sells organics
- Current and potential growing areas (Walmart GDC map with WO. Inc. growing areas added is needed)
- Crop priorities for Walmart and Winnett and where they intercept, and where greatest potential exists.
- Preferred Varieties and Resilient sourcing (need a summary slide if Victor feels we can share)
- Interest and Next Steps

***Interline Exhibit 10:*** **Winnett Organics Organic "Produce Consultant" Greg Crossgrove is Defendant Sheriff Joseph Arpaio, Convicted Serial Civil Rights Violator**

**Gregory P. Crossgrove, Inc.**
**Agriculture Consultant**

**GREG CROSSGROVE**

Cell: 602-909-6357    Email: gpcrossto@yahoo.com
Website: www.crossgroveconsulting.com

**Joe Arpaio**



Arpaio in 2016
**36th Sheriff of Maricopa County**
**In office**
January 1, 1993 – January 1, 2017

# Contents

**Early life**

**Tenure as sheriff 1993–2017**
    Jail conditions
    Tent city jail
    Public relations actions
    Immigration posse
    Organizations criticizing Arpaio
    Claims that sheriff's office failed to properly investigate serious crimes
    Targeting of reporters
    Targeting of political opponents
    Election law violation
    Misspending analysis
    Misconduct and mismanagement memo
    Wrongful arrest and entrapment lawsuit and settlement
    Abuse-of-power allegations and investigation
    Immigration patrols

**Federal class-action suit**

***Melendres v. Arpaio*** racial profiling class-action lawsuit

**Litigation on jail conditions**
    *Graves v. Arpaio*: federal court finding of unconstitutional jail conditions
    *Braillard v. Maricopa County*: wrongful death suit and settlement

**Justice Department investigation on racial profiling**
    *United States v. Maricopa County*

**Birther movement**

**Conviction for contempt of court and presidential pardon**
    Contempt of court
    Presidential pardon

**Election results**

https://en.wikipedia.org/wiki/Joe_Arpaio_and_the_Maricopa County Sheriff%27s Office %28MCSO%29_litigation against Arpaio

***Interline Exhibit 11:*** **Lead Plaintiff Sued Individually in Federal Court For Alleged Misuse of Funds Provided For Police Powers Entrapment Operation**

***Interline Exhibit 12:*** **Lead Plaintiff Starts New Enterprise - Sheldon Beef Example Business Plan**



*Interline Exhibit 13:* **Cover Page of Sheldon Beef Sales Contract Signed With Wal-Mart (China) Investment Co., Ltd., a Walmart Inc., subsidiary**

Walmart contract implementation was dragged out by insider defendants until Trump started the China trade war in 2018 and countervailing Chinese tariffs made retail pricing excessive.

**Interline Exhibit 14:** August 2021 58th Anniversary MLK "I Have A Dream" Speech Lincoln Memorial Permit Allegedly Cancelled by Organizer – FALSE FOIA Response to Cover First Amendment Violation



**United States Department of the Interior**

NATIONAL PARK SERVICE
Interior Region 1 - National Capital Area
1100 Ohio Drive S W
Washington D C 20242

FOIA 2021-6105

September 22, 2021

Mr Dennis Brewer
1210 City Place
Edgewater, NJ 07020
dsbrewer923@hotmail.com

Dear Mr Brewer:

Subject: Freedom of Information Act Request Dated September 20, 2021
National Park Service (NPS) re: National Mall and Memorial Parks

This letter is in response to your Freedom of Information Act (FOIA) request dated September 20, 2021, in which you requested "On August 28, 2021, I attended a voting rights related event on the National Mall adjacent to the National Archives Building I am making a FOIA request to identify the sponsors of that event. This event occurred at the same time as another voting rights event at the Lincoln Memorial Please let me know if you require other information from me prior to fulfilling my FOIA request. Thank you."

The following response was prepared by the National Capital Area through consultation with the division of Permits, National Mall and Memorial Parks. The FOIA, 5 U S C § 552, generally provides that the Government shall make documents available to the public for inspection and copying to the widest extent possible. However, certain classes of documents may be exempt The FOIA does not require that new records be created in response to a request and only applies to records in existence at the time the request is received. Additionally, because the NPS creates and maintains law enforcement records, we are required by the Department of Justice to provide the following information, even though it may or may not apply to your specific request Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U S C § 552(c) This response is limited to those records that are subject to the requirements of the FOIA This is a standard notification that we are required to give all our requesters and should not be taken as an indication that excluded records do, or do not, exist

We have enclosed 2 pages of records that are responsive to your request which are being released to you in full

We have classified you as "other" requester However, we do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be

INTERIOR REGION 1 · NORTHEAST NATIONAL CAPITAL

**NYPD and FBI Coordinate Cover-Up of Human Trafficking, Pre-Texted Investigations**

331.  Defendant NYPD confirmed the earlier terrorism investigation on September 3, 2021 (Interline Exhibit 15) against Lead Plaintiff but refused to produce the information, which refusal was appealed. In NYPD's September 15, 2021 reply to Lead Plaintiff's appeal of the refusal to produce, Defendant NYPD stated there was absolutely no record of any contact with Lead Plaintiff nor any records indicating any such investigation, plainly a bald-faced lie. An FBI liar letter then followed on September 30, 2021. See also LP Evidentiary Exhibits pages 354-367, 799-802, and 10302-10304.

332. FBI Headquarters issued that denial letter below (Interline Exhibit 16) on September 30, only 15 days after NYPD disappeared its records from their system. These are obvious official lies by both FBI and NYPD, are clearly coordinated, and may constitute criminal destruction of evidence. This sequence disavows and removes from the evidentiary record key evidence of human trafficking and servitude over time, as well as pretexted national security entanglements, to wit:

333. Lead Plaintiff's direct supervisor at Establish, William Drumm, was identified in September 2023 as Charles "Chuck" Rosenberg, now an MSNBC legal analyst. As an FBI official during Lead Plaintiff's tenure at Establish, Rosenberg was Lead Plaintiff's human trafficker, interviewer, and hiring manager. Rosenberg had previous undercover history with Lead Plaintiff dating back to the early 1980 when the first known lethality attempt against Lead Plaintiff was attempted in British Columbia as noted at paragraph 343. Other long-running FBI entanglement details follow this exhibit.

334. FBI Headquarters would have known Rosenberg moved from FBI Anchorage field office cover to a Seattle cover legend as Chuck LeFevre in the early 1980s to become CEO of the

startup natural foods wholesaler and FBI spying operation at NutraSource. He joined Andrew

Weissman, a former FBI general counsel, a deep cover agent known as Lyle Whiteman to Lead

Plaintiff while engaged in embed spying as General Manager of Puget Consumers Coop in

Seattle. Whiteman was directly responsible for the loss of hundreds of thousands of dollars of

PCC equity by his opening of a failed store in South Everett, a continuing cash drain for about

two years on PCC's limited resources. Lead Plaintiff served on the Boards of PCC and

NutraSource for about three years.

335. Nutra Source was formed on the bankruptcy court wreckage of three natural and

organic foods wholesalers in Seattle. The Board of NutraSource also included two white males

from Oakland Food Coop which was in the late stages of being financially ruined under their

supervision by internal dissension, a classic FBI wrecking operation well known to Lead Plaintiff

during his employment servitude with FBI. This team is likely largely responsible for the

wrecking sequences in Washington state, national security entanglements there, human

trafficking to Boston and homelessness, thence human trafficking to New Jersey for fraudulent

employment, servitude perpetuation, and pretexted terror color of law abuses.

336. Subsequent to this NYPD and FBI sequence at Interline Exhibits 15 (NYPD) and 16

(FBI Headquarters), Lead Plaintiff writes to DOJ Inspector General and receives a no interest

reply, then provides a response to the no interest letter, and receives no further

acknowledgement. This DOJ IG sequence is shown in Interline Exhibit 17. Individual

defendants, and former FBI and DOJ personnel, Rosenberg, Weissman, Rubin, and Melber are

all current residents of the greater New York City area where defendant has lived since his

human trafficking here by Rosenberg in 2007. All also apparently worked at some point since

leaving Washington state for FBI and/or DOJ in northern New Jersey or New York City. Several have direct senior ties to FBI, Weissman as General Counsel at one point.

337. FBI New York is the possible source of the block of emails in accounts owned by the Lead Plaintiff's between 2018 and 2020. That FBI office ran an illegitimate interference with interstate commerce against the Lead Plaintiff, joined by FBI Amarillo. This pattern is consistent with FBI's past pattern of practice against Lead Plaintiff in his prior commercial endeavors from 2011. This racketeering pattern sequence against the Lead Plaintiff involved agents in the New York City Manhattan office posing as the principals of Sole Source Capital, a named Defendant. Sole Source principals Rossi and Turner verbally promised a major investment in a meeting with the Lead Plaintiff at the St. Regis Hotel bar, New York City, on January 9, 2018, then reneged including through a phone call on January 23, 2018. As is FBI's custom, fraudulent investment promises were made verbally in the presence of a team of agents (four in this meeting) and then reneged in writing sometime later, often after weeks or months of delay, intended to string out and distress the target, regardless of whether there is any valid basis for their actions, in the vain hope the target will violate some law or regulation so they can perpetuate their actions. When this fails, they terminate within 90 days to evade the inspection process and rotate the responsibility to another team in another location.

338. In this scenario, FBI New York chose to rotate that role to FBI Amarillo, which is the federal jurisdiction of a single federal judge known for prejudicial decisions toward certain classes of defendants should a case mature to that point. CFOSearch, in the form of Mike Maggard in Lubbock, Texas, was the vehicle of choice used by FBI Amarillo. CFOSearch recruited a foreign national for consideration as CFO of Winnett Perico, the company which the Lead Plaintiff was attempting to start in interstate commerce. After months of captive fruitless

financing attempts by Lead Plaintiff were shuffled around using electronic frauds to sustain their captive environment and involuntary control of Lead Plaintiff, Maggard provided $6,000 for Lead Plaintiff's business use to develop a website, which the developer never completed (a common experience across FBI operations against captive targets like the Lead Plaintiff is that tasks are never allowed to proceed to full completion, there is always one last thing and not quite enough funds are ever available). Maggard also provided funds to the Lead Plaintiff used in a good faith effort to retire credit card obligations while attempting to improve his personal credit score so he could co-sign for a business related loan. Maggard then solicited advice about whether to lie during a loan application process.

339. The captive business project failed with much sturm and drang throughout the process as usual. The good faith acts by the Lead Plaintiff, part of his 50 year pattern of actions in interstate commerce, left FBI Amarillo with no legal pretext to continue its prejudicial operation and a problem directly traceable to its Maggard, its CFOSearch cover operation principal - the $6,000 personal loan to the Lead Plaintiff. Interest needs to be paid on the loan in order to avoid it becoming taxable income to the Lead Plaintiff. This interest payment was made in good faith in early 2023. This leaves the loan outstanding and avoids the requirement to declare the loan as income if defaulted personal or to risk his Section 8 voucher through a failure to properly report his income. Failure to report income leading to forfeiture of the Section 8 voucher was likely the real purpose behind this FBI scheme. This would force Lead Plaintiff from his residence (again).

340. Generally speaking, the northern New York and New Jersey police powers environment has become notably more hostile toward the Lead Plaintiff again in 2021-2023 as it was in 2008-2010. This time it is because of the complaints by Lead Plaintiff to the U.S.

Attorney SDNY and work toward police powers accountability being made through this litigation. To solve this traceability dilemma for FBI Amarillo, another FBI scheme was unhatched in 2023. A Whistler, British Columbia condo timeshare formerly owned by Lead Plaintiff and his second wife was presented for release of interest, despite the interest reportedly never having been recorded as required by law in British Columbia, and reportedly never having appeared on the ownership records of the condo association. This generates a roughly $6,000 capital loss to the Lead Plaintiff in 2023 which is approximately equal to the $6,000 loan value. This incentivizes a default by Lead Plaintiff on the FBI Amarillo Maggard loan, as the capital loss on the condo would offset the income effect of the default on the cash loan from CFOSearch, thus taking it off their books so the evidence destruction period could result in its removal from accounting records, leaving no trace of the operation.

341. Lead Plaintiff has come to more clearly recognize these Defendant pattern offenses and evidence destruction practices through his continued forensic review in 2023 and declined any opportunity to default. Litigation discovery using this pattern evidence will demonstrate continued predicate acts consistent with the racketeering patterns in this complaint, this time using the Defendant's own still available records. Meanwhile, deprivation of Lead Plaintiff's access to owned emails accounts which inculpate Sole Source and FBI New York continues. Evidence preservation letters were sent to FBI in 2021.

342. Further acceleration of the enhanced threats intimidation, harassment, and lethality sequences cycle from 2021 continues in northern New Jersey and New York City, as related below at paragraphs 343-348.

*Interline Exhibit 15:* **Defendant NYPD Assists Defendant FBI Cover-up**



NYPD admits existence of records documenting FBI Rosenberg's pretexted terror operation on September 3, 2021 above, then denies any records on September 15, 2021, next page.



**POLICE DEPARTMENT**
Office of Deputy Commissioner,
Legal Matters
One Police Plaza, Room 1406A
New York, New York 10038
FOILAppeals@NYPD.org

September 15, 2021

Dennis Brewer
dsbrewer925@hotmail.com

RE:    **FREEDOM OF INFORMATION LAW**
       **REQUEST: FOIL-2021-056-13163**

Dear Mr Brewer:

This letter is in response to your email, dated September 3, 2021, appealing the determination issued by the Records Access Officer (RAO) on September 3, 2021 regarding records requested from the New York City Police Department. Your request, pursuant to the Freedom of Information Law, was originally received by the FOIL unit on September 1, 2021 and subsequently denied pursuant to Public Officers Law §87(2)(e)(iv).

Your appeal of that determination is denied because a diligent search has been conducted for the requested records based on the information provided, however, no records were located. The New York Court of Appeals has determined that "[w]hen an agency is unable to locate documents properly requested under FOIL, Public Officers Law § 89(3) requires the agency to certify that it does not have possession of a requested record or that such record cannot be found after diligent search... Neither a detailed description of the search nor a personal statement from the person who actually conducted the search is required" *Rattley v. New York City Police Dept.*, 96 NY2d 873, 875, 730 NYS2d 768 (2001).

Furthermore, in 2009, the Appellate Division held that an agency cannot produce documents it does not possess or cannot disclose and that the Court cannot require respondents to produce documents that they certify they cannot find after a diligent search because petitioner "has received all that he... is entitled to under the law" *Bernstein Family Ltd. P'ship v. Sovereign Partners, L.P.*, 66 AD3d 1, 8, 883 NYS2d 201, 206 (1st Dept 2009).

You may seek judicial review of this determination by commencing an Article 78 proceeding within four months of the date of this decision.

Respectfully,

Jordan S. Mazur
Sergeant

COURTESY • PROFESSIONALISM • RESPECT

*Interline Exhibit 16:* **Defendant FBI Sends Official Liar Letter in Cover-Up**

U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

September 30, 2021

MR. DENNIS SHELDON BREWER
1210 CITY PLACE
EDGEWATER NJ 07020

Request No. 1505514 000
Subject: BREWER, DENNIS SHELDON

Dear Mr. Brewer

This is in response to your Freedom of Information/Privacy Acts (FOIPA) request. Based on the information you provided, we conducted a search of the places reasonably expected to have records. However, we were unable to identify records responsive to your request. Therefore, your request is being closed. If you have additional information pertaining to the subject of your request, please submit a new request providing the details, and we will conduct an additional search.

Please see the paragraphs below for relevant information that may be specific to your request. Only checked boxes contain corresponding paragraphs relevant to your request. If no boxes are checked the corresponding information does not apply.

☐ Please be advised that your request was reopened based on the additional information you provided. A new search was conducted, and we were unable to identify responsive records.

☐ Records potentially responsive to your request were destroyed. Since the material could not be reviewed, it is not known if it was responsive to your request. Record retention and disposal is carried out under supervision of the National Archives and Records Administration (NARA) according to Title 44 United States Code Section 3301, Title 36 Code of Federal Regulations (CFR) Chapter 12 Sub-chapter B Part 1228, and 36 CFR 122V.10. Please be advised that the General Records Schedule (GRS) disposition authority for FOIPA records is DAA-GRS-2016-0002-0001 (GRS 4.2, Item 020).

☐ Records potentially responsive to your request were transferred to the National Archives and Records Administration (NARA). If you wish to review these records, file a FOIPA request with NARA at the following address:

     National Archives and Records Administration
     Special Access and FOIA
     8601 Adelphi Road, Room 5500
     College Park, MD 20740-6001

☐ Potentially responsive records were identified during the search. However, we were advised that they were not in their expected locations. An additional search for the missing records also met with unsuccessful results. Since we were unable to review the records, we were unable to determine if they were responsive to your request.

☐ The portion of your request concerning an FBI identification record - commonly referred to as a criminal history record or "rap sheet" - has been forwarded to the Criminal Justice Information Services (CJIS) Division for processing. For additional information, see the enclosed FBI FOIPA Addendum General Information Section.

☐ Requests for expedited processing are not applicable when a final response is issued within ten calendar days.

LP Evidentiary Exhibits Page 000799                                    10:05:2022

⌐  Police departments should be aware that the search conducted was limited to FBI records. Requests for criminal history records or rap sheets should be directed to Criminal Justice Information Services (CJIS). Information regarding CJIS is listed in the enclosed FBI FOIPA Addendum General Information Section.

⌐  Records potentially responsive to your request were transferred to the National Personnel Records Center - Civilian Personnel Records (NPRC CPR). In order to obtain information on a file located at the NPRC, your request must be mailed to the following address:

   National Archives and Records Administration
   ATTN: Archival Programs
   P.O. Box 38757
   St. Louis, MO 63138

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. "Part 1" of the Addendum includes standard responses that apply to all requests. "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third party individuals. "Part 3" includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice 441 G Street, NW, 6th Floor, Washington D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Enclosures

FBI's Rosenberg and Weissman first met Lead Plaintiff in the early 1980s and knew him well from dozens of direct interactions as a Trustee and Director of the two organizations they illegally operated for general searches while in their corporate undercover roles in Seattle, Washington. Later terror claims were knowingly absurd and willful abuses of official position.

**Interline Exhibit 17: Defendant Department of Justice Inspector General Declines Investigation of Defendant FBI and Ignores Lead Plaintiff's Follow-Up**

November 9, 2021

U.S. Department of Justice
Office of the Inspector General
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Good day:

I have filed a civil complaint against DOJ and FBI, among others, related to a long-running series of civil and constitutional rights abuses by the United States. This complaint relates an on-going series of manipulations by the Defendants and other law enforcement agencies acting in writing or unwitting cooperation with the United States. A copy of this complaint, filed in US District Court of the District of Columbia is included herewith. I have also attached a list of cooperating and likely cover entities used by Defendants in their pursuit and manipulation of me as Plaintiff.

I will also note that I complained about this matter to Defendants beginning in 2005 with the U.S. Attorney's Office for Western Washington, and during a personal trip (after documents to be delivered by U.S. mail, UPS and FedEx did not reach their destinations or were missing required proof of delivery) with a member of the legal team at FBI Headquarters, by hand delivery to DOJ Headquarters, and to the Executive Office of the President, among others. Further, immediately after filing a complaint in U.S. District Court for New Jersey at Newark in 2010, I was removed from my residence and rendered homeless. That same six unit building had been under FBI surveillance and an alien tenant was removed and deported.

I note that the FBI OIG is conducting a review of undercover entries, some of which may be related to my complaint and the Defendants' pattern of manipulation and harassment. I am also providing a copy of an NYPD response to my FOIA request under New York State Law for your evaluation. Please feel free to share this information with FBI OIG or other OIG operations as you wish.

Kindly review the complaint and the ongoing series and consider careful review of this matter as it is highly likely that similar undertakings against other persons may have resulted in incarceration, injury, destruction of families and businesses, and the death of U.S. persons and others.

Thank you,



January 28, 2022

Dennis Brewer
1700 City Place
Edgewater, NJ 07020

Dear Mr. Brewer,

This is to acknowledge receipt of your recent correspondence and to thank you for contacting the Department of Justice, Office of the Inspector General with your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

March 22, 2022

Dennis Brewer
1210 City Place
Edgewater, NJ 07020

Dear Mr. Brewer:

Thank you for your recent correspondence. The U.S. Department of Justice (DOJ), Office of the Inspector General, investigates allegations of misconduct by employees and contractors of DOJ, as well as waste, fraud and abuse affecting DOJ programs or operations.

The matters you raised are outside our investigative jurisdiction; therefore no action can be taken by our office. You may wish to consult the following web page for information on where to submit certain complaints that do not fall within the DOJ OIG's investigative authority: https://oig.justice.gov/hotline/non_doj_complaints

Please be advised that this is the only correspondence you will receive from our Office regarding this matter. Of course, if you obtain new information that involves other allegations or issues regarding DOJ employees, contractors, programs or operations, please feel free to submit that information to us.

Thank you for giving us the opportunity to review your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

Assistant Inspector General for Investigations
Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Good day -

I received your letter of March 22, 2022, indicating the subjects raised in my complaint were outside your investigative domain. On knowledge and belief, the entire sequence of events involving the financial destruction of Performa, a company I owned in partnership, between 2002 to 2005 was undertaken by FBI. The agency was further involved in improper police powers activities in Boston and New York metropolitan areas summarized below.

The conduct in question is not individual misconduct which can be handled by the agency. Rather, it is **institutional misconduct by an agency within the Department of Justice**. So, I am requesting official answers to the following three direct and specific questions for potential use in civil litigation already filed against the Department of Justice.

1. **Is your office stating officially for the record that institutional misconduct by the FBI is outside the jurisdiction of DOJ OIG?**

A copy of the revised Complaint 22-cv-00592, now pending before the DC District Court, is attached for your convenience.

For your further investigative development, I offer the following if you wish to proceed to investigate institutional misconduct by FBI. The following sales leads have a common thread beyond TSL, they occurred across state lines in the jurisdiction of numerous field offices and in plants that had no employees present (other than faux employees, all FBI field agents upon knowledge and belief).

This fact, the complete absence of hourly and other managerial employees, is unlike any other period of sales activity I had undertaken between August 1979 and September 2001. During that period, I was a consultant who conducted and managed hundreds of projects on behalf of management consulting firms and an engineering firm, in a very wide variety of enterprises, as well as an executive in startup and mid-size commercial enterprises.

In other words, I have vastly more experience and knowledge of the customs and habits of such enterprises than any government employee would reasonably be expected to have. I know and understand the territory of commercial enterprises. Kindly refer to my resume in Complaint 22-cv-00592 for more information.

Upon knowledge and belief, FBI Boston arranged the set up of a dummy company, known to me as Technology Sales Leads (TSL), which I visited in downtown Boston during the period that Performa was in business. TSL provided a series of bogus sales leads in the 2003/2004 period for the unstated purpose of conducting a financial starve-out of the company, which resulted in the loss of my personal residence in Kirkland, Washington in the fall of 2005. The residence itself may well have been subsequently

Complaint originally provided to your office.

Sales leads provided by TSL are shown below. None ever closed and converted to revenue projects, unlike my prior 20 year history of 60% to 80% converting to sales revenue while selling and conducting projects and technological products in large scale, mid-size, and startup enterprises.

1. Bay State Milling, Boston, MA, software improvement
2. Briggs Stratton, Midwest location, information technology
3. Badger Meter, Milwaukee, WI
4. Raynor Garage Door, Dixon, IL
5. First Alert, Aurora, IL, plant operations improvement
6. Borg Warner transfer case plant, Muncie, IN, information technology
7. Alabama telecom, sales discussion including manufacturing cell visibility system requirement
8. Western Digital (CA), manufacturing cell visibility system demo by an alleged VP using the username "Guest"
9. Grocery wholesaler, Midwest location
10. Orange City IA beef plant, purchasing efficiency
11. BioControl, Zoe Schumaker, Lawrenceville, GA, information technology
12. Brightstar, Miami, FL, information technology
13. Rockwell Collins, Cedar Rapids, IA financial planning
14. Rocketdyne Folsom, CA, F 35 e procurement
15. Steel and Pipe Supply, Manhattan, KS, information technology
16. Samsonite, near Denver
17. Holland Group, Holland, MI

A series of fraudulent checks was also proffered to Performa for work conducted, or at least allegedly conducted during this time period by my partner, or a carefully disguised substitute as he allegedly relocated to Tucson with his wife and subsequently reappeared in the Seattle area, totaling about $160,000. Perhaps FBI, being so closely engaged with my company through TSL, was unaware of this, or perhaps they were fully engaged. I am unable to investigate this matter further until the discovery phase of my civil complaint, though perhaps it will offer further evidence of institutional misconduct as part of this overall package of destruction.

**2. Has FBI officially and categorically stated to your office they had no involvement with the Technology Sales Leads Boston boiler room sales leads development and the series of subsequent sales calls involving me and Performa in 2003/2004?**

FBI was also involved during my time in Boston as a homeless person in 2006 and 2007, and in the New York City metro area from 2007 to present. I was trafficked by a police powers network I am currently working to identify and subjected to investigation as a terrorist as confirmed by NYPD. This would strike most people as peculiar, given my previous consideration by the Governor of the State of Washington to Chair the Higher Education Coordinating Board for the State of Washington. This Board oversees an agency which has various regulatory authorities over all institutions of higher education in the state. Also, my tenure as the regional Chair of a high technology trade association and personal familiarity to and with members of the leadership of the state's House and Senate may strike some as a bit contradictory to the concept that I was inclined toward terrorism.

investigation of me as a terror suspect in the state of Washington, the Boston metropolitan area, the New York City metropolitan region, or any other location within or without the United States, between 2001 and the present?

That would stretch credulity well beyond the point of disbelief. I will note again that the landlord of my building informed me that an individual was removed from my seven unit apartment building in Cliffside Park, New Jersey by FBI and handed over to DHS for deportation due to anti American statements or sympathies while I was a resident there.

Finally, I recommend you carefully review the full extent of my Complaint 22-cv-00592 to determine if you can truly disregard any and all institutional misconduct possibilities by any and all agencies, offices, bureaus of the Department of Justice.

I look forward to your reply to my three specific questions above and to other matters as you wish. I clearly understand your investigations are the confidential domain of the Department. Thank you very much for your attention to this matter.

Sincerely,


Dennis S. Brewer
1210 City Place
Edgewater, NJ 07020
201-887-6541


Cc:     Inspector General
        Department of Justice
        950 Pennsylvania Ave NW
        Washington, DC 20530

Enclosures:

        Complaint 22-cv-00592

        Letter to SDNY dated December 6, 2021 (later forwarded to DOJ OIG DC and acknowledged in January 28, 2002 reply)

        Letters to SDNY and OIG – Investigations

                February 16, 2022

                February 28, 2022

                March 2, 2022

                March 21, 2022

                March 25, 2022

Letters from DOJ OIG

January 28, 2022

March 22, 2022

Lead Plaintiff has never received a reply to the letter above dated March 25, 2022.

## A. Defendants' Lethality Attempts On Lead Plaintiff Have Occurred Repeatedly Over Four Decades

343.  The first known attempt in a now long-running sequence of attempts by Defendant

United States against the Lead Plaintiff 's life was an extra-territorial act of attempted double

murder of Lead Plaintiff and his first spouse, Lynne, in British Columbia in the early 1980s as

described at Table 1-001A and LP Evidentiary Exhibits page 181. The series of subsequent

attempts to severely injure or kill the Lead Plaintiff occurred periodically throughout the 1990s,

including during his second marriage to Jeanette from 1990 into 2005, and continued in the

2000s, 2010s, and 2020s into the current year. A more complete sequence as recollected is

shown at Table 1, and in the lethality series (the L subcounts herein) portion of the fact patterns

herein.

### B.  Defendants Accelerated Their Pace of Threatening Behaviors, Severe Injury, and Lethality Attempts in 2021-2023

344. Threatening and potentially severe injury and lethality efforts accelerated from

2021. As during prior decades, these incidents are consistently planned and produced at vast

expense to appear as naturally occurring events, but Defendant United States employs BRMT to

orchestrate these events intended to tamper, retaliate, and intimidate. Information about the ill

effects of BRMT has been communicated to the US Attorney for SDNY beginning in December

2021, including a curated evidentiary record delivered on two identical computer USB memory

drives addressed to SDNY and to DOJ Headquarters use in Summer 2023. Lead Plaintiff has

never received any direct response to any of these communications.

345. Since 2021, examples of defendant BRMT active threats, harms, injury, and lethality

focused actions include:

a)  colonoscopy related trapped fall toward the elevated leg of a roller stand which narrowly

    missed the Lead Plaintiff's right temple in April 2021 (Table 1-039), producible medical

    records available from the hospital;

b) Mets game mini-torture session of outer tendon of left knee tendon (along with induced sleep period during two base hits with loud crowd noise which are completely unheard and unseen) in August 2021;

c) Induced choking on meat by deliberately mistimed BRMT induced swallowing was introduced in early 2022;

d) Verbal threat delivered July 17, 2022 (Interline Exhibit 2A) is the first ever verbal threat in a series which continues in 2023 delivered courageously as always from behind;

e) Sword slice style very precise pattern physical contraction of neck muscles across the back of the neck began, emulating the sensation of a guillotine slicing the neck in August 2022. Since this sensation is literally impossible for the brain to produce except by artificial means this nerve activation pattern is dropped by September, returning to a blunt force karate chop style sensations to the back of the neck. Shortly thereafter, Defendant United States added an involuntary rapid twist of the neck which simulates a lethal neck twist like that used in lethal martial arts;

f) Express train derailment attempt (terrorism) was executed on September 11 (Interline Exhibit 2B), a full somersault fall on the fourth flight of deliberately darkened stairs was orchestrated after sunset using BRMT in Morningside Park, New York City on September 17 (Interline Exhibit 2C);

g) Vehicle rundown threat sequence was run November 18-19 after dark in New York City and in Bergen County, NJ (Interline Exhibit 2D);

h) During 2023, the focus has shifted toward more verbal threats always delivered from behind (of course);

i) Vehicular intimidations continue including pop-outs, blind crosses, bus travel paths and narrow misses, and aggressive electric scooter passes;

j) periodic physical bumps while being adrenaline (fight or flight) hacked by BRMT, among other such events, on late Saturday evening, October 8, 2023, Times Square, New York City);

k) medical injury and medical collapse narrative construction attempts, including previously dismissed heart issues being resurrected by doctors which were previously identified as non-issues of aging,

l) colon blockages to biomedically threaten life and long term health in late summer 2023, medical indifference sequences including a primary care physician walk-off and blocked gastroenterologist phone lines thereafter detailed at LP Evidentiary Exhibits pages 11656-11664.

m) Two severe focused pain mini-torture BRMT attacks of 5 and then 15 minutes to the upper outer tendon of the right knee during the live performance on September 23, 2023 during a Wyton Marsalis concert, and other biomedical threats and harassment, as well as technical hacks and harassment, detailed at LP Evidentiary Exhibits pages 11653-11670.

n) Numerous BRMT driven slips and trips over curbs, stairs and manhole covers continue throughout

345. The extent of Defendants' control of the Lead Plaintiff's environment is demonstrated by Defendants' sabotage of the Hudson Valley Line of Metro-North Railroad the evening of September 11, 2022 shown at LP Evidentiary Exhibits pages 786-793. The Defendants dropped a tree across three of four active rail lines as the Lead Plaintiff was returning from an excursion to Storm King Art Center. This incident occurred as the sun was setting in the

southwestern sky. Since the general direction of travel was into the setting sun, it would have

been difficult for the train operator to see this dangerous track obstruction just after the sunset, an

indication of the sophisticated planning which was used to determine the precise location of the

tree to be toppled onto the tracks. All of the 300 or so passengers on that southbound express

train and on any oncoming northbound train were at risk of derailment from the fallen tree totally

or partially blocking the three eastern tracks of this four track section of the rail line. The

emergency stop resulted in a modest collision with the upper story branches of the tree which

was hit the by engine and several of the passenger cars. The collision resulted in a backing and

rerouting detour and a service delay but, like the other such incidents, could have resulted in the

derailment of the express train at relatively high speed, and severe injury or death to passengers

and crew as it traveled about 30 feet from the Hudson River.

346.   In Morningside Park in New York City at 7:29 pm on September 17, 2022, Lead

Plaintiff successfully navigated three flights of darkened stairs as his eyes continued to adjust

from a bright environment to the darkened path, BRMT forced acceleration of the Lead

Plaintiff's walking pace and locked his head at level vision rather than looking downward. As a

result, Lead Plaintiff was unable to detect the color change which indicated the first step in the

next flight of stairs on the path. When the mid-arch of his foot hit the edge of the first lower step,

he rotated forward and somersaulted to land on his back, injuring the right eye, right forehead,

both hands and left knee. An interesting free to the public movie in Morningside Park was the

attraction for Lead Plaintiff. Bright restaurant lighting, followed by the deliberately extinguished

park path lighting, very dense tree cover of the unlit path, no ambient light, and BRMT

manipulation were combined by Defendants to create this scenario which directly caused a full

forward somersault and physical injury, creating a substantial risk of paralysis or death to Lead Plaintiff, see LP Evidentiary Exhibits pages 786-793 and Interline Exhibit 2C.

347.  The threat sequence run on November 18 and 19, 2022 infers the threat of BRMT hijacked induced inattention to opposing traffic in darkness. This sequence began with electric scooters traveling one-way streets in the wrong direction in New York City to distract attention away from the legal direction of travel while Lead Plaintiff crossed in sidewalks. It then progressed the following evening to the rapid acceleration of a car in a New Jersey shopping center parking lot. The car accelerated immediately after I turned my attention away from the vehicle toward my destination after determining the current speed of the car posed no threat of collision. It accelerated and rapidly braked, stopping about 5 feet short of Lead Plaintiff. He was rendered unable to move quickly out of the way by the remote commands of BRMT which first froze my attention directly forward, then precluded rapid movement to avoid a potential collision on November 19, 2022. This sequence is a rerun of numerous prior BRMT inattention threats which involved street crossings in daylight hours from 2020 forward.

348.  Defendants' recent actions present as clear, definitive, convincing consciousness of guilt. Described at length in this Complaint and accompanying evidence, these acts are the best evidence that these Defendants understand the harsh reality of the prohibited BRMT bioweapon, its illegal use, and intend their actions to cover up their involvement by eliminating the Lead Plaintiff as a key witness. Defendant's malign and malicious behavior is completely consistent with their other and prior conduct noted by Lead Plaintiff in LP Evidentiary Exhibits pages 413-415, 473-507, 598-606, 613-615, 766-769 which document injuries to others.

**C. Defendants' Actions Evidence Consciousness of Guilt**

349. Defendants continue their broad-based stonewalling, hacking, obstruction, and other tampering and retaliations even as this sentence is being typed. They have blocked, hacked, misled, and stonewalled every attempt by Lead Plaintiff to understand the facts and circumstance of their systematic pattern of practices, their misconduct and violations, even as they continue to actively violate a wide variety of Constitutional and statutory protections. Defendant NYPD has continued these operations even as they and other undercover Defendants tacitly acknowledge Lead Plaintiff's presence frequently at the street level in Manhattan.

350. Defendant CIA has never acknowledged the Lead Plaintiff's FOIA and Privacy Act requests despite multiple requests and evidence of delivery as shown in LP Evidentiary Exhibits pages 387-412. Defendant Department of the Army did not do so until October 2022, 13 months after two sequential FOIA/Privacy Act requests for the same information by Lead Plaintiff and letters to the Secretary of the Army. Other Defendant United States departments and agencies also continue to stonewall, failing to meet their legal disclosure obligations required under FOIA, Privacy Act, and other mandatory disclosure laws. This is likely due to "state secrets" issues and restrictions of access to even the most benign information legally accessible which might acknowledge a tiny corner of their comprehensive pattern of racketeering acts, of civil rights violations, and of criminal conspiracies used to hide the existence, duration and broader pattern of prohibited BRMT bioweapon abuses against Lead Plaintiff, other related persons and others in the personal network of Lead Plaintiff, thereby exposing the range and array of criminality of Defendants.

351. Email communications with neuroscience experts in universities and the legal community have been blocked, false flag operations have mounted to attempt inculpatory

connections with the Lead Plaintiff, US mail and parcels have been diverted, delayed, misdirected and "lost" while communicating with the US Attorney's office in Manhattan, attempting to communicate with various public interest law firms and legal organizations, (see LP Evidentiary Exhibits pages 378, 803-843);  police powers have continually interfered with personal relationship attempts (see LP Evidentiary Exhibits pages 378 and Table 2 – Destroy Family and Personal Relationships column), personal interests, with personal matters, hacked printers and computers (see LP Evidentiary Exhibits pages 473-507), directed Lead Plaintiff to specially organized in-house events not open to any other member of the public (see selected examples at LP Evidentiary Exhibits pages 441-459, 564-570) but presenting as ordinary exhibits, performances, and so forth – this list is virtually endless, and on-going for decades as Defendants stall, obfuscate, and lie. Attempts to seek justice are continually being hacked and stymied as Defendants now understand that the Lead Plaintiff finally understands the full pattern of depravity, the broad-based harms and risks of future harms to a broad class of victims

### D. FBI and CIA Abuse International Intelligence Powers and Their Relationships With Foreign Intelligence Agencies

352.  Lead Plaintiff has and continues to experience multiple daily prohibited BRMT bioweapon and bioweapon delivery system abuses. These abuses have occurred both inside and outside the United States. Prior episodes were experienced in Canada, Mexico, and the United Kingdom between the 1970s and 2008, and likely included France, Italy, Luxembourg, and Switzerland in the mid-1980s. Lead Plaintiff has also operated internationally in other countries without physically stepping into those jurisdictions as recently as 2022.

353.  Defendants CIA and FBI are among the defendants specifically known to have foreign operations. Foreign intelligence agencies of allies have been and may continue to be

involved. Under 18 USC § 175, extra-territorial jurisdiction is appropriate as to US persons

impacted by biological weapons and delivery systems used for BRMT hijacking commands

These extra-territorial lethality acts began with the attempted double murder in British Columbia

in the early 1980 as described at Subordinate Count LETHL-1, pages 276-277.

### E. Defendants' Currently Abuse Plaintiffs Using BRMT

354.  The Lead Plaintiff came to understand in 2021-2022 the full scope of his life which

has been subject to the surreptitious control of Defendant United States and its co-conspirator

Defendants. The Defendants wittingly sustain the pattern of racketeering acts and civil rights

crimes and violations, and may have been unwitting as to the prohibited BRMT bioweapon. All

police powers Defendants are witting perpetrators and conspirators iin the pattern violations as to

civil rights and racketeering regardless of their knowledge level regarding BRMT, and have and

do directly conspire and participate in illegal and predatory acts against him and others in this

class of Plaintiffs under color of law.

355.  Lead Plaintiff and others similarly situated do not live as full and free citizens of the

United States regardless of alleged Constitutional guarantees. Based on the massive investment

required to develop and deploy the prohibited BRMT bioweapon and bioweapon delivery

system, and Defendant United States' long history of duplicitous constitutional violations and of

mass deployment of such programs under the guise of "state secrets," it is highly probable the

scale of violations extends to all states, to foreign allies, and of course, to natural current

adversaries. Legal prohibitions on paper (five treaties and the US Criminal Code at Title 18) are

functionally meaningless due to the persistent history of failures to ever, much less consistently,

hold institutional bad actor federal departments and agencies criminally accountable for broad-

based wrong-doing under their tacit permission structures – FBI, CIA, DHS, and the rest.

Instead, we have a persistent culture of public facing sanctimonious public relations, of periodic Secretary and Director apologies and firings for epic scale problems which go unsolved, and Lead Plaintiff's own experience over 50 years– on-going and systemic violations of law, of human rights, and of civil rights throughout.

356. Lead Plaintiff has been dragged by Defendant United States and its co-conspirators on a grand tour of Title 18  - from prohibited bioweapons violations at 18 USC § 175, to myriad frauds at 18 USC § 1037, to racketeering patterns at 18 USC § 1962, to torture at 18 USC § 2340, to war crimes at 18 USC § 2441, all conspired, perpetrated, and enabled by the supposed protector to cover the criminal acts of Defendant United States as it seeks to defend the indefensible – violations of its international obligations under five distinct international treaties and of its own People in knowing and willful offenses against the Constitution. Its history of outrages has and does demonstrably extend to inhumane conduct, even without its direct employ of Nazi Dachau Concentration Camp doctors after World War II to inspire and direct some of these programs. BRMT is the direct descendant and "beneficiary" of this depraved heritage. Defendant United States owns both this internationally prohibited weapon system and its heritage as a weapon used against humanity.

357. The harsh reality of the Lead Plaintiff's life and that of other Plaintiffs of the class is that Defendant United States seeks primarily to protect itself from legal and political consequences and to preserve its research investment in the Lead Plaintiff and others so long as Plaintiffs do not threaten the continued functioning and "state secrets" status of the BRMT program, which status itself in turn protects the exploitive and abusive pattern of racketeering of criminal and rights violations of executives, managers, and operators of the BRMT program. For example, as described in Table 2, each and every real estate and residential improvements

personal financial and do-it-yourself labor cycle of Lead Plaintiff since the 1980s has been completed by the Lead Plaintiff shortly before the Lead Plaintiff experiences an adverse life events sequence and is forced from the residence where the improvements were recently completed. This pattern is also true of personal relationships from marriage to business networks; and of career and business options, opportunities, and destruction cycle of Defendants; to and including divorces and personal bankruptcy.

358. The neuro-technological madness of BRMT is that it is a prohibited biological weapon and biological weapons delivery system which hijacks the brain and free will of its victim - in a country founded upon and ostensibly dedicated to liberty and freedom of choice in a wide variety of personal matters so long as those choices do NOT harm others. Yet it is those sworn to protect who are doing the harm. This perverse system of institutional misconduct is being "protected" as "state secrets" and "national security" apparatus while employing a pattern of racketeering acts and crimes to directly violate the very definition of liberty - a citizen exercising free will. BRMT demonstrates yet again most clearly Defendant United States' contempt for the Enlightenment era concepts applied by the Founders as they created our nation.

359. BRMT demonstrates yet again most clearly Defendant United States' operationalized contempt for the Constitution and the laws of the United States of America. BRMT demonstrates yet again most clearly that Defendant United States holds itself above the People by abusing its "state secrets" privilege to evade accountability, embarrassment, and humiliation for its malicious actions against US persons.

360. BRMT program termination and accountability are the primary purposes of this litigation against Defendant United States and all other Defendants who have been or are culpable and have and do fail to act to prevent injury and who have and do fail to protect rights

as required by our Constitution. This Court holds in its hands the key to liberty in these

Plaintiffs' virtual imprisonment in BRMT by Defendant United States and its Defendant co-

conspirators.

**Persistent Patterns of Government Abuses in US History Validate These Extraordinary Allegations**

361.  These extraordinary allegations by the Lead Plaintiff may strike the court as angry,

unfounded, bizarre, and delusional. But the official history of the United States, including

Congressional Committee and Presidential Committee reports, informs this view of the conduct

of the Defendants. This history confirms our view as rational and fact-based. Current

applications of biomedical, computing and communications technology lend weight to these

allegations. Five key fact sets weigh strongly against the Defendants' likely loud denials and

protests:

362.  **A.  First: Lead Plaintiff's personal history, education, professional experience,**
**and psychological soundness strongly confirm these allegations**. See LP Evidentiary Exhibits

pages 140-236 for a full report and a sampling of indications of psychological fitness below.

[Intentionally left blank.]

*Interline Exhibit 18:* **Lead Plaintiff's Psychological Fitness**

Conscientiousness



Level of Neuroticism



363. **B.  Second: The first FDA approved commercial implant of a brain-computer interface occurred in July 2022.** The implant is a key component of a substantially less sophisticated system than BRMT which is being commercially developed as described at LP Evidentiary Exhibits pages 11-25.

364. **C. Third: The Defense Advanced Research Program Agency (DARPA), an agency of Defendant Department of Defense, since the early 1970s pursues research in the technologies and neuroscience used in BRMT development and openly displays these types of research projects on its website.**

*Interline Exhibit 19*: Relevant Categories of Defendant DARPA Projects



- **Rethink Complex Military Systems:** To help enable faster development and integration of breakthrough military capabilities in today's rapidly shifting landscape, DARPA is working to make weapons systems more modular and easily upgraded and improved; assure superiority in the air, maritime, ground, space and cyber domains; improve position, navigation and timing (PNT) without depending on the satellite-based Global Positioning System; and augment defenses against terrorism.

- **Master the Information Explosion:** DARPA is developing novel approaches to deriving insights from massive datasets, with powerful big-data tools. The Agency is also developing technologies to ensure that the data and systems with which critical decisions are made are trustworthy, such as automated cyber defense capabilities and methods to create fundamentally more secure systems. And DARPA is addressing the growing need to ensure privacy at various levels of need without losing the national security value that comes from appropriate access to networked data.

- **Harness Biology as Technology:** To leverage recent breakthroughs in neuroscience, immunology, genetics and related fields, DARPA in 2014 created its Biological Technologies Office, which has enabled a new level of momentum for the Agency's portfolio of innovative, bio-based programs. DARPA's work in this area includes programs to accelerate progress in synthetic biology, outpace the spread of infectious diseases and master new neurotechnologies.

- **Expand the Technological Frontier:** DARPA's core work has always involved overcoming seemingly insurmountable physics and engineering barriers and, once showing those daunting problems to be tractable after all, applying new capabilities made possible by these breakthroughs directly to national security needs. Maintaining momentum in this essential specialty, DARPA is working to achieve new capabilities by applying deep mathematics, inventing new chemistries, processes and materials, and harnessing quantum physics.

365.  **D.  Fourth: Defendant United States has never renounced Defendant CIA's goal to achieve mind control of humans.** Defendant CIA's predecessor, Office of Strategic Services, as part of the War Department, and the US Army began this search for mind control even before the end of World War II. Adolph Hitler pursued research to develop super-soldiers who could fight on through all conditions and even injuries by taking medical stimulants. Defendant United States pursued Hitler's quest for "super-soldiers" through its espionage programs in Europe. That goal persisted through the disaster of MKUltra to become BRMT.

366.  **E.  Fifth: Defendants' pattern of racketeering acts and rights violations against Plaintiffs clearly violates dozens of sections of United States Code Chapter 18 (Crimes, Prisons, and Criminal Procedure), are undoubtedly illegal, and many acts likely indictable as criminal acts under color of law.** By way of example of conduct against the entire class of Plaintiffs, the pattern of racketeering acts of the Defendants' associated-in-fact enterprise impact all dimensions of the life of the Lead Plaintiff. This is clearly demonstrated by the evidence, which is briefly highlighted in the Facts section and referenced in detail in each Subordinate Count of this Complaint.

**Direct Evidence of Injuries to Lead Plaintiff Convicts Prima Facie Case**

367.  Lead Plaintiff's direct evidence, derived from decades of personal experiences with Defendants' violations under law, is fully sufficient to prove a prima facie case with regard to the Defendants' violations under federal law, state statutes, and under the statutory effects of international treaty obligations in the *International Covenant on Civil and Political Rights* and the *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.* The Complaint and accompanying evidence demonstrate beyond reasonable doubt that Defendants knew and/or should have known that:

a. <u>Defendants have definitively created the risks</u> which resulted in the Lead Plaintiff's harm from BRMT and their related conspiratorial acts as shown at LP Evidentiary Exhibits pages 237-865, and have failed to cease and desist or otherwise mitigate the injuries they cause.

b. <u>Defendants with intelligence and police powers at all levels of government have a well-established legal duty under law to protect from harm.</u> Defendants explicitly harmed and continue to harm the personal relationships, personal finances, income, businesses, property, and physical and mental health of Lead Plaintiff and other Plaintiffs. Defendants United States, Central Intelligence Agency, Federal Bureau of Investigation, New York Police Department, Maricopa County (AZ) Sherriff's Department, and Joseph Arpaio, the former Maricopa County Sheriff, have each been found civilly and/or criminally liable for violations of individual rights and liberties. See LP Evidentiary Exhibits pages 237-367, police powers and intelligence services patterns of practice, including relevant Congressional findings on CIA and FBI.

c. These are the <u>completely voluntary actions of the Defendants</u>, and include a sweeping variety of violations of law, such as wire fraud and mail fraud; fraudulent investments as pretext for perpetuation of involuntary servitude; deliberate harm to interstate commerce, business, and property; aggravated assaults, numerous attempts to injure or murder; other direct and indirect violence including physical abuse, psychological abuse; and BRMT brain hijacking. A sampling of a few dozen of these incidents is included in the fifty-six Counts, ninety-two sub-counts relating to specific predicate acts already in evidence, and in more than 12,000 pages of LP Evidentiary Exhibits incorporated herein by reference.

368.  The three principal elements of Defendants' continuing actions, 1) voluntary creation of risks to plaintiffs by Defendants, 2) voluntary continuation and conspiratorial actions by Defendants in harming rights, business, and property, despite their clear and contrary legal duty to protect, and 3) willful and completely voluntary actions which perpetuate and conceal the actions of Defendants, fully satisfy and are legally sufficient under law to prove the Lead Plaintiff's prima facie case against the Defendants.

**Plaintiffs' Injuries – Individual and Entire Class**

### A. Lead Plaintiff's Injuries are Representative and Stand in for Injuries Likely Sustained by Entire Class

369.  Lead Plaintiff's injuries, carefully covered up by, among other practices (i) fraudulent concealment,  (ii) deliberate acts of forced victim relocation to deprive access and conceal financial and medical records, and (iii) financial destruction episodes used to destroy source records using normal records retention processes over time, are representative of injuries to the entire class of plaintiffs.

370. Lead Plaintiff's civil rights injuries, covered up by defendants' fraudulent concealment, range from extreme annoyances and aggravations to personal humiliation, managed and manipulated personal relationships and emotions in those relationships, extreme psychological traumas leading to suicidal ideations, and to near death experiences including physical injury.

371. Lead Plaintiff's financial injuries due to racketeering patterns, covered up by fraudulent concealment, extend over fifty years, including (1) three decades of involuntarily servitude and managed income, (2) businesses losses, loss of income, forced forfeiture of real property and financial assets, (3) deprivation of government benefits to commercial enterprises

resulting in lost profits, lost revenue from sale of the businesses, (4) fraudulent takings and sales contracts, loss of honest services; all followed by (5) two decades of total loss of income and assets, and will be calculated at trial.

372. Other plaintiffs' injuries will include deceased family members, wrongfully incarcerated people, mentally and physically disabled people, permanently injured people, and victims of all variety of heinous criminal actions from induced and fraudulent personal relationships to theft of assets to induced third party deaths. See lethality fact pattern series (L subcounts herein) and paragraphs 343-348 for representative forms of lethality events likely experienced by other plaintiffs.

373. These are all the criminal acts of Defendants against the individual comprising the class of Plaintiffs while these Defendants hide behind "national security" and "state secret" exemptions, "qualified immunity," and other statutory subterfuges which defeat the very concept of "justice under law" and fail to meet even the most basic standards of ratified international treaty obligations. A sampling of the range, scope, and scale of five decades of offenses against the Lead Plaintiff only are described below. These representative harms to Lead Plaintiff, detailed at Table 2 in LP Evidentiary Exhibits beginning at page 12023, and elsewhere in this Complaint, were very likely experienced to a greater or lesser degree for varying periods of time over the five plus decades by others in the class of injured plaintiffs. These harms include the following direct losses and other injuries:

a. Elimination of personal relationship choices beginning around high school age;

b. Employment in an enterprise of an extended family member as a grocery clerk beginning in 1972, which had fraudulent government co-investors and was designated for federal wrecking;

c.  Involuntary servitude through managed college age experiences at community college and university through graduate school, including personal friendships manipulated to introduce to initial handlers and their supervisors, managed romantic interest patterns and oxytocin levels, and initial professional employment options and key professional referral from graduate school;

d.  Human trafficking, mail fraud, and internet access fraud pattern by federal agencies eliminates all private sector employment options from 1979, including unwitting initial employment in FBI domestic and CIA international cover operations at Deloitte Seattle;

e.  Pressured employment relocation from Deloitte to LazerSoft in 1986 to follow a CIA commercial cover operative's exit from an international spying project at Deloitte;

f.  First wife and stepdaughters, extended family including nephews and nieces in 1988;

g.  First family home he and his wife now valued at $1.8 million, purchased in 1985 for $184,340 around the age of 30, through orchestrated BRMT oxytocin driven divorce in 1988;

h.  All financial resources and creditworthiness through 1993 lost to business wrecking related personal bankruptcy in FBI contrived business wrecking of prior domestic spying platform Steve's Maintenance, renamed Alliance;

i.  Multiple illegal spying platform faked employment sequences during operations and orchestrated wreckings to destroy source records related to illegal spying,

including PAN, Pacific Pipeline, and CNA Industrial Engineering from 1990 to 2002;

j.  Forced use of steroids to control BRMT contrived allergic reactions from 1980s used to orchestrate sinus surgery in 1900s, likely to embed a then required BRMT stage of development location device such as passive RFID precision locator adjacent to brain, followed by unexplained overnight eardrum break around 2000 perhaps for implant;

k.  Community service and relationships with legislators and governor's staff from 1997-2002 trashed in reputation destruction sequence beginning in 2002;

l.  Aggressive BRMT brain and muscle torture drives suicide ideation in early 2000s after departing CNA employment;

m.  All financial resources and creditworthiness through 2005 wrecked by FBI spying operation CNA's compensation theft documented in King County Superior Court records, and by FBI ShipNow cover operation fraudulent checks to Performa in contrived business wrecking of Performa, repeating a trans-generational extended family business wrecking pattern experienced in first high school family business above in 1972 and with Alliance in 1986-1989;

n.  Second wife, stepson, in an institutionally fabricated family, including extended family, nephews and nieces, as initially entangled in 1988, then sequentially destroyed through 2005 by CIA BRMT program executive orchestrations in cooperation with FBI, and with military intelligence resources deployed in violations of posse comitatus laws of the United States;

o. Second family home now valued at $1.1 million, lost in forced 2005 sale after laboring and personally investing $100,000 over about ten years to rebuild, improve, and refurnish;

p. Romantic interests turned into fake dates in Seattle and Portland areas and sexual dysfunction in late 2004-2005 as turned into dysfunction and sexual abuse as all online access to romantic interests is blocked;

q. Nearly all material possessions except for one rolling suitcase, and some boxes left at sister's house on leaving Seattle area in 2005;

r. Homelessness in Boston from December 2005 to August 2007;

s. Faked in-house employment in United States illegal intelligence platform operation Establish in 2007-2008;

t. Complete absence of all private employment choices since 2008, including in the most basic skill level occupations such as night stocking clerk at grocery store;

u. Romantic interest turned into dysfunction and sexual abuse by willful actions in 2008 with all online access to romantic interests blocked from 2004 except as contrived;

v. Aggressive BRMT brain and muscle torture leading to suicide ideation repeats in 2009-2010;

w. All financial resources and creditworthiness through 2010 trashed by federal safe house landlord theft of labor and materials used to remodel;

x. All material possessions except for one rolling suitcase when forced from the wrecked safe house apartment in Cliffside Park, NJ in October 2010 after filing federal civil rights and racketeering litigation in June 2010;

y.  Six months civil confinement after no-notice hearing used to force dismissal under duress of federal civil rights and racketeering case in January 2011 before being reassigned to federally identified rehousing in March 2011;

z.  Extreme physical and psychological abuse by indirect means continues in newly assigned housing from 2011 in Ramsey, NJ;

aa. Personal romantic interests turned into dysfunction and sexual abuse by willful actions in 2011-2014 local sex traps and remote girlfriend sequence driven by BRMT oxytocin manipulation for online theft of $14,000 between 2014-2018;

bb. Relocation to Edgewater, NJ in 2018 immediately after completing refurbishment of Ramsey, NJ residence including electrical improvement, furniture, and appliances;

cc. Personal romantic interests turned into dysfunction in 2019-2020 for faked dates and relationship driven personal sexual and public humiliation sequence;

dd. Forced use of anti-depressants from 2011 to 2023 to combat years of BRMT biochemical abuse of brain;

ee. Psychological and physical sabotage, abuse, and violence in a long series of attempts to humiliate, discredit, injure, and/or end life by indirect lethal means;

ff. All personal relationship options since 1988, included in decades of comprehensive involuntary servitude;

gg. Private life and reputation publicly savaged and destroyed in the most corrupt and reprehensible manner by Defendant officials sworn to protect and defend and by political hacks who conspired with those officials;

hh. All career and entrepreneurial options, included in decades of comprehensive involuntary servitude;

ii. Exposure to, spying by, and risks from foreign intelligence services, including corrupt international intelligence horse-trading among "friendly" intelligence services, such as Mossad, MI-6, CSIS, RCMP and others as a means of inculpating a US citizen in pretexted foreign surveillance;

jj. Wild and wrongful accusations pretexted, promulgated, and promoted for many criminal actions which have absolutely no basis in fact to justify prejudicial operations of police power agencies in the United States;

kk. Lethality sequences repeatedly from the 1970s, and as accelerated in 2021 to the present, described at paragraphs 343-348.

**B. Injuries and Intrusions of BRMT Refined Over Time**

374.  As each succeeding generation of BRMT has been deployed across time and different platforms from local to fully remote, the ability to inflict more subtle damage has increased from gross manipulations of hormones in the 1970s to direct manipulations of patterns of speech and thought patterns and sequences, and voluntary and involuntary actions, including involuntary brain and nervous system abuses described herein. This is particularly noticeable in Lead Plaintiff's 2021-2023 forensic review of the period since the early 2000s, when finding was likely dramatically increased after the 9/11 attacks. Both technology platforms and neuroscience research advances fuel this sequence of enhanced and more subtle depraved BRMT hijacking capabilities. For example, erectile dysfunction (ED) impacts on victims by using BRMT in the early 2000s, which was only a complete disabling (on/off) of the nerve function during 2004 to 2008, which could be suppressed using medications at the time; evolved to the much more

granular ability to inflict (and reverse) this normal nerve activity in varying degrees at different moments while completely defeating the effects of normal erectile medications by 2020.

375.  This more subtle class of injuries makes the identification of class plaintiffs ever more difficult without full discovery, which defendants have and will use all legal tools and illegal tools to delay and defeat. Other named and unnamed Defendants have and continue to pursue, hound, harass, intimidate, and engage in other destructive and harmful acts, some while acting under color of law. All Defendants have and do act with intent to harm using malign political, personal, psychological, and economic abuses as described herein and as the discovery process will further and still more clearly evidence. As before, these injuries have likely been sustained to a greater or lesser degree by other members of the class of Plaintiffs who must be identified.

### C. BRMT Direct Impacts On Innocent Victims

376.  The evidence presented here is gathered from Lead Plaintiff's direct experience, from his contemporaneous notes of incidents as shown in the LP Evidentiary Exhibits, and from reliable independent sources. Among other things, this evidence demonstrates Defendants' clear consciousness of guilt. Defendants' increasing threats and violence toward the Lead Plaintiff evidence both impunity and clear hints of desperation as Defendants try to sweep the criminal reality they have created under the rug.

377.  Defendants, including departments and agencies of the Defendant United States, continue to conduct coercive operations against Lead Plaintiff together with other jurisdictions' Defendant police powers operations and other co-conspirator defendants. These operations violate civil and constitutional rights in attempts to self-exculpate by (i) these agencies and are

color of law abuses, and (ii) individuals agents and officers acting jointly and severally in bad faith acts, so are likely also being experienced by other members of the class.

378. US persons who are BRMT victims ARE the involuntary servants and vassals of Defendant United States. We are subject to whatever egregious or lethal behaviors the national security and police powers operations choose to inflict, directly and indirectly. Even given the depth of direct evidence of injuries, and of Defendants' documented historical patterns and practices, this evidence barely scratches the surface of the Defendants' depravity. At best, it is an incomplete description of fifty years of violations directly experienced by only one victim, a catalog of abuses which is not even close to being comprehensive. And that is the reason Defendants relentlessly pursue the Lead Plaintiff to this day.

**Strong Likelihood of Future Injuries to Plaintiffs and Risks to the Public Require Prompt Court Action**

**A. Systematic Administrative Failures To Identify and Correct Abuses**

379. Both MKUltra and Cointelpro injured or killed some of the millions of US persons they directly and indirectly impacted. Both programs' lawless acts against US persons by Defendant United States ended in the early 1970s only after public exposure and outrage. Both programs were criminally indictable under the RICO Act of 1970, among other applicable federal and state statutes. But nothing was ever done to provide criminal accountability for federal executive criminal acts by these institutions executives, managers, or field personnel.

380. The inspection functions, which supposedly assure the public of internal compliance and accountability to law and regulation, report to the same people (Cabinet Secretaries and Agency Directors) who oversee and implement these programs, including illegal programs and the illegal patterns of practice used in these programs. The profound conflict of

interest and lack of true independence is clear to anyone who would bother to look. Institutional

non-compliance with law ordered, directed, or silently assented to by senior management to

cover up senior managers its own current or prior misconduct may never see the light of public

disclosure, be ignored, or swept under the rug. Congress rarely acts on any scandal which does

not raise extraordinary outrage among the media and the public. A President's usual answer

(whoever that may be at the moment) is to fire some one person, which typically has no impact

on the other thousand, thirty thousand, or one hundred thirty thousand people involved in

creating and sustaining this illegal conduct. So the conduct continues unabated. We see that in

this Complaint – again.

381.  The Inspectors General took years to find the illegalities of MKUltra and the crimes

committed – because no one looked. CIA operated MKUltra in a "need-to-know" silo

supposedly only known to the CIA Director while a parallel program ran in the Army. But

thousands of people were employed in both of these programs, as government and contract

"researchers," as program assistants and accountants, as paid employees and contractors of three

CIA bordellos, as officers and agents, and so forth. An insider whistleblower died on the

sidewalks of New York City after a fall from the tenth story window of a hotel room he shared

with the MKUltra Program Director's personal assistant just as the program was ramping up in

1953. MKUltra did not end until the 1970s.

382.  As for actual consequences for these criminal acts, CIA destroyed nearly all

MKUltra program evidence, obstructing justice and accountability for lives lost and lives

destroyed. The CIA Director who ordered the evidence destruction was then promoted to

Ambassador and confirmed to that post by the US Senate.

383. FBI's Cointelpro was directed and supervised by an Assistant Director in the DC headquarters who reported (across the hall) to Director Hoover. The program was widespread across the United States, involved burglaries, break-ins, wiretapping without court order, frauds, character assassinations, sowing of discord in activist groups, and all manner of other criminal acts by FBI field agents and by violent militia members funded by FBI. It began around the same time FBI agents were surveilling the Lead Plaintiff's grandfather's dairy farm, where he led a small evangelical Christian church spin-off of a Quaker sect as an elder in this church. FBI funded far right White Supremacist militia and other right wing extremists, and directly and indirectly spied for fifteen years on American citizens trying to exercise their civil and Constitutional rights, engage in free speech and assembly, and protest malicious and indifferent police powers and White Supremacist misconduct and crimes against them.

384. FBI's Cointelpro was exposed by the *Citizens' Commission to Investigate the FBI* burglary of files in the FBI's Media, Pennsylvania Field Office. They passed the burgled information to the press after the March 8, 1971 burglary. After Cointelpro was exposed, notably not by either DOJ or FBI, FBI Director Hoover retired, not to criminal RICO indictment, but to great acclaim, including the naming of the FBI's DC headquarters building in his name in 1973, and a memorial book published in 1974 by Congress in his honor.

385. Congress enacted reforms as a result of these public exposures in the mid-1970s. But what has actually changed in the meantime? Nothing.

386. In addition to the pattern of evidence presented herein, the FISA Court affirms the 45th anniversary years of FISA warrant violations by these federal defendant agencies. Congress affirms the 15th consecutive year of Section 702 violations, an amendment to the Patriot Act

passed to legalize other prior criminal violations of the Fourth Amendment by these same agencies.

387. Defendant United States tradition of functional field contempt for the Bill of Rights and violations of rights is alive and well. One more modest example of this contemptuous view of rights:

a. Lead Plaintiff traveled to the District of Columbia from New York City on Friday, August 27, 2021, and was purposefully misdirected to a faked alternate voting rights rally near the National Archives building on Saturday, August 28, 2021, the 58th anniversary of Martin Luther King's "I Have A Dream" speech at the Lincoln Memorial in 1963. First Amendment right to peaceably assemble – a joke according to these federal police powers defendants.

b. The New York Times online version viewed by the Lead Plaintiff the next morning was doctored by Defendants so there was not one single mention of even one of these voting rights rallies, which were held across the nation on August 28th. First Amendment right to freedom of the press - a joke according to these federal police powers defendants.

c. Defendants then lied about the actual location of that event to Lead Plaintiff in their September 22, 2021 response to Lead Plaintiff's FOIA request. See Interline Exhibit 14. Bill of Rights – what Bill of Rights? A joke according to these federal police powers defendants who act with impunity.

388. These kinds of frauds and deprivations of rights, which require conspiracies to execute, have been experienced thousands of times over decades against this entire class of plaintiffs. Clearly, these perpetrators intended to misinform, disinform, harass, and discredit the Lead Plaintiff and others of this class similarly situated, placing plaintiffs at material

disadvantage to other citizens, and to these persecutors with badges who act with impunity, and look away when these same violations against these same individuals are undertaken by other police powers or interest groups they may favor.

**B. Defendant DOJ's Repetitive Failures to Administer Criminal and Civil Justice on Behalf of Victims**

389. The Justice Department has an uninterrupted 153 year history of failures to fairly and impartially administer justice against Defendant United States executive branch departments and agencies for their <u>institutional</u> violations of the Constitution and laws of the United States. For example, searches for criminal prosecutions by Defendant DOJ of institutional criminality and corruption during CIA's 20 year MKUltra secret LSD and mescaline drugging program; and during FBI's Cointelpro 15 year White Supremacist campaign against civil rights activists, both turn up the exact same result. Nothing.

390. No criminal consequences ever for decades of felonies directly committed, including break-ins, burglaries, assaults, defamation, druggings, violence through proxies, and numerous other crimes. The agencies suffered no consequences. No accounting was ever made to the families or to the American People for the lives lost and people destroyed. So, these same Defendant United States departments and agencies get this oft-repeated message about consequences from Defendant DOJ and the Courts, from our dysfunctional justice system. Consider the following evidence responding to the Lead Plaintiff in 2022:

391. Simply put, the lesson Defendant United States has learned is that criminal liability for institutional criminal acts never happens. Evidence is destroyed and executive branch criminality goes unpunished. This lawless conduct IS the rule of law for the victims so long as Defendant United States invokes "state secrets," hides behind national security and classification schemes, and declines to pursue its own felonious acts. The courts then frequently effectively

cover for these violations and the acts continue in ever more depraved and aggressive manner than before.

382. This is not the biased perspective of an embittered Plaintiff. It is simply the historical reality of how our system actually fails to protect rights of People over power of government agents. In its second paragraph, our Declaration of Independence states the principal reason for a government to exist at all

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--**That to secure these rights, Governments are instituted among Men,** deriving their just powers from the consent of the governed..."

393. This original assertion of the reason for the mere existence of any government is <u>not</u> the current pattern of practice of our government across any of the three branches.

394. As with any group of co-conspirators intent on lawless evasions, Defendants' conduct will continue and patterns of practice will progressively degenerate toward ever increasing depravity and violence until there are real consequences for the Defendants, including criminal consequences, convictions, and incarceration. The Dachau, MKUltra, and Cointelpro progressions illustrate this truth perfectly. The record clearly shows no impactful consequences against malign institutionally accepted behaviors against US persons in 153 years of criminal prosecutions by Defendant Department of Justice - ever.

395. Roughly two dozen attempted lethal acts against the Lead Plaintiff from the 1980s to 2022 at the lethality subcount series (L) below directly demonstrates this truth about human and

institutional behavior in the absence of consequences. The Lead Plaintiff has a legitimate fear for his life and safety. Others unidentified plaintiffs likely do as well. So, the logical questions for any victim, and for this Court, are - Who else? What other programs? How many US persons are there - dead, disabled, incarcerated, destroyed? How many more will be discovered under cover of "state secrets?" Who will suffer tomorrow? We simply do not know.

396. Based upon this history of acts against plaintiffs and of failures to act by DOJ, this civil litigation is literally the only apparent option for the Lead Plaintiff and other victims of BRMT, racketeering, and similar institutional criminality to escape these Defendants' depravities, and for those defendants to be held liable for this depraved decades long program which violates Constitution, law and international treaties.

397. No civil case brought by direct victims of MKUltra and Cointelpro ever withstood DOJ dismissal challenges using the national security exemption used to hide these myriad crimes. But governing case law requires the United States to meet certain standards to sustain its state secrets privilege under *United States v Reynolds,* 345 U. S. 1, 12 (1953). All such programs must be complaint with law (including our Constitution) to sustain the state secrets privilege, see the requirement in law cited in "Footnote 4: *5 U.S.C. 22:* "... **not inconsistent with law**...".

398. Factually and legally, the Defendants in this case forfeited that privilege against this entire class of plaintiffs from the first day of their violations and injuries by their myriad BRMT and racketeering offenses. These offenses against the Constitution, the U.S. Code enacted by Congress, international treaties which are the law in these United States, as summarized at paragraph 10, are well proven prima facie in this Complaint.

399. All governments at all levels are obligated under the Constitution to fully enforce each and every provision of all treaties ratified by the United States. The *International Covenant*

*on Civil and Political Rights* at Articles 7 and 8.2 obligate the United States to enforce under law

the following:

"Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

Article 8

2. No one shall be held in servitude.

See the full text of this ratified international treaty at LP Evidentiary Exhibits pages 895-

920.

Defendant United States explicitly violates these provisions of this treaty, as well as the

Thirteenth Amendment prohibition on involuntary servitude.

400. There are no state secrets refuge afforded Defendant United States, nor any

governmental co-conspirator defendant, for these violations. The DOJ does not act. This court

must. There is no other practical forum for justice for this entire class of plaintiffs, which may

well number in the millions, than this specific case in this court on this day.

### C. Conflicts of Law Favor Plaintiffs

401. Further, a conflict of law exists at 18 U.S.C. § 2340B which violates the United

States' legal treaty obligation under its ratification of the *Convention Against Torture and Other*

*Cruel, Inhuman or Degrading Treatment or Punishment* Article 14. Article 14 requires

Defendant United States to permit recovery of civil damages and other civil remedies for torture

and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture

obtains redress and has an enforceable right to fair and adequate compensation, including

the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law."

This court is constitutionally obligated to hear the relevant claims and to fully and fairly enforce this treaty. See the full text of this ratified international treaty at LP Evidentiary Exhibits pages 921-933.

402. Paragraphs 402 through 499 are reserved.

[Intentionally left blank.]

**FACTS – Illegal BRMT and Racketeering Pattern Offenses and Injuries**

500. The patterns of facts which follow (known as subcounts herein) are arranged for ease of understanding. There are six principal categories of offenses and injuries which are further organized into subcategories within that category. These categories illuminate the Defendants' primary patterns of color of law abuses and criminal acts across time. Each of these offenses and patterns of offenses is managed by and for the convenience of the Defendant United States' assigned subjugators, though some are conducted by other police powers operations and by other defendants which have conspired with principal offender and defendant United States.

501. All offenses and patterns of offenses are key elements of Defendant United States' program of involuntary servitude and network capture which control all aspects of the life of the Lead Plaintiff and others similarly situated. The overall intent is to perpetuate the development of BRMT and to abuse these victims through illegal biomedical experiments and manipulations for varying periods of time which range from short intervals for some victims, and to the point of death for others, such as intended for the Lead Plaintiff based upon the obvious pattern of practice.

502. The six primary categories of BRMT and racketeering pattern offenses are:

*Lethality Attempts (LETHL-xx series offenses)* – personal injuries and potential injuries which are likely to result in severe injury or death.

*Illegal Human Experimentation - BRMT Brain Hijacking Abuses (HEXP-xx series offenses)* – forcible human experiments without consent, including a wide variety of interferences with liberty, human autonomy and rights, civil and Constitutional rights, some in interstate commerce. Primary subcategories of offenses are:

    a)  Biological and Medical Invasions – Torture

    b)  Orchestrated Personal and Intimate Relationships

    c)  Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness

      ***National Security Pretexting and Entanglements (NSEC-xx series offenses)*** –
pretexting and entanglements in national security related matters to justify continuing
interferences using abusive color of law investigations and other corrupt acts.

      ***Individual Rights Violations and Conspiracies (RGTS-xx series offenses)*** - direct
interferences with liberty and freedom of choice in personal life and relationships, including
entrapment and incriminatory practices. Primary subcategories of offenses are:

    a)  Entrapments, Illegal Searches and Willful Blindness

    b)  Direct Interferences in Personal and Intimate Relationships

    c)  Hacking, Harassment, Disinformation, Abuse of Official Records

      ***Racketeering – Personally Targeted (RICO-xx series offenses)*** - racketeering offenses
including, without limitation, frauds which result in the direct and indirect loss of personal, real,
and financial assets, and career, employment, and income opportunities, managed for the
convenience of the Defendant United States subjugators, and a key element of involuntary
servitude and network capture to control all aspects of the life of the Lead Plaintiff and others
similarly situated. Primary subcategories of offenses are:

    a)  Thefts and Takings

    b)  Color of Law Entrapment Attempts

      ***Racketeering – Business and Enterprise (RICO-xx series offenses)*** - racketeering
offenses including, without limitation, frauds and deprivation of government benefits to small
businesses, which result in direct loss of business equipment, real property, financial assets,
contracts, projects, and sales and income opportunities, managed for the convenience of the

Defendant United States subjugators, and a key element of involuntary servitude and network capture to control all aspects of the life of the Lead Plaintiff and others similarly situated. Primary subcategories of offenses are:

      a)  Fraudulent Financings

      b)  Fraudulent Sales Leads

      c)  Dishonest Professional Services

      d)  Fraudulent Production Asset Sales

503. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetical order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Note there are spelling errors in the email subject lines referenced throughout these subcounts. These errors have not been corrected to maintain 100% traceability in the LP Evidentiary Exhibits. Use the directories of emails listed by date and party name in the compendium to access these emails.

504. A listing of all subcounts below is shown in the Table of Contents which begins at page 16. Each and every subcount below from LETHL-1 through RICO-50 inclusive includes all the following subparagraphs which are incorporated therein by reference:

A. Each subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants' programmed color of law entrapments, to inculpate victims, to exculpate themselves, and to sustain the intricate neurological research process used to further develop Defendant United States illegal BRMT brain hijacking bioweapon and delivery system, underlie each and every element of Defendants' conduct. All subcounts throughout this Complaint are driven by Defendants' conspiracy to commit, and comprise an integrated pattern of racketeering acts.

B. These violations abuse these plaintiffs by a color of law fiction of "state secrets" and "national security," as key elements of an intertwined pattern of illegal biomedical experiments, on-going biomedical manipulations, and racketeering acts to control and human traffick Lead Plaintiff and others similarly situated. Defendants fraudulently conceal these acts and perpetuate their violations so as to (i) conceal their own criminal and illegal deployment of BRMT against US persons and other innocents and to (ii) conceal the illegal acts of co-conspirator Defendants, as Defendants have since BRMT program inception in approximately 1972.

C. Fraudulent BRMT manipulations, and deprivations of rights, resulting from the Defendants' careful timing of events, and public exposure to facilitate vigilantism, are contrived by Defendants to appear as life circumstances and events, which have been and are used to control and human traffick Lead Plaintiff and others through a series of physical and emotional traumas. These traumas include the selection, assignment, and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas directly created by or arising from the Defendants actions and from their willful and negligent violations of the privacy of these plaintiffs, which has and does expose these plaintiffs to abnormal public safety risks from public vigilantism.

D. Discovery against these defendants will produce further evidence of the BRMT bioweapon induced bodily reactions and responses included in each subcount. The discovery process will provide development of evidence through recovery of the Lead Plaintiff's own records currently in the hands of and/or blocked from access by Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and

controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses without Constitutional authority and in violation of rights, law and ratified international treaties, which comprise crimes against its own citizens and other innocents. To the extent they have not been destroyed, medical records, likely including copies secretly maintained by Defendant United States, its medical contractors and/or researchers, can also be discovered to validate these claims. See Complaint Table 2-001, 2-026, 2-0150, 2-0153, 2-201, 2-202, paragraphs 332, 369, 371, 373, 400, LP Evidentiary Exhibits pages 140-189 paragraphs 1-24, 54, 116-117, 575-597, 598-606.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to

consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Relevant emails and other documents providing further evidence are incorporated by reference in each subcount. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Note that relevant direct evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020 which are inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; as will recovery of Lead Plaintiff's own records currently in the hands of Defendants.

H. Discovery against Defendants will provide additional evidence of the violations of this subcount in furtherance of related violations thereof documented herein, and an element of the pattern of offenses, including a pattern of racketeering acts, critical to the Defendants' overarching and continual pattern of involuntary servitude at all times from inception of their violations to the present time of, among others, the Thirteenth and Fourteenth Amendments to the United States Constitution, in furtherance of the Defendants' conspiracy to and the systematic violation of 18 USC § 175 prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of

rights; and in furtherance of conspiracy to and violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC § 1590 relating to human trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States.

J. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. Those acts undertaken against this class of protected civilians, subjected to the direct control of Defendant United States, since September 18, 2001 comprise 18 USC §

2441 war crimes against this entire class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the *International Covenant on Civil and Political Rights* and the *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.* See full text at LP Evidentiary Exhibits pages 895-933. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or

without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore, all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses. This legal fact is further sustained by case law relating to bad faith acts which void all qualified immunity defenses, see *Harlow v. Fitzgerald, 457 U.S. 800* (1982).

L. Discovery of the primary defendants in this case was carefully, and at great taxpayer expense, fraudulently concealed for decades by these perpetrator defendants, despite their continuing undercover operations in plain sight until a September 2023 forensic break in this case described at LP Evidentiary Exhibit page 11639 led to specific identities of individual perpetrators who figure in the overall BRMT and racketeering conspiracy, which then finally connected these acts and the underlying corrupt motives strongly to the responsible institutions. This coordinated fraudulent concealment was extensive and nearly foolproof.

M. For example, in September 2021, Defendant NYPD verified and then disappeared evidence of a terror related investigation against the Lead Plaintiff surrounding the human trafficking to northern New Jersey, when Lead Plaintiff was met around November 2007 on his first recreational outing into New York City at the Port Authority Bus Terminal by about two dozen NYPD uniformed counter-terror squad members in bulletproof vests, helmets, and bearing submachine guns along the west side of Eighth Avenue. Together with FBI's official fraudulent

concealment fifteen days later, these NYPD actions further delayed discovery of the primary

responsible defendants (FBI and CIA) for the decades long overall pattern of BRMT human

experimentation and bioweapon abuse, the racketeering associated-in-fact enterprise, and their

fraudulent concealment, as well as the direct involvement of other police powers operations over

decades. See Interline Exhibits 15 through 17.

N. Pervasive fraudulent concealment by these Defendants, to and including the deliberate

creation of post-facto legends which further obscure the false identities of culpable individual

and institutional defendants, tolls the statute of limitations as to this entire program of BRMT

bioweapon concealment, involuntary servitude, and forced labor by Defendant United States,

which has and does operate this program integrating illegal human experimentation, biomedical

abuse, racketeering, and rights violations primarily through CIA, FBI, with the support and

participation of DOD assets and personnel.

O. These acts are conducted, and are sponsored and permitted to co-conspirators, by

Defendant United States to sustain its involuntary control, servitude, and forced labor against

Lead Plaintiff and other similarly situated US persons while fraudulently concealing this entire

pattern of criminal acts. In violation of *United States v Reynolds,* 345 U. S. 1, 12 (1953),

Defendant United States continues to claim "state secrets" and "national security" privilege as if

these privileges were legal playing cards in the game it plays with the lives of its own citizens

and those of other US persons, and with their mental and physical well-being, all while it

arrogates to itself the benefits of liberty to act freely and willfully in the corrupt interests of its

own institutions, departments, and agencies which employ these decision-makers and their

hierarchically managed personnel in patterns of racketeering and other offenses contrary to the

liberty interests and rights of the US persons it is sworn to protect.

# LETHALITY ATTEMPTS (LETHL series offenses)

## *504. LETHL-1 Lethality Attempts:* **British Columbia Sea to Sky Highway BRMT Melatonin Overdose, Mid 1980s**

A. Lead Plaintiff is deliberately overdosed with melatonin to induce sleep while driving on the Sea-To-Sky highway south of Squamish, British Columbia, Canada near Porteau Cove by Defendant United States or its agents in approximately 1983. The Lead Plaintiff and his first spouse are together in the vehicle traveling south at about 50 to 60 miles per hour approximately eight feet from the unguarded edge of an 80 to 110 foot cliff adjacent to Howe Sound. Both would be severely injured or killed if the Lead Plaintiff fails to stop before being overtaken by the BRMT melatonin overdose in early afternoon after a full night of sleep. The evidence as to the specific date, time, and remote BRMT instructions which provide specific evidence of this event are likely to be available upon further investigation and discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | LETHL-1 through LETHL-17, RICO-14, HEXP-1 through HEXP-3, HEXP-5 through HEXP-14, RGTS-3, R6 through RGTS-10 |
| Table 1 paragraphs: | 1-001A |
| Table 2 paragraphs: | 2-0026 |
| LP Evidentiary Exhibits pages: | 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304, 11656-11664 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

C. See other selected relevant content in searchable indexes and lists at LP Evidentiary Exhibits Compendium at pages 934-1075. Directly cited relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | 2, 2C, 2D |
|---|---|
| Complaint paragraphs: | LETHL-1 through LETHL-17, RICO-14, HEXP-1 through HEXP-3, HEXP-5 through HEXP-14, RGTS-3, RGTS-6 through RGTS-10 |
| Table 1 paragraphs: | 1-001A, 1-001C, 1-001D, 1-001E, 1-032, 1-056, 1-058, 1-059, 1-064, 1-065, 1-066, 1-067 |
| Table 2 paragraphs: | 2-0026, 2-0076, 2-0099, 2-0115, 2-0117, 2-0150, 2-0158, 2-0188, 2-0193, 2-0194. 2-0196, 2-0202, 2-0203 through 2-0215, 2-0217 |
| | 140-182 paragraphs 1-4, 118, 140, 78, 113, 189, 109; 140-189 paragraphs 1-4, 78, 113; starting page 140 paragraphs 1-4, 122; 11-139, starting page 140 paragraphs 1-4, 117; 140 paragraphs 1-4, 119; 140 paragraphs 1-4; 140 paragraphs 1-4, 118; 140 paragraphs 1-4, 120; 140 paragraphs 1-4, 97, and 121; |
| LP Evidentiary Exhibits pages: | 1-10, 413-415, 416-418, 419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793; 794, 1074V (10/31/2017 entry), 9679-9696, 9875, 10187-10250, 10302-10304, 10306-10310, 10614-10619, 10620, 10631, 10637, 10639, 10653, 11656-11664, 10672, 10694-10736, 10737-10738, 10739-10744, 10745-10747, 10748-10749, 12160-12232 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Certain emails are currently blocked by a defendant computer hack |

## 505. LETHL-2 Lethality Attempts: Washington State BRMT Induced Falls, 1990-2005

A. While a resident of the state of Washington, Lead Plaintiff is subject, between approximately 1990 and 2005, to a series of unexplained falls which are caused and created by Defendant United States or its agents. These falls cause the Lead Plaintiff to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and creating a serious risk of severe injury or death. These falls are initiated while the Lead Plaintiff is hiking alone near

Stevens Pass, climbing a ladder to the roof of his home in Kirkland, standing on a scaffolding

during construction, and under other circumstances not currently recalled. The evidence as to the

specific date, time, and remote BRMT instructions which are given to initiate each event are

likely to be available upon discovery against Defendant United States.

      B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Paragraph C from subcount LETHL-1 is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001C |
| Table 2 paragraphs: | 2-0076 |
| LP Evidentiary Exhibits pages: | 140-182 paragraphs 1-4, 118; pages 419-426, 774-785 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | War Crimes - Geneva Convention 1949 Table of Contents 10614-10619<br>War Crimes - Geneva Convention 1949 Article 3 Murder, Torture, Degrading Treatment, Religion 10620<br>War Crimes - Geneva Convention 1949 Article 32 Access to Health Care 10631<br>War Crimes - Geneva Convention 1949 Article 33 Property 10631<br>War Crimes - Geneva Convention 1949 Article 50 Medical Experiments 10637<br>War Crimes -Geneva Convention 1949 Article 56 Access to Health Care 10639<br>War Crimes - Geneva Convention 1949 Article 97 Theft 10653<br>War Crimes- Geneva Convention 1949 Article 147 Murder, Torture, Medical Experiments, Property 10672<br>War Crimes Geneva Convention 1977 Additional Protocol 1 10694-10736<br>War Crimes - 010911 AUMF 2001 Afghanistan 010911.pdf 10737-10738<br>War Crimes- 021016 AUMF 2002 Iraq 021016.pdf 10739-10744<br>War Crimes - 200228 Brookings Natnl Security Study Group 10745-10747<br>War Crimes - 200228 Pres Auth Natnl Security 202228.pdf 10748-10749 |

**506. LETHL-3 Lethality Attempts: Washington State BRMT Induced Suicide Ideation, 2003-2005**

      A. In the aftermath of the precursor and successor events related to the 9/11/2001 terrorist attack, Defendants destroy Lead Plaintiff's income and marriage while a resident of the state of Washington, Lead Plaintiff is subject between approximately 2003 and 2005 to intense, torturous BRMT manipulation of brain biochemistry and to on-going psychological abuse by visual and electronic means which Defendants use to drive Lead Plaintiff to suicide ideation. This sequence of high stress events and manipulations induce severe brain biochemical imbalances, caused and created by Defendant United States and/or may directly involve other Defendants and their respective agents. This creates a very high risk of severe injury or death. The evidence as to the specific date range and sequence of the remotely commanded BRMT instructions which drive this sequence are available during discovery against Defendants.

      B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0115, 2-0117 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 78, 113; pages 419-426, 598-606, 774-785, 9679-9696 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**507. LETHL-4 Lethality Attempts: Inciting Public Vigilantism, 2004-2023**

A. Defendants with police powers hack and manipulate Lead Plaintiff's personal computer to make his actions, plans, and movements a matter of public viewing sometime after he joins CNA Industrial Engineering in 1996. This leads to and inspires violent acts against third parties, ranging from commercial enterprises to individuals. Defendants use BRMT, tradecraft signaling, and direct action against third parties to create and sustain a public mythology about Lead Plaintiff, which directly endangers his life, well-being, personal prospects, employment, and entrepreneurial activities to further their illegal scheme to employ public vigilantism, along with their direct acts against Lead Plaintiff, and harm third parties while engaged in this corrupt process.

B. These direct acts range from mass casualty attempts to individual acts against innocent third parties with lethal and potentially lethal outcomes. This fraudulent scheme, running to the present, primarily uses BRMT to control certain of Lead Plaintiff's movements, public and private activities, words, expressions, and brain chemistry; induces on-going brain biochemical depression and indices suicidal ideations at times; uses wire frauds and email frauds to control Lead Plaintiff's digital and online environment, and to make his actions and reactions to the Defendants' on-gong harassment public; and systematically disrupt Lead Plaintiff's private and commercial actions.

C. Defendants' overriding purposes are, without limitation, to sustain and perpetuate the Defendants' ability to control Lead Plaintiff, and his moment-to-moment environment and actions across years, perpetuate Lead Plaintiff's involuntary servitude, forced labor, in violation of the Fourth, Thirteenth, and Fourteenth Amendments, and other civil, Constitutional, and

human rights; to subject him to public sensationalism, greatly enhance the risk of direct violence

and vigilantism against Lead Plaintiff; and create the circumstances for public harassment of

Lead Plaintiff creating risks and circumstances which they could not legally conduct directly,

and which could not otherwise occur in or to the Lead Plaintiff. These acts are intended to

discredit, damage, or harm the health and well-being of the Lead Plaintiff through all feasible

means, be it entrapment, intimidation, an act of lethal public vigilantism, or a natural appearing

lethal sequence or event.

     D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount

LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific

subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 paragraphs 1-4, 109; pages 419-426, 774-785, 9679-9696 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 508. LETHL-5 Lethality Attempts: New Jersey BRMT Induced Suicide Ideation, 2008-2010

     A. While a resident of the state of New Jersey, Lead Plaintiff is subject between

approximately August 2008 and June 2010 to severe BRMT manipulation of brain biochemistry

and psychological abuse which Defendants use to drive Lead Plaintiff to a suicide ideation. This

sequence of high stress events and manipulations of brain biochemical imbalance are caused and

created by Defendant United States and/or may directly involve other Defendants and their respective agents. This creates a very high risk of severe injury or death. The evidence as to the specific date range and sequence of these remote BRMT instructions which are given to sustain the event are available upon discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-032 |
| Table 2 paragraphs: | 2-0150 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 1-4, 78, 113; pages 419-426, 598-606, 774-785, 9679-9696 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 509. LETHL-6 Lethality Attempts: New Jersey Cliffside Park BRMT Falls, 2008-2010

A. While a resident of the state of New Jersey, Lead Plaintiff is subject between approximately 2008 and 2010 to a series of unexplained falls which are caused and created by Defendant United States or its agents. These falls cause the Lead Plaintiff to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and creating a risk of severe injury or death. One of these falls is triggered while the Lead Plaintiff is walking alone at the northwest corner of Thompson Lane and River Road. The back of the Lead Plaintiff's head strikes the sidewalk, missing the base of a streetlight and a broken neck by approximately 24 inches. The evidence as to the specific dates, times, and remote BRMT instructions which are

given to initiate each event are likely to be available upon further investigation and discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001C |
| Table 2 paragraphs: | 2-0076, 2-0158 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 1-4, 118; pages 419-426, 774-785 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**510. LETHL-7 Lethality Attempts: BRMT Staircase Falls and Attempts in New Jersey and New York 2008-2022**

A. While a resident of the state of New Jersey, Lead Plaintiff is subject from approximately 2008 to the present to a series of near falls in New Jersey and New York on staircases inside, for example, the Metropolitan Museum of Art ground floor entrance near the southeastern corner of the main building; at various times on stairs n his residential building; in the building housing the third floor New School theater space, and numerous other locations. Defendant United States deliberately uses BRMT to misplace a foot on the stair, either by hitting the heel, or by misplacing the foot on the stair tread behind the toes causing a fall. These loss of balance disturbances are easily created. BRMT is used to divert or distract attention and keep the head upright and eyes looking forward instead of down; by momentary interruption of central

nervous system muscle control which drops the descending foot too early; and/or by momentary loss of consciousness. Each and every loss of balance event creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to initiate each event is available upon discovery against Defendant United States and the co-conspirators participating in the set-up of that specific event.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001D |
| Table 2 paragraphs: | 2-0076, 2-0158, 2-0194 |
| LP Evidentiary Exhibits pages: | 1-10, 11-139, starting page 140 paragraphs 1-4, 122; pages 419-426, 564-574, and 786-793 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 511. LETHL-8 Lethality Attempts: New Jersey Hackensack BRMT Fall, 2017

A. While a resident of the state of New Jersey, Lead Plaintiff is subject in approximately 2017 to a BRMT induced fall in a County of Bergen, NJ office building while leaving a housing interview appointment. This fall is caused and created by Defendant United States purposefully locking the Lead Plaintiff's eyes to the horizon rather than toward the stair he is descending at that moment, causing Lead Plaintiff to trip and fall forward. Lead Plaintiff's heel strikes the edge of the stair tread, and he stumbles to his knee, abrading and injuring that knee. This event creates a risk of severe injury or death. The evidence as to the specific date,

time, and remote BRMT instructions given to trigger the event are available upon discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001C |
| Table 2 paragraphs: | 2-0076, 2-0158 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 118; pages 419-426, 774-785. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 512. LETHL-9 Lethality Attempts: California BRMT Induced Extreme Eye Watering, 2017

A. While traveling for business between Pico Rivera, CA and Los Angeles International Airport on October 31, 2017, Defendant United States and/or its agents, produces extreme eye irritation and watering of Lead Plaintiff eyes while he is driving a freeway traveling approximately 65 to 70 miles per hour. This creates a substantial risk of loss of vehicle control and collision with another vehicle or obstacle, creating a severs risk of injury or death. This is not an allergic reaction to any airborne substance. Lead Plaintiff previously spent years in this part of California under the same conditions and had driven this same freeway through this same area without incident a very few hours earlier while traveling toward his meeting in Pico Rivera.

B. Lead Plaintiff has subsequently experienced these symptoms periodically while

using over-the-counter eye drops at home, likely due to a deliberate BRMT induced

manipulation of the pH of the eyes. These symptoms also correlate with extreme headaches and

blurry vision induced on occasion during 2021 and 2022 and experienced with extreme pain and

blurred vision for months on end in Boston, MA in 2006-2007 and in Cliffside Park, NJ, in

2008-2010 occurring at the same time each day, abruptly appearing and later abruptly

disappearing with no clear medical reason. A neurological examination in Boston, MA, and two

brain scans in New Jersey provide no explanation for these symptoms or for the long-duration

irregular recurrence.

      C. The evidence as to the specific date, time, and remote BRMT instructions given to

initiate the event are available upon discovery against Defendants.

      D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount

LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific

subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 1-10, starting page 140 paragraphs 1-4, 117; pages 419-426, 774-785, 1074V (10/31/2017 entry), 10306-10310 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 513. LETHL-10 Lethality Attempts: New Jersey Edgewater Bedroom BRMT Falls, 2019

      A. On two instances in 2019, Lead Plaintiff is rolled out of bed like a log and strikes

the floor. These falls are initiated while the Lead Plaintiff is sleeping alone in his residence in

Edgewater, NJ. These falls are caused and created by Defendant United States or its agents using BRMT. One of these falls causes a visible head injury to the right side of the forehead as the head strikes a nightstand as the rest of the body is falling to the floor, torquing the neck and spinal cord. This injury is noted several months later and again over a year later by medical professionals during routine head examinations at dental hygiene appointments at the Bergen Community College Dental Hygiene Clinic. This fall creates a risk of severe injury or death. The evidence as to the specific dates, times, and remote BRMT instructions given to initiate these falls are available upon discovery against Defendants.

      B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001C |
| Table 2 paragraphs: | 2-0076 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 119; pages 419-426, 774-785. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**514. LETHL-11 Lethality Attempts: Website Hacks to Eliminate or Delay Covid Vaccination, 2020**

      A. On 149 occasions from late January to March 24, 2021, Defendants hack or spoof Lead Plaintiff's access to www.bergencountycovidvaccine.com so an appointment cannot be made to receive the Covid-19 vaccine he is eligible for as a 65 year old, creating additional risk

of hospitalization, severe injury, or death. On occasion, he gets to the appointment setting step before being denied, at other times he is told there are no appointments available. He emails with the Bergen County Executive's office about these issues and emails the Bergen County Council members but receives no response from any of them (likely blocked by Defendants who may also have spoofed both the only site then accessible to Lead Plaintiff and the email responses received).

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0188 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4; pages 419-426, 794, 9875, 10187-10250 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Currently blocked by defendant computer hack |

## 515. LETHL-12 Lethality Attempts: New Jersey Edgewater BRMT Falls, 2021 to present

A. While a resident of the state of New Jersey, Lead Plaintiff is subject between approximately December 2021 and August 2022 to unexplained tripping and falling events. These events are caused and created by Defendant United States or its agents using BRMT to momentarily cause blackouts, and/or contract or relax muscles of Lead Plaintiff, leading to a loss of control and balance. These events cause the Lead Plaintiff to trip and very nearly fall near the southwest corner of the Edgewater Commons south access road at River Road and while

crossing River Road near Penny Lane, both in Edgewater, NJ. Failure to quickly regain balance by stumbling forward to an upright posture could end with the Lead Plaintiff falling to this heavily traveled street. Such an outcome could cause severe injury or death in traffic. Evidence as to the specific date, time, and remote BRMT instructions given to initiate each event are available upon discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001D |
| Table 2 paragraphs: | 2-0196, 2-0202 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 118; pages 419-426, and 774-785. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 516. LETHL-13 Lethality Attempts: North Bergen Hospital Fall, 2021

A. While a resident of the state of New Jersey, Lead Plaintiff is subject in April 2022 to a BRMT induced fall in Palisades Medical Center, North Bergen, NJ. This fall causes the Lead Plaintiff to tip to the right while remaining completely rigid, tipping him as if a statue. His head narrowly misses striking the vulnerable right temple on the 4 inch tall metal base of a rolling bed table. This fall is caused and created by Defendant United States or its agents use of BRMT and creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions which are given to initiate the event are available upon discovery

against Defendants. Medical evidence which documents this event and the follow on medical tests required before a doctor will release the Lead Plaintiff is also available.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-001E |
| Table 2 paragraphs: | 2-0193, 2-0194 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 120; pages 419-426, 774-785 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 517. LETHL-14 Lethality Attempts: New York Metro North Mass Casualty Attempt, 2022

A. While a resident of the state of New Jersey, Lead Plaintiff boards a Metro North Hudson Line express train from Beacon, New York to Grand Central Terminal in New York City on Sunday evening, September 11, 2022. The express train is traveling approximately 50 to 60 miles per hour when the engineer urgently brakes the train during an emergency stop. The train collides with a portion of the tree which had fallen to block tracks at that point, including the southbound express track the train is traveling on at the time.

B. This incident occured shortly after sundown and could not be made any more difficult to see than it is. The timing of the strike is carefully selected by those who plan the strike for this moment just after sunset as the train engineer's eyes are adjusting from the bright sunlight of the setting sun to moonless darkness. The location is a remote track section with no nearby

structures or inhabitants so there are no ambient light sources in the area. If the tree had been larger, the train could have contacted a more substantial portion of the trunk of the tree. The tree's full weight and its root ball, still wedged in the ground could exert enough lateral force to derail the train at a relatively high speed. This creates a very significant risk of injury or death to the Lead Plaintiff and several hundred other passengers.

     C. There is a specific sequence of follow-on events, including a reportedly stalled train, which results in the Lead Plaintiff's exit from the train at Yankee Stadium, one stop from his destination, and use the subway to travel to Grand Central Terminal in New York City. This sequence includes signature tradecraft events, details available from Defendants upon discovery, indicating their knowledge and planning of this sequence by Defendants under command authority of Defendants with police powers. Evidence of the specific Defendants who conspire and/or cause this event are available upon discovery. See this event and other relevant lethal and potentially lethal events, including other mass casualty attempts below.

     D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 2 |
| --- | --- |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-056 |
| Table 2 paragraphs: | 2-0099, 2-0202 |
| LP Evidentiary Exhibits pages: | 413-415, 416-418, 542-547, 564-574, 598-606, 766-769, 772-773 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**518. LETHL-15 Lethality Attempts: New York Morningside Park BRMT Fall, 2022**

A. While a resident of the state of New Jersey, Lead Plaintiff is subject on September 17, 2022 at 7:29PM to a fall from the top step of a deliberately darkened staircase in a series of park pathway stairs in a New York City Park which is caused and created by Defendant United States acting in coordination with individuals employed by Defendants City of New York and/or NYPD. This BRMT induced fall causes the Lead Plaintiff to misplace his left foot on the top stair, lose his balance, and forward somersault on the stairs, landing on his back on the set of stairs, and injuring his head, knees, and hands. This fall creates specific risk of severe injury or death. Further evidence corroborating the specific date, time, and remote BRMT instructions given to initiate this event are available upon discovery against Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 2C |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-058, 1-059 |
| Table 2 paragraphs: | 2-0076, 2-0099, 2-0202, 2-0203 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 1-4, 97, and 121; pages 419-426, 542-547, 564-574, and 786-793, 10302-10304 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**519. LETHL-16 Lethality Attempts: New Jersey North Bergen Vehicle Rundown, 2022**

A. A vehicle rundown sequence, intended to harm and/or intimidate the Lead Plaintiff is conducted in New York City and North Bergen, NY on November 18 and 19, 2022. Two

streets being crossed by Lead Plaintiff in New York City have their streetlights extinguished in both directions from Eighth Avenue, and electric scooters run in the wrong direction after dark. No other vehicle traffic is on either street at this time. About 90-110 minutes later, normal vehicle traffic in the proper direction is allowed on these streets as the Lead Plaintiff returns to the same subway station. The following night BRMT is used, his attention is distracted toward a bright light, his peripheral vision limited by angle, and his walking pace fixed as a white compact car is raced toward him in the parking lot of the North Bergen, NJ Walmart, stopping very abruptly within 15 feet from the Lead Plaintiff and coming to a final stop about 5 feet away. As he visits a restroom in the shopping complex after a meal, there is a male vomiting into the restroom sink. There is no injury from this event sequence, but this pattern of practice is completely consistent with other collaborative BRMT and physical violence directed toward the Lead Plaintiff as further described herein.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 2D |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-064, 1-065, 1-066 |
| Table 2 paragraphs: | 2-0099, 2-0203 through 2-0215 |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**520. LETHL-17 Lethality Attempts: Programmed Health Collapse, 2023**

A. During 2023, Lead Plaintiff has observed Defendants' direct attempts to construct a programmed health collapse narrative using health professionals assigned to Lead Plaintiff as part of their on-going illegal involuntary servitude program. Two primary sequences have been used to construct this narrative – on-going obstructions of the colon and a heart health sequence.

B. Lead Plaintiff begins experiencing constipation in irregular cycles around 1984. Periodically throughout and after these progressions, Lead Plaintiff's constipation completely disappears, then recurs in bouts. While others also naturally experience this issue, it is notable as a BRMT manipulation and potentially lethal, given the bizarre and aggressive form this manipulation has taken on in 2023.

C. This specific 2023 colon blocking sequence is evidenced by a series of Lead Plaintiff diary entries which identify a specific sequence of highly medically improbable occurrences including the progressive cyclic failures of a series of normal medical interventions including fiber supplements, polypropylene glycol, and lactulose. Further, the lag period between each of those medical interventions and the normal period in which they act upon the body, compared to the direct experience of the Lead Plaintiff, does not consistently match their normal efficacy and lag time patterns. This can only be explained as an external intervention using BRMT, a biomedical abuse tool available only to Defendant United States. When explained to Lead Plaintiff's primary physician, actually an employee of Defendant United States, the physician recommended contacting a gastroenterologist, suggested one might be joining his local practice, then simply walked away, suggesting a return visit in three months. Upon attempting to contact the gastroenterologist whose office had completed the colon

examination described at subcount LETHL-13, the phone company message indicated the office phone line had been temporarily disconnected and the gastroenterologist's direct personal cell phone was not accepting calls. See LP Evidentiary Exhibits pages 12234-12244.

      D. The heart health narrative sequence is evidenced by a cardiologist who was introduced to Lead Plaintiff immediately after subcount LETHL-13 in 2021, reviewed a routine EKG in 2023, and recommended a series of interventions, including a wearable round the clock heart monitor and a hospital based heart test, based upon EKG readings which were identical to the prior year when the cardiologist stated that no interventions were either needed or appropriate. See LP Evidentiary Exhibits pages 12160-12233.

      E. During a prior visit to this cardiologist's office, a pulse monitor indicated a Lead Plaintiff heart rate of 38 beats per minute at a time when the actual reading was well within normal range of about 65 to 74 beats per minute (based upon the Lead Plaintiff's own physical body reactions at that time). Depending upon the actual software code in the EEPROM (electrically erasable programmable read only memory) of the wearable heart monitoring device, it too can be manipulated to suit a specific narrative simply by recording a different pattern to the device's memory than that actually being experienced by the wearer of the monitor. This allows a third party intervenor to construct an alternative health narrative about the patient so that the patient can be orchestrated into an apparently natural adverse life outcome using BRMT as the method of intervention. BRMT can and does control any bodily function as demonstrated by, among other things, the unnatural nature of the colon interventions described in subparagraph B above. Medical records and related medical tests will be produced from the attending physicians.

F.  All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph C from subcount LETHL-1 and paragraph B from subcount LETHL-2 are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0217 |
| LP Evidentiary Exhibits pages: | 12160-12233, 12234-12244 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

# ILLEGAL HUMAN EXPERIMENTATION (HEXP series offenses)

*Biological and Medical Invasions- Torture*

## 521. HEXP-1 Illegal Human Experimentation: BRMT Induced Torture, Washington State 2002-2005

A. During 1975-1976, 1988-1989, and 2002-2005, Defendant United States used BRMT and carefully orchestrated extremely adverse life event sequences to disguise and enhance a series of extreme biomedical manipulations of Lead Plaintiff's brain chemistry. The most intense in this specific series occurred in 2002-2005. Stealthy, very high intensity, and long running BRMT manipulations of serotonin comparable to months and months of "Chinese Water Torture" were endured by the Lead Plaintiff. Together with the extreme field operations psychological and relationship coercion, and the financial coercion described below, this resulted in a suicide ideation by Lead Plaintiff in approximately 2005.

B. These extreme BRMT brain chemistry manipulations were combined with a years-long campaign of Defendants' field-deployed psychological operations, with the stress of a manipulated and then wrecked relationship, with a total loss of income, and with several litigations required to attempt to recover various frauds, thefts, and the destruction of his small business during this period, all as described in other subcounts herein.

C. Public vigilantism was shaped by his deliberate public exposure during this period, and unbeknownst to him at the time, and by a public narrative of lies and rumors pushed by these defendants, principally Defendant United States. Together with defendants' direct manipulations, this public vigilantism created and sustained oppressive life circumstances across all dimensions of Lead Plaintiff's life, foreclosing career and entrepreneurial choices he believed were his to make (they were not), to intimate personal relationship choices he believed were his to make (they were not), and shaped public perceptions and direct public vigilantism, including threats of lethal violence, toward Lead Plaintiff.

D. This was an overwhelming campaign by Defendant United States and its co-conspirators directed against the Lead Plaintiff which is comparable to and worthy of any of the world's great demagogues and propagandists throughout history. Together with the serotonin hack using BRMT, it was nearly fatal.

E. Lead Plaintiff sought out his physician Paul Mayeda one day after the suicide ideation but was met by a so-called female physician's assistant in an empty medical office. This had never happened before. As Lead Plaintiff left the patient examination area, the figure representing his doctor Paul Mayeda had his back turned to the Lead Plaintiff on a stool, and did not turn to greet the Lead Plaintiff – very unusual. There were no other patients, nor any other

personnel than one receptionist, the physician's assistant, and the white coat male figure on the stool observed in this entire normally moderately busy 2 story multi-doctor Lakeshore Medical Clinic facility near Evergreen Hospital. A prescription for paroxetine (Paxil, an SSRI) was entered and used to relieve the BRMT induced serotonin overdose.

F. Defendant United States has since actively conspired to conceal its acts by destroying the Lead Plaintiff's personal medical records through the passage of time. After human trafficking the Lead Plaintiff through programmed destruction in Washington, through homelessness in Massachusetts, then faked employment in New Jersey, these essential medical records from about 1990 to 2005 were not passed on to Lead Plaintiff's physician in New Jersey in 2007 despite his written request to his Kirkland, Washington primary care physician.

G. This form of evidence suppression and destruction is a common pattern of practice of Defendant United States, as documented elsewhere throughout this Complaint. Lead Plaintiff's own father was a medical practice examination room paper salesperson between about 1960 and 1963. He routinely bought expired x-rays for recycling by his employer from medical practices in northern and southern California which sales targets were specifically assigned by his employer, Pacific Paper Products, Tacoma, Washington. This was most probably an FBI cover operation to cover its tracks and suppress evidence as Cointelpro, a violent felony-filled campaign against civil rights activists and others, was in full operation at the time. When he was asked to undertake the same pattern in Texas, he quit the company and returned to Washington state with his young family.

H. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph B from subcount LETHL-2 is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9P, 9R(i), 369 |
| Table 1 paragraphs: | 1-013, 1-014, 1-015, 1-023 |
| Table 2 paragraphs: | 2-0003 through 2-0006, 2-0015 |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 paragraphs 1-6, 54, 62-73, 78-80, 103-124, 371, 575-597, 9679-9696, 10372 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

    I.  See other selected relevant content in searchable indexes and lists at LP Evidentiary

Exhibits Compendium at pages 934-1075. Directly cited relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | 3, 4, |
|---|---|
| Complaint paragraphs: | 9P, 9R(i), 369, RGTS-1, HEXP-7 |
| Table 1 paragraphs: | Entirety |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 1-10, 140-189, 153-154 (para 42-45), 155-164 (paragraphs 45-69), 181-182 (para 107-111), 368-793, 7467-8179 (2014-2018), 2023 Financial Times photo confirmation of identity at 7470-7470A, 8233-8262, 8263-8287, 8347-8350; 9679-9696, 10256-10258, 10306-10310, 10335-10342, 10346-10351, 10365-10375, 10372, 10394-10422, 10428, 11653-11654, 12129 (third paragraph), 12150-12159 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Hurd Pine Street Inn update 110419.pdf<br>Bergen Regional Sinisi re resume and cover ltr 101230<br>D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf<br>D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf<br>D Brewer Marriage App Jeanette 1990 900330.pdf<br>D Brewer Marriage App Jeanette 1990 900330.pdf<br>Jeanette Timeline 1 061001.pdf<br>Jeanette Timeline 2 061001.pdf<br>Jeanette Timeline 3 061001.pdf<br>Jeanette timeline email 061001.pdf<br>Match Group Second Notice re Preserve Evidence 220122,<br>Match EPL Response 221110,<br>Match Group Legal Dept Email 221110, |

|  | Modderman email re Pankowski wedding Drumm attends 080625, <br> Modderman email re Pankowski wedding Drumm attends 312pm 080625, <br> Modderman re wedding 080626, <br> Modderman email re Pankowski wedding Drumm attends 817am 080627 <br> Akoto re AltaVista bad actor 161018, <br> Akoto re Blackpool then DD 170315, <br> Akoto Laura re $2K to Mr Prince from Porter Patten $3K 171021, <br> Akoto Hints of money laundering entrap scam 171025, <br> Akoto Ramsey Fixup Expenses 171027 <br> Akoto Mailing Address 150101.pdf <br> Gia first date 211207, <br> Match Group Second Notice re Preserve Evidence 220122, <br> Match EPL Response 221110, <br> Match Group Legal Dept Email 221110 <br> New York Cares Library Bowling Outing 080815 <br> Certain emails are blocked by a defendant computer hack |
|---|---|

## 522. HEXP-2 Illegal Human Experimentation: BRMT Induced Torture, Massachusetts 2006-2007

A. During 2006-2007, Defendant United States again used BRMT and its carefully orchestrated life event sequences to disguise and sustain a series of biomedical manipulations of Lead Plaintiff's brain chemistry. This combination of stealthy high frequency manipulations (comparable to "Chinese Water Torture"); long duration extreme daily headaches and severe vision impairment for protracted periods of extreme duress; and BRMT manipulated adrenaline levels induce hypersensitivity to certain sounds (such as the crinkling of plastic bags) which are employed each night in a public shelter by Lead Plaintiff's nearby minders while he is homeless. These acts together with occasional fights among the homeless residents and their drug and alcohol induced collapses of consciousness which lead to concussions among other homeless

residents work together to amplify this emotional anxiety.

B. The October 31, 2017 symptoms identified at LETHL-9 also correlate with extreme headaches and blurry vision induced on occasion during 2021 and 2022 and experienced with extreme pain and blurred vision for months on end in Boston, MA in 2006-2007 and in Cliffside Park, NJ, in 2008-2010 occurring at the same time each day, abruptly appearing and later abruptly disappearing with no clear medical reason. A neurological examination in Boston, MA, and two brain scans in New Jersey provide no explanation for these symptoms or for the long-duration irregular recurrence.

C. In late June 2006, one of Lead Plaintiff's minders leaves a one broadsheet section of the Boston Globe newspaper containing an article about the suicide of Denise, then Chancellor of the University of California at Santa Cruz, carefully folded to that story on the end table next to the couch on which Lead Plaintiff normally watched the evening news. Lead Plaintiff would be sure to see this announcement about Chancellor Denton, who jumped to her death from her 33rd floor high rise apartment in San Francisco. She had previously been the Dean of the College of Engineering at the University of Washington in Seattle, WA and had invited Lead Plaintiff to join the College's Board of Advisors which met periodically to advise the Dean.

C. These psychological operations, including the above reminder of his own previous suicide ideation, and the theft and destruction of Lead Plaintiff's eyeglasses which were then crushed beyond use and left on the day after the theft on a sidewalk he used each day to reach the Boston Public Library, and BRMT manipulations were combined with Defendants' other field-deployed psychological operations.

D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. HEXP-1 subparagraph I is incorporated herein by reference.

Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials

related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-030 |
| Table 2 paragraphs: | 2-0125, 2-0150 |
| LP Evidentiary Exhibits pages: | 10306-10310 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Hurd Pine Street Inn update 110419.pdf |

## 523. HEXP-3 Illegal Human Experimentation: BRMT Induced Torture, New Jersey 2008-2011

A. During 2008-2011, Defendant United States uses BRMT and its carefully orchestrated

life event sequences to disguise and sustain a series of biomedical manipulations of Lead

Plaintiff's brain chemistry. These manipulations are also routinely used to influence a variety of

personal decisions of Lead Plaintiff. This combination of stealthy high frequency manipulations

(comparable to "Chinese Water Torture"); and a protracted episode of extreme duress leading to

a suicide ideations around 2009-2010 and involuntary commitment in 2010; are interspersed

with periodic lethality events and attempts from the 1980s to 2022; as well as selective exposure

to lethality events directed at others and then amplified through selective coverage in the

manipulated media sources fed by Defendant United States to Lead Plaintiff (2002 to 2022).

B. These BRMT manipulations are combined with Defendants' field-deployed

psychological operations which include a sequence of events which later indicate foreknowledge

and pretexting of the US Airways 1549 Hudson River emergency landing he witnesses on

January 15, 2009 from a living room window; followed by a brief out of place sighting from his apartment's kitchen window looking onto Palisade Avenue of the "Beast" Presidential limousine some months later and; shortly before his forced departure from this Cliffside Park, NJ apartment, three messages delivered one afternoon to appear as aural hallucinations to Lead Plaintiff from the "United States Secret Service" instructing him to descend to the building's basement and hide, a behavior witnessed by two female undercover officers.

C. These incidents are intermingled with years of sustained daily BRMT induced extremely painful headaches and severe vision impairment. The October 31, 2017 symptoms identified at LETHL-9 correlate directly with extreme headaches and blurry vision induced on occasion during 2021 and 2022 and experienced with extreme pain and blurred vision for months on end in Boston, MA in 2006-2007 and in Cliffside Park, NJ,  in 2008-2010 occurring at the same time each day, abruptly appearing and later abruptly disappearing with no clear medical reason. A neurological examination in Boston, MA, and two brain scans in New Jersey provide no explanation for these symptoms or for the long-duration irregular recurrence.

D. Defendants have also continued their other coercive psychological operations and public vigilantism inspired by Defendants to create and sustain oppressive life circumstances across all dimensions of Lead Plaintiff's life, from career and entrepreneurial choices and outcomes, to intimate personal relationships, to BRMT bioweapon bio-manipulated feelings of self-worth, and to shape public perceptions and direct public vigilantism, including threats of lethal violence, toward Lead Plaintiff. This is an overwhelming effort by Defendant United States and its co-conspirators against Lead Plaintiff which is comparable to and worthy of any of the world's great demagogues and propagandists throughout history.

E. During 2008-2011, the methods used by Defendant United States, and its Defendant police powers co-conspirators and private sector co-conspirators are even more extreme than usual, leading to Lead Plaintiff's second suicide ideation and, eventually to Lead Plaintiff's involuntary commitment without benefit of personal contact with legal counsel or the Court before so ordered by the Court. During these periods, BRMT imposed brain chemistry and physical manipulations of brain, central nervous system and muscles are particularly extreme, severe, and of long duration, leading to Lead Plaintiff to repeatedly cry out in pain and suffering imposed by Defendant United States use of BRMT.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-032 |
| Table 2 paragraphs: | 2-0153 |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Bergen Regional Sinisi re resume and cover ltr 101230 |

**524. HEXP-4 Illegal Human Experimentation: Short Cycle BRMT Torture Sequences 2023**

A. Defendants orchestrate a variety of short cycle torture sessions in public places including, without limitation:

(i) August 1, 2023, when sleep deprivation over a three day period is used to prime the Lead

Plaintiff for one of thousands of attempts to orchestrate some sort of public outburst of violence by Lead Plaintiff.

(ii)     September 23, 2023 during a Wynton Marsalis concert inflicting extended extreme pain in a knee tendon.

(iii)    on October 10, 2023 during a bus trip from depositing evidence of BRMT and racketeering with members of Congress inflicting extreme pain by extended cramping of the right palm and extended extreme pain in a knee tendon behind both knees.

(iv)    on October 20, 2023, while awaiting NJ Transit bus route 158 from about 6:00 P.M., with a strong adrenaline surge which was physically associated with the arrival of a bearded male after some delay in the planned arrival of the bus but actually directly experienced as a BRMT hack to create a flash temper event against that federal undercover officer in that moment. This sequence is relatively familiar to the Lead Plaintiff from other similar events. See contemporaneous write-up at LP Evidentiary Exhibits pages 12150-12159.

(v)     These occurrences have become commonplace in Lead Plaintiff's life experiences over the past twenty years since the first cramping of the palm was experienced around 2004. Incidents of short cycle torturous abuses of the central nervous system by Defendant United States number in the thousands or perhaps tens of thousands over this entire period, so no attempt ahs been made to capture each event. There have simply been too many to count. Medical records including neurological examinations and MRIs, show no neurological damage which would provide any alternate organic medical explanation for these central nervous system manipulations using BRMT.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0217 |
| LP Evidentiary Exhibits pages: | 11653-11654, 12129 (third paragraph), 12150-12159 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

### *Orchestrated Personal and Intimate Relationships*

### 525. HEXP-5 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests Using BRMT Oxytocin Manipulation, Generally

A. Defendant United States has and does use its BRMT bioweapon and bioweapon delivery system to deliver and suppress natural occurrences of hormones such as melatonin (sleep) and oxytocin (love) to manipulate Lead Plaintiff to their desired goals. These goals have included the melatonin induced double homicide by motor vehicle, see subcount LETHL-1, and oxytocin manipulated thefts, see subcount HEXP-9.

B. Defendant United States used BRMT induced oxytocin dosing to manage the romantic and intimate affairs of Lead Plaintiff by suppressing or accelerating the oxytocin (love) hormone, beginning as early as the 1970s to gain and sustain its control of the Lead Plaintiff and his involuntary servitude from that time to the present. These BRMT induced brain biochemical manipulations occurred in the presence of his long term college girlfriend, a second strongly

interested college friend who later became a regional news anchor, and both spouses, who were all carefully placed by Defendant United States and its agents, officers, or confidential informants, in Lead Plaintiff's presence at key periods in his life. Defendant United States continued this manipulation of romantic and intimate interests (see the more recent examples at subcounts HEXP-9 through HEXP-12).

C. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend.

D. Defendants then continued this pattern of romantic and intimate interests manipulation through 2022, as partially related in other subcounts herein, by purposefully screening-in and screening out potential romantic interests using various means, including meetings and wire fraud on dating sites and Lead Plaintiff's known concern to retain traceability of these manipulations to sustain their isolation of Lead Plaintiff. Defendants have deliberately conspired to place four BRMT manipulated romantic interests in his life for a time (see subcounts HEXP-9 through HEXP-12) in the 2000s.

E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0038, 2-0128, 2-0171, 2-0179, 2-0185 |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111 |
| Emails and documents by topic and date, also located in LP | Not applicable |

| Evidentiary Exhibits: | |
|---|---|

**526. HEXP-6 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With First Spouse, Lynne 1979-1988**

A. Defendants purposefully orchestrated the initial meeting by professionally isolating Lead Plaintiff at a months-long financial audit assignment at Safeco in 1980, then later destroyed his first marital community with Lynne in 1987-88, using BRMT manipulated oxytocin to orchestrate these events. Defendant United States, to support its development and deployment of the BRMT bioweapon and bioweapon delivery system, directly interfered in the personal lives, careers, and brain biochemistry of both spouses from the purposes of arranging, then stressing, harming and destroying their marital community and to endanger and/or entrap both Lead Plaintiff and both spouses.

B. Defendants eventually succeed in causing and creating the circumstances of the divorce by delivering overdoses of oxytocin (love hormone) to Lynne in the presence of her best work friend's husband, a serial adulterer, which results in divorces of both couples, forces liquidation of real property and improvements, and causes and creates the loss of marital community, mutual emotional and financial support, and a wide range of future financial benefits from that community remaining intact, including accretion of financial assets and real property appreciation, Interline Exhibit 3 on NE 133rd Street.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 3 |
|---|---|
| Complaint paragraphs: | RGTS-1, HEXP-7 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0023 through 2-0039 |
| LP Evidentiary Exhibits pages: | 153-154 (para 42-45), 181-182 (para 107-111), 8233-8262 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf<br>D Brewer Marriage Cert May 5 1984 Lynne 840505.pdf |

**527. HEXP-7 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated BRMT and Other Interference in Marital Community With Second Spouse, Jeanette 1988-2005**

A. As Lead Plaintiff's first marriage dissolution is being processed by the Court in 1988, Defendant United States acting through Defendant Stephen Waters, a contract software engineer at Lead Plaintiff's employer, LazerSoft, arrange a meeting with several female co-conspirators to introduce Jeanette Smith, an employee of First American Title Insurance, Bellevue, WA at the Greenwood Inn, Bellevue, WA on a weeknight when there are no other parties present in the bar/lounge. This eventually results in his second marriage to Jeanette.

B. A series of at least four lengthy informal separations (four to six months typical) occurs during the 15 year marriage, as do multiple periods of financial instability including orchestrated business failures, employment instability, and unemployment, as documented in RICO series subcounts from 1990 to 2005. His stepson develops symptoms of schizophrenia during his teen years and engages in several violent outbursts against both Lead Plaintiff and his wife, forcing them to remove him from the family home to avoid a deadly outburst against his mother.

C. Despite these problems, Lead Plaintiff rebuilds the house he is living in near Kirkland, Washington (see Interline Exhibit 4) which is directly across 149th Street from the initial cover residence used by Dr, Heffron around 1990 (actually William Burns, now CIA Director). Lead Plaintiff also rebuilds his personal credit after the FBI imposed business failure of Alliance which also occurred while living across 149th Street from Heffron (William Burns).

D. After approximately two years of dating and fifteen years of marriage, Defendant United States again orchestrates the final destruction of the Lead Plaintiff's second marital community with Jeanette in 2004-2005. As before, Defendant United States acts to support its development and deployment of the BRMT bioweapon and bioweapon delivery system by interfering directly in the personal lives, careers, and brain biochemistry of both spouses, causing, among other violations, financial distress and extended separations for the purpose of attempting to harm and destroy the marital community, and engages in other deliberate acts which stress, harm, endanger and attempt to entrap spouses.

E. Defendants eventually succeed in causing and creating the circumstances of the divorce, forced liquidation of real property and improvements, and loss of marital community and mutual support, and a wide range of future financial benefits from that community remaining intact, including accretion of financial assets and real property appreciation.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraphs H, I and J are incorporated herein by reference. Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 4 |
|---|---|

| Complaint paragraphs: | Not applicable |
|---|---|
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062 through 0092, 2-100 through 2-0121 |
| LP Evidentiary Exhibits pages: | 155-164 (paragraphs 45-69), 8263-8287, 8347-8350 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | D Brewer Marriage App Jeanette 1990 900330.pdf<br>D Brewer Marriage App Jeanette 1990 900330.pdf<br>Jeanette Timeline 1 061001.pdf<br>Jeanette Timeline 2 061001.pdf<br>Jeanette Timeline 3 061001.pdf<br>Jeanette timeline email 061001.pdf |

**528. HEXP-8 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fake Relationship – Marinka 2008**

A. Defendants used the online dating platform Match.com, owned and controlled by Defendant Match Group, or its spoofing by an unknown Defendant police powers operation to screen-in and screen-out persons of interest to Lead Plaintiff, to conspire to arrange the introduction of a co-conspirator, whether by choice or coercion, and to arrange a fake relationship between Lead Plaintiff and Marinka Modderman, whereabouts currently unknown to Lead Plaintiff, but very likely known to various police powers Defendants. Lead Plaintiff has dates with this New York City resident in New York City and Cliffside Park, NJ, as well as one weekend trip to rural NY and CT, all of which require at least one of the two parties to engage in interstate travel. Lead Plaintiff spent over $1,000 to travel and pay for meals and other entertainment during these 2008 fake relationship dates.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0148, 2-0149 |
| LP Evidentiary Exhibits pages: | 10335-10342, 10346-10351, 10394-10422, 10428 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110, Modderman email re Pankowski wedding Drumm attends 080625, Modderman email re Pankowski wedding Drumm attends 312pm 080625, Modderman re wedding 080626, Modderman email re Pankowski wedding Drumm attends 817am 080627 |

## 529. HEXP-9 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fake Relationship, Laura 2014-2018

A. Defendants use online dating platforms, including Match Group and Bumble websites, or their spoofing by an unknown Defendant police powers operation to screeNSEC-in and screeNSEC-out women in 2014, and arrange a fake online relationship with Laura Akoto, ostensibly a resident of Ghana until 2018. Using wire fraud and BRMT oxytocin (love hormone) manipulation this online relationship steals more than $14,000, two cell phones, a PlayStation 1, and game cartridges from Lead Plaintiff between 2014 and 2018 for police powers control over his movements and finances.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0171, 2-0179 through 2-0181, 2-0185 |
| LP Evidentiary Exhibits pages: | 7467-8179 (2014-2018), and 2023 Financial Times photo confirmation of identity at 7470-7470A. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Akoto re AltaVista bad actor 161018, Akoto re Blackpool then DD 170315, Akoto Laura re $2K to Mr Prince from Porter Patten $3K 171021, Akoto Hints of money laundering entrap scam 171025, Akoto Ramsey Fixup Expenses 171027 Akoto Mailing Address 150101.pdf |

## 530. HEXP-10 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests, Induced Fake Relationship, Gia 2019-2021

A. Defendants use online dating platforms including those of Match Group and Bumble, or their spoofing by an unknown Defendant police powers operation to screen-in and screen-out persons of interest to Lead Plaintiff, to arrange the introduction of their co-conspirator, whether by choice or coercion, to arrange a fake relationship between Lead Plaintiff and Norelle Dean, aka Gia Shakur, aka Nina Rhinehart, whereabouts currently unknown to Lead Plaintiff, but very likely known to various police powers Defendants. Lead Plaintiff has dates with this New York City resident in New York City and in Edgewater, NJ, along with one trip to New Orleans, LA, all of which require at least one of the two parties to engage in interstate travel. Lead Plaintiff spends over $1,000 to travel and pay for meals and other entertainment during these fake relationship dates. These dates occur between December 2019 and 2021 and are described at Complaint Table 2-0188.

B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| --- | --- |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0188 through 2-0192 |
| LP Evidentiary Exhibits pages: | 10256-10258 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Gia first date 211207, Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110 |

*Biological and Medical Invasions – Personal Humiliation, Endangerment, Illness*

**531. HEXP-11 Illegal Human Experimentation: Personal and Intimate Relationships - Orchestrated Romantic Interests, BRMT Induced Erectile Dysfunction 2008, 2020-2021**

A. Defendants use intimate relationships between Lead Plaintiff and a series of women from 2005 to 2021 to field deploy increasingly sophisticated BRMT functionality against the Lead Plaintiff by inducing erectile dysfunction (ED). In 2005, two dates result in ED failure (BRMT induced). In 2008, BRMT is again induced but is offset by prescription medication tadalafil. In 2020 into 2021, Defendant United States uses its BRMT bioweapon and bioweapon delivery system to induce a progression of ED symptoms despite this medication, indicating that BRMT bioweapon sophistication has evolved to be much more granular in its effects on the brain, central nervous system, and muscular control to attain and sustain an erection.

B. Periodically throughout and after this progression, Lead Plaintiff's erectile dysfunction completely disappears, directly indicating the ED symptoms are explicitly due to

BRMT bioweapon intervention by Defendant United States. Accomplishing this result requires

coordination between persons with direct operational control of the BRMT bioweapon and

bioweapon delivery system, field agents and confidential informants willing or coerced to

engage sexually with the Lead Plaintiff. Wire fraud is used to arrange some of these dates as part

of the date sequences which are the subject of other sub-counts in this Complaint. Lead Plaintiff

expends personal funds on travel and entertainment  during these fake relationship dates. These

dates occur in 2005, 2008 and 2020-2021.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference.

Subcount HEXP-5 subparagraphs C and D are incorporated herein by reference. Paragraph B

from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0115, 2-0148, 2-0188 through 2-0190 |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**532. HEXP-12 Illegal Human Experimentation: BRMT Orchestrated Personal Movements and Orchestrated Activities**

A. Defendant United States uses the BRMT bioweapon to manage, direct, and control

Lead Plaintiff's movements for the convenience of the Defendants, including for example:

(i) daily movements as basic as the timing of shopping trips so orchestrated events, such

as contaminated foods (such as bagged spinach, milk, and brats), stockouts of common products

such as cereals and vegetables, and so field harassment sequences such as aisle blocking can be

run by field personnel at all hours of day and night;

(ii) being purposefully misdirected by flipping Lead Plaintiff's sense of direction in New

York City to arrange non-randomized directed walks which include psychological operations;

(iii) to manage the timing of his arrival at events or his missing of events;

(iv) to elect and cancel vacation travel, and many other activities and actions inside his

personal residence and in public places.

B. One such example is the inducement of strong anxiety in advance of a film festival in

Telluride, CO which he arranges and cancels as shown at LP Evidentiary Exhibits pages 10365-

10375 while employed at Establish. This anxiety-induced vacation cancellation comes in May

2008 after an earlier ski vacation to Park City, UT The Park City trip is orchestrated and allowed

by Defendant United States to arrange his "incidental" view of classified pulse jet technology in

flight operations during this early 2008 trip on the day before he visits the Hill Air Force Base

Museum near Ogden, UT See other examples of this type of physical movement intervention, a

daily occurrence to Lead Plaintiff by Defendant United States' use of its BRMT bioweapon to

hijack Lead Plaintiff's daily life herein.

D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference.

Paragraph B from subcount LETHL-2 is incorporated herein by reference. A comprehensive set

of relevant pre-discovery evidence and information which relates this subcount to other relevant

subcounts includes, without limitation:

| Interline Exhibits: | Not applicable |
|---|---|

| Complaint paragraphs: | Not applicable |
|---|---|
| Table 1 paragraphs: | Entirety |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 10365-10375 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | New York Cares Library Bowling Outing 080815 |

### 533. HEXP-13 Illegal Human Experimentation: Reckless Endangerment Through BRMT Induced Defamation

A. Defendant United States engaged in protracted manipulation of Lead Plaintiff's words and action from approximately 2000 to 2021 to publicly defame and mischaracterize the Lead Plaintiff. Combined with their careful pre-texting of Lead Plaintiff in national security matters beginning in 1996 and continuing after the September 11, 2001 terrorist attack, their purposeful public internet exposure of Lead Plaintiff, and their enhanced powers and general public and police powers paranoia surrounding Defendants United States' failure to interdict the 9/11 attack, these BRMT manipulations recklessly endangered the Lead Plaintiff's life at the hands of both other Defendants and due to public vigilantism; and defamed the Lead Plaintiff in the view of many people.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-027 to end |
| Table 2 paragraphs: | 2-0083 to end |
| LP Evidentiary Exhibits pages: | 140-189, 368-793 |

| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |
|---|---|

**534. HEXP-14 Illegal Human Experimentation: BRMT Induced Adverse Medical Reactions, Symptoms, and Illnesses 1980 to present**

A. Lead Plaintiff has and does experience notably atypical progressions of medical symptoms, quite unnatural to their normal progressions in medical presentation, to wit, the nasal allergy and eye aging progressions documented here. Other abnormal progressions related to BRMT include excess hormone production ,extreme unexplained illness symptoms upon return from London in 1994 or 1995 leading to DVT, symptoms of non-Hodgkins lymphoma in August 2007, and others noted in the referenced evidence.

B. Allergy symptoms in the early 1980s, despite having lived in the exact same environment with evergreen trees since birth. A Redmond, Washington allergist diagnosed this as a primary allergy to deciduous trees. The problem steadily worsened from about the 1980s through 2005, required persistent nasal and oral steroid use, resulted in frequent nasal infections and antibiotic use. Nasal surgery was performed in the early 1990s in the same Evergreen Surgical Center medical building where Heffron (Burns) allegedly had his medical practice adjacent to Evergreen Hospital in Kirkland, Washington.

C. The nasal surgery may have concealed implantation of a device used in the further development of BRMT along with an unexplained episode of a bleeding eardrum after what seemed to be a normal night of sleep in his Kirkland area residence some years later. An independent MRI in a medical facility, and using medical technology and software securely furnished by the manufacturer is required to establish whether this smoking gun evidence is

present in Lead Plaintiff's sinuses and/or ear canal.

D. The extremely persistent allergy symptoms described at subparagraph B above change dramatically, in a very unexpected and unnatural direction, after Lead Plaintiff is human trafficked by the FBI wrecking progression from Kirkland, Washington and its millions of fir, hemlock, and cedar evergreen trees to Boston, Massachusetts on December 23, 2005. Boston is a heavily treed city with millions of deciduous trees. Lead Plaintiff's medically diagnosed allergy to deciduous trees nearly vanishes and is never again present in any particularly notable manner though today, even when Spring and early Summer pollen loads are heaviest, despite deciduous trees being the only trees near any of his residences in the Boston and northern New Jersey area from 2006 to today. This is strongly suggestive of manipulated medical symptoms by Defendant United States' biomedical abuses using BRMT to sustain adverse medical experiences.

E. Lead Plaintiff began experiencing strong headaches days after joining CNA Industrial Engineering in November 1996. His visit to an optometrist resulted in a moderate strength bifocal prescription. Subsequent visits continued normal age related progression until 2008. Since 2008, he has been told on each successive visit that his prescription strength was being reduced, through and including at his most recent vision check-up in 2022. This vision progression since 2008, as verbally represented by his eye doctors and in their written prescriptions, directly contradicts the normal progression over time of virtually everyone who must use prescription eyewear.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials

related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0002, 2-0013, 2-0014, 2-0022, 2-0026, 2-0028, 2-0065, 2-0067, 2-0076, 2-0099, 2-0115, 2-0131, 2-0150, 2-0153, 2-0189, 2-0193, 2-0196, 2-0197, 2-0198, 2-0200, 2-0202, 2-0213 |
| LP Evidentiary Exhibits pages: | 10306-10310 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**535. HEXP-15 Illegal Human Experimentation: BRMT Forced Public Urination Sequence, 2022**

A. Defendants orchestrate forced public urination sequence using BRMT after Lead Plaintiff attends an abortion right protest rally in 2022. See LP Evidentiary Exhibits page 11667 for the detailed description of that forced public humiliation, consistent with Defendant United States' pattern of practice to discredit, humiliate, and retaliate directly against a citizen whistleblower and victim.

B. Further evidence of these BRMT bioweapon induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses without Constitutional authority and in violation of rights, law and ratified international treaties, which comprise crimes against its own citizens and other innocents. To the extent they have not been destroyed medical records, likely including copies maintained by

Defendant United States, its medical contractors and/or researchers, can also be discovered to validate these claims.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-001, 2-0217 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 1-24, 54, 116-117, 575-597, 598-606, 10372 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**536. HEXP-16 Illegal Human Experimentation: BRMT Public Flash Temper Hack, 2023**

A. Defendants orchestrate a dangerous Tunnel Flash Temper Hack using BRMT in a subway tunnel near the Port Authority Bus Terminal in New York City. See descriptive narrative at LP Evidentiary Exhibits pages 11668-11670.

B. Further evidence of these BRMT bioweapon induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses without Constitutional authority and in violation of rights, law and ratified international treaties, which comprise crimes against its own citizens and other innocents. To the

extent they have not been destroyed medical records, likely including copies maintains by

Defendant United States, its medical contractors and/or researchers, can also be discovered to

validate these claims.

    C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference.

Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials

related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0001, 2-0217 |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 537. HEXP-17 Illegal Human Experimentation: Biological and Medical Invasions – Food Borne Illnesses 2008-2010, 2018-2023

    A. Defendants orchestrated multiple episodes of food borne illnesses to Lead Plaintiff by

arranging for spoiled food products to be placed among fresh refrigerated product in 2008-2010

and again in 2020-2022. Bagged salads were contaminated with rotted and blackened spoiled

spinach in 2008 through 2010 which risked potentially deadly salmonella and listeria infections,

and in milk and packaged Johnsonville brats are allowed to spoil and then placed on the

refrigerated dairy shelf for sale to the Lead Plaintiff in 2020-2022, which carried similar

infectious disease risks.

    B. All the refrigerated foods which are spoiled originate at the Acme grocery store in

Edgewater Commons shopping center in Edgewater, NJ. Some packaged foods originate there, and others are home delivered from Walmart in North Bergen, NJ. Emails evidencing Lead Plaintiff's correspondence with the parent company of the Acme Edgewater, NJ grocery store, Albertsons, customer service organization in 2020-2022 are no longer on the Lead Plaintiff's personal Hotmail.com email account as of the date this Complaint is being prepared and was deleted by the Lead Plaintiff, indicative of evidence tampering by these defendants.

   C. Lead Plaintiff also endured several episodes of vomiting from rice and other packaged foods in 2020-2022, though these were likely BRMT imposed symptoms rather than from spoiled foods.

   D. Further evidence of these food borne illness induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses. To the extent they have not been destroyed maintained by Defendant United States, its medical contractors and/or researchers, can also be discovered to validate these claims.

   E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount HEXP-1 subparagraph I is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0006, 2-0151, 2-152, 2-0191 |
| LP Evidentiary Exhibits pages: | Not applicable |

| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | ACME emails are blocked by defendant computer hack |
|---|---|

# National Security Pretexting and Entanglements (NSEC series offenses)

## 538. NSEC-1 National Security Frauds: Human Trafficking - Purposeful Family Assignment and Entanglement in National Security Matters, Lifetime

A. Defendant United States has purposefully and repeatedly entangled Lead Plaintiff in national security matters as a pattern of practice Lead Plaintiff's close college era friends included numerous persons who were in fact government employees of FBI, DOJ, CIA, and the military assigned to assist the secret development of BRMT in CIA.

B. FBI and CIA were likely involved in his initial professional assignment to an audit of Safeco Mutual Funds in Seattle where he met his first wife, the former wife of a King County Sheriff Department serial killer task force commander. She was later removed in 1988 by a divorce which resulted from an overdose of oxytocin in the presence of a serial adulterer.

C. His second wife resulted from an orchestrated introduction and timely BRMT oxytocin boosts after they met. The introduction itself was a field operation in 1988 undertaken by Defendant United States. Stephen M. Waters, an unknown federal agent, posing as a software engineering contractor at LazerSoft, orchestrated the introduction with other field agents of Defendant United States during the latter stages of Lead Plaintiff's divorce. During this period, Lead Plaintiff also sought out an offline dating service and was orchestrated into a fruitless cover operation by FBI instead. FBI then presents again overtly as a friend introduced through his second spouse.

D. Lead Plaintiff's second extended family included numerous persons portraying

themselves as friends or relatives who were in fact government employees of FBI, DOJ, CIA, and the military. These include specific individual defendants who concealed their actual identities and official positions which were unknown to the Lead Plaintiff until September 2023. In several cases, these individuals have built new legends which morph from their undercover identities, changed their ages, certain aspects of their biographies, and in some cases appearances to some degree, in order to conceal their prior roles in this illegal program. These include a former Associate Justice of the Supreme Court, a former member of the National Security Council, and media personalities who were DOJ and/or FBI employees at the time of their fraudulent interactions with Lead Plaintiff. These known individual Defendants are individually identified at LP Evidentiary Exhibits pages 11630-11640, 11643. Others will be identified through the discovery process.

E. On knowledge and belief, Lead Plaintiff's father was employed by a FBI cover company, Pacific Paper Products, Tacoma, Washington, from approximately 1960-1963 in northern and southern California for the stated purpose of selling examination table disposable paper drapes to medical doctor and medical facilities. The actual target of this cover operation was to remove and recycle X-ray films from targeted medical practices to dispose of evidence potentially detrimental and inculpatory for FBI and its collaborators as they continued their illegal Cointelpro program and other illegal and violent operations against civil rights activists and others. When offered a third transfer, this time to Texas, Lead Plaintiff's father quit and returned the young family to Washington state where he pursued work as a route delivery employee, later delivery route owner under the watchful eye of another uncover agent named Earl Keller.

F. As a teenager, Lead Plaintiff worked for Larry's Market, an independent food market in Federal Way, Washington which was co-owned by Larry Brewer, a cousin of Lead Plaintiff's father, and unbeknownst to him by FBI acting through an undercover agent who posed as a business partner and produce manager for a time. Lead Plaintiff also attended a designated spin-out, Decatur High School, in the Federal Way School District with 83 people in its initial graduating class, which included youthful undercover agents posing as high school students. Lead Plaintiff was designated for the BRMT program by FBI, CIA, and military during this period. Both Lead Plaintiff's father and uncle served in the US Army medical corps as conscientious objectors. Lead Plaintiff's uncle's life and career path bears a marked resemblance to the Lead Plaintiff's own subsequent path, to and including college era romantic interests and difficulties experienced throughout their careers and entrepreneurial activities.

G. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Discovery will provide critical confirming information directly from these institutional and individual defendants and, among some who presented at the time as family members, their children. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A through 9V |
| Table 1 paragraphs: | 1-007, 1-008, 1-010  through 1-016, 1-020 through 1-026 |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 140-189, 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10376-10393 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

H. See other selected relevant content in searchable indexes and lists at LP Evidentiary Exhibits Compendium at pages 934-1075. Directly cited relevant pre-discovery

evidence and information which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A through 9V, 322-333, 373, LETHL-1 through LETHL-17, RGTS-11, RGTS-12, RICO-9, RICO-10, HEXP-5 through HEXP-7, HEXP-1 through HEXP-3, HEXP-12 through HEXP-14, HEXP-17, RGTS-3, RGTS-10, RGTS-4, RGTS-5, RGTS-13, RGTS-14, and NSEC-1 through NSEC-5 |
| Table 1 paragraphs: | 1-006 through 1-017, 1-020 through 1-026, 1-031, 1-032 |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 140-189, 416-426, 428, 569-571, 575-581, 598-606, 766-769, 778-780, 8294-8346, 10376-10393 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 539. NSEC-2 National Security Frauds: Classified Equipment Pretexting, 1972-1986

A. Defendant United States began its pattern of pretexting Lead Plaintiff in police powers investigations, and in intelligence and national security matters for the purpose of perpetuating and covering up his involuntary enrollment as a human subject of BRMT in the early 1970s while he is a high school teenager (at age 16). He and his cousin, Steve Smith, encountered an apparent hitchhiker, actually a federal agent who left a classified briefcase satellite phone in the bed of Lead Plaintiff's pickup truck. The briefcase is spotted a few miles after the hitchhiker is dropped off, and safely returned to that agent at the Greenwater Tavern in Greenwater, Washington. With his fingerprints on the handle and locks of the briefcase, Lead Plaintiff becomes a national security suspect as satellite phones are classified equipment unknown to the general public in 1972.

B. Lead Plaintiff spotted his first national security spy, Christopher Boyce, in an

orchestrated event in August 1981 as he walks one morning from an ATM machine near his office in Seattle, back toward his car to pay for parking. An unmarked prisoner van and two unmarked Ford Crown Victoria federal police cruisers swept into the secured loading dock of the U.S. Federal Courthouse on Fifth Avenue in Seattle carrying the later-convicted domestic spy about 60 feet ahead of the Lead Plaintiff during his walk back to pay for parking.

        C. This color of law pattern of pretexts and targeted irregular activities continues through the 2021-2023 forensic review and preparation of this Complaint, including the entirety of the lethality series (L subcounts above ) and various other such acts related elsewhere in these subcounts. These targeted lethality actions, and the life events encompassing set of other biomedical, physical, financial, and emotional abuses and violations are performed against the Lead Plaintiff by Defendant United States which, in the aftermath of 9/11/2001 enlisted other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and deployment, including its international criminal law and ratified treaty violations of US persons and other innocents.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. NSEC-1 subparagraph H is incorporated herein by reference. Witness testimony and archival discovery against these defendants will confirm this specific incident and the surrounding events. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-006 through 1-012 |
| Table 2 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LP Evidentiary Exhibits pages: | 140-189 |
| Emails and documents by topic | Not applicable |

| and date, also located in LP Evidentiary Exhibits: | |
|---|---|

**540. NSEC-3 National Security Frauds: Human trafficking, Pretexting, Abuse of Allies in Violations of Rights – CSIS, RCMP, MI-6 MI-5, London Metropolitan Police, UK 1990-1994**

A. During 1990 through 1994, Defendant United States, its agents, officers, and confidential informants, conspire with Canadian and British intelligence and police powers organizations to develop pretexts for international spying on Lead Plaintiff. Defendant United States directly or through a confidential informant used the Lead Plaintiff's search for financings for Alliance and for P.A.N. Environmental Services (PAN) to defraud Lead Plaintiff of authentic financing options in Canada and Great Britain through authentic sources and to entangle him in national security and cross-border financial investigations of FBI and other police powers agencies.

B. This series of FBI and CIA international RICO frauds includes persons posing and/or acting as financial brokers, barristers, company executives, and in other professional roles to facilitate these frauds and swindles and permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in British Columbia, Canada, and London, England as well as within the United States using intelligence acquisition methods and assets which Defendant United States cannot legally deploy against its own citizens. Agents operating in international cover roles as financiers engaged in fraudulent financings on behalf of the Lead Plaintiff's own company, Alliance, and on behalf of P.A.N,, all of which were fruitless and intended to perpetuate Defendant United States' involuntary servitude of the Lead Plaintiff both

in the United States and in their own countries.

C. Defendant United States operated primarily through Gerald Cornwell, a US Navy veteran of the Vietnam War era, a female federal agent or officer posing as his wife, a fake cover residence in Newcastle, WA, and an extended series of financing services search trips to Vancouver, British Columbia while seeking financing to offset the prior frauds, thefts, and denial of SBA bonding and loan guarantees by Defendant United States against Lead Plaintiff's environmental services company, Alliance in 1990-1993. Alliance was destroyed by FBI and caused the personal bankruptcy of Lead Plaintiff and his spouse, Jeanette, in 1993.

D. Cornwell had previously operated with his twin brother in CIA commercial cover operations by selling center pivot irrigation systems to farmers throughout the United States to cover this form of covert intelligence operations in northern Africa, primarily Libya in the 1970 and 1980s, from a dealership in Pasco, Washington.

E. The Canadian intelligence and police powers operations, most likely RCMP and CSIS, posed in various roles and as domestic and international mining executives and financiers in various office locations throughout Vancouver, British Columbia, Canada, include various associates of Cornwell known as John Young, Ralph Shearing, and Rory Godhino from the Vancouver, British Columbia region, all of whom figure in the fraudulent Alliance financing sequence.

F. MI-6 and other British intelligence officers and police powers operations (likely London Metropolitan Police, MI-5, and MI-6) primarily operated through an individual known to Lead Plaintiff as Michael Kurtanjek, likely an MI-6 agent, posing as a Managing Director - Mining for Credit Lyonnaise Laing, an international investment bank headquartered in France,

and operating from its stock trading floor in London. Lead Plaintiff travels to London on three occasions, including one three week business trip. On one of these trips between Summer 1993 and the end of 1994, Lead Plaintiff is greeted by a trotting Metropolitan Police counter-terror squad in a lengthy construction tunnel at Heathrow Airport. He is the only other person in the 500 plus foot long tunnel in mid-afternoon at a busy Heathrow Airport international terminal. This is the second of three similar instances related to national security spying and terror-related alerts and episodes, including one in Seattle in August 1981 and another in New York City around November 2007.

G. RCMP and/or other Canadian officers, agents, and cooperators together with Defendant United States undercover agents and officers, are also engaged by FBI and CIA to provide discrete security and surveillance of Lead Plaintiff and his families for various trips over many years to Vancouver and Whistler, British Columbia, and for Lead Plaintiff's solo trip to the Rocky Mountain area of western Alberta in 2005. The Rocky Mountain trip in late Summer 2005 includes an overnight disappearance and search of the Lead Plaintiff's briefcase travel bag including his personal computer and all related tracking data and documents to that point, somewhere between Lake Louise, Calgary, Canada and its recovery at the front desk of his condo hotel in Canmore, Calgary, Canada, the following day.

H. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount NSEC-1 subparagraph H is incorporated herein by reference. Witness testimony and archival discovery against these defendants will confirm this specific incident and the surrounding events. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|

| Complaint paragraphs: | 9A through 9I |
|---|---|
| Table 1 paragraphs: | 1-017 |
| Table 2 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LP Evidentiary Exhibits pages: | 140-189 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**541. NSEC-4 National Security Frauds:  Pretexting Abuse of Sensitive and Classified Nuclear and Space Programs – 1996 through 9/11/2001 to 2002, and Subsequent Domestic Sabotage Campaign**

A. The Lead Plaintiff was human trafficked, after his arbitrary termination from unwitting involuntary servitude at Pacific Pipeline (later wrecked in 1996-1997 by its "founder" Vito Perillo), the FBI domestic book wholesaler spying operation he was referred into by FBI's Charles Rosenberg (Chuck LeFevre as known at NutraSource), and where he had a base salary of about $125,000 in 1995-96, through an FBI and CIA programmed six month period of unemployment, to C.N.A. Industrial Engineering, Bellevue, WA, by CNA employee Greg Lins where he was offered $80,000 by Chrles Hadjinian (a former CIA covert asset from Nicaragua) which he negotiated up to $88,000 (with no bargaining power as all other employment options were foreclosed by FBI mail and wire fraud). Soon thereafter, CNA began work on a material handling systems engineering design and implementation supervision contract secured by a person known as H. Paul Lowber, another undercover FBI agent who left soon after the contract was secured. This design and implementation supervision field engineering contract was for The Austin Company as it constructed the Boeing/US Air Force Delta IV rocket assembly plant design in Decatur, AL. Lead Plaintiff's further unwitting entanglement and inculpation in

national security matters and his unwitting involuntary servitude was continued.

## DELTA IV ROCKET FACTORY
### THE BOEING COMPANY

 

B. As this project progressed, CNA sent Lead Plaintiff to Torrance, California to work on a programmed project failure ostensibly for Davidson Entertainment, a gaming and educational software company, which involved an Accu-Sort laser barcode sorter from this USPS mail sortation contractor. The sorter was ostensibly set up to fill custom orders for software retailers in a warehouse in Torrance, ran successfully on occasion, but sabotaged over its telephonic support line as FBI personnel tied up the Lead Plaintiff in this Los Angeles area project, and a co-employee at CNA worked with a team of contractors to construct a failed software system implementation project alongside the sorter sabotage project for about 18 months. Incomplete and failed software projects became a common theme which emerged over many years through 2022. FBI spent about $1.2 million on this programmed project failure to keep the Lead Plaintiff occupied for about 18 months. Soon after this project failure, Chuck Hadjinian was terminated from CNA and Lead Plaintiff was promoted to Managing Director for CNA, consistent with the still not understood FBI pattern of practice in the Lead Plaintiff's still unwitting involuntary servitude.

C. CNA also engaged in other sensitive technologies projects during Lead Plaintiff's tenure, including software selection for non-destructive eddy current technology testing equipment and services company which support the nuclear industry, aerospace, rail and other key industries in the United States and elsewhere. Software selection and engineering services require extensive detailed knowledge of processes and procedures, so Lead Plaintiff and his team developed an extensive body of knowledge of the technology, company services, and customer base to assist this client to make the optimal software system selection.

[Intentionally left blank.]



**ZETEC**

## Sustaining the energy for the power generation industry

With our world class quality control and breadth of offerings in the eddy current instruments and ultrasound technologies, we are one of the dominant forces in the power generation industry. Our strength is in the nuclear segment, and our ability to leverage learning in one discipline helps to drive innovation to that one well engineered and tele tested.

### Nuclear

With our world class quality control and breadth of offerings in the eddy current instruments and ultrasound technologies, we are one of the dominant forces in the power generation industry. Our strength is in the nuclear segment, and our ability to leverage learning in one discipline helps to drive innovation to that one well engineered and tele tested. Discover our nuclear solutions



D. Lead Plaintiff was also engaged by Media Arts Group in San Jose, California to design its new art production and distribution facility to be built in Morgan Hills, CA. This study and design process begins under the management of a CIA commercial cover covert agent temporarily redeployed from Asia to Silicon Valley and using this as his interim commercial cover while in the United States. This asset was then reportedly redeployed to Asia and the technology sector about six months later and CNA continues with the project through design, implementation, and completion. A similar study, design, and implementation process for a Japanese consumer technologies firm is undertaken in Orange County, CA.

E. These projects continued CNA's long history of unprofitable industrial design and engineering projects, such as various US Navy nuclear submarine base construction and maintenance facility projects; domestic international airport projects; the Boeing 747 assembly plant; and Sega, Sony, Nintendo, and Panasonic manufacturing and distribution plants in the United States. These prior projects, and the projects Lead Plaintiff was involved in were, in fact, undertaken as commercial cover domestic intelligence acquisition and counterintelligence operations of the United States. The Lead Plaintiff was thereby continually being entangled unknowingly in various commercial cover domestic and international intelligence operations as he has been since arriving at his professional employment in 1979. And his treatment at the hands of these Defendant United States departments and agencies was about to spiral ever more quickly toward his personal and financial destruction and a much more rapid pace of lethality attempts.

F. In May 2001, the Lead Plaintiff traveled to Washington, DC for the annual May AeA National Board Meeting and Capitol Hill visit. The Lead Plaintiff's taxi from Dulles Airport was halted on Constitution Avenue west of 15th Street, soon after passing the White House, for the Vice President's motorcade enroute west from Capitol Hill toward the White House or Naval Observatory in late afternoon as Lead Plaintiff traveled to his hotel a few blocks south of the Capitol in Washington, DC. During this visit, Lead Plaintiff was part of a group which toured the West Wing of the White House one evening and has his picture taken at the Press Room podium.

G. On this visit, the Lead Plaintiff spent an unusually long 90 minutes with Representative Jennifer Dunn (the Washington Eighth District Republican Congressperson who

represented Lead Plaintiff and was close to the President) in a House office building television studio which was set up to look like a typical Congressional outer office but had television studio lighting and an interview style conference set-up in what is typically expected to be an inner office. As an aide sat nearby, Representative Dunn and the Lead Plaintiff discussed higher education policy and the Lead Plaintiff's policy related report and work with the Legislature, Governor, universities, colleges, and private sector in Washington State.

H. In Summer 2001, CNA was requested by Berger ABAM Engineering, Inc., a Naval Facilities Command regional office (NAVFAC) contractor to perform an indefinite quantity engineering study at Puget Sound Naval Shipyard (PSNS), Bremerton, WA, to repurpose and redeploy engineering and maintenance spaces in several dockside buildings at this nuclear submarine and aircraft carrier heavy maintenance and decommissioning facility. This project was placed on hold immediately after the 9/11/2001 attack on the World Trade Center, Pentagon, and in Shanksville, PA.

I. When the project resumed in Spring 2002, the Lead Plaintiff and one other CNA employee (Darrell Pray, an insider) are escorted through the approximately six to seven buildings to be studied in the 1.48 mile long shipyard docks area. On a typical weekday, the shipyard employs about 15,000 people. On this regular workday, not a federal holiday, there were about two dozen total employees in the entire dockside complex. This is one example of a now well understood pattern of vacated facilities used by FBI and CIA in this operation across decades and intended to preserve their deniability and version of events due to a complete lack of public witnesses to these events.



J. During this detailed hours-long tour, Lead Plaintiff is left standing beside a highly classified nuclear submarine pump covered by a green tarp, sitting, completely out of place, on the floor in an engineering building which has no tooling or machine tools which would be used to repair or maintain such a pump. The PSNS tour leader was most likely a key BRMT program operative known to the Lead Plaintiff long before these events (Mike Cunha, the AFROTC medical psychiatrist candidate and WSU Resident Assistant at Perham Hall in 1974) and long after these events (Mark Gross, Dominick and Dickerman, New York City international investment banker in 2019).

K. Lead Plaintiff and CNA co-employee Pray are left standing unescorted in this maintenance and engineering building for about fifteen minutes as the entire escort team of about five to six people simply walk away. Upon the return of the escort team, the tour resumes without comment or explanation. This is a major breach of security protocol in a secure U.S.

Navy facility handling nuclear materials and with sand-bagged gun emplacements to protect its submarine pens. The Marine Corps detachment which guards this facility was on a heightened alert status after the 9/11/2001 attack and has shoot-to-kill authorization to protect sensitive and classified technology, nuclear fuels, and other sensitive equipment and materials as needed.

L. This PSNS tour was undertaken a few months after Lead Plaintiff visits New York City at the same time (though in different locations) as President Bush. During a November 2001 visit, Lead Plaintiff visits the 9/11 World Trade Center wreckage family viewing platform one afternoon as recovery work is underway and the workforce stops to honor the dead as they are removed.

M. Lead Plaintiff also had extensive interaction with an internationally deployed US commercial cover intelligence asset while that individual was working in a domestic cover assignment at Media Arts Group, San Jose, California before redeploying back to Asia. Lead Plaintiff led a CNA engineering project for Media Arts Group to relocate their production and distribution operations to Morgan Hill, California. This is similar to Lead Plaintiff's experiences with other CIA commercial cover assets dating back to the 1980s.

N. CNA operations were terminated by its "founder" Larry R. Cook around 2003, after the Lead Plaintiff's departure just as with Pacific Pipeline in the years before. This enterprise destruction pattern is also a now familiar theme which uses the passage of time and common records destruction practices to eliminate records which could be used to inculpate FBI, CIA, and other participating departments and agencies in their illegal general searches, criminal activities, and racketeering patterns in the event of any future discovery such as through this litigation.

O. An affiliated company, CNA Architecture was spun out of CNA as Collins Woerman during the Lead Plaintiff's tenure and continued to operate long after the demise of CNA Industrial Engineering. That firm engaged primarily in the architectural design of health care facilities in and around Seattle, Washington. Its current status is unknown.

P. Subsequent to his departure from CNA, Lead Plaintiff was skylined by this secret CIA and FBI program for inculpation and association with a variety of front-run new reports and domestic sabotage events, known to those agencies far ahead of general public knowledge.

Q. Domestic sabotage incidents include the fully involved arson fire in Conyers, Georgia against the Bio-Lab chemical warehouse there in May 2004 which generated a very large cloud of extremely poisonous phosgene and chlorine gases over this suburban city. This arson fire occurred weeks after a fraudulent FBI orchestrated sales call at Bio-Lab's Lawrenceville, Georgia headquarters office location with Performa co-owner Darrell Pray, meeting with the Great Lakes Chemical parent company CIO Zoe Schumaker and members of the Bio-Lab information technology team (all now known to be unidentified federal officers operating undercover).

R. The other most notable domestic sabotage event was the bird strike flameout and crash of U.S. Airways Flight 1549 on January 15, 2009, which was preceded by two flights of Canadian geese over Lead Plaintiff's involuntary FBI or CIA assigned safe house in Cliffside Park, NJ overlooking the Hudson River. The Lead Plaintiff noted this crash in process as the aircraft was gliding over the Hudson River enroute to its forced landing crash site. Sometime prior to this event sequence, Lead Plaintiff had experienced a BRMT hack of his visual nervous system which included the image of a noiseless commercial jet aircraft to the north of his

apartment over the Palisades in a literally impossible flight configuration about 500 feet above

the Palisades near Fort Lee, NJ. The date of this specific BRMT hack is not recollected but is

believed by Lead Plaintiff to be the initial event in the sequence which preceded the crash.

S. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount NSEC-1 subparagraph H is incorporated herein by

reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Witness

testimony and archival discovery against these defendants will confirm this specific sequence

and the surrounding events. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 329, 373 |
| Table 1 paragraphs: | 1-020 through 1-026 |
| Table 2 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LP Evidentiary Exhibits pages: | 140-189, 416-426, 766-769, 8294-8346 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**542. NSEC-5 National Security Frauds: Human Trafficking, Pretexting, Abuse of Allies in Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK 2007**

A. During 2007 through 2008, Defendant United States, its agents, officers, confidential

informants and other Defendants, after human trafficking Lead Plaintiff from Washington state

to nearly two years of homelessness in Massachusetts, then again human traffick Lead Plaintiff

to ten months of fraudulent employment in Fort Lee, NJ at Establish Inc, a logistics consulting

firm domestic and international cover operation.

B. In September 2007, FBI's Charles Rosenberg (while known as William Drumm)

orchestrates and conspires with British intelligence and police powers organizations to human

traffick Lead Plaintiff to London, United Kingdom for an ostensible week-long company international business conference, and thereby again develop pretexts (as in 1995 at PAN, see NSEC-3) for international spying on Lead Plaintiff. British intelligence and police powers operations (likely London Metropolitan Police, MI-5, and MI-6) posed at this September 2007 London meeting as international employees of Establish posted at varied location in Europe, including its ostensible Swedish headquarters, and as employees in China.

      C. This series of Defendants' RICO frauds includes persons posing and/or acting as company executives and employees, in professional roles which facilitate color of law pretexts to permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in London and elsewhere in Great Britain, as well as within the United States using intelligence acquisition methods and assets which Defendant United States cannot legally deploy against its own citizens.

      D. For the several months before and during this London trip, and into early 2008, Defendant United States operates primarily through William Drumm (Rosenberg) and several other US based "employees" of Establish (including agents known as Ray Kovonuk. Piotr Pregner, Steve McDonald, and Jason Pankowski), and engaged other various federal, state, and local police powers and intelligence operations and assets in the greater New York City area in this corrupt color of law civil rights and racketeering pattern, which continues into the present, having again morphed repeatedly in form but not in substance.

      E. In September 2021, Defendant NYPD verified and then disappeared evidence of a terror related investigation against the Lead Plaintiff surrounding the initial human trafficking, when Lead Plaintiff was met around November 2007 on his first recreational outing into New

York City at the Port Authority Bus Terminal by about two dozen NYPD uniformed counter-terror squad members in bulletproof vests, helmets, and bearing submachine guns along the west side of Eighth Avenue. Together with FBI's fraudulent concealment, these acts further delayed discovery of the primary responsible defendants (FBI and CIA) for the decades long overall pattern of BRMT human experimentation and bioweapon abuse, the racketeering associated-in-fact enterprise, and their fraudulent concealment until the September 2023 forensic break in this case described at LP Evidentiary Exhibit page 11639.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount NSEC-1 subparagraph H is incorporated herein by reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Witness testimony, including direct examination of Defendant United States undercover personnel, including Rosenberg, Kovonuk, Pankowski, McDonald, Ross, and others who worked at Establish, and archival discovery against these defendants will confirm this specific incident and the surrounding events. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 15, 16, 17 |
| Complaint paragraphs: | 323-333, 373 |
| Table 1 paragraphs: | 1-031, 1-032 |
| Table 2 paragraphs: | 2-0003 through 2-0012, 2-0024, 2-0059, 2-0060, 2-0095, 2-0097, 2-0109, 2-0153, 2-0155, 2-0202 |
| LP Evidentiary Exhibits pages: | 140-189, 8351-8355, 11639 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**INDIVIDUAL RIGHTS VIOLATIONS AND CONSPIRACIES (RGTS** series offenses

which incorporate paragraph 504 at all subcounts herein by reference.)

***Entrapments, Illegal Searches, and Willful Blindness***

**543. RGTS-1 Rights Violations: Entrapment and Incrimination Attempts, Stevens Pass**

**1980s**

A. Defendant United States and its Defendant co-conspirators engage in an BRMT

assisted operation which poses extremely dangerous personal risk to Lead Plaintiff's first spouse

Lynne during a ski outing to Steven's Pass, Washington. This operation also posed a grave risk

of false incrimination to the Lead Plaintiff.

B. Defendants created this scenario by initiating a public argument between Lead

Plaintiff and his first spouse. Lead Plaintiff knocked over a glass of wine, his spouse rose

explosively and angrily from the table (BRMT carefully timed gives this result as seen in the

2023 Tunnel Flash incident documented herein at HEXP-16) and began to walk west down

Steven Pass Highway. After loading the ski equipment on the car, Lead Plaintiff located his

spouse walking down the north side of the highway about 1 mile from the summit and stopped

to persuade her to return to the vehicle for the ride home, about 75 to 90 minutes by car. Had he

angrily left his spouse walking on that highway that night, Lead Plaintiff believes it is likely his

spouse would not have returned home alive. Though it did not occur to him then, this would

have been the perfect setup of witnesses and events for her mysterious disappearance and his

likely incarceration as the prime suspect. See LP Evidentiary Exhibits page 182.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | HEXP-16 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0030 |
| LP Evidentiary Exhibits pages: | 140-189 paragraph 110 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

D. See other selected relevant content in searchable indexes and lists at LP Evidentiary

Exhibits Compendium at pages 934-1075. Directly cited relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | 5-17 |
|---|---|
| Complaint paragraphs: | 9A-9V, 35, 59(iii),  HEXP-16 |
| Table 1 paragraphs: | Entirety |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 1-10, 140-189, 368-794, 797-865, 934-1075, 6044-6084, 8453, 10187-10250, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444, 10614, 10620, 11630-11936, 12160-12232, HEXP-9 through HEXP-12 incorporated herein by reference |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | See emails and documents listed at all relevant individual subcounts in HEXP series and all other subcounts in other series listed at Complaint paragraphs above. |

**544. RGTS-2 Rights Violations: Illegal Searches, Hacking, and Harassing, Oregon Trip 2021**

A. One simple and relatively recent example of the myriad forms of public harassment

by Defendant police powers operations is related here. Lead Plaintiff's flight from Kennedy

Airport in New York City to Seattle, WA, enroute to Redmond OR, for the Lake County Ranch

tour listed at subcount RICO-50, in July 2021 is delayed for about two hours due to local

thunderstorm over Kennedy Airport. The flight arrives in Seattle about 1AM local time, about 20 hours after the Lead Plaintiff awakened the previous morning in New Jersey, and well after last evening flight connection to Redmond, OR. Lead Plaintiff remains overnight in Seattle, where he gets about four hours of sleep. Defendants attempt to take advantage of this much shortened night of sleep to cause the Lead Plaintiff to act out against an undercover officer the next morning.

B. An undercover police powers officer abruptly replaces a food service worker in a concourse restaurant shortly after the Lead Plaintiff orders breakfast, then delays providing a check for about 15 minutes while he converses with the 6 to 8 person undercover police backup team which has arrived and is seated a couple of tables away. Needing to catch the departing flight, Lead Plaintiff calls to this server several times for the food service check, the server delays repeatedly, so the Lead Plaintiff, who rarely carries cash, drops a $20 bill on the table and begins to leave. Seeing that his bluff has been called and the establishment allegedly not accepting cash (illegal in Washington state), the server rushes to the table and a BRMT induced moment of anger on short sleep ensues as the server insists a credit card must be used. No violence occurs as Lead Plaintiff has by now learned more about BRMT brain hijacking and manipulations, and carefully keeps his arms rigid at his sides so his movements cannot be misinterpreted by the police snatch team seated nearby, and simply raises his voice, so the nearby police snatch team will be aware of the operational failure.

C. This is a typical BRMT-enhanced entrapment sequence run by Defendant United States hundreds of times against Lead Plaintiff (including many dangerous scenarios which are not reverse engineered until 2021 and thereafter), using the natural circumstances of events as

they unfold to involve local police powers who would not be aware of BRMT manipulation (BRMT has been a very highly classified federal program of Defendant United States) in an entrapment attempt. If an unpaid food service check walk-off or an assault on the undercover officer (food server) occurs, local police would arrest, process, and prosecute this incident as an unprovoked assault on a police officer, though it is actually a perfect entrapment crime perpetrated on the Lead Plaintiff by Defendant United States using BRMT, its brain hijacking bioweapon and bioweapon delivery system, to effect the imprisonment of the Lead Plaintiff through this third party local police powers operation.

D. This conduct is completely consistent with prior and subsequent behaviors of Defendant United States and its co-conspirator Defendant police powers entities, officers, and agents, as expressed through their conduct, including conspiratorial conduct cited in all the Lethality counts (LETHL-1 through LETHL-17) and several of the Personal subcounts (RGTS-11, P-2, HEXP-13, RGTS-4, RGTS-5, RGTS-14, NSEC-1 through NSEC-5). See also this type of attempt at LP Evidentiary Exhibits page 181H paragraph 138. These are but a very small selection of examples of these incidents run against Lead Plaintiff. Hundreds of other such incidents will be unveiled through the discovery process, including in Lead Plaintiff's hand-written notes and other materials currently in the hands of the Defendants dating back into the early 2000s

E. Since members of the general public also engage in these behaviors in the vicinity of the Lead Plaintiff at times, it can be difficult at times to distinguish the purposeful harassment by Defendant police powers personnel acting illegally under color of law from lawful exercises of civil rights and nonviolent free expression by members of the public. This particular scenario on

a Sea-Tac Airport concourse before flying to Redmond Oregon is a clearly obvious police

powers operation to the well-experienced Lead Plaintiff. The clear of risk of BRMT induced

escalation in his hijacked brain at these kind of moments leads Lead Plaintiff to exercise extreme

caution around others in these scenarios to avoid any undue provocations and encounters which

could lead to escalation and use of force by police powers personnel or others.

    F. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 181H paragraph 138 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Bryant Park Jazz and 911 call bemused response 220701, Costco GC reply to verficiation request 211102, Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110, NYPD FOIL righttoknow Summary 210901, NYPD FOIL Appeal Denial Letter 210915, NYC Mayor Ofc Assist Re NYPD FOIL Appeal Denial 211001, NYC Mayor Ofc Assit Request NYPD FOIL Appeal Denial 211001, NYPD FOIL Request 210901, NYPD Response to FOIL Request 210903, NYPD Notice of Duty to Preserve Evidence 211116, NYPD Reply to Evidence Retention Letter 211123, NYPD Reply to Corbett Evdence Preservation 211127, NYPD Event Sequence 220422. |

**545. RGTS-3 Rights Violations: Bad Faith Acts – Federal Police Powers Abuses of Legal Processes 1990 to present**

A. Defendant United States and its Defendant co-conspirators engage in bad faith acts in their systemic abuses of the legal system and legal process. Defendant United States uses a variety of abusive practices to engage in broad ranging general searches, to harm and wreck political and commercial interests of US persons, and to conceal those illegal acts behind normal practices of records destruction to conceal evidence of their crimes and criminal intent, and those committed by co-conspirators. Federal police powers defendants act and fail to act to sustain this pattern of practice. These abusive practices, experienced directly by the Lead Plaintiff against his interests and against the interests of others of this and other classes of harmed persons include:

i.   Imposed litigation expenses required to remedy illegal acts undertaken in cover operations by or on behalf of federal defendants against US persons, such as thefts of compensation, check fraud, wire fraud, receivables fraud persons. (Direct examples of this pattern of practice include frauds against Alliance, Performa cited herein.)

ii.  Imposed compromises of financial and other assets required to remedy illegal acts undertaken in cover operations by or on behalf of federal defendants against US persons, such as thefts of compensation, check fraud, wire fraud, receivables fraud persons. (Direct examples of this pattern of practice include direct frauds against Alliance, and against Lead Plaintiff by CNA cited herein.)

iii. Non-working attorneys embedded in law firms who make vague claims to represent client interests but who do no direct work for those clients (government targets) to evade

attorney-client privilege ethical and legal constraints, and thereby conduct de facto
general searches. (Direct examples of this pattern of practice include embedded attorneys
Hibbs and Garrison cited herein.)

iv.  Corporate lawyer abuses using embedded and solo practice attorneys who represent
corporate entities not individuals and use this distinction to conduct intelligence
operations and general searches against individuals. (Direct examples of this pattern of
practice include Hibbs, Garrison, and Sullivan cited herein.)

v.  Subpoena process abuses used to extract otherwise inaccessible information by engaging
in litigation directly against the target and/or indirectly by faux litigation between two
cover entities. (Direct examples of this pattern of practice include Cornhusker Capital v.
Auctus cited herein.)

vi.  Entity embeds of undercover officers and/or agents as employees of an entity who target
firm and/or customer operations and/or finances for disruption, dissension, and/or
sabotage. (Direct examples of this pattern of practice include PCC - Whiteman; Pacific
Pipeline - Perillo et al; Nutra Source – LeFevre et al; Alliance – Hintz, Kealoha, Steele et
al; Establish – Drumm et al cited herein.)

vii.  Corporate and other legal form cover entities used to sustain captive employees in
entities which have employed Lead Plaintiff were and/or are cover entities used, together
with various mail and electronic frauds, to sustain involuntary servitude and forced labor,
and human biomedical experimentation without consent. (Direct examples of this pattern
of practice include Deloitte (Seattle Consulting) – Hopper et al; LazerSoft – Moller et al;
PCC-Whiteman; NutraSource – LeFevre; P. A. N. – Cornwell et al; Pacific Pipeline-

Perillo; CNA Industrial Engineering – Cook et al; Establish – Drumm et al cited herein.)

viii.    Corporate and other legal form cover entities used to sustain captive "owners" are entities which have employed Lead Plaintiff as an "owner" were and/or are cover entities used, together with various mail and electronic frauds, to sustain involuntary servitude and forced labor, and human biomedical experimentation without consent. (Direct examples of this pattern of practice include Alliance, Performa, Winnett Perico, Gannett Peak Ranch – all with co-investment by federal Defendants, generally FBI and/or CIA cited herein.)

ix.    General searches, which are unconstitutional and directly violate the Founder's intent, using legalistic maneuvers to claim them as intelligence operations, and which embed undercover personnel and informants and bleed appropriated funds into ostensibly private cover entities and favored collaborating private entities to sustain their financial losses while competing with private sector firms for certain types of contracts and sales. Used to conduct commercial and other general searches (under the sweeping title of "intelligence operations") of all forms of persons, private entities, including civic, political, cultural, artistic, and religious groups, cooperatives, and other officially disfavored institutions and individuals. (Direct examples of this pattern of practice include all elements of Lead Plaintiff's human existence both domestic and international; Deloitte (Seattle Consulting) as to various domestic undercover investigations and international commercial cover spying projects; NutraSource as to food buying clubs and cooperatives; Pacific Pipeline as to authors, publishers, and retail booksellers; CNA as to the "Japanese Miracle" and national security cited herein.)

x.  Foreign intelligence and national security entanglements claimed as intelligence operations which abuse relationships with foreign intelligence and officially propagated lies to abuse US persons by orchestrating both in-country and international spying on those persons by foreign intelligence operations who then share this information legally acquired under their own laws with US police powers operations. Used to conduct otherwise illegal general searches (under the sweeping titles of "intelligence operations" and "national security") of all forms of persons, private entities, including civic, political, cultural, artistic, and religious groups, cooperatives, and other officially disfavored institutions and individuals. (Direct examples of this pattern of practice include all elements of Lead Plaintiffs human existence, both domestic and international cited herein.)

xi.  Attorney-client privilege inadvertently waived by having individuals unrelated by marriage engage legal counsel on an issue in which both do not have a direct interest.

B. All subcounts throughout this Complaint relate directly and explicitly to these patterns of practice which are driven by Defendants' conspiracy to commit and comprise an integrated pattern of illegal acts including racketeering acts, which both individually and as a pattern of practice, would reasonably be expected to engage the interest of elements of the Department of Justice, rather than no element of that Department.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Subcount RGTS-1 subparagraph D is incorporated herein by reference. All entities listed at RICO-29 are incorporated herein by reference. Evidentiary materials related to this

specific subcount follow:

| Interline Exhibits: | 5-17 |
| --- | --- |
| Complaint paragraphs: | 9A through 9V |
| Table 1 paragraphs: | Entirety |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 140-189, 368-794, 797-865, 934-1075, 11630-11936 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Liberty EB-5 Contract Annotated 141112.pdf |
| | Liberty EB-5 LOI .pdf |
| | Liberty EB-5 LOI 141112.pdf |
| | Liberty EB-5 LOI WinnettOrganics LOI 11-5-14.pdf |
| | WO (CO) Articles of Incorporation 150702.pdf |
| | WP (CO) Articles of Incorporation 121022.pdf |
| | WP IRS Employer ID Number FEIN 120824.pdf |
| | Stock Cert 003 D Merck 121202.pdf |
| | WP WO Los Angeles Management Meeting Agenda 150924.pdf |
| | 150805 WP Stock Cert 002 Preferred Series A Dean Smith 150805.pdf |
| | 150917 WP Stock Cert 003 D Brewer 150917.pdf |
| | 150921 WP Stock Cert 016 Common Belli Architectural Group 190521.pdf |
| | 150921 WP Stock Cert 017 Common Sullivan 190521.pdf |
| | 150927 WP Stock Cert 004 Preferred Series A Doug Petersen 150927.pdf |
| | 150927 WP Stock Cert 005 Preferred Series A Dean Smith 150927.pdf |
| | 150929 WP Winnett Perico Shares Auth Attach150929.pdf |
| | 160320 WP Stock Cert 006 Preferred Series A Dean Smith 160320.pdf |
| | 160404 WP Stock Cert 007 Preferred Series A Doug Petersen 160404.pdf |
| | 161024 WP Stock Cert 008 Preferred Series A Dean Smith 161024.pdf |
| | 161028 WO Cattle Co Annual Report 161028.pdf |
| | 170103 WP Stock Cert 009 Preferred Series A Doug Petersen 170103.pdf |
| | 170420 WP Stock Cert 010 Preferred Series A Doug Petersen 170420.pdf |
| | 170519 WP Stock Cert 011 Preferred Series A Doug Petersen 170519.pdf |
| | 170708 WP Stock Cert 012 Preferred Series A Doug Petersen 170708.pdf |
| | 170911 WP Stock Cert 013 Common D Brewer 170911.pdf |
| | 170914 WP Stock Cert 014 Preferred Series A Doug |

Petersen 170914.pdf
170923 WP CO SOS Annual Report 170923.pdf
180305 WP Stock Cert 015 Preferred Series A Doug
Petersen 180305.pdf
190628 WP Shares Distribution 190628.pdf
SBI AP Aging Detail Report 2020 12-31 draft v1
201231.pdf
SBI Articles of Incorporation NJ 200123.pdf
SBI Balance Sheet 2020 12-31 draft v1 201231.pdf
SBI Case Ready Plant 17 Plant Operations Workflow
Design Rev 1.7 200707.pdf
SBI Completed App NJ-REG 200123.pdf
SBI Debt Schedule Digitally Signed Document Not
Converted 210703.pdf
SBI EIN CP 575 A Notice 200123.pdf
SBI Income Statement 2020 12-31 draft v1 SBI.pdf
SBI Shares Distn 200124.pdf
SBI Shares Distn 200225.pdf
SBI Sheldon Beef Tax Return 2020 12-31 Draft v1
201231.pdf
200123 SBI Completed NJ-REG 200123.pdf
200123 SBI EIN 84-4406368 CP 575 A Notice 200123.pdf
200123SBI Articles of Incorp NJ 200123.pdf
200225 SBI 001 Brewer Stock Cert Common 200225.pdf
200225 SBI 002 Waseman Stock Cert Common
200225.pdf
200225 SBI 003 Nickless Stock Cert Common 200225.pdf
200225 SBI 004 Sullivan Stock Cert Common 200225.pdf
200225 SBI 005 Canchola Stock Cert Common 200225.pdf
200225 SBI 006 Petersen Stock Cert Common 200225.pdf
200225 SBI 007 Belli Stock Cert Common 200225.pdf
200225 SBI 2020 Stock Opt Plan approved by BD on
200225.pdf
200225 SBI Canchola SB Grant - Signed 200225.pdf
200225 SBI Canchola SBI Notice of Stock Option Grant
200225.pdf
200225 SBI Nickless SBI Notice of Stock Option Grant
200225.pdf
200225 SBI Nickless Stokcoption Grant 200225.pdf
200225 SBI Waseman SBI Notice of Stock Option Grant
200225.pdf
200324 SBI Shares Distribution 200324.pdf

**546. RGTS-4 Rights Violations: DOJ Willful Blindness - US Attorney Offices, DOJ Headquarters 2005 to present**

A. Lead Plaintiff shared information about all the then known sequences from about 2002 to 2005 with the U.S. Attorney's Office for the Western Washington in Summer 2005. The U.S. Attorney's Office for the District of Columbia received a courtesy filing in September 2021 (and a laughable DC Fire Department Hazmat Team sluggish emergency response is witnessed immediately thereafter by Lead Plaintiff). A series of letters and evidence was delivered to the Southern District of New York in person between December 2021 and September 2023, to DOJ Headquarters through SDNY during 2022 and 2023, and to the DOJ Assistant Inspector General for Investigations.

B. The Lead Plaintiff's communications attempts are evidenced in extensive exhibits throughout this complaint, both inline and in hundreds of pages and dozens of letters included the LP Evidentiary Exhibits herein. A 2022 no interest letter series with the DOJ Assistant Inspector General for Investigations is at Inline Exhibit 17. No other contact from any U.S. executive branch police powers operation has been forthcoming, with the notable exception of the FBI's "liar letter" coordinated in time with an admission and quick retraction by Defendant NYPD shown in series in Interline Exhibits 14 through 16 herein.

C. All subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of illegal acts including racketeering acts, which both individually and as a pattern of practice, would reasonably be expected to engage the interest of elements of the Department of Justice, rather than no element of that Department.

D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 14 though 17 |
|---|---|
| Complaint paragraphs: | 35, 59(iii) |
| Table 1 paragraphs: | 1-038, 1-040 through 1-059, 1-067 |
| Table 2 paragraphs: | 2-0116 through 2-0119, 2-0154, 2-205 through 2-0207, 2-0210 |
| LP Evidentiary Exhibits pages: | 140-189, 368-794, 797-865, 934-1075, 11630-11936 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 547. RGTS-5 Rights Violations: Illegal General Searches, Continual Monitoring in Involuntary Servitude 1972 to present

A. Defendants fraudulently and repeatedly engage in the hacking of Lead Plaintiff's personal computer and printers, used for both personal and business matters, beginning around 1984 and into the present time. At all times, they invade his privacy, and monitor his communications whether by email, telephone, or cellular phone, including arranging through his spouse, then a newly hired employee of US West Cellular, cellular car telephone service in the 1980s from AT&T's cellular telephone service. This US West subsidiary, and a previous client of Lead Plaintiff while serving as a consultant at Deloitte, was used to track movements, to listen to in-car conversations and communications and to sustain their pattern of planning and manufacturing pretexts for color of law investigations of Lead Plaintiff.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9V |

| Table 1 paragraphs: | Entirety |
|---|---|
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | 140-189, 770-772, 783-784, 10251-10255, 10376-10393, 10434-10444 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | D Brewer reply to DOJ OIG decline ltr 220325, DOJ OIG Institutional Contacts 211109, DOJ OIG From Investigations 220128 Div Ack Letter 220128, DOJ OIG Decline Ltr 220322, NJ EDC Inquiry 200805, NJ Unemployment Hangup and shelter info request 081217, Wire Fraud Examples Raising Consciousness of Guilt 221004 |

**548. RGTS-6 Rights Violations: Privacy and Quiet Enjoyment 1972 to present**

A. Since approximately 1972, Lead Plaintiff's life, relationships, family life, physical health, emotional well-being, career, businesses, life circumstances, and public reputation, as well as all human, Constitutional, civil, and legal rights have been usurped by Defendant United States and its co-conspirators.

B. Lead Plaintiff was, without consent, designated as an involuntary servant of Defendant United States as a child. Lead Plaintiff's formal petitions in 2005 under FTCA for limited injuries, as then understood, were never answered by any Defendant United States department, agency, nor the Executive Office of the President. A litigation attempt in US District Court at Newark, NJ, was indirectly answered by Defendants through their illegal racketeering acts. By their acts, he was rendered homeless, then involuntarily committed to a psychiatric hospital for six months. In 2022, as this entire pattern of facts was first completely understood and communicated to a US Attorney's Office, Defendants again answered indirectly with BRMT assisted attempts on the Lead Plaintiff's life, and through their still on-going and

persistent pattern of threats and violence. Defendants desperately seek to avoid legal liability for

their associated-in-fact enterprise, their patterns of racketeering and civil rights conspiracy and

acts of violence, and their patterns of terror. Terror acts include at least three mass casualty

attempts, the most recent against an express train traveling 50 to 60 miles per hour enroute to

New York City on the evening of September 11, 2022 which directly threatened the lives of

about 300 people in addition to the Lead Plaintiff.

     C. The broad sweep of about fifty years and nearly uncountable predicate acts of

Defendant, including thousands of examples presented in this Complaint and the accompanying

exhibits which, together with the violations of five international treaties, are systematic

violations of RICO, civil rights, and the powers of limited government envisioned by the

founders. The Constitution, from its ratification in June 1788 was and is intended to restrain the

federal government from replacing the tyranny and oppression of a King with new forms of the

same. Our institutions continue to fail us rather dramatically in these matter including their

failure to protect both enumerated and unenumerated rights of Lead Plaintiff and others of this

class, each and every one of whom is, together with all others, entitled to the quiet enjoyment of

life, liberty, family, and property; to the pursuit of happiness rather than the imposition of

coercive psychological operations and BRMT driven suicide ideations; and to the protections of

the rule of law, rather than their lives being dictated – past, present, and future – to the whims of

government executives, managers, remote BRMT operators, and undercover police powers a

ting with impunity under color of law and subjecting them to the dangers of public vigilantes.

     D. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9V |
| Table 1 paragraphs: | Entirety |
| Table 2 paragraphs: | Entirety |
| LP Evidentiary Exhibits pages: | Entirety |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Entirety |

**549. RGTS-7 Rights Violations: Biological and Medical Invasions - Access to Basic Health Care Lifetime**

A. Defendant United States and its Defendant co-conspirators deprive Lead Plaintiff to access to basic health care services using a variety of means including, without limitation, through penury inflicts by denial of employment, theft of compensation, theft of personal services, deprivation of access to unemployment benefits payments, using email fraud and wire fraud. Defendant United States and its Defendant co-conspirators deny access to initial Covid vaccinations series 149 times when eligible; to medical doctors; to prescription medications essential to treat the BRMT induced mental depression ranging to suicide ideation, while Defendant United States is fully aware of the broad spectrum of biochemical and physical abuses it is inflicting with its BRMT bioweapon and bioweapon delivery system while the Lead Plaintiff resides at Cliffside Park, NJ after being terminated from his fake employment in Fort Lee, NJ in June 2008.

B. This awareness is most clearly demonstrated by the physical presence of two undercover officers on the southeast corner of Thompson Lane and River Road, Edgewater, NJ, who stand in front of and block the Lead Plaintiff's path to cross this very busy street at this

particular moment on this particular day of suicide ideation. Defendants also block access to

basic preventative dental services, exams, checkups, and other routine but essential preventative

services.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by

reference. Paragraph B from subcount LETHL-2 is incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9V |
| Table 1 paragraphs: | 1-039, 1-067 |
| Table 2 paragraphs: | 2-0001 through 2-0006, 2-0059, 2-0067, 2-0076, 2-0117, 2-0118, 2-0159, 2-0167, 2-0196, 2-0205 |
| LP Evidentiary Exhibits pages: | 140 paragraphs 78, 95, 128; pages 10187-10250, 11656-11664, 12160-12232 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Bergen Covid Exec emails 210324, Bergen Covid Exec emails 210326. |

*Direct Interferences in Personal and Intimate Relationships*

**550. RGTS-8 Rights Violations: Personal and Intimate Relationships - Managed Romantic Interests, Arranged In-Person Meetings 2004-2005**

A. Defendants, in late 2004 and continuing in 2005 use an ostensibly drunken female bar

patron in hot pants, an in-person bar pickup, and other females of interest as they screen-in and

screen-out women placed in the presence of Lead Plaintiff. Lead Plaintiff expends personal

funds during these screened and manipulated in-person events in the Kirkland, WA area.

Additional evidence noted by Lead Plaintiff during this period and related to this sequence is

currently in the hands of Defendants.

B. Defendants continue this romantic and intimate interests manipulation through 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed BRMT manipulated romantic interests in his life for a time (see subcounts HEXP-9 through HEXP-12).

C. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0115, 2-0148, 2-0188, 2-0192 |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**551. RGTS-9 Rights Violations: Personal and Intimate Relationships – Blocked and Spoofed Access to Dating Sites 2004-2005, 2007-2008, 2011-2014, 2018 to present**

A. Defendants use online dating platforms, including those of Match Group and Bumble, or their spoofing by an unknown Defendant police powers operation, to completely block Lead Plaintiff from all access to other dating site participants. When Lead Plaintiff provides direct

feedback about this specific interference and criminal deprivation and conspiracy against rights to these imaginary dates, the texts related to this conversation are subsequently deleted, destroying this evidence from, for example, Hinge which is accomplished by the website administrator claiming that match was a fraud, withdrawing the match, thereby automatically deleting it from the Lead Plaintiff's phone application, which destroys the evidence of the Defendants' knowing, clear, and continuing violations of the Lead Plaintiff's First Amendment civil rights as communicated directly to the perpetrators of these acts.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9V, HEXP-9 through HEXP-12 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0115, 2-0148, 2-0169, 2-0184, 2-0188 |
| LP Evidentiary Exhibits pages: | From HEXP-9 through HEXP-12 incorporated here by reference |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | From HEXP-9 through HEXP-12 incorporated here by reference |

## 552. RGTS-10 Rights Violations: Personal and Intimate Relationships - Managed Romantic Interests, Fake Dates 2004-2005, 2008, 2019-2020

A. 2004-2005: Defendants use the online dating platform Match.com, a Match Group website, or its spoofing by an unknown Defendant police powers operation, to arrange approximately 15 to 20 fake dates with Defendant police powers agents, officers, and confidential informants in the greater Seattle and Tacoma, WA area and the greater Portland, OR area. Lead Plaintiff spends over $1,000 for in-state and interstate travel and to pay for meals and

other entertainment during these fake dates in late 2004 and the first half of 2005, arranged using email and other electronic means. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, as well as the routine police reports of these incidents controlled by Defendants.

B. 2007-2008: Defendants, use various online dating platforms including Match, or spoofing by an unknown Defendant police powers operation as they screen-in and screen-out women of interest to Lead Plaintiff in 2008. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, as well as the routine police reports of these incidents controlled by Defendants.

C. 2019 to present: Defendants use online dating platforms, Hinge, Plenty of Fish, Elite Singles, Black People Meet, Tinder, Bumble, Adult Friend Finder, eHarmony, Zoosk, Ashley Madison, OKCupid, or spoofing of these sites by an unknown Defendant police powers operation from 2012 and orchestrate a series of approximately 15 to 20 fake dates with Defendant police powers agents, officers, and confidential informants in the greater New York City area in 2019-2020. All these dates require interstate travel from Lead Plaintiff's residence in Edgewater, NJ to various parts of New York City, NY. Lead Plaintiff spends over $1,000 to travel to and pay for meals and other entertainment during these fake dates arranged using email and other electronic means. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently controlled by Defendants, as well as the routine police reports of these incidents controlled by Defendants. Defendants have allowed no direct interpersonal interactions, only online contacts which are brief and typically then disappeared (as frequently noted on Hinge) to avoid a permanent record on Lead Plaintiff's

phone app history if Lead Plaintiff engages in a forthright discussion of public corruption with the online match.

D. Defendants continue this romantic and intimate interests manipulation through the present time by purposefully screening-in and screening out potential romantic interests using wire, email, text., and other electronic frauds on dating sites and communications with prospects, and his known concern to retain traceability of these manipulations, to sustain isolation of Lead Plaintiff in their knowing and continuing violations of human, Constitutional, and civil rights. Defendants have also placed four BRMT manipulated romantic interests in his life since 2008 (see subcounts HEXP-9 through HEXP-12).

E. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0115, 2-0148, 2-0169, 2-0184, 2-0188 |
| LP Evidentiary Exhibits pages: | 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111, from HEXP-9 through HEXP-12 incorporated here by reference |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Match Group Second Notice re Preserve Evidence 220122, Match EPL Response 221110, Match Group Legal Dept Email 221110 From HEXP-9 through HEXP-12 incorporated here by reference |

*Hacking, Harassment, Disinformation, Abuse of Official Records*

**553. RGTS-11 Rights Violations: Illegal Searches, Hacking, and Harassing, Computer Technology**

A. Defendants fraudulently and repeatedly engage in the hacking of Lead Plaintiff's personal computer and printers, use for both personal and business matters beginning around 1984 and into the present time, even for the purposes of managing his unemployment compensation access and his work with public charities. They have and do create troubleshooting opportunities to strip data, to install and remove malware and keyboard loggers, to permit personal computer video camera operation without consent, to create remote printer and other computer hacks which require harassing forms of customer support use by Lead Plaintiff while failing to solve the problem they created and shifting responsibility among various in-house assets to perpetuate these frustrations of Lead Plaintiff.

B. Defendants also cause and create circumstances requiring the Lead Plaintiff to replace or return non-functional equipment at considerable expense on his very limited financial resources (also subject to control and to asset stripping by Defendant United States and co-conspirators). Defendants have and do systematically violate the Fourth Amendment rights, among many other rights, of Lead Plaintiff, and have and do continuously fail to respect, much less protect, those rights.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A through 9V |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0207, 2-0215 through 2-0217 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 125-134, 142, 145; pages 371, 473, 544, 549, 566-573, 575-576, 599, 603, 609-612, 770-771, 783, 6044-6084, 10251-10255, 10259-10301, 10423-10433, 10434-10444, 11673-11925 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**554. RGTS-12 Rights Violations: Blocking Information Access and Supplying Deliberate Disinformation**

A. Defendants have and do block, continuously surveil, and/or spoof Lead Plaintiff's access to various online services both in-state and interstate, including, without limitation, dating sites; news sites such as New York Times, Washington Post, Wall Street Journal, Al Jazeera, and others; corporate sites for shopping, technical support, customer service, and other commercial purposes; performance and performance ticketing sites; brain-computer interface company sites, a vital element of evidence for the non-technical US District Courts to evaluate the veracity of Lead Plaintiff's technological claims, are blocked and suppressed from Lead Plaintiff's web search results until at least late 2021; and many others, including all online activities. Defendants fraudulently fail, despite their direct control of access, to prevent certain hacks, perform others of their own making, some of which require remote computer takeovers by technical support personnel to resolve (particularly useful for color of law "legal" manipulations, and for installing and/or deinstalling Defendants' own software and malware under color of law), and abuse paid services to sustain their control and manipulation of Lead

Plaintiff, including events attended by Lead Plaintiff, to arrange various captive events,

including public charity volunteer work, which Lead Plaintiff attends alongside Defendant

police powers agents, officers, confidential informants and/or performance actors, in their

scheme to manage and control the actions of Lead Plaintiff.

B. This spoofing and/or blocking of various websites, has and does include the blocking

of accurate information access and its absence or replacement by other false and misleading

information intended to mislead and/or publicly discredit the Lead Plaintiff when he cites this

incorrect information currently continues under Defendants' direction and control.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 14 |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0129, 2-0141, 2-0148, 2-0169, 2-0171, 2-0179, 2-0179, 2-0180, 2-0185, 2-0199, 2-0200, 2-0202, 2-0205 through 2-0207 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 91-93, 125-134, 142, 145; pages 548-549, 576, 582-597, 771-772, 782, 10251-10255, 10259-10301, 10423-10433, 10614, 10620. See also beginning page 148 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 11738-11739, 11743-11748, 11760-11870, 11871-11886, 11908-11925 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Certain time periods continue to be blocked by defendant computer hacks |

## 555. RGTS-13 Rights Violations: Misuse of Official Records,  Mispersonation, Dubai 2015

A. Defendant United States purposefully engages in a fraudulent scheme to misuse Lead

Plaintiff's passport and an airline ticket he purchases in 2015 as cover to exfiltrate an unknown

individual from the United States to Dubai by orchestrating and directing a fraudulent financing

in that region to Lead Plaintiff and then demanding a known to be unaffordable advance fee a

few days prior to the Lead Plaintiff's already paid and scheduled departure. Simple replacement

of the Lead Plaintiff's picture and physical description by Defendant United States is all that is

needed to complete this specific exfiltration to Dubai. According to these records, Lead Plaintiff

left the United States on May 2, 2015 and has never returned.

B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RGTS-1 subparagraph D is incorporated herein by

reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | Not applicable |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 8453 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## *Racketeering* – (RICO series offenses)

### *Thefts and Takings Targeted at Personal Assets*

### 556. RICO-1 Racketeering Violations: Human Trafficking, Involuntary Servitude, and Investigative Entanglements – Blocking All Employment and Personal Business Investments from Deloitte (1979) through Establish (2008)

A. Fraudulent takings resulting from the Defendants' careful timing of events contrived

by Defendants to appear as life circumstances and events have been and are used to control and

human traffick Lead Plaintiff through a series of physical and emotional traumas including the

selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

B. Each and every act against the Lead Plaintiff included in the inline evidence herein at all paragraphs, and each and all the LP Evidentiary Exhibits are incorporated herein by reference. All this evidence is also representative of the array of injuries to other similarly situated plaintiffs by these Defendants, though certain plaintiffs likely did not survive these acts by these Defendants and must therefore be represented through their heirs.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 3 through 13 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, |
| Table 1 paragraphs: | 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032 |
| Table 2 paragraphs: | Entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LP Evidentiary Exhibits pages: | 10311-10364, 10376-10393 |
| Emails and documents by topic | Mail and email blocks and website spoofs and hacks as |

| and date, also located in LP Evidentiary Exhibits: | described at NSEC, RGTS, and RICO subcounts incorporate predicate acts which preclude valid First Amendment protected rights and communications, which are consistently violated by defendants. See also Complaint paragraph 70 for a separation of powers example of defendants' contempt for First Amendment rights, and paragraph 74 for relevant demonstrations of contempt for Fourth Amendment rights, all of which proceed with minimal, if any at all, adverse consequences ever against these defendant perpetrators (paragraph 40). |
|---|---|

D. See other selected relevant content in searchable indexes and lists at LP Evidentiary Exhibits Compendium at pages 934-1075. Directly cited relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation:

| Interline Exhibits: | 3 through 13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 69.f.(v), 150-155, 175, 177, 193, 194, 196, 199, 208, 209, 216, 317, 318-330, 333, 337, 338, 339, 341, 358, 373, RGTS-5, HEXP-14 through HEXP-17 |
| Table 1 paragraphs: | 1-007 through 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032, 1-067 |
| Table 2 paragraphs: | 2-0001, 2-0036, 2-0039, 2-0045, 2-0047, 2-0050, 2-0053 through 2-0058, 2-0059, 2-0061, 2-0068, 2-0072, 2-0081, 2-0106, 2-0107, 2-0110, 2-0111, 2-0113, 2-0114, 2-0115, 2-0117, 2-0122, 2-0134, 2-0135, 2-0140, 2-0141, 2-0150, 2-0157 through 2-0164, 2-0165 through 2-0179, 2-0185, 2-0186, 2-0195, 2-0202, 2-0207; entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LP Evidentiary Exhibits pages: | 1-10, 11-139, 140-189, 371, 380, 382, 383-384, 386, 398, 420, 427, 430-438, 440, 463, 473, 474, 486, 518, 549, 542-547, 566-573, 575-576, 599, 602, 603, 609-612, 616-765, 767-768, 770-771, 783, 1740, 6085, 8290, 8291-8293, 8350-8355, 8351-8352, 8370-8373, 8378, 8379, 8411, 8454-8467, 8472-8473, 8474, 8479, 8489-8506, 8507-8514, 8563-8714, 8715-8718, 8770-8787, 8788-8804, 8805-8812, 8813-8854, 8937-8938, 8939-8955, 8956, 9053-9059, 9068-9078, 9093, 9094, 9181, 9193, 9194-9206, 9207-9214, 9219-9222, 9240, 9241-9248, 9256-9259, 9260, 9270-9272, 9275-9276, 9277, 9278-9279, 9280, 9281-9283, 9285, 9300-9306, 9307-9310, 9311, 9312-9313, 9314-9318, 9328-9337, 9340-9391, 9392-9393, 9394- |

| | |
|---|---|
| | 9401, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9601-9604, 9610-9611, 9636-9637, 9639, 9642, 9645, 9646-9647, 9649, 9651, 9653, 9722, 9727-9728, 9788-9790, 9820, 9840, 9890-9896, 9897-9901, 9902, 9905, 9907, 9917, 9920, 9923, 9925, 9926, 9984, 9985, 9987, 9989, 9991-9993, 9997, 10000, 10002, 10004, 10005, 10007, 10011, 10013, 10014, 10015, 10017, 10021, 10023, 10027 second line, 10028 second line, 10093, 10094; 10095, 10132-10137, noting entries for Arizona destinations and locations, 10750-10771, 10179-10186, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25; 10108-10118, 10138-10613, 11641, 11704-11707, 11708-11726 <br><br> Axial Investor Interest 150904.pdf <br><br> Axial to Altahawi connect 150910.pdf <br><br> Axial NYC re Investor Referrals 171108.pdf <br><br> Axial re Paine Schwartz 171113.pdf <br><br> Axial NYC Fractal Intro 171116.pdf <br><br> Axial NYC Fractal stall 171129.pdf <br><br> Axial NYC Fractal stall 171204.pdf <br><br> Axial NYC Fractal drag out 171206.pdf <br><br> Axial fake investor leads 180302.pdf <br><br> See Compendium at LP Evidentiary Exhibits pages 934-1075 for other selected relevant emails and documents related to each entity and individuals named in this subcount. Full documentation to be provided in discovery. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | See emails and documents listed at all relevant individual subcounts in RICO series and all other subcounts in other series listed at Complaint paragraphs above. |
| Disbursements in Interstate Commerce (partial listing only, bank statements to be produced during discovery process): | 130101 Winnett Perico 2013 Expenses P&L 130101.pdf <br> 130926 Jackson fee from BA personal acct130926.pdf <br> 150730 Smith 100K Check 150730.pdf <br> 150822 Inv Blue Sky Search150822.pdf <br> 150824 Vista Bus Cards Pd 150824.pdf <br> 150825 Pd Inv Org Trade Assn150825.pdf <br> 150825 Pd Inv Tucson Intel Ofc 150825.pdf <br> 150828 D Brewer Expense report 150824.pdf <br> 150831 Petersen 25K Inv Check 150831.pdf <br> 150901 Pd Inv Tucson Intel Ofc 150901.pdf <br> 150916 D Brewer Expense report 150916.pdf <br> 151116 D Brewer Expense Report 151116.pdf <br> 151231 D Brewer Expense Report 151231.pdf <br> 151231 WP Financial Statements 151231.pdf <br> 170126 Smith 5K Wire 170126.pdf <br> 170315 Smith Active 1K Wire170315.pdf <br> 170930 WCC Balance Sheet Only 9-30-2017 170930.pdf |

180131 NBH 7469-BUSINESS CHECKING-
20180131.pdf
180228 NBH 7469-BUSINESS CHECKING-
20180228.pdf
180308 Lance Surety Livestock Dlr Bond 180308.pdf
180320 ADP Quote Reprint 180320.pdf
180329 NBH Pex Deposit 180329.pdf
180331 NBH 7469-BUSINESS CHECKING-
20180331.pdf 180414
Sallyport Wire ACH Information 180414.pdf
180430 NBH 7469-BUSINESS CHECKING-
20180430.pdf
180430 Tradekey Orbit ACH 180430.pdf
180501 Weblink Pymt180501.pdf
180511 Reprint of ADP Payroll Setup Fees 180511.pdf
180515 Tradekey Orbit ACH 180515.pdf
180521 Lux Offices Pd 180521.pdf
180531 NBH 7469-BUSINESS CHECKING-
20180531.pdf
180620 Lux Offices Pd 180620.pdf
180720 Lux Offices Pd 180720.pdf
180726 Smith 30K Note 180726.pdf
180803 Autoklose Paid Invoice180803.pdf
180803 EGM List Pd INV 4479 180803.pdf
180806 EGM Deploy INV 4481 180806.pdf
180905 EGM Email List Rent Pd Inv 4485 180905.pdf
180906 EGM INV 4485 $300 Completed ACH
180906.pdf
180807 Smith $18K Wire 180807.pdf
180814 Sallyport Fee 2K Wire180814.pdf
180814 Tradekey Orbit 3K ACH 180814.pdf
180814 Tradekey Orbit ACH 180814.pdf
180816 True Comm Pd 180816.pdf
180823 NAL Hughes $2K Wire Details 180823.pdf
180831 Alvarez Lori Acctnt Svcs Invoice Pd 180831.pdf
180906 Exact Data Fee ACH 180906.pdf
180906 Exact Data Rent Agrmt180906.pdf
180925 Right Networks $25 pd Setup INV180925.pdf
181012 NAL Hughes $5000 Compl Wire 181012.pdf
181203 Weblink $500 Wire 181203.pdf
181204 Weblink Invoice 181204.pdf
181231 WCC PandL 181231.pdf
181231 WP IRS 1120 18Exp Sched 181231.pdf
181231 WP IRS 1120 for 2015 181231.pdf
181231 WP IRS 1120 for 2016 181231.pdf

|  | 181231 WP IRS 1120 for 2017 181231.pdf<br>181231 WP IRS 1120 for 2018 181231.pdf<br>190228 NBH 7469-BUSINESS CHECKING-20190228.pdf 190331 NBH 7469-BUSINESS CHECKING-20190331 (1).pdf<br>190430 Financials WCC 190430.pdf<br>190430 NBH 7469-BUSINESS CHECKING-20190430.pdf<br>190513 NBH 7469-BUSINESS CHECKING-20190513.pdf<br>190531 NBH 7469-BUSINESS CHECKING-20190531.pdf<br>190630 NBH 7469-BUSINESS CHECKING-20190630.pdf<br>190731 NBH 7469-BUSINESS CHECKING-20190731.pdf<br>191231 WP Financials 2018-2019 191231.pdf<br>201231 SBI General Ledger Detail 201231.pdf<br>201231 SBI Income Statement Detail 201231.pdf<br>210901 DB Reimb for Advance to SBI 210901.pdf<br>210903 GPR 210731 FS Change Notes 210903.pdf<br>210904 GPR INC 073121 GAAP FS 210904.pdf<br>220614 Sheldon Beef Chase Check To 220614.pdf<br>C1 220628 Notes to C1 Ltrs Series 220628.pdf<br>C1 220629 CapitalOne Autopay June 29 220629.pdf<br>C1 220719 CapitalOne WMT late fee dispute 220719.pdf<br>C1 220801 C1 CEO 220629Ltr re Autopay 220801.pdf<br>C1 220805 C1 Letter from 220805.pdf<br>C1 220808 C1 Pymt Corresp 220808.pdf<br>C1 220812 C1 Letter from 220812 .pdf<br>C1 220813 C1 Collections Process 220813.pdf |
| Calendared meetings and phone calls in date sequence:<br>Dennis Brewer, WinnettOrganics.com Calendar (partial listing only, bank statements to be produced during discovery process): | **Date   Party**<br>**2016**<br>1/22 Colby Arkin, NetSuite update<br>2/18 Chris Nichols, Ryder<br>3/17 Ramsey Café Ryder Mtg (Chris Nichols + Mktg VP or Sandra, Controller<br>3/30 Richard Miller, RAM Consulting<br>4/25 Richard Miller, RAM Consulting<br>5/2 BA Bestwick Cardone Group Group Natural Food symposium Andrew Cardone<br>6/22 Matt Paul<br>8/11 Libby Leggett re solar greenhouses<br>8/25 NYC Food Investing Conference - intial introduction, Revolution VC |

9/12 Quentin Cote, LeaseQ
9/19 GVC intro call
9/26 Michael Callahan, Domincik and Dickerman (DD)
9/30 Peter Hsuing, DelMorgan introduction
10/4 Cardone intro of John Kiely - trust attny
10/11 Micheal Callahan, DD
10/18 Ron McCormick, Walmart Senior Director, Fresh,
WebEx call
10/26 John Cecilian, Clutch
10/27 Jim Case, Champion (re housing at Hyder farm,
AZ)
11/3 Jim Case
11/4 Lance Troutman
11/9 Jacob Krempel & Jose Merced, Kroger re organic
produce in KPPC Conference room,
Blue Vine, OH
11/10 Dan Davidson re soils and gypsum addition
11/14 Michael Callaahn, DD, meeting at NYC office on
Lexington Ave
11/21 Chris Nichols, Ryder, re update
11/23 Ken Ferguson re Hyder ag housing
11/29 Britney Smith re Hyder ag housing
**2017**
1/6 Sarah Freese re IBM marketing cloud
1/27 Dan Krewson, Multifunding re loans
2/6 Shefford Wire Transfer
2/8 Kingman, AZ farm visit w/ Christine J Volk, realtor,
and Jonathan Cross
(Blackpool/Shefford), Bruce Blitch
2/17 C Arkin
2/21 Walmart Bentonville, AR - Meeting with Ron
McCormick, Shawn Baldwin, others in
Walmart second floor GPS conference room
2/22 Jim Case, Chamion re Gerlach, NV , Hyder, AZ,
Kingman, AZ agricultural worker
housing
2/23 C Arkin, NetSuite, review of NetSuite Professional
Services statement of work
2/24 Shefford closing sked
2/27 J. Buddy Persons re Constsvcs ag housing
2/27 C Nichols, Ryder reupdated fleet needs
2/28 Dave Wanders, Utica Leaseco
4/6 Wendy Berger, re refrigerated facilities development
4/26 Steve Monroe, re factor financing NJ
5/18 M Callahan, DD and staff meeting at DD Lexington

Avenue offices, NYC

7/11 G Troutman, telcon re SPAC meeting at Chardan offices, Battery Park, NYC

7/11 EarlyBird telcon re SPAC meeting at their offices

7/11 Loeb & Loeb telcon re SPAC meeting at their offices

7/14 J Ju, DD, conference call w/Advantage Capital Partners

7/18 Conference call w/HIG

8/7 Gordon, Maughan breakfast meeting in Salt Lake City re accounting services

8/7 Sam Sanders, Swan Raelty, travel from Salt Lake City to Idaho Falls, ID for two days at

Skaar, then afternoon visits to Wells Fargo Bank, Idaho Falls, Jefferson County offices, then to

Teton River Farm and rural residential property near Driggs, ID

8/8 Sam Sanders - Skaar tour complete and return to Salt Lake City, UT for travel home to NJ

8/24 Jasper Van Brakel, Armonia, and 2 female team members in NYC shared offices

conference room re grassfed beef

8/25 Jasper Van Brakel follow-up telcon

9/7 JD Kritser, Ranch Partners, Seattle, WA telcon

9/8 Stephen O'Hara Riverside Capital, NYC re investment review

9/25 Gavin Haladay - Equilibrium Capital, Portland, OR permanent crop investment firm telcon

10/30 JD Kritser, Ranchland Partners, Seattle, WA and Fiona Industries ex-CEO John Herring

TX feedlot expert call, per email

10/31 Visit to Manning Beef, Pico Rivera, CA with Anthony DiMaria

11/1 Phoenix, AZ investor meeting scheduled with Greg Smith, Zach Sease, both of Banco

Advisors. Both are no shows at their office in Scottsdale with WP employees including Blitch

and others. Receptionist connects us to Banco and some of the supposed investors on a

conference call while we are at their offices. Afternoon meeting thereafter with Joel Gottesman,

Liquid Capital AZ re financing.

11/1 Joel Gottesman Liquid Capital early pm restaurant mtg

11/13 Gavin Haladay - Equilibrium Capital, Portland, OR permanent crop investment firm telcon

| | |
|---|---|
| | 11/13 Monday date to confirm Andy Wiegand Peninsula Funds telcon per email on 11/10/17<br>12/22 Lucas Gibson NBH re nat org beef telcon<br>12/27 Lucas Gibson NBH re nat org beef telcon<br>**2018**<br>1/9 Sole Source Capital in NYC for meetings with their funders, so Brewer has meeting with<br>Turner, Rossi, two others at St Regis King Cole Bar in NYC. Managing Partner Rossi verbally<br>commits to funding Winnett Perico during that meeting<br>1/10 Eric Edwards NBH Ag Banking telcon<br>1/17 Chris Nichols, Ryder update<br>1/18 Mike Roznowski Fractal Advisors intro Black Lake Capital intro<br>1/23 Dewey Turner telcon<br>2/26 Brandon Sowder Indoor cattle pen facility telcon Hart TX<br>2/28 Bryan Sprinkman project review telcon<br>4/26 Colby Arkin, NetSuite update |

**557. RICO-2 Racketeering Violations: Theft and Takings - Financial Resources, Blocking Personal Employment Opportunities 1977 to present**

A. Defendants with police powers have and do hack and manipulate Lead Plaintiff's personal computer and the websites and/or spoofs of legitimate websites presented to Lead Plaintiff to engage in repeated blocking of access to legitimate personal employment opportunities perpetuating involuntary servitude and forced labor from 1977 forward. Defendants repeatedly substitute their own fraudulent executive recruiters and their own insider network of Defendant police powers, domestic and international intelligence agents, officers, and confidential informants for both legitimate existing and non-existent positions, and do not permit the Lead Plaintiff to seek or engage in legitimate private employment. This fraudulent scheme, running from the Lead Plaintiff's first instance of mailed application and resumes through his ownership of a personal computer beginning in the 1980s to the present, used mail

fraud, and since the 1980s primarily uses wire frauds and email frauds, in both in-state and interstate commerce, to sustain and perpetuate Defendants' involuntary servitude, forced labor, and their systematic violations of the First, Fourth, Ninth, Thirteenth, Fourteenth, and Fifteenth Amendments, and other civil, Constitutional, and human rights guaranteed under ratified international treaties.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373 |
| Table 1 paragraphs: | 1-007 through 1-010, 1-015, 1-017 through 1-023, 1-025, 1-031, 1-032 |
| Table 2 paragraphs: | Entirety of column entitled: Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate |
| LP Evidentiary Exhibits pages: | 140-189, 8350-8355, 10259-10301, 10352-10363, 10376-10393 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | CaseStack cutout Edwards Tracy 080625, IBM Circo DB Headhunter 1080717, LLoyd Staffing K Shipper DB Headhunter 110621, Paul Rainer IMS 080701, Personal Recruiter Connections Carnegieww Stricklin DB Headhunter 080625, Personal Recruiter Connections Circo 080716, Personal Recruiter Connections Kvederis 080716, Personal Recruiter Connections Circo 080725, Personal Recruiter Connections Rivera 080725, Personal Recruiter Connections Rowa 080801, Personal Recruiter Connections Sklenar 081021, Personal Recruiter Connections Gonzalez 110324, Personal Recruiter Connections Knox 110413, Personal Recruiter Connections Santorelli 110420, Personal Recruiter Connections McQuilkin 111015, Personal Recruiter Connections Lang 120726, Personal Recruiter Connections Melino 130213, Personal Recruiter Connections Andersen 140128, |

| | |
|---|---|
| | Personal Recruiter Connections DeNapoles 150210,<br>Personal Recruiter Connections Weis 171019,<br>Personal Recruiter Connections Pages 171205,<br>Personal Recruiter Connections Nithin 180206,<br>Personal Recruiter Connections Alcanzirin 181105,<br>Personal Recruiter Connections Harte 190910,<br>Personal Recruiter Connections Foster Peters 210518,<br>Personal Recruiter Connections Olympia 210518,<br>Personal Recruiter Connections Walsh 210518,<br>Personal Recruiter Connections Foster Peters 210604,<br>Personal Recruiter Connections Vasamshetti 220127 |

### 558. RICO-3 Racketeering Violations: Theft and Takings - Financial Resources, Establish Theft of Compensation 2008

A. Establish sales commissions are not paid as due while Lead Plaintiff is employed in 2007 and 2008, despite the explicit and specific wording of the Lead Plaintiff's offer letter from Establish. This purposeful and deliberate fraud by Defendant Establish and its key executive in the United States, Defendant William Drumm, actually Defendant Charles Rosenberg This fraudulent employment is first confirmed while this individual is posing as William Drumm in Summer 2007. Drumm chooses to fail to pay Lead Plaintiff these commissions timely, citing company cash flow issues, despite this sole US office being alleged as wholly owned by a well-capitalized Swedish parent company.

B. Defendants' long-running pattern of fraudulent concealment incorporated a local news feed deep fake targeting Lead Plaintiff who then used this fraudulent news feed deep faked image to misidentify Drumm to SDNY as a prominent member of the news media and a long-serving former political operative and aide to Richard B. Cheney, the current Vice President at the time of Lead Plaintiff's human trafficking from the Seattle, WA area to Boston, MA in 2005 and then to northern New Jersey in 2007).

C. Defendants purposefully delayed these payments until they placed the Lead Plaintiff in a more financially vulnerable position after he was terminated in June 2008 and lacked the financial resources to adequately defend his personal financial interests. The actual sales commissions due by the time of Lead Plaintiff's June 2008 termination are approximately $6,600. Establish also refused to pay the one month of termination pay agreed with the executive recruiter (nearly $11,666) despite a verbal agreement. According to the terminating manager, Conrad Ross, the agreement to pay one month of severance is not included in the company offer letter signed by William Drumm, and therefore is not due. Establish provided $700 to Lead Plaintiff and claimed this as full payment of all these claims.

D. The Defendants thus once again defrauded the Lead Plaintiff, this time of approximately $18,000. The Lead Plaintiff lacked the funds to pay for legal services to litigate this matter and so was unable to legally pursue and collect the full amount of compensation due, legally permitted damages, and attorney's fees, which he would otherwise have received in a Court action. This action repeats the compensation theft pattern used by FBI at CNA in RICO-6.

E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 69.f.(v), 318-330, 333, 373, 373s. |
| Table 1 paragraphs: | 1-031, 1-032 |
| Table 2 paragraphs: | 2-0094, 2-0129 through 2-0150 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 44-48, 51-52, 58, 60, 64-68, 72-77, 83-90, 125-126; pages 8351-8355, 10311-10364 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Establish Drumm post wedding 253pm 080630, Establish Meeks re closeout issues 080630, Establish Ross re CWP stiff and closeout 080702, Establish Ross re CWP stiff and closeout 080709, |

| | Establish Ross Demand Ltr 080714, |
| | Establish Meeks New Ramsey Address Move in date 110331 |

### 559. RICO-4 Racketeering Violations: Theft and Takings - Financial Resources, Theft of Funds and Services, Cliffside Park Apartment Renovations 2008

A. After Lead Plaintiff is terminated from Establish in June 2008, his Cliffside Park landlord requests he renovate and improve his top floor apartment in Cliffside Park, NJ several months after he begins collecting unemployment benefits. To avoid losing his eligibility for unemployment payments (and being entrapped for collecting unemployment benefits while employed), Lead Plaintiff agrees and stops his unemployment compensation benefits while he works on this project. When the project is completed, he presents Defendant Chalom the bill for equipment rental, tools, materials, supplies, and for his labor at $17.00 per hour, a total of approximately $16,000. Defendant Chalom then informs Lead Plaintiff that New Jersey law requires written contracts for all such agreements when the cost totals more than $5,000. Lead Plaintiff is forced to settle for $5,200, less than the out of pocket costs he incurred. He continues his professional job search for alternate employment as he applies for resumption of unemployment compensation.

B. As in similar prior sequences driven and orchestrated by Defendant United States and its co-conspirators, Lead Plaintiff is again in a very precarious financial position while unemployed, with no financial reserves after only ten months of employment in this fraudulent VP job at Establish and prior homelessness, exactly where Defendant United States and it co-conspirators seek to keep him as they have for years already – and will tomorrow and the next day – through the preparation of this Complaint.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 317, 318-330, 373, 373x. |
| Table 1 paragraphs: | 1-032 |
| Table 2 paragraphs: | 2-0141, 2-0157 |
| LP Evidentiary Exhibits pages: | 140-189, 10305-10307 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Chalom re improvements billing 081229, Chalom Final rent pymt 100913 |

## 560. RICO-5 Racketeering Violations: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment 2008-2011

A. As a result of incurring renovation and improvement out-of-pocket expenses at Cliffside Park, NJ apartment, as related in subcount RICO-4, while his unemployment compensation had been suspended, by using his available credit to pay for the project costs and for daily food and other necessities, Lead Plaintiff's access to the credit he had reestablished in 2007 and 2008 was eliminated yet again, and his credit rating was again destroyed in this process. His $10,000 Bank of America credit card was completely exhausted by advances to pay for the renovation project.

B. When he missed a payment on the credit card (likely actually issued by an FBI or federal defendant captive bank, not the actual Bank of America commonly used by the general public) while awaiting resumption of unemployment benefits, the credit card insurer (likely also a captive of federal defendants and which had removed funds by its premium charges)

immediately cancelled his credit insurance. The credit card then went into default as he was forced to choose eating and paying rent over making his credit card payment.

C. Lead Plaintiff composed and filed a US District Court Complaint filed in Newark, NJ on June 23, 2010 naming FBI as a lead Defendant, though he did not realize the full scope of the problem and assumed these defendants rather than having the positive identification of these perpetrators he possesses since September 2023. This filing was swiftly followed in July 2010 by a certified letter from his landlord, Defendant Chalom, terminating his month to month apartment rental. The Cliffside Park Post Office did not allow him to collect this certified letter due to an alleged signature mismatch between the addressee name and his electronic signature at the point of collection, the clerk's workstation in the Post Office.

D. Chalom knocked at his apartment door on September 1, 2010 demanding he leave the premises. He overstayed his rental period to remain in his renovated Cliffside Park, NJ until October 1, 2010 when, with no financial resources or credit, he became homeless again.

E. Lead Plaintiff took one rolling suitcase, leaving all other possessions behind again, to board a New Jersey Transit bus to the Bergen County homeless shelter in Hackensack, NJ. He is informed the shelter is full and redirected to the street address of a nightly shelter a few blocks away. There is no shelter at that address, only older family residences, and no such street address number between those residences.

F. Lead Plaintiff then walked to the Hackensack Police station and waited for about 20-30 minutes for a not particularly busy desk sergeant to respond. He was directed and walked to a South Hackensack motel about 2 miles away. One night in this low budget motel exhausted his remaining funds, and he called 911 in distress the morning of October 2, 2010. A South

Hackensack Police officer and an ambulance responded. Lead Plaintiff was loaded into the ambulance and, without explanation, transported to an unfamiliar hospital location (Bergen Regional Medical Center in Paramus, NJ), was briefly examined, and waited about 12 hours in the emergency room.

G. Unknown to Lead Plaintiff, an emergency involuntary commitment hearing was held with no contact with either his appointed legal counsel before the hearing or with the Court at the time of the hearing. He was informed some days later by legal counsel that he had been ordered involuntarily committed for 14 days. A few days into this involuntary commitment, after refusing medication because the nurse would not tell him the names or the effects of the medications being administered orally, he was placed in a padded cell overnight and forcibly medicated by three large male orderlies. Since NJ state law says hospitals may only release admitted patients to safe housing, and he had no access to housing or funds, he "elected" to remain, and was unable to leave the locked psychiatric wards of his confinement until March 31, 2011, about six months later. During this six month period, he had access to indoor exercise facilities intermittently and to the outdoors for a very few minutes less than once each week.

H. This "voluntary decision" was the direct consequence of the sequence of Defendants' police powers actions, including their intentional starve outs, thefts of resources, and deprivation of benefits under law, including their denial of shelter and misdirection to a non-existent homeless shelter on October 1, 2010. Defendants, led by Defendant United States in this on-going conspiracy against rights and long-running RICO frauds sequence, once again acted as, and are clearly shown to be, human traffickers of the Lead Plaintiff, among their other violations of rights and law.

I. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, 373y |
| Table 1 paragraphs: | 1-032 |
| Table 2 paragraphs: | 2-0141, 2-0157 through 2-0164 |
| LP Evidentiary Exhibits pages: | 10259-10301, 10305-10310, 10311-10364, 10434-10444 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Bergen Regional Sinisi re resume and cover ltr 101230 |

**561. RICO-6 Racketeering Violations: Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses 1993-2022**

A. In September 2019, Defendant Dean T. Smith filed litigation in the Eastern District of California (19-cv-01918, which see on Pacer.gov) which further extended Lead Plaintiff's involuntary servitude and functionally destroyed the interstate commerce startup Winnett Perico and its subsidiaries. The federal court case filed lacked a sound legal basis for the claims made and was based on false representations, demonstrating virtually no due diligence by the filing attorney. The Smith v. Winnett/Brewer et al case 19-cv-01918 was voluntarily dismissed without prejudice in April 2022, so it effectively continues to hang over the Lead Plaintiff despite the false original premise for the claims being made in the Complaint. See LP Evidentiary Exhibits pages 140-189 paragraph 85; pages 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9925, 9926, 9997, 10004.

B. Litigation was also required to attempt recovery of stolen and/or promised funds and

compensation at

(1) LaserAccess (formerly LazerSoft when run by Lead Plaintiff) in 1993 for recovery of $40,000 of post-merger sales bonuses with an eventual recovery of $22,000 coming from Defendant Stephen M. Waters rather than the entity itself; at

(2) Alliance for a stolen project account receivable payment of approximately $165,000, with eventual recovery of about $82,000;

(3) to pay $2,200 of legal fees after leaving P.A.N. by a supposed freelancer seeking payment for an unpaid P.A.N. bill for services which must be defended; with

($) P.A.N. Environmental Services (PAN), an employer who promised and then denied compensation by using the fraudulent subterfuge of accounts receivable factoring fraud in 1994;

(5) CNA Industrial Engineering in 2003, another compensation theft where there was no valid legal basis for the arguments being presented and legal maneuvering including a change of attorneys and failures to comply with court deadlines used to delay the matter while starving Lead Plaintiff's financial resources so as to avoid the treble damages and attorney's fees recovery allowed under Washington state law for this kind of compensation theft (see LP Evidentiary Exhibits pages 10467-10527), and costing $37,000 in legal fees, and

(6) Allegent LLC dba Performa for $82,000 of bad checks passed to Performa by a customer, actually a Defendant insider entity ShipNow (see LP Evidentiary Exhibits pages 10445-10471).

C. Adding these six fraudulently derived compensation thefts and imposed litigation expenses to the other thefts and misappropriations by Defendants operating under color of law brings the total number of such racketeering pattern bad faith violations directly against the

interests of the Lead Plaintiff to twelve (12) such events since 1990. This litigation pattern of racketeering acts by Defendants is similar to a very broad and long running pattern of Defendants prior bad faith acts toward Lead Plaintiff's enterprises in interstate commerce, which include thefts by various means, such as uncollectible and disputed accounts receivable, bad checks, compensation theft, and related litigation recounted at subcounts RICO-11, RICO-14, RICO-39 through RICO-50, and RICO-2 through RICO-7, RGTS-5.

    D. This series of "legal" techniques, used by Defendant United States and its officers, agents, and confidential informants, abuses the legal system to induce delay, expense, and mental and financial stress, while "dirtying up" the Lead Plaintiff as it does for other similarly situated plaintiffs.

    E. The acts of compensation theft alone, leaving out all other offenses, directly cost the Lead Plaintiff over $400,000 in previously agreed compensation, all of which is agreed while under the coercive control of his human trafficker, Defendant United States, in circumstance not reflecting the full market value of the Lead Plaintiff's professional services. These amounts are not adjusted for inflation or interest due, nor for consequential damages such as the loss of other professional and entrepreneurial opportunities, the repeated loss of real property and financial assets, and appreciation of those assets over time due to interest compounding and real property appreciation.

    G. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 9A-9P, 30-37, 196, 208, 209, 317, 318-330, 373, 373x, RICO-11, RICO-14, RICO-39 through RICO-50, and RICO-2 through RICO-7, RGTS-5 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0047, 2-0056, 2-0057, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0185, 2-0186 |
| LP Evidentiary Exhibits pages: | A. 140-189 paragraph 85; pages 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9925, 9926, 9997, 10004<br><br>B.5  10445-10471<br><br>B.6  10467-10527 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Costco GC reply to verficiation request 211102,<br>D Brewer reply to DOJ OIG decline ltr 220325<br>Performa (Allegent dba) v ShipNow 220818 040210.pdf<br>040713 Allegent ShipNow Confirmation of Joinder 040713.pdf<br>040713 Allegent ShipNow Dismissal With Prejudice 040713.pdf<br>040713 Brewer Allegent ShipNow Docket Sheet 040713.pdf<br>040713 Brewer ShipNow Amended Complaint 040713.pdf<br>040713 Brewer ShipNow Disclosure 040713.pdf<br>040713 Brewer ShipNow Notice of Appearance 040713.pdf 10445-10467<br>030122 Brewer CNA Brewer Counsel Larson 030122.pdf<br>030122 Brewer CNA CNA Motion for Summary Judgment 030122.pdf<br>030122 Brewer CNA Decl Amount Due etc 030122.pdf 10468-10527<br>030122 Brewer CNA Docket Sheet 030122.pdf<br>030122 Brewer CNA Plaintiff Brewer Ans 030122.pdf<br>030122 Brewer CNA Summons and Complaint 030122.pdf<br>Smith 100K Check 1of2 150730.pdf Smith 100K Check 2oof2 150730.pdf<br>Smith 100K Subscription Agreement SKMBT_C36415072911310 DB Signed 150729.pdf<br>Smith Litigation Halt Proposal to resume company operations 200106.pdf<br>Smith Litigation Sullivan Winnett - WCC Letter Respond to Evers-DSmith 190621.pdf<br>Smith Litigation Sullivan Winnett - WCC Letter to Evers - |

| | Dean Smith III 190723.pdf |
| | Smith Litigation Winnett - WCC Letter Responding to Evers - Dean Smith II 190710.pdf |
| | Smith Note 5K 190201.pdf |
| | Smith Loan pays Cornhusker Retainer 10125 |
| | Smith $30K Loan 10157 |
| | Smith $5K loan 10164 |
| | Smith Paid Costco Trip Hotel Reservation 10165-10171 |
| | Evers Ltr to R. Sullivan 160925.pdf |

**562. RICO-7 Racketeering Violations: Theft and Takings -Financial Resources, Banking System Manipulations**

A. Defendants' control of Lead Plaintiff's finances was demonstrated yet again by their hacking of the ACH system, or their complete control of Lead Plaintiff's financial life through use of a completely controlled financial system in their hack or their contrivance to appear as a hack. An $8 ACH payment to CapitalOne from Lead Plaintiff's personal checking account failed as a result of their hack or some other fraudulent contrivance of Defendants and resulted in a $20 late fee. This is part of a pattern of similar offenses by Defendant United States directed at Lead Plaintiff and others similarly situated.

B. Defendants routinely impound Lead Plaintiff's funds and credit availability using double-billing and overbilling for goods and services, as well as order fulfillment shortages, delivery of wrongly sized items, and hacked electronic devices requiring returns to the vendor, to frustrate rights, to constrain available financial resources and to limit financial flexibility and the ability of Lead Plaintiff to travel, entertain, and purchase goods and services at certain times. This complements Defendants' outright illegal conversions to the benefit of themselves or to others, by alternate means including without limitation, contrived employment and businesses losses and destroyed marital communities, of real and personal property, thefts of financial

assets, and imposed expenses documented throughout the RICO series of offenses and injuries herein.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0047, 2-0054, 2-0115, 2-0202, 2-0207 |
| LP Evidentiary Exhibits pages: | 609-612 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

*Racketeering – Personal Color of Law Entrapments*

**563. RICO-8 Racketeering Violations: Theft and Takings - Credit and Credit Access Hacks**

A. Defendants' control of Lead Plaintiff's finances was demonstrated yet again by their continuing control of his credit and credit access. Defendants routinely impound Lead Plaintiff's funds and credit availability using:

(i) posting delays when crediting available funds,

(ii) double billing to reduce available credit,

(ii) hacking to prevent credit availability online.

These illegal manipulations constrain available financial resources and limit financial flexibility and the ability of Lead Plaintiff to travel, entertain, and purchase goods and services at certain

times.

B. On knowledge and belief, this particular credit and collections accounts fraud and swindle are an element of Defendants' broader scheme to use uncollected credit card account balances as part of a scheme to generate some sort of tax liability which could be coordinated with other entrapment attempts such as RICO-9 and RICO-10.

C. Non-payment of these collection accounts by Lead Plaintiff would lead to taxable income from unpaid debts. This specific entrapment combination of unpaid collection accounts and loans and any forced or voluntary defaults such as which are not serviced by Lead Plaintiff's annual interest payment to Defendant Maggard, could be used in an effort to render the Lead Plaintiff guilty of tax fraud for failure to declare income resulting from these debt extinguishments and from improperly secured refunds such as the EITC refund generated by Defendants' tax software hack (RICO-9). Lead Plaintiff could then be deprived of certain federal government benefits, including, without limitation, the Section 8 housing voucher he must use to maintain stable housing, again limiting his ability to pursue litigation against these Defendants as they were able to accomplish by imposing extreme duress in 2010 after his filing in Newark federal court. This complex scheme arose shortly after the Lead Plaintiff mentioned such a scheme to the US Attorney for the Southern District of New York in a hand delivered letter on July 18, 2022.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, 373h, 373m, 373w |
| Table 1 paragraphs: | 1-067 |
| Table 2 paragraphs: | 2-0047, 2-0054, 2-0055, 2-0056, 2-0068, 2-0122, 2-0195 |
| LP Evidentiary Exhibits pages: | 542-547, 10256-10258, 11708-11726 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

## 564. RICO-9 Racketeering Violations: Illegal Searches, Hacking, and Harassing– Tax Software Hack EITC Entrapment Attempt 2021, 2022

A. Defendants' control of Lead Plaintiff's finances is demonstrated yet again by their hacking of tax software so that it requires earned income to complete the filing. Normally, a Social Security recipient with no taxable income could file without the need to add any taxable income to their filing. Lead Plaintiff works around this hack by reporting $1 of earned income for 2021 and 2022 so the tax return can be filed timely. This generates a 2022 EITC check from the State of New Jersey, which Defendants clearly intend would not be returned to the State as required by law (since there was no actual earned income). Lead Plaintiff returns the EITC check with a note to the NJ state tax investigators, see LP Evidentiary Exhibits pages 11704-11707.

B. This is another in a series of recent transparent attempts to entrap for loss of benefits which would cause the loss of Lead Plaintiff's Section 8 rent subsidy and force displacement of the Lead Plaintiff from his NJ apartment. This is completely consistent with these Defendants' long running pattern of practice which included prior losses of residence and related personal property to and including to homelessness. This would have the practical effect of making civil

rights litigation over this fraudulently concealed illegal program of BRMT and racketeering practically impossible as these Defendants have done in the past in December 2005 (following a FTCA complaint letter) and October 2010 (federal district court at Newark complaint) to create duress and to continue to fraudulently conceal their on-going illegal BRMT and racketeering operations.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 3, 4 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 339, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 11704-11707 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**565. RICO-10 Racketeering Violations: Sole Source Fraudulent Financing with Ironwood Tax Loss Self-Exculpatory Offset Attempt**

A. In 2018, Lead Plaintiff sent a series of email solicitations sourced from a list in a Los Angeles Times business news article, now known as likely a faked planted story on a spoofed LA Times website, seeking business financing. Sole Source Capital responded and introduced Dewey Turner, a principal, from this likely FBI cover operation actually run from Manhattan, New York. A few weeks later, Turner and three other agents, one known as Bradford Rossi, ostensibly visiting from Los Angeles, requested a meeting the afternoon of January 9, 2018 on

very short notice at the St. Regis Hotel bar in New York City. Rossi, the senior most person at

Sole Source, verbally promised a multi-million dollar financing at that meeting. Sole Source,

acting through emails and a January 23, 2017 phone call from Dewey Turner, then reneged to

the Lead Plaintiff company in 2018 (see paragraph 337). This is part of the pattern of fraudulent

financing commitments which has become evident to Lead Plaintiff over time. It is an element

of Defendant United States' pattern of involuntary servitude racketeering acts which continues

from the 1970s forward to this day.

B. Turner mentioned a visit to an operation in west Texas in one of his calls to Lead

Plaintiff sometime later (paragraph 338). In searching for a CFO to support the originally

promised financing or a replacement financing, Lead Plaintiff had also come across CFOSearch,

a specialized senior financial officer executive search firm with a partner who worked from

Lubbock, Texas. The partner, known as Michael Maggard, located a CFO, an Egyptian national

working in the United States, but the funding was not completed.

C. At the time, Lead Plaintiff had not connected these FBI dots between Sole Source and

this search firm, CFOSearch. The search firm partner, Defendant Michael Maggard, likely an

FBI agent assigned in the Amarillo field office who had coordinated with the New York field

office agent known as Sole Sole principal Dewey Truner, then loaned $6,000 to Lead Plaintiff's

company Gannett Peak Ranch (GPR) for web development, and another $6,000 which Lead

Plaintiff used to try to improve his credit score by lowering utilization and payment defaults so

he could co-sign for a six figure loan for the company. As previously experienced, these good

faith interstate commerce projects also went wrong - the web site was never completed (yet

again as with other prior software projects) but the $6,000 personal loan was still due, the $6,000

business loan was still due and there was no offsetting revenue or income. Same pattern on another project, repeated since LazerSoft in 1986, by Defendant United States.

D. Defendant United States then cooked up a new entrapment scheme to get this $6,000 loan off the agency's records. A release form for a condo relinquished to Lead Plaintiff's second spouse in their 2005 divorce mysteriously shows up in 2023 in the approximate amount of $6,000 a nearly perfect offset for the $6,000 loan (if defaulted) for tax purposes.

E. This is a transparent attempt to secure a loan default against agency funds. The agency then holds this open looking for another offense to add, or the statute of limitations and internal record keeping then run their course so this fake loan record is lost to the evidence destruction cycle related to closed "investigations," disappearing the direct evidence of FBI's repeated direct interference in the Lead Plaintiff's financial affairs and business in interstate commerce. See LP Evidentiary Exhibits page 11641 for date when Lead Plaintiff connected these FBI dots.

F. FBI has a long history of these types of practices, including evidence destruction cycles in bad faith acts against Lead Plaintiff and his business efforts in interstate commerce. This pattern is part of their BRMT and racketeering conspiracy with CIA and other Defendants as related throughout this complaint.

G. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 193, 194, 318-330, 337, 338, 341, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 11641 |

| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Maggard TX re Abdelsayed 200722,<br>Maggard TX re Abdelsayed start date 200817,<br>Maggard TX status 201015,<br>Maggard re Korea Angus pgm etc 210118,<br>Maggard re 26 Ranch and Abdelsayed 210221,<br>Maggard on Abdelsayed positive connect 210222,<br>Maggard re Abdelsayed 210302,<br>Maggard re Abdelsayed to Egypt 210304,<br>Maggard on loan docs PFS need 210306,<br>Maggard re gty and PFS 210307,<br>Maggard re Big Sandy BAFO 210322,<br>Maggard re Big Sandy reprise 210505,<br>Maggard re investors and Big Sandy 210519,<br>Maggard re Lake County LOI 210701,<br>Maggard re Lake County 210702,<br>Maggard re 500k loan 210703,<br>Maggard enroute Lake County 210707,<br>Maggard re Lake County enroute 210707,<br>Maggard re Lake Copunty tour and plus minus issues 210709,<br>Maggard re Lake County and pers FICo improvement 210715,<br>Maggard re Lake County 210719,<br>Maggard Loan to DB improving FICO 210721,<br>Maggard re Lake County 3559 LOI 210721,<br>Maggard on Lake County Fin snags 210725,<br>Maggard on WMT Wagyu comp price and other status 210804,<br>Maggard re startup sequencing plan 210816,<br>Maggard re status web dev sales 210816,<br>Maggard re add subs WeFunder 210817,<br>Maggard re GAAP fin need 210818,<br>Maggard re mkt gap 210818,<br>Maggard 5k GPR loan 210826,<br>Maggard re 4500 loan recvd 210826,<br>Maggard Revised GPR Startup Plan 210830,<br>Maggard re DB overadvance 210901,<br>Maggard re loan not pursued 210903,<br>Maggard re 26k loan 210909,<br>Maggard re ICPO LOI-FM-LZ-210913,<br>Maggard re Terminating Trader efforts 210916,<br>Maggard re status 211104,<br>Maggard re 700 211221,<br>Sole Source cold email hit 171219,<br>Sole Source feedback 171222, |
|---|---|

| | |
|---|---|
| | Sole Source call 171226,<br>Sole Source NDA Double D feedyard 171227,<br>Sole Source Turner phenom news HEC etc 180105,<br>Sole Source TX feedyard options 180105,<br>Sole Source Turner mtg invite StRegis NYC 180108,<br>Sole Source Turner re NYC mtg 180108,<br>Sole Source mtg fup NYC 180109,<br>Sole Source mtg in NYC 180109, (see also LP Evidentiary<br>Exhibits page 1074V entry 1/9/2018)<br>Sole Source Turner at mtg StRegis 180109,<br>Sole Source mtg results to Nickless 180110,<br>Sole Source 180111,<br>Sole Source update TX 180119,<br>Sole Source 180121,<br>Sole Source Check by outsider 180122,<br>Sole Source re WMT China added opptntys 180123,<br>Sole Source on string out 180125,<br>Sole Source hold cmu to Gearn 180126,<br>Sole Source repeat decline 180228,<br>Sole Source Turner on Big Sandy 210507,<br>Sole Source Turner on feed price sensitivity 210601,<br>Turner on Feedyards and Deloitte Earnings review 180111,<br>Turner re TX feedyards status 180121, |

*Racketeering – Targeted at Small Business And Enterprise (RICO series offenses)*

**566. RICO-11 Racketeering Violations: Theft of Receivables, Check Frauds 1990 to present**

A. Defendant United States conspires with other Defendants, both named and not yet identified, plans and conduct thefts of property and legally due accounts receivable and to purvey fraudulent unfunded checks to Lead Plaintiff and his in-state and interstate commercial businesses. Defendants systematically conspire and act to deprive Lead Plaintiff of personal and business' financial resources, force litigation for recovery or partial recovery, and force arbitration to compromise amounts due, and engage in outright theft, including passing bad checks, to perpetrate these frauds. This set of wire and mail frauds total about $930,000

including the commercial racketeering frauds against his enterprises, and directly costs the Lead

Plaintiff approximately $220,000 of personal funds out of pocket.

B. These check, mail, and wire frauds are used by Defendants to control Lead Plaintiff

through involuntary servitude and forced labor in what are supposedly the Lead Plaintiff's

private enterprises owned and controlled by him and an "investor" or "partner," (who is actually

preselected as part of this conspiracy by Defendants who place police powers officers, agents,

and confidential informants in these positions by systematically screening out all other options)

between 1990-1993, and 2002-2005, as well as during his employment at LazerSoft from 1986

to 1990, and P.A.N. Environmental Services, Pacific Pipeline, and CNA Industrial Engineering

between 1993 and 2002.

C. Other than 10 months of fraudulent employment at Establish in 2007-2008 after

trafficking to and then from Boston by FBI's Rosenberg, Defendants have never allowed further

employment by the Lead Plaintiff nor allowed any enterprise he has attempted to run to actually

begin to operate.

D. Lead Plaintiff is subject at all times from 1979 to the present, to involuntary servitude

and forced labor while being human trafficked to various assigned employment "options" and

immediate termination on whim as determined by Defendant United States and co-conspirator

Defendants for their convenience. He is forced to accept the compensation the Defendants

indirectly specify using mail fraud, wire fraud, and their internal illegal intelligence operations

and enterprises, as he is unable to access any private employment opportunities, and his

businesses are repeatedly defrauded to failure using various means including deprivation of SBA

loans, guarantees, and bonding, and access to private investor financing or the public investor

markets.

E. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation. At all times Defendants also use these and other fraudulent methods to effectively reduce legally due compensation of Lead Plaintiff which directly costs the Lead Plaintiff more than $400,000 as will be proven at trial.

F. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | RICO-41, HEXP-14 through HEXP-17 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 208, 209, 318-330, 373, 373m |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0047, 2-0054, 2-0056, 2-0057, 2-0061, 2-0081, 2-0106, 2-0110, 2-0111, 2-0113, 2-0114, 2-0115, 2-0150 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 44-59, 64-68, 124-126, 145-146; pages 566, 8291-8293, 8351-8352, 10445-10506 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**567. RICO-12 Racketeering Violations: Fraudulent Financial Services – Ex-CIA Northern Africa Case Officer 1992-1995 Alliance**

A. A similar sequence of fraudulent financing actions which lead to no results but do require considerable time and expenses began in late 1992 or early 1993 at Lead Plaintiff's company, Alliance, when an alleged financial services broker, Gerald Cornwell, confirms funding from a "known reliable source" in Vancouver, BC. Reviews financial statements are

required. This financial statement preparation sequence also suffers protracted delays when an outside accountant quits in the middle of a compilation after being paid for all work to date, and the Lead Plaintiff is forced to spend days straightening out her mess instead of bidding projects to sustain his company's critically important sales and cash flow. The financial statement review process is further dragged out as Alliance, already lacking the SBA bid and performance bonding it is legally entitled to access as a small business, is starved out of existence due to this lack of bonding, and resultant cash flow from projects.

B. This 1992-93 sequence involves two local "accounting firms," one of whom is run by an individual who is "related" to a Deloitte Seattle office alumni who worked with Lead Plaintiff there, and a fake SBA representative (likely Defendant FBI), a fake factoring company Pacific Financial Services in Bellevue, WA, a previously seized Utah bonding company used as a false front for a fraudulent performance bond later cancelled by Defendants in mid-project, and a deliberately delayed start and rapid acceleration of work leading to a requirement to rapidly add employees to Alliance on a federally funded project at Sea-Tac Airport, which causes further financial stress to the small company.

C. Cornwell later became CEO of P.A.N. Environmental Services (PAN), a SEC pink sheet company which in 1994 also deprives Lead Plaintiff of compensation due through yet another fake factoring fraud. This particular episode of the pattern of racketeering acts occurs while Defendant United States, unbeknownst to Lead Plaintiff, is using PAN as a platform for a cross-border investigation of financial frauds involving US persons and the Vancouver Stock Exchange, its brokers, agents, and others, while looping the Lead Plaintiff unknowingly into this international investigation, a theme Defendant United States will use repeatedly (among other

still worse patterns of acts at other subcounts) in the coming years to ensnare, ensnarl, and attempt to entrap Lead Plaintiff.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A. viii. and C are incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, 373h, 373m |
| Table 1 paragraphs: | 1-017 |
| Table 2 paragraphs: | 2-0053 through 2-0055 |
| LP Evidentiary Exhibits pages: | 1-10, 11-139, 140-189, 383, 398, 420, 463, 566, 767-768 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**568. RICO-13 Racketeering Violations: Fraudulent Financial Services – Ex-CIA Latin America Case Officer 2013-2015**

A. Charles Jackson, (represented by defendant Ray Sullivan as deceased at the time of this Complaint) is a former Merrill Lynch Mexico City investment banker who likely operated for many years under commercial cover throughout Latin America as a CIA officer, is paid $750 from Lead Plaintiff's personal funds and contracted by Winnett Perico, Inc., owned by Lead Plaintiff, for investment banking services. These services are fraudulently provided in bad faith to perpetuate the involuntary servitude of Lead Plaintiff. Lead Plaintiff expends an additional $700 of personal funds for travel for Phoenix area investor development meeting with Jackson, his spouse, and John Tyler, Cherry Creek Partners, and a supposed major investor, as well as to

tour potential organic farming sites with Jack Doughty, Three Rivers Ag, a real estate broker.
All elements of this swindle are completely fraudulent representations made in person and using
email and phone calls.

B. All paragraphs above are incorporated herein by reference including, without
limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3
subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to
this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 5 through 13 |
| Complaint paragraphs: | 9A-9P, 30-37, 178, 318-330, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0171 |
| LP Evidentiary Exhibits pages: | 383-384, 431, 440, 8370-8373, 8378, 8411, 9902, 9905, 9923 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Charles Jackson Resume 130311.pdf<br>Jackson Contract 140207.pdf<br>Jackson Initial Contact 130311,<br>Jackson ibanker deal agreed 130809,<br>Jackson retainer pymt 130903,<br>Jackson re Blackpool Term Sheet and BP fail 131015,<br>Jackson intro to Sullivan 131125,<br>Jackson re Alberts Organics as customer 140114,<br>Jackson investor status inquiry 140115,<br>Jackson re new cust 2 3 140115,<br>Jackson reply on investor questions 140128,<br>Jackson Hurwitz on 25MM loan 140206,<br>Jackson Hurwitz verbal Relay 140206,<br>Jackson Pru Ag Reed Mitchell referral 140207,<br>Jackson Reed Mitch Pru Ag Loans self intro 140207,<br>Jackson on Alberts contract update 140218,<br>Jackson re 140226 Sullivan mtg Ramsey 140219,<br>Jackson re Sullivan face mtg 140219,<br>Jackson Domeier Prudential Ag referral 140224,<br>Jackson re Zayid alleged investment 140303,<br>Jackson re Attorney retainer wire on Zayid deal 140304,<br>Jackson re Zayid Attny Retainer Xfr 140304,<br>Jackson re Burstein call FL 140307,<br>Jackson re Sherbrooke Capital 140404,<br>Jackson connects Skye Root 140407, |

| | Jackson re circular referral to Resource Land Byron Lekulvich 140627, Jackson re Tyler 140629, Jackson re Tyler Eager to Raise 200MM 140701, Jackson Contract 140707, Jackson re 55% MS investor 140827, Jackson on 3 London closings 140902, Jackson re 3 London Closings 140902, Jackson re Tyler Doughty Maricopa County mtg 140909, Jackson Maricopa County Visit Details 140917, Jackson re PHX trip 141101 Tyler mtg 140917, Jackson re personal BofA acct number 141015, Jackson VanDeGraaf likely Maricopa Rabo poser 141024, Jackson 700 for Maricopa trip 141027, Jackson VanDeGraaf likely Maricopa Rabo poser 141027, Jackson re Burstein Miami update 141204, Jackson re Burstein mtg and Hain 141210, Jackson re Hain Celestial interest 141210, Jackson Gail on Charles Death 150209, Jackson Tyler re PPM review by Sullivan 150806, Westchester Mgmt Skye Root re farm acq parameters 140407 Zayid 20MM Cancelled Signed Subscription Agreement Cancelled 121002.pdf Zayid Signed JV Agreement121022.pdf |
|---|---|

**569. RICO-14 Racketeering Violations: Fraudulent Financings and Loans - NYC Broker/Investor 2011-2017**

A. Defendant Jonathan Cross, representing himself as an officer or principal of various entities using the various Defendants sharing the names Blackpool and Shefford while acting as a Defendant agent, officer, and as a part of this on-going conspiracy, and represents his firms legally named in the caption of this Complaint, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role from approximately 2013 to 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of investment and

authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 through 13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 150-155, 177, 193, 194, 318-330, 358, 373, RICO-12 through RICO-30. |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 8454-8467, 8939-8955, 9053-9059, 10138-10156, 10528-10565, 10566-10613 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Blackpool First Hit 110815, Blackpool IC Approval 120919, Blackpool decl Podzemny to Dalhart Realty130201, Blackpool Cross early hook 140120, Blackpool Persists Example 150707, Blackpool IC Approval 150821, Blackpool on PHX trip 150825, Blackpool Persists Example 151103, Blackpool merge anncmnt 161101, Blackpool PPM process 161122, Blackpool 1MM Bridge Loan Contract 161129, Blackpool WF wire advice 161130, Blackpool Term Sheet proposal email Smith Petersen 170126, Blackpool re TIAA-CREF (Skye Root Jackson tieback poss) 170131, Blackpool email Term Sheet Signed 170201, Blackpool re other investors rejected 170201, Blackpool tour Stckton Hill Farm LV realtor contact 170202, Blackpool re Stckton Hill Broadway Volk connection |

|  | 170203,<br>Blackpool Stockton Hill tpour fup 170210,<br>Blackpool Stockton Hill dataroom access 170213,<br>Blackpool Stockton Hill offer status 170214,<br>Blackpool Saul Barings Stockton Hill LOI 170215,<br>Blackpool Stockton Hills Farm Tour Final Logistics 170217,<br>Blackpool re Stockton Hill Saul Barings LOI response 170221,<br>Blackpool re delay 170225,<br>Blackpool xmit detail financial info 170227,<br>Blackpool re investment to date 170228,<br>Blackpool to fund fup 170301,<br>Blackpool re Saul Barings Deadline Stockton Hill 170303,<br>Blackpool stringout 60MM financing 170303,<br>Blackpool Cmte Mtg 170307,<br>Blackpool re possible loss Stockton Hill Farm 170307,<br>Blackpool more questions string out 170308,<br>Blackpool stringout 60MM financing 170308,<br>Blackpool recvs CFO Smith resume during IC mtg 170308,<br>Blackpool re DB personal bkgrnd 170310,<br>Blackpool re former counsel Seattle 170310,<br>Blackpool to request firm commit on 60MM 170310,<br>DD Callahan on Blackpool funding 170202,<br>DD Callahan re Blackpool Term Sheet 170202,<br>DD Callahan update Blackpool 170227 |
|---|---|

**570. RICO-15 Racketeering Violations: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution 2014-2015**

A. In June 2015, Defendants undertake a complex interstate and international funding fraud across several weeks. A $10 million financing commitment is made by email. This fraud and swindle uses BRMT and check fraud to cause fraudulent checks to be deposited in the Winnett Perico corporate account by mailing a check to the Lead Plaintiff ($9,826 as deposited) and by an agent of Defendants who uses the Lead Plaintiff's identity and live automated teller assistance at an ATM in New York City ($26,430 as deposited). Lead Plaintiff transfers $9,125

to a third party (Defendant United States' BRMT influenced mental process at work). Both deposits from two different parties are dishonored, and the business account is overdrafted by $9118. The Ramsey, NJ Bank of America branch where these accounts can be serviced is closed for the day as Lead Plaintiff receives this emailed notice of dishonor, so he calls Bank of America's customer service line. He is unable to reach live customer assistance despite several long periods on hold. This inability to reach a responsive customer service agent is a new experience which becomes quite familiar to Lead Plaintiff over the next 15 years into 2022, as a result of the Defendants' direct control of his finances and financial relationships, most likely by Defendant FBI or Defendant Secret Service.

B. Lead Plaintiff receives a check drawn on a Canadian company and addressed to him personally around this same time, deposits this check and receives an overdraft notice mailed on July 7, 2015 for $180,000 against his personal account days later.

C. These Bank of America accounts are soon closed by the bank. The Ramsey, NJ branch refuses to accept a cashier's check made out to Bank of America from Wells Fargo, forcing the Lead Plaintiff to transport about $9,200 in cash between the two bank branches in Ramsey, NJ. to pay off the overdraft and fees on the closed account. This is yet more evidence which Lead Plaintiff reverse engineers, years later in preparation of this Complaint, indicating the Defendants' efforts to cause and create circumstances of non-payment of this overdraft to the Bank, exposing the Lead Plaintiff to potential criminal liability as one instance of an on-going series of nearly perpetual entrapment attempts across his personal and professional life.

D. Simply put, this is a multi-layers entrapment attempt and a modified and more predatory reprise of his experience with "Washington Mutual Savings Bank," and his complete

inability to understand their method of balance calculation. This difference between his checking

account balance as calculated (paper checks are still quite common at this time) by him and by

the "Bank" leads to literally thousands of dollars of $25 overdraft fees being illegally drains

from his account for NSF fees over several years. This repetitive pattern of strong circumstantial

evidence leads Lead Plaintiff to believe his finances are the subject of direct government control

by Defendant United States and have been for decades. More color of law RICO and Fourth

Amendment violations by Defendant United States and its co-conspirators.

     E. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3

subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| Interline Exhibits: | RICO-12 through RICO-30, RICO-37, RICO-46, RICO-2 through RICO-7 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 1686, 1699-1700 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Tissiman first hit 140519, Wells Oliver Tissiman 419pm acct info150612, Wells Oliver Tissiman 654pm 150612, Wells Oliver Tissiman 150613, Wells Oliver Tissiman 2015 150615, Wells Oliver Tissiman 1 655am 150616, Wells Oliver Tissiman 2 713am 150616, Wells Oliver Tissiman 3 141110 to 1120am 150616, Wells Oliver Tissiman 3 BA Deposit Slip 1120am 150616, Wells Oliver Tissiman 4 439pm 150616, Wells Oliver Tissiman 5 619am 150617, Wells Oliver Tissiman 6 818am 150617, Wells Oliver Tissiman 7 1207pm act fast on 150617, Wells Oliver Tissiman 8 105pm 150617, Wells Oliver Tissiman 9 343pm 150617, Wells Oliver Tissiman 9190 150622, Wells Oliver Tissiman 150616R BA 180K NSF 150707, |

| | Wells Oliver Tissiman P BA 180K NSF 150707, Wells Oliver Tissiman Q re bank fraud 150715 |
|---|---|

## 571. RICO-16 Racketeering Violations: False Personation – NYC Forbes 200 Captive Corporate Investment Firm 2013-2017

A. Defendant Daniel Weiner, a practicing attorney in New York City, engages in mispersonation, fraudulently misrepresent himself as a Defendant Arlon employee to further the Defendants' scheme, thereby coordinating with and playing an on-going role from 2013 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts. See LP Evidentiary Exhibits pages 386, 3938.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 386, 3938 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Arlon Weiner intial hit 130202, Arlon update to WO team 130203, Arlon Declines 130207, Arlon Weiner reprise 170510, Arlon Webel DD Callahan phone call set 170530, Arlon Webel from Weiner 170530, Arlon Danl Weiner 170826, |

| Weiner Arlon 130202 |
|---|

**572. RICO-17 Racketeering Violations: Fraudulent Investor Personation - Investments and Loans 2015-2022**

A. Defendant Dean T. Smith (now considered likely FBI Sacramento field office) responds to online EquityNet.com solicitation of accredited investors and makes an initial investment of $100,000 in August 2015, then makes a series of additional investments and loans from personal funds and personally controlled trusts and entities. These funds are used to perpetuate this four year episode of involuntary servitude from August 2015 to September 2019, adding still more years to Defendants' perpetual string out and subjugation while they and other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using wire fraud and police powers operations in, without limitation, Maricopa County and other locations in Arizona, in New York, including in New York City, New Jersey, Nebraska, Arkansas, Missouri, Washington state, as well as international conspirators, and explicitly screened-in domestic and international bad actors.

B. Meanwhile, other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual interstate commerce activities, primarily by using wire fraud and police powers operations in Maricopa County, Arizona, the state of New York, and the state of New Jersey, as well as others including international co-conspirators, and explicitly screened-in bad actors.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 6 specifically, 5 through 13 |
| Complaint paragraphs: | 9A-9P, 30-37, 196, 318-330, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate from 2-0165 through 2-0187 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 44-45, 46-47, 48-49, 51-52, 58, 66, 84-87, 126;  380, 382, 430, 8472-8473, 9642, 9645, 9646-9647, 9907, 9925, 9926, 9997, 10004, 10157, 10164, 10165-10171 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Shareholder Info D Smith Address Preferred Trust 150821.pdf<br>Smith adds investment 160326,<br>Smith 5K View Wire Transfer Detail - U.S 170126,<br>Smith Active Air Freight LLC USbank wire 1000 170315,<br>Smith adds 1000 170315,<br>Smith avail escrow funds 170531,<br>Smith VP Fin intvw and connect DSmithPDX 150826,<br>Smith on expenses Vindiola 160114,<br>Smith on BA pers acct scam wire xfrs 160125,<br>Smith on Jabor wire fee scam 160125,<br>Smith on potential financing network intro 160217,<br>Smith on development costs per acre 160406,<br>Smith sales intro call in AZ 160704,<br>Smith re Oliver Term Sheet 160707,<br>Smith re fine tuning on Oliver financial proposal 160720,<br>Smith re IT traceability budget add Oliver Hyder 160731,<br>Smith re Status Report Detail on Hyder Oliver et al 160818,<br>Smith Triple Fresh Contact on Sales Prospects 160907,<br>Smith status 160908,<br>Smith Triple Fresh passes setback on sales 160915,<br>Smith re WMT prior sales agents failures 161011,<br>Smith re continuation 161012,<br>Smith re 2500 add 161022,<br>Smith re avocdos sales hook and PACA 161102,<br>Smith re Blockpool Funding 170202,<br>Smith re backup plan 170322,<br>Smith re Shefford Active Air Frt LLC 170322,<br>Smith re collateral support for loan 170323,<br>Smith re prior lost orders and funding level 170427,<br>Smith re investor lead development 170504,<br>Smith re trip 170506, |

| | Smith worried 170510, |
| | Smith escrow lender fail 170603, |
| | Smith complains 170712, |
| | Smith referred investor 170719, |
| | Smith re WMT 170811, |
| | Smith on 7500 loan and cattle rotation 170914, |
| | Smith re 7500 loan and cattle rotation 170914, |
| | Smith update WMT ND investor 171106 |
| | Smith 100K Check 1of2 150730.pdf Smith 100K Check 2oof2 150730.pdf |
| | Smith 100K Subscription Agreement SKMBT_C36415072911310 DB Signed 150729.pdf |
| | Smith Litigation Halt Proposal to resume company operations 200106.pdf |
| | Smith Litigation Sullivan Winnett - WCC Letter Respond to Evers-DSmith 190621.pdf |
| | Smith Litigation Sullivan Winnett - WCC Letter to Evers - Dean Smith III 190723.pdf |
| | Smith Litigation Winnett - WCC Letter Responding to Evers - Dean Smith II 190710.pdf |
| | Smith Note 5K 190201.pdf |
| | Smith Loan pays Cornhusker Retainer 10125 |
| | Smith $30K Loan 10157 |
| | Smith $5K loan 10164 |
| | Smith Paid Costco Trip Hotel Reservation 10165-10171 |

**573. RICO-18 Racketeering Violations: Fraudulent Investor Personation and Investments 2015-2020**

A. Defendant Doug Petersen (CEO of Worker's Credit Union, New Hampshire) responds to online EquityNet solicitation of accredited investors and invests $25,000 in 2015, plus additional funds over following years, from personal funds and retirement trusts. These funds are used to perpetuate this four year episode of involuntary servitude from August 2015 to February 2020, adding still more years to Defendants' perpetual string out and subjugation while they and other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using wire fraud and police powers

operations in, without limitation, Maricopa County and other locations in Arizona, in New York, including in New York City, New Jersey, Nebraska, Arkansas, Missouri, Washington state, as well as international conspirators, and explicitly screened-in domestic and international bad actors.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 through 13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179, column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate from 2-0165 through 2-0187 |
| LP Evidentiary Exhibits pages: | 9653, 9917, 9923 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Petersen Stock Cert Issued 150927, Petersen Status comments 160107, Petersen adds 2500 170102, Petersen re backup financing plans 170315, Petersen stock for cash infusion 170420, Petersen adds 2500 170516, Petersen re investor options 170516, Petersen stock cert 170519, Petersen FL agent on funds xfr 170913, Petersen FL agent stock cert 170914, Petersen re WMT China 171016, Petersen extends 171024, Petersen re funding next steps WMT 180301, Petersen re WMT China 180301 Petersen Midland Completed New Asset Information Document.5.10.17 170510.pdf 150831 Petersen 25K Inv Check 150831.pdf 150927 WP Stock Cert 004 Preferred Series A Doug Petersen 150927.pdf 160404 WP Stock Cert 007 Preferred Series A Doug Petersen 160404.pdf 170103 WP Stock Cert 009 Preferred Series A Doug Petersen |

| | 170103.pdf |
| | 170420 WP Stock Cert 010 Preferred Series A Doug Petersen |
| | 170420.pdf |
| | 170519 WP Stock Cert 011 Preferred Series A Doug Petersen |
| | 170519.pdf |
| | 170708 WP Stock Cert 012 Preferred Series A Doug Petersen |
| | 170708.pdf |
| | 170914 WP Stock Cert 014 Preferred Series A Doug Petersen |
| | 170914.pdf |
| | 180305 WP Stock Cert 015 Preferred Series A Doug Petersen |
| | 200225 SBI 006 Petersen Stock Cert Common 200225.pdf |

**574. RICO-19 Racketeering Violations: Fraudulent Financings – Private Placement and Public IPO 2015-2017**

A. Defendant Adamson Brothers (with Defendant Andrew Altahawi, CEO, (now considered likely FBI Newark field office) of New Jersey offers investment banking services to Winnett Perico including a $22 million private placement shown at Interline Exhibit 7, to be followed by a public offering to provide those investors with future liquidity, a classic financing process legitimately use by smaller companies when investment market conditions are favorable.

B. Winnett Perico expends $40,000 of invested funds from Dean T. Smith of California for this fraudulent private placement and for legal fees to Defendant I-Bank Attorneys of Illinois to prepare a SEC Form S-1 public stock offering registration statement for the promised public offering which is to follow for Lead Plaintiff's company Winnett Perico. The alleged interstate private placement raises  zero dollars after an extended delay, as has been previously experienced in other prior Defendant scenarios and as will be experienced by Lead Plaintiff again as "sponsored" by a small but highly prestigious old line Wall Street brokerage firm in 2017.

C. During the preparation of the SEC S-1 statement, Defendant Adamson's CEO

Altahawi delays the required financial statement audit by delaying his auditor recommendation, so Lead Plaintiff's company is unable to file audited financial statements with the S-1 public offering statement for timely SEC review. In the meantime, other actions are taken by Defendants in their captive environment of Lead Plaintiff to exhaust company and personal funds, so Lead Plaintiff is unable to pay auditors so they will provide the signed audit opinion within the required SEC filing period, which then expires as to the S-1.

        D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 7 specifically, 5-13 |
| Complaint paragraphs: | 9A-9P, 30-37, 165-170, 318-330, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0053, 2-0054, 2-0059, 2-0173 |
| LP Evidentiary Exhibits pages: | 8507-8514, 8565-8626, 9923 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | AJSH Jain re xmit audited fin stmts 151205, Altahawi re S1 PPM fees 150909, Altahawi 40K and info for S1 PPM 150910, Altahawi re PPM corrections150919, Altahawi re any progress S1 PPM 150928, Altahawi re auditor ref 150929, Altahawi PPM progress 151001, Altahawi re auditor engagement ltr 151001, Altahawi S1 PPM progress 151005, Altahawi PPM connection 151007, Altahawi re Jabor MEC fee 151028, Altahawi Tracy re 100mm debt PPM 151203, Altahawi Jain re auditor consent 160108, Altahawi re auditors 160111, Altahawi on status 160115, Altahawi on status 160126, Altahawi on status 160324, Altahawi on status 160401, Altahawi on investor search fail 161122, |

|  | Altahawi re status 161122,<br>Altahawi re Dropbox Access to Blackpool 170202,<br>Altahawi Auditors popup 171114,<br>Altahawi Adamson 150908 Capital Markets Agreement<br>Signed 150908.pdf<br>Altahawi Adamson 150908 Consultency Agreemnt,<br>Winnett Perico Signed 150908.pdf<br>Altahawi Adamson 22MM WP PPM FINAL 150920.pdf<br>Altahawi Adamson Consultancy Agreement ANNEX A.pdf<br>Ibankattny S-1 update email 161022,<br>Kunsak re Altahawi Adamson Contract 160108,<br>WO Status Report Adamson PPM 150917,<br>WO Team re PPM S-1 processes 150921 |
|---|---|

**575. RICO-20 Racketeering Violations: Fraudulent Financings, International CFIUS Pretexting 2015**

A. Lead Plaintiff's company, Winnett Perico, pays $9975 by wire transfer to an account in the United Kingdom after Defendant Sullivan consults a third party to assist in determining the veracity of a Qatar ministry document from the Ministry of Economy and Commerce required to secure a license to processed with a USD $52,000,000 investment by Jabor International Investment QSC, controlled by members of Qatar's al-Thani royal family. See LP Evidentiary Exhibits pages 754-765, 10108-10118.

C. Lead Plaintiff takes a copy of the signed agreement with him to an October, 2015 organic vegetable packing plant construction design meeting at Willmeng Construction's otherwise empty Maricopa County, AZ headquarters building and shows the signed document to Crossgrove (aka Defendant Sheriff Joseph Arpaio), who sits to Lead Plaintiff's immediate left as they face the large video conference viewing screen in the conference room. See LP Evidentiary Exhibits pages 1740, 8489-8506.

E. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3

subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 5 through 13 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 754-765, 10108-10118; 1740, 8489-8506 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Belli 14077 Belli-WO PSA Signed 150917.pdf |
| | Belli 14077 WO Mtg Agenda Salinas 150925.pdf |
| | Belli 14077_Meeting Minutes 150918.pdf |
| | Belli 14077_Project Contacts 150925.pdf |
| | Belli 14077_Winnett Organics Kick-Off Meeting Minutes 1 150925.pdf |
| | D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf |
| | D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer Hotel Tucson EWR PHX Hold for Anglade EWR 150830.pdf |
| | D Brewer US Airways EWR PHX EWR 150830.pdf |
| | Swisslog Winnette Organics-Budget Proposal 12-28-2016 v1_1 161228.pdf |
| | Jabor Funding Due Diligence151012, |
| | Jabor dilution and free trading share plan 151014, |
| | Jabor investor team info to Sullivan 151020, |
| | Jabor Due Diligence Info Sullivan 151021, |
| | Jabor Funding Agreement 151021, |
| | Jabor investor wire xfr date 151021, |
| | Jabor Funding Stock Adj Petersen 151022, |
| | Jabor Funding wire tomorrow 151026, |
| | Jabor Funding MEC fee and agreement sig page 151027, |
| | Jabor MEC fee wire xfr record TD Ameritrade 151028, |
| | Jabor Funding MEC fee wire MIA 151030, |
| | Jabor Funding Cinfirm to Belli Salinas 151105, |
| | Jabor Funding MEC License Rcvd 151105, |
| | Jabor Funding Bust 151119 |

| | DoubleK Invoice Ricky King 10132- 10133 |
|---|---|

**576. RICO-21 Racketeering Violations: Fraudulent Financing Fees Supporting Fraudulent Sales Opportunities 2018**

A. Defendant Sallyport, a commercial financing company domiciled in Texas, is paid an application fee of $2,000 for Accounts Receivable and Purchase Order financing services which arise as a result of and are interfered with by Defendants through their offering of fraudulent immediately pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce, to consume financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages. See LP Evidentiary exhibits pages 9271-9272, 9281-9283, 9312-9313, 10005.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 through 13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 9312-9313, 9271-9272, 9281-9283, 10005 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | 180814 Sallyport 1750K SCF Proposal Letter Winnett Cattle Company Inc_ (003) 180814.pdf<br>180414 Sallyport Signed SCF Proposal Letter Winnett Cattle Company Inc_ (003)<br>180616 Sallyport Signed SCF Application 180616.pdf |

**577. RICO-22 Racketeering Violations: Fraudulent Financing Fees 2018**

A. Lead Plaintiff business entities pay fees to alleged financial services providers in April, August, and October of 2018 totaling $14,950. Access to the accounting detail which identifies these potential Defendants is currently blocked and in the hands of the Defendants or other third parties, so the payees identities and the exact amounts of these payments are currently unknown. See LP Evidentiary Exhibits pages 10027 second line, 10028 second line, for the currently accessible recordation of these expenditures.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 10027 second line, 10028 second line |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Blocked by Defendant computer email access hack |

**578. RICO-23 Racketeering Violations: Fraudulent  Financial Services – Domestic Debt Broker 2018**

A. Defendant New America Lending, a Illinois domiciled LLC owned and managed by David Hughes, which engages in commercial financing  and broker/finder of private investors for commercial enterprises company is paid fees totaling $7,500 to arrange or complete financing for the Lead Plaintiff's company, to be supplied by Defendant using its own internally

controlled loan and equity investment funds, and those of third parties which are to be raised by

Defendant, to finance general working capital, specific assets, and/or sales opportunities of the

Lead Plaintiff's commercial entities. See LP Evidentiary exhibits pages 9314-9318, 9328-9337,

9394-9401, 9653, 10011, 10021. Relevant emails are currently blocked as this Complaint is

being prepared.

B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3

subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to

this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 5-13 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 9314-9318, 9328-9337, 9394-9401, 9653, 10011, 10021 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | 150130 Multifunding Sullivan re referral to David Hughes 150130 Bates.pdf<br>180823 NAL Hughes $2point5MM Initial Term Sheet debenture 180823.pdf<br>180823 NAL Hughes $2K Wire Details 180823.pdf<br>180905 NAL Hughes Consulting Agreement Winnerr 180905.pdf<br>181012 NAL Hughes 350K min Winnett Conditional Term Sheet (002) 181012.pdf<br>181012 NAL Hughes $5000 Compl Wire 181012.pdf |

**579. RICO-24 Racketeering Violations: Fraudulent Financial Services -International Debt Broker 2015-2016**

A. Winnett Perico expends $4,950 with PPM Experts in Europe for the preparation of a

Private Placement Memorandum required for fraudulent private placement services by

Defendant Insight Networks, legally named above, which thereupon engages in pretending to work to place $100 million of debt with investors and submits false and misleading progress reports by email and phone. Exactly zero dollars are raised in this fraudulent scheme, another in the long-running series of investor and investment finder/banker agreements frauds failing to provide honest services. In the meantime, other actions are taken by Defendants in their captive environment of Lead Plaintiff to exhaust personal and business entity funds.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 8563-8564, 8627-8714, 9923 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Insight Keiser Intl Debt placement 100mm 151028, Insight Ovcar Intl Debt placement 100mm 151029, Insight Keiser Terms for Intl Debt placement 100mm 151104, Insight Verbal Commit by WO 151104, Insight PPM Winnett Perico 151201, Insight status inquiry 160112, Insight status report 160113, Insight status report 160122, Insight re lack of progress 160418, PPM Expert Invoice 145.11-2015 Winnett Perico, Inc 151117 PPM Expert 100MM Debt Offer Document Winnett Perico 160105.pdf PPM Expert Questionnaire 151123.pdf |

**580. RICO-25 Racketeering Violations: Fraudulent Financial Services – Mid-Market Investment Bank 2016-2017**

A. Defendant Madison Street Capital's various officers and employees, while Defendant police powers agents, officers, and/or confidential informants, and as a part of this on-going conspiracy and pattern of racketeering acts, represent themselves and their firm as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business entities, thereby coordinating with and playing an on-going role during 2015 through 2018 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources ($1,950 per a signed agreement on April 5, 2018) of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, and swindles.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 5 through 13 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; |
| LP Evidentiary Exhibits pages: | 9270, 9722 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Madison St Capital 160328, Madison St outreach 170726, Madison St Ibanker Madison St Capital initial hit 170727 |

**581. RICO-26 Racketeering Violations: Fraudulent Financial Services - International Financial Services Institution 2016-2017**

A. Defendant Bank of America Bestwick Cardone Group Senior Vice President Robert Bestwick and Vice President Andrew Cardone (now considered FBI Manhattan, New York) hold a Natural Foods Symposium in New York City in May2016, inviting Lead Plaintiff for the purpose of screening, acquiring intelligence, and introducing Lead Plaintiff to Dominick and Dickerman investment banker Michael Callahan, thereby aiding and abetting the fraudulent scheme and swindle, as summarized in subcount RICO-27.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 5-13 |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0178, 2-0179 |
| LP Evidentiary Exhibits pages: | 8805-8812, 9094 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | BA Bestwick Cardone Axial Nat Food Symposium 160415, BA Bestwick Cardone on my BA history160502, BA Bestwick Cardone Fake Food Symposium 160531, BA Bestwick Cardone on RAM CS sales contract 160608, BA Bestwick Cardone referes Callahan DD 160707, BA Bestwick Cardone re intro at DD 160712, BA Bestwick Cardone progress report DD 160808, BA Bestwick Cardone lunch pre DD mtg 160927, BA Bestwick Cardone sked Kiely call 161024, BA Bestwick Cardone NYC Keily trust ref call161102, BA Bestwick Cardone on Kroger uptake agreed 161110, BA Bestwick Cardone update 170227, BA Bestwick Cardone on Balckpool fail new search DD170323, |

|  | BA Bestwick Cardone on Blackpool Shefford 170324, BA Bestwick Cardone Fake Food Symposium 170516, BA Bestwick Cardone Fake Food Symposium 170609, BA Bestwick Cardone alt ibanker intro 171130, BA Bestwick Cardone re Skaar alt ibankers intro offer 171130 |
|---|---|

**582. RICO-27 Racketeering Violations: Fraudulent Financial Services – Wall Street Investment Bank 2015-2021**

A. Defendants Michael Callahan and Mark Gross, while acting as Defendant agents, officers, or confidential informants, (now considered likely CIA, FBI, and/or NYPD) as part of this on-going conspiracy and pattern of racketeering acts, represents themselves and their firm, Defendant Dominick and Dickerman, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business entities, thereby coordinating with and playing an on-going role during 2016 and 2017 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, and swindles.

B. Other Defendant bad faith actors and co-conspirators in this fraudulent scheme and swindle include Defendants legally named above and commonly known as Joseph Arpaio, both as Maricopa County Sheriff and individually after leaving office; Double K Farming and Ricky King, as an associate of Arpaio; Walmart; Kroger; Willmeng Construction; RAM Consulting; Liquid Capital of Arizona; Sean Lyle and David Hinson, together and separately, and their related entities; and fake employees known to Lead Plaintiff as Bruce Blitch, Michael Castro,

Rafael Gomez, Peter LeBlond, Jon Nickless, Paul Smith, Mark Vindiola, and Jason Waseman.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
| --- | --- |
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0178, 2-0179 |
| LP Evidentiary Exhibits pages: | 622-623, 632-635, 639, 642-643, 651-652, 656-658, 659-661, 8770-8787, 8788-8804, 8805-8812, 9193, 9207-9214, 9277, 9280 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | AltaVista Investment Commitment- Winnett Perico, Inc.161010, <br> AltaVists faked fin 161017, <br> AltaVista fup 161018, <br> AltaVista key personnel intro 161018, <br> AltaVista Sullivan re bad actor 161018, <br> AltaVista WP due diligence on AV 161018, <br> AltaVista fake followon funding anncmnt 161025, <br> AltaVista update 161026, <br> Belli 14077 Belli-WO PSA Signed 150917.pdf <br> Belli 14077 WO Mtg Agenda Salinas 150925.pdf <br> Belli 14077_Meeting Minutes 150918.pdf <br> Belli 14077_Project Contacts 150925.pdf <br> Belli 14077_Winnett Organics Kick-Off Meeting Minutes 1 150925.pdf <br> Centerboard Grp as Investor 170517, <br> Centerboard Grp as Finder DD 170526, <br> Centerboard PE intro 170526, <br> D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf <br> D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf <br> D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf <br> D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf <br> D Brewer Hotel Tucson EWR PHX Hold for Anglade |

EWR 150830.pdf
D Brewer US Airways EWR PHX EWR 150830.pdf
DD Engagement Letter Signed 160713.pdf
DD Signed Terminated Engagement Agreement Winnett-
Dominick_5_31_17 171116.pdf
DD Skaar JBS Letter 170522.pdf
DD Skaar Teaser 170905.pdf
DD Swisslog Winnette Organics- JAN Mtg 1-24-2017 v1
170124.pdf
DD Callahan on Holistic Impact Partners 140417,
DD on Oliver Term Sheet 160711,
DD Callahan re engement ltr 160714,
DD Callahan re cancelled Oliver mtg 160812,
DD on Oliver Hyder resurrection 160824,
DD re Revolution intro 160825,
DD for Revolution WinnettOrganics Presentation 160910,
DD Callahan 160914,
DD on Revolution VC presentation 160919,
DD on Nielson organic foods outlook 160920,
DD on DelMorgan intro 160925,
DD mtg fup 160929,
DD Sep Discussion Document 160929,
DD re work Wakefern connection 160930,
DD Commitment Cmte pkg to Callahan 161006,
DD re Kingman acquisition 161007,
DD Gross on other fin options 161014,
DD re Alta Vista involvement 161014,
DD Callahan re AltaVista 401pm 161017,
DD notes on AltaVista offer 161017,
DD Callahan 2 re AltaVista 161018,
DD Callahan re AltaVista 1107am 161018,
DD Callahan re AltaVista739pm 161018,
DD Gross on Alta Vista2 161018,
DD Gross re AltaVista 161018,
DD on Alta Vista play out 161018,
DD on Smith CFO Hyder Stall 161105,
DD Hinson on production volumes 161106,
DD Callahan on proposed WMT revision 161114,
DD Callahan re investor interest 161115,
DD on WMT Swisslog 161230,
DD re 5 yr plan to WMT 161231,
DD Callahan re 170124 Swisslog mtg 170109,
DD Callahan re Swisslog mtg 170109,
DD Callahan re lending DD name to WMT presentation
170126,

DD Callahan re Swisslog mtg fup 170126,
DD Callahan on Blackpool funding 170202,
DD Callahan re Blackpool Term Sheet 170202,
DD Callahan update Blackpool 170227,
DD Callahan continue working 170328,
DD update to outside bridge potential investor 170410,
DD revised Bus Plan adds cattle 170417,
DD re Rabo ID Skaar 170503,
DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,
DD Transom re Skaar 170512,
DD on Skaar fert option 170513,
DD Skaar Barns Detail Site Opt 8 170523,
DD Fleming on DD Finl Model 170526,
DD Callahan re PE dilutive 170531,
DD on Skaar Organic Fertilizer Mkt Size 170531,
DD on Skaar Organic Fertilizer Plant Ops 170531,
DD on Skaar Organic Fertilizer Plant Concept Plan
170601,
DD Skaar Royal Chem CAS numbers Contract Fert Pkg
170604,
DD Skaar Site Plan 170605,
DD Skaar Site Plan Ammonia Recovery Manure 170605,
DD Skaar Organic Fertilizer Effectiveness 170607,
DD Skaar Organic Fertilizer Pricing 170607,
DD Skaar PE Investor Bid email 170607,
DD Skaar PE Investor Bid form 170607,
DD re Centerboard Housing Solution WO 170608,
DD WCC teaser draft 170608,
DD Skaar Organic Fertilizer Production Cost 170609,
DD Callahan re funding sked 170612,
DD Skaar Organic Fertilizer Advantages 170614,
DD WCC Pitch Deck Skaar etal 170614,
DD Callahan on DeSai 170616,
DD Skaar Biiding Process to Sanders 170616,
DD Callahan on Axial lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,
DD NYC Van Brakel 170622,
DD Callahan re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan re Skaar visit sked 170726,
DD on HIG Capital Miami 170728,
DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan connects to BDO SLC 170808,
DD Skaar Callahan Update 170809,
DD LaBelle Teton County 240 Tour Pass 170810,
DD Skaar Cost per pound gain 170811,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan re no progress 170906,
DD Skaar Kritser 170907,
DD Skaar Kritser to WO team 170907,
DD Skaar Sanders tours Frank Maughan BDO 170913,
DD Skaar Sanders on Kritser alt structure 170915,
DD Skaar Kritser re adjusted LOI 170919,
DD Callahan on failure to date and breach 170920,
DD Skaar Kritser 170921,
DD Skaar Sander re Kritser 170921,
DD Skaar Sanders on revised structure 170929,
DD Skaar Kritser 171002,
DD Skaar Kritser string out 171004,
DD Skaar Sanders Update 171013,
DD Skaar Sanders re Kritser Friona Ind ExCEO call 171022,
DD Skaar WMT China ND Rep Sr Legislator Banco Advisors 171024,
DD Skaar Kritser dragout decline to WO team 171110,
DD Skaar Revised Buyout 171112,
DD Termination Notice 171114,
DD Callahan Disappears 171115,
DD Callahan acks Termiantion 171117,
DD Skaar Sanders revised LOI 171128,
DD Skaar WMT China procurement 180817,
DoubleK Invoice Ricky King 10132- 10133
Gross re Korea beef pgm finance 210115,
Gross re Big Sandy finance 210506,
Gross re grainfed organic taste difference 210513,
Gross 210514,
Gross re Big Sandy rewrite Bus plan 210517,
Gross re mkt research to demo our case 210519,
Gross on organic mkt update 210522,

Gross re organic beef proof of concept 210603,
Gross re WMT Redfield US Grocery SVP 210618,
Gross re Lake County tax advantages opptny zone 210630,
Hartman re Gross organic mkt research inquiry 210520,
Hartman re refs and experience 210525,
Hartman Group re Organic Mktg Study for Gross Mark 210603,
M Gross re Korea contract finanaicn g et al 210119,
Swisslog automation Jennings NYC in house 161101,
Swisslog automation Jennings NYC in house 161107,
Swisslog automation Jennings NYC in house 161205,
Swisslog to Waseman re automation 161228,
Swisslog Jennings re DD mtg and progress 170113,
Swisslog re NYC meeting notes and fup 170126,
Swisslog Deck DD mtg to WO team members 170128,
Swisslog Winnette Organics-Budget Proposal 12-28-2016 v1_1 161228.pdf
WMT initial hit on cold email 161002,
WMT fup Baldwin 161010,
WMT McCormick ref from Balwin 161011,
WMT sales news to WO team 161011,
WMT McCormick Webex 161014,
WMT McCormick call tomorrow email 161017,
WMT McCormick call fup 161018,
WMT McCormick call fup production volumes 161020,
WMT McCormick call 161109,
WMT McCormick re DD discussion 161114,
WMT McCormick resked and participant list 161114,
WMT McCormick call fup 161116,
WMT McCormick call fup 161118,
WMT McCormick re investors ibankers 161121,
WMT McCormick on contract outline 170108,
WMT McCormick Bentonville Mtg Attendees 170111,
WMT McCormick 170224 Bentonville mtg Present Draft 170123,
WMT McCormick email Bentonville Mtg Presentation 170123,
WMT McCormick Bentonville Mtg Attendees 170216,
WMT McCormick Bentonville Mtg Invite 170216,
WMT McCormick Bentonville Mtg Location 170216,
WMT McCormick Bentonville mtg fup 170222,
WMT McCormick re post Bentonville Mtg Rev 170222,
WMT McCormick nonreply fup 170328,
WMT Baldwin re decision next week 170403,
WMT McCormick re mktg plans 170403,

WMT McCormick on price drop 170412,
WMT McCormick buyer contacts 170425,
WMT China Beef ref from McCormick 170703,
WMT connects China on beef 170703,
WMT China Zheng initial contact 170704,
WMT China Zheng merch support 170707,
WMT China Zheng ROM pricing 170708,
WMT China beef Higaki intro 170718,
WMT China beef Higaki pricing 170811,
WMT China Higaki price quote 170811,
WMT China Hgiaki Quotes Specs 170821,
WMT China Higaki adding WO factory id 170821,
WMT China Higaki request factory number add 170821,
WMT China Higaki quote fup 170822,
WMT China WO Status Report WMT China Beef 680 ton order 170921,
WMT Chna Higaki re WMT contract 170924,
WMT China Higaki re process steps 170926,
WMT China Preferred Freezer initial hit 170926,
WMT China Americold initial hit 170929,
WMT China Cargill contact punt 171002,
WMT China Higaki Executed WMT Contract 171010,
WMT China Update WO Team 171012,
WMT China Higaki China visit and update 171023,
WMT China Higaki re contract signature rqmt 171023,
WMT China Higaki re JBS Specs 171026,
WMT China Higaki on revised order pricing 171208,
WMT McCormick on China status 171220,
WMT China re labeling 180110,
WMT China xmit manually signed contract copies 180112,
WMT China order processing timeline 180115,
WMT China Higaki re sked 180116,
WMT China order timing Apr 180116,
WMT China Higaki re factory flow charts trial shipment 180122,
WMT China Higaki orig signed contracts sent 180123,
WMT China CA OWB Packers delay 180131,
WMT China Higaki intro of SCS process 180201,
WMT China Higaki re OWB approval 180201,
WMT China Higaki SCS 180201,
WMT China Hgiaki re Cargill Tyson on China 180202,
WMT China Higki re OWB SCS audit 180202,
WMT China OWB stringout 180206,
WMT China OWB stringout 180207,
WMT China OWB stringout 180214,

WMT China OWB stall 180223,
WMT China OWB stall continues 180223,
WMT China SamsClub China dragin 180227,
WMT China Higaki email sig page xmit 180228,
WMT China LiqCap AZ update 180228,
WMT China Petersen re signed contract evidence 180301,
WMT China re post OWB to JFO 180301,
WMT China JFO inquiry 180302,
WMT China re retail link 180302,
WMT China status on China 180302,
WMT China re local China ofcs 210130,
WMT China re China ofc and contact history 210202,
WMT China Liao re China ofc details 210204,
WMT China on packaged cuts 210222,
WMT China docs needed 210312,
WMT China Liao re new ofcs in China 210407,
WMT China re beef purchase embargo in China 210415,
WMT China SAmerica Quote 210422,
WMT China rejects BR Tradimpex case ready pricing 210426,
WMT China intro to RMC China rep Jason 210428,
WMT re US organic beef pgm 210605,
WMT Redfield on domestic organic beef 210607,
WMT Lehr Organic Beef Intro 210610,
WMT re organic beef partner pgm 210615,
WMT Lehr video mtg 210616,
WMT Lehr re comp organic price premiums on ther products 210617,
WMT Redfield cc Lehr video mtg 210617,
WMT Lehr alt sales ramp 210618,
WMT Lehr Baskin video mtg to come 210702,
WMT Hutchins mtg set 210713,
WMT Baskin Lehr call fup on pricing 210729,
WMT Baskin Lehr video call 210729,
WMT Partnering Zoom Call 210729,
WMT Baskin on pricing 210810,
WMT Baskin status inquiry 210816,
WMT Baskin pass 210818,
WMT Organic Beef pass 210818,
WMT Organic Beef pgm not established 210823,
WMT Baskin re pass pricing other issues 210824,
WO Plant Kickoff Salinas Mtg 150916,
WO Plant Willmeng ref from Sayre 150917,
WO Status Report Adamson PPM 150917,
WO Team re PPM S-1 processes 150921,

WO Plant Kickoff Salinas Mtg 150922,
WO Plant Willmeng contract draft 151012,
WO Plant Willmeng kickoff meet Oct 27 151019,
WO Plant Willmeng cost workup status 151021,
WO Status Report Jabor and Sales 151022,
WO Hyder Farm Castro on Oliver 151028,
WO Weekly Status Report reaction Petersen 151029,
WO Hyder Farm Terminal Estimate to Oliver 151030,
WO Sales Fresh Express Smith contact 151104,
WO Grt Western Bk local takeover visit 151117,
WO Team on Jabor Funded on Time 151117,
WO Team re Jabor snag  151118,
WO Team on financings 151120,
WP Paypal Acct Detail Sep-Dec 151231,
WO Team on 179mm Financings 160101,
WO Status Financings 160121,
WO Financings deal status to team 160208,
WO Status Kingman Startup Financings 160209,
WO Status Report financings 160421,
WO Status re Oliver Term Sheet Verbal 160719,
WO Status Final Oliver Hyder present sked 160804,
WO Status Hyder Oliver rework 160818,
WO Status DD Fin Sales 160929,
WO Status Report on Hyder Oliver new pitch status
161006,
WO on WMT progress 161018,
WO Status financings 161103,
WO Status Financings WMT Kroger 161115,
WO Status Kroger projection incl 161226,
WP Great Western 2016 DDA Account 161231,
WO Org Chart 170111,
WO Blitch re ofc space tour 170118,
WO Status Report Reed Wood join 170119,
WO Team re Gerlach soi tests 170201,
WO Blitch re Stockton Hill Famr tour w Blackpool
170203,
WO Smith CFO re Revolution VC pass 170203,
WO Status Rpt Stockton Hill Update 170209,
WO Status Rpt incl WMT status 170223,
WO Team re Blackppol to fund 170301,
WO Team re Blackpool no reply stringout 170309,
WO Team re Blackpool deadline miss 170310,
WO Status Report DD retainer need 170320,
WO also Cardone on Status WMT others 170403,
WO Team WMT dead Alb on track others 170404,

|  | WO Status Skaar 170504,<br>WP Executive Summary Bus Plan 170507,<br>WO Status Report Skaar Investor Interest 170515,<br>WO Team Smith CFO Termination Notice 170612,<br>WO Team Smith CFO Termination 170613,<br>WO Team on DD Funding Skaar Acq Date 170615,<br>WO Status Report Skaar nothing from Alberts 170706,<br>WO Status Report re DD potential investors 170713,<br>WO Status Report Skaar deal progress LOI 170727 |
|---|---|

**583. RICO-28 Racketeering Violations: Fraudulent Financings and Representation, Online Referral Services 2015-2018**

A. Defendant Axial.com holds an annual investor conference in New York City in Fall 2015, inviting Lead Plaintiff as an interested party. Defendants use this conference, open to the public, to arrange meetings with Madison Street Capital, Perella Wasserstein Partners, and Young America Capital, among others. Most of these meetings are carefully arranged for the purpose of screening, acquiring intelligence, and introducing Lead Plaintiff to other Defendant police powers officers, agents, and confidential informants to further Defendants' fraudulent scheme and swindle by portraying themselves as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2015 through 2018 in the continuation of their decades long complex sales, production, operations, financing and litigation scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. Defendants also later reintroduce themselves using Axial email addresses and phone calls to refer Lead Plaintiff to other similar fraudulent contacts and to cut out any contact between Lead Plaintiff and any serious investor interest from the real business and investor community. This scheme requires and consumes the time and financial resources of Lead

Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. RICO-1 subparagraph D is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | Axial Investor Interest 150904.pdf<br>Axial to Altahawi connect 150910.pdf<br>Axial NYC re Investor Referrals 171108.pdf<br>Axial re Paine Schwartz 171113.pdf<br>Axial NYC Fractal Intro 171116.pdf<br>Axial NYC Fractal stall 171129.pdf<br>Axial NYC Fractal stall 171204.pdf<br>Axial NYC Fractal drag out 171206.pdf<br>Axial fake investor leads 180302.pdf |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | AGI 1 NYC Investor hit Axial 170515,<br>AGI 1 Lee Mtg Set 170517,<br>Axial Investor Interest 150904,<br>Axial to Altahawi connect 150910,<br>Axial NYC re Investor Referrals 171108,<br>Axial re Paine Schwartz 171113,<br>Axial NYC Fractal Intro 171116,<br>Axial NYC Fractal stall 171129,<br>Axial NYC Fractal stall 171204,<br>Axial NYC Fractal drag out 171206,<br>Axial fake investor leads 180302,<br>Fractal re initial contact 171117,<br>Fractal progress 171206,<br>Fractal on status and nterest 171221,<br>Fractal intro Black Lake Chad Scripps 180117, |

| | NYC Investor Axial Conf Intro PWP Growth Schectman 151028, |
| | NYC Investor from Axial Formanek 151027 |

**584. RICO-29 Racketeering Violations: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses 1986 to 2022**

A. Fraudulent commercial financing opportunities require the Lead Plaintiff and his related business entities to expend time and financial resources to locate and attempt to secure these alleged but fraudulent financings, and occur in conjunction with both fraudulent sales opportunities and fraudulent property acquisitions arranged by Defendants in conspiracy with other Defendants, including, among others, individual persons and marital communities as owners; various forms of commercial enterprises, some as direct co-conspirators and others who are being spoofed by Defendants.

B. Defendants make common use of interstate wire fraud, mail fraud, in-person visits, entertainment, travel, and other means requiring expense or efforts by the Lead Plaintiff on his own behalf and for his business entities. These individuals and entities include, without limitation, all named Defendants in various schemes as experienced by Lead Plaintiff and these various business entities, dating from 1986 to 2022. These Defendants include domestic and international entities and individuals legally named above in this Complaint when known, and named as commonly known herein, and/or spoofed as the authentic entity by Defendants with police powers, their officers, agents and confidential informants and other bad actors carefully screened-in by these Defendants, including many entities for which there is no available pre-discovery evidence that disbursements have been made. These individuals and entities include, without limitation, the following 220 plus domestic and international entities and individuals:

Bank of America BA Bestwick Cardone; Dominick and Dickerman; Alta Vista; EarlyBird Capital; Chardan; NGEN; US Bank; Rabo Bank; JP Morgan Chase; New America Lending; Intrepid Capital; Jabor; NHIG; JCXL; Alfardan; RJ Lumba; William Hoyle; Worldwide Financial; Stratos Commercial, Tessina Painter; Warren John, Borgenson; Kabah family; Liberty West Regional Center; Vision Partners; Trinity; Blumberg; Whitestone, Lex Gubsky; Ken Shepherd; Multifunding; Utica Leaseco; Reich Bros; Viking Equipment Finance, Jim Buckingham; RAM Consulting, Richard A Miller; DelMorgan, Robert Finkelstein; Moise Anglade; Fiera Comox; Barings; Fractal Advisors; Black Lake Capital; Summit Partners; Summit Investment; NBH Banks; Great Western Bank; Currency Capital; Dynamic Capital; Al Mal; Kennedy Financial; Commercial Finance Partners; Capital Source Group; Ag America; World Business Lenders; Axos Bank; Patriot Funding/David Antonelli; Capital Markets Expert; Johnston-Todd; Business Capital; SouthStar; AgAmerica; Capstone Trading; AAY Panama; Credit Lyonnaise Laing/Michael Kurtanjek; Coco Capital; Sole Source Capital; Mayfield VC; Legendary VC; VII Capital; Vendome Bond; Songbird UK; Liquid Capital; Lantern Capital Advisors; Key and Company, David Key; JCXL; Jack Burstein; Zayid Mohammed; Isaac Capital; Interstate Capital; Insight Network; Holistic Impact Partners; Harvest Returns; Fisher Enterprises; Equilibrium Capital; Centerboard Group; Farm Enterprises, Margie Costamanga; Brereton Hamilton; Elkehereiji; HIG Capital; Riverside; Armonia, Jasper Van Brakel; Manna Tree; Crystal Lands Resources; Crestnorth Capital; Conterra; Correlation VC; Ethan Blum; Charles Blair; Big Path Capital; Banco Advisors; Auctus Capital; Armgold Harmony; Arlon; Alam Junaid; Hurwitz Financial; Silverwood Partners; Firelake Capital; Fountain Partners; Ridgestone; Chess Capital Partners; Endeavor; Republic Business Credit; Loan Whisperer;

LeaseQ; Falcon Investments; CFA Omaha; Hawthorne Equity Partners; LNK Partners;

MSTCPT; KLC Financial; Land O Lakes; BBVA; Ranch Creek; Hillstar Capital; AGR Partners;

High Street Capital; C6 Capital; MetLife; Ag Lending Group; BMO; Arizona Bank and Trust;

Bank of Tucson; Wells Fargo; Liquid Capital Express; FSW; Paramount Payment; Grand

Canyon RC (EB-5); Prudential; United Financial Investment Group; Broadmark Capital; Zions

Bank; Green Card Fund; TTM Capital; London Manhattan; Crucible Capital; Roth Capital

Partners; Trianz; Citi Financial Group; Clarke Advisors; Noble Business Lending; Funding

Merchant Source; Crowd Fooding; AgFunder; Prosperity Funding; Business Backer; YA

Capital; Altima Partners; Jackson Consulting Group; IPO Capital UK; Premier Financial

Services; Commerce Bank Arizona; Merchant Finance; GUD Capital; Lynwood Capital;

Headwaters Merchant Bank; Pinnacle Ventures; LGV Partners; New Star Financial; SJF

Ventures; Farwest Capital; Resource Land Holdings; VN Partners; Cobank; Huron Capital; BLC

Lending; Brickell Financial; Siena Lending; FCP Capital; DB Capital Solutions; First Capital

Business Finance; Midland American Capital; Black Coral Capital; Olin Capital; US Capital

Partners; SuperG Funding; Modern Capital Solutions; Brightway Financial Group; Sherbrooke

Capital; WGIM Global; FS Equity; Point Financial; Clarion Partners; Biltmore Bank; Wall

Street Strategic Capital; Nations Equipment Finance; MARV Capital; Fire Lake Capital; Perella

Wasserstein Partners; Lycom Financial Group; Farwest Capital; Comerica; Mainstreet Capital;

TDP Fund; Farmland LP; Blue Leopard LLC; SCS Dynamics; Don L Wood; Open Prairie;

Chase Winters; New Seed Advisors; Bahraini Investment Group; Biz2Credit; American United

Capital; Vertex Financial; Phoenix Global Finance; Brahma Lending; West Monroe Partners;

Lucid Solutions; Popular Commercial; ITBMS Global; Bibby Financial; Bradley Gibson;

Crossroads Financial; MB Financial; Blackpool (various entities); Shefford (various entities);

Priority Funding; and various unknown Canadian broker and investment banker entities,

typically doing business related directly or tangentially to the Vancouver Stock Exchange and

with offices in the Vancouver, British Columbia area.

     C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by

reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | 9A-9P, 30-37, 318-330, 338, 373, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179, column entitled Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate 2-0165 through 2-0179 |
| LP Evidentiary Exhibits pages: | See Compendium at LP Evidentiary Exhibits pages 934-1075 for selected relevant emails and documents related to each entity and individuals named in this subcount. Full documentation to be provided in discovery. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | AAY Investments Panama Info Form PO Fin $3MM SBI AAY CIS – 2020 Completed 200306.pdf<br>AgAmerica Reiten Big Sandy loan re pers gty issues 210304,<br>AgAmerica attempt Miles Reiten Big Sandy pers gty 210322,<br>AgAmerica Miles Reiten 210415,<br>AgAmerica Reiten sked call 210707,<br>AgAmerica Carson re WMT organic sales progress 210716,<br>WCC AgAmerica Land Loan Application FL 3MM 190730.pdf<br>Alam Junaid ibanker too busy AZ 160419,<br>Alfardan Carr ref investor Prince Omar Alfardan160404,<br>Alfardan loan proposal accepted 160512,<br>Alfardan decline due to advance fee rqmt 160627,<br>Al Mal Capital KYC 181025.pdf |

Al Mal Capital signature page on This PC drive 181120.pdf
AltaVista Investment Commitment- Winnett Perico,
Inc.161010,
AltaVists faked fin 161017,
AltaVista fup 161018,
AltaVista key personnel intro 161018,
AltaVista Sullivan re bad actor 161018,
AltaVista WP due diligence on AV 161018,
AltaVista fake followon funding anncmnt 161025,
AltaVista update 161026,
Anglade FL investor 150811,
Anglade FL investor update PHX trip date 150817,
Anglade FL investor cancel PHX trip date 150910,
Armgold Harmony Vusimile on seed funds investor
141211,
Armgold Harmony Vusimile funds notice email 141215,
Armgold Harmony Vusimile funds notice recvd 141215,
Armgold Harmony Vusimile funds notice 141216,
Armgold Harmony Vusimile delay discussion 141218,
Armgold investor interest 160412,
Armgold affirms investor interest 160418,
Armonia Van Brakel re poss SLC mtg 170807,
Armonia Van Brakel 170810,
Armonia NYC Van Brakel on grass fed other options
170822,
Armonia NYC vanBrakel MacGill mtg 170926,
Armonia Mtg Delay 171016,
Armonia NYC mtg 171107 invite 171021,
Armonia Van Brakel on Rabo referral 171204,
Armonia Van Brakel Rabo referral 171204,
Antonelli refers World Bus Lenders 2point5MM WCC
WBL Application 190508.pdf
Auctus on Skaar DD 170822,
Auctus Confidentiality Agreement 10119
Auctus Subpoena re Cornhusker Poaching Illegal Search
Pretext 10126-10131
AZ Foreign Corp Signed 150825 WINNETT PERICO,
INC. AZ QUALIFICATION 150825.pdf
BA Bestwick Cardone BAML-Natural Food Symposium
(2017) 170524.pdf
Banco Advisors ref from Gottesman 171011,
Banco Advisors Nov 1 mtg w Nicholas 171021,
Banco Advisors 171101 mtg Blitch re pitch 171024,
Banco Advisors 171101 busted mtg fup Nickless 171102,
Banco Advisors Blitch Vindiola Waseman invite 171114,

(see also LP Evidentiary Exhibits page 1074V, entries 11/1/2017)
Banco Advisors re other intl investors 171130,
Banco Advisors China drag out 171206,
Bankers Capital ref to Riverside Marcks 210624,
Barings WinnettOrganics Barings Presentation 170107.pdf
Bibby 1MM AR Line WCC Signed Proposal for Winnett Cattle Company, Inc. 180320.pdf
Bibby WCC Signed Proposal for Winnett Cattle Company, Inc. 180320.pdf
Big Path ping MA D Patrick Bain 170823,
Big Sandy Ranch sub debt RFQ 210314,
Bk Tucson Lender re S-1 and banker due diligence 151025,
Bk Tucson Lender re Brewer bio red flag issues for lenders 151030,
Bk Tucson Lender re Brewer bio red flag issues for lenders 151102,
Bk Tucson Lender re S-1 and banker due diligence 151103,
Black Lake Capital ref Fractal perhaps 180216,
Black Lake Capital re capital rqmts 180227,
Blackpool 20MM WinnettOrganics Term Sheet Executed 170202.pdf
Blackpool Private Placement Offering Doc Winnett 150618.pdf
Blackpool Shefford Consulting Agreement $1MM WinnettOrganics Fully Executed 161129.pdf
Blackpool Bridge Loans Brochure 10138-10156
Blair bogus lender 170418,
Blair 17mm fin proposal 170419,
Blair bogus lender 170419,
Blair bogus lender 170420,
Blum re mtg to discuss finders fee arrangement 130327,
Blum Signed Agreement Blum 130620,
Brickell Fin FL referred to Adamson 150910,
Broadmark WA 150717,
Broadmark re Lake County fin 210704,
Broussard re Lake County fin 210710,
Caasmailaffairs Morocco Investment for Williams R 140918,
Capital Markets Expert WCC Submission Policy w. agent CME 190729.pdf
Capital Source Group App 190325.pdf
Capital Source S Gordon 210316,
Capital Source S Gordon 211015,

Capstone Trading re fin 210831,
Capstone Trading re fin 210901,
Capstone App 200110.pdf
Capstone Term Sheet 11MM Trade Finance Line
200401.pdf
Case Champoin rep re funding options 170328,
Case intro Dickens PVG Global re financing 170328,
Centerboard Grp as Investor 170517,
Centerboard Grp as Finder DD 170526,
Centerboard PE intro 170526,
Cerebro Capital on Big Sandy Ranch 210317,
Chardan SPAC overview (June 2017) - $50 MM
(Sponsors) 160601.pdf
Chardan SPAC overview (June 2017) - $50 MM
170601.pdf
Blum Signed Agreement Blum 130620.pdf
Chase phone intro appt 210402,
Chinese money laundering scam email 161219,
Chinese AR money laundering scam attempt 220218,
Coco Capital 2 LA NYC re sub debt 151002,
Coco Capital LA NYC re sub debt 151002,
Coco Capital on loan availability 161015,
Coco Capital on status 161130,
Coco Capital on status incl WMT 170103,
Coco Capital connects others 170104,
Coco Capital Strasser re connect results pass 170104,
Collins ref by Sullivan on Bridge Loan 150629,
Commercial Finance Partners App 190319.pdf
Commercial Finance Partners App Acct Rec Suppl
190319.pdf
Conterra IA brdige loan term sheet Skaar 170509,
Correlation VC are followon investors 170328,
Crestnorth Capital disbursement instruction 140327,
Crossroads PO Fin 750K Winnett Cattle Company - Signed
Proposal 180331.pdf
Crystal Lands Resources 150924,
Crystal Reosurces Xfr 150928,
Crystal Resources Xfr Fail 150928,
Crystal Resources XFR Fail to Smith 150928,
Crystal Resources Fee Scam 150929,
WCC 420K App Currency Signed Verification Form -
Currency 2016 180323.pdf
Dynamic Capital App Signed Winnett Dynamic App
180620.pdf
DD re Rabo ID Skaar 170503,

DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,
DD Transom re Skaar 170512,
DD Fleming on DD Finl Model 170526,
DD Callahan re PE dilutive 170531,
DD Skaar Site Plan 170605,
DD Skaar PE Investor Bid email 170607,
DD Skaar PE Investor Bid form 170607,
DD re Centerboard Housing Solution WO 170608,
DD WCC teaser draft 170608,
DD Skaar Organic Fertilizer Production Cost 170609,
DD Callahan re funding sked 170612,
DD Skaar Organic Fertilizer Advantages 170614,
DD WCC Pitch Deck Skaar etal 170614,
DD Callahan on DeSai 170616,
DD Skaar Biiding Process to Sanders 170616,
DD Callahan on Axial lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,
DD NYC Van Brakel 170622,
DD Callahan re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan re Skaaar visit sked 170726,
DD on HIG Capital Miami 170728,
DD Skaar site visit Sander 170728,
DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan connects to BDO SLC 170808,
DD LaBelle Teton County 240 Tour Pass 170810,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan re no progress 170906,
DD Skaar Kritser 170907,
DD Skaar Kritser to WO team 170907,
DD Skaar Sanders on Kritser alt structure 170915,
DD Skaar Kritser re adjusted LOI 170919,
DD Callahan on failure to date and breach 170920,
DD Skaar Kritser 170921,
DD Skaar Sander re Kritser 170921,

DD Skaar Kritser 171002,
DD Skaar Kritser string out 171004,
DD Skaar Sanders re Kritser Friona Ind ExCEO call
171022,
DD Skaar WMT China ND Rep Sr Legislator Banco
Advisors 171024, (see also LP Evidentiary Exhibits page
1074V, entries 11/1/2017)
DD Skaar Kritser dragout decline to WO team 171110,
DD Skaar Revised Buyout 171112,
Deeken re financing 200710,
DelMorgan re intro 160925,
DelMorgan email WP proposal 160928,
DelMorgan fup DD declines to share 160929,
DelMorgan update WMT 170106,
DelMorgan 170110,
DelMorgan re DD engagement 170308,
DelMorgan re alt retainer arrangement 170324,
DelMorgan revised docs170324,
DelMorgan re alt firm retainer avail 170327,
DelMorgan nogo on alt fee provider 170404,
DelMorgan on DD Callahan telcon 170822,
DelMorgan 160928 Engagement Summary -
WinnettOrganics.pdf
Dooley Hook to EB-5 110922,
EarlyBirdCapital SPAC Overview - June 2017 v3
170601.pdf
Edgar Wood on Dubai Trip Sched 150626,
Elkhereiji Assistant referral 150410,
Elkhereiji Loan 150412,
Elkhereiji Reponse 150412,
Elkehereiji Increased Loan Amount 150421,
Elkhereiji Agreement Meeting150430,
Elkhereiji Wood Edgar on trip cancelled 150626,
Energy Bank Ghana Kabah xfr bank info 170425,
Equilibrium Capital cold email on online article 170628,
Equilibrium Capital referral to Haladay 170706,
Equities dot com Financing Proposal 160623,
Equities dot com Financing contract 160630,
Equities dot com implementation sked 160708,
EquityNet Profile Interest 150520,
EquityNet Profile up 150520,
Factoring Rec Financing Fees 160217,
Fargotrust Investor ND interest in PPM 151010,
Fiera Comox Corbett initial hit 210511,
Fiera Comox Corbett Big Sandy structure revision 210519,

Fiera Comox Corbett Big Sandy returns issues 210520,
Fiera Comox Corbett decline 210520,
Figdor Drew Paris investment banker 160712,
Fisher Ent NYC re 60MM funding 160701,
Flores on funds raise 160705,
Flynn re additional capital 200730,
Flynn re Lake County fin and DB prior WMT China issue 210714,
Signed Focus Acquisition-Winnett Cattle NDA 170710.PDF
Fractal re initial contact 171117,
Fractal progress 171206,
Fractal on status and nterest 171221,
Fractal intro Black Lake Chad Scripps 180117,
Fractal Roznowski Executed Agreement1-17-18 180117.pdf
Fundable re fin after zero leads dev for WO 171211,
Funding options Patriot Antonelli 200720,
Gaines Ira AZ first contact ref by Sayre Tappen 150311,
Gibson 8plusMM BGibson WCC LOAN Contract 180901.pdf
Gomez Dir Food Safety Intvw 150829,
Gomez refers Brereton Hamilton 160407,
Gomez re investor call request 160408,
Gomez re investor interest 160427,
Gomez on Costamanga mtg plan 160429,
Gomez update on CA investor progress 160506,
Gomez Costamanga mtg request 160508,
Gomez re new investor leads 160512,
Gomez investor update 160525,
Gomez re Japanese Inv Lead sales progress 160616,
Gomez update Kevin investor 160704,
Gomez re Costamanga mtg 170203,
Gomez re Brereton has organic cattle in TX 171228,
Gross re Korea beef pgm finance 210115,
Gross re Big Sandy finance 210506,
Gross re grainfed organic taste difference 210513,
Gross 210514,
Gross re Big Sandy rewrite Bus plan 210517,
Gross re mkt research to demo our case 210519,
Gross on organic mkt update 210522,
Gross re organic beef proof of concept 210603,
Gross re WMT Redfield US Grocery SVP 210618,
Gross re Lake County tax advantages opptny zone 210630,
Grt Western Bk local takeover visit 151117,

GWB Pagel re Financing 160216,
GWB Pagel re 7500000 LOC 160222,
GWB line announcement to team 160223,
Harvest Returns Debt Opptny Zone 210623,
Harvest Returns 210701,
Harvest Returns Cattle Notes Decline 210709,
Harvest Returns Lake County Due Diligence 1of2 210709,
Harvest Returns Lake County Due Diligence 2of2 210709,
Harvest Returns 1 cattle notes 210720,
Harvest Returns 2 Cattle Notes 210720,
Harvest Returns Cattle Notes SBI team email 210721,
Harvest Returns checkin 210909,
Hillcrest PE IL interest 180112,
Hillcrest pass IL 180115,
Hitoshi Investment $3MM Fully Executed NOGUCHI
HITOSHI 190714.pdf
Holistic Impact intro 170404,
Holistic Impact fup 170415,
Holistic Impact fup on prospectus distn 170503,
Hoyle Finl Intro 140216,
Hoyle Fee Agreement Signed 140221,
I banker BreretonHamilton 160407,
I banker BreretonHamilton 160412,
I banker BreretonHamilton 160718,
Interstate Commerce WMT KR emails 170403,
Intrepid Capital DC reprise 221011,
Intrepid Capital Fees 12K Invoice 1 200225.pdf
Intrepid Capital Sheldon Beef Intrepid NC-NDA
Completed 200220.pdf
Intrepid Capital Sheldon Beef Intrepid NC-NDA
Completed Screenshots 200220.pdf
Investor Commitment Crystal Resources 150924,
Investor Commiment Fail to Smith re Ukraine Xfr Fail
150928,
Investor Commitment Crystal Resources Xfr 150928,
Investor Commitment Crystal Resources Xfr Fail 150928,
Investor Commitment Crystal Resources Fee Scam
150929,
Investor Contact List Sent to Wyly 130712,
Investor Lead Gomez re CA 160322,
Investor Lead fup Gomez 160331,
Investor Prince Omar Alfardan 160404,
Isaac Capital Grp NYC investor interest 170515,
151021 Jabor Qatar MEC Application for JV License -
Jabor 100108-10110

151027 Jabor Wire Transfer $9975 for MEC License 10111-10113
151027 Jabor TD Ameritrade Wire Transfer 10114-10118
JacksonCG Frambes TX 161205,
JCXL Advance Fee Scam Barrister140602,
JCXL Term Sheet 10MM 140609,
JCXL Term Sheet 10MM Jackson Sullivan 140609,
JCXL Advance Fee Scam 140611,
Johnson Todd Approval letter to Loaning 2.8MM 190729.pdf
JPM Aberbach ref to another unit 210604,
JPM Kolleng re China LC monetization 210131,
Kabah scam resurrection 140424,
Kabah first hit 140526,
Kabah funds xfr 140605,
Kabah Energy Bank Ghana 180K 170425,
Kabah Energy Bank Ghana 180K 170426,
Kabah Energy Bank Ghana Govt Doc Forged 180K 170426,
Kabah Energy Bank Ghana 180K 170427,
Kabah re Energy Bank xfr 170428,
Kabah Energy Bank Ghana 180K 170502,
Keiser 100MM Debt Raise Terms Summary 151104,
Kennedy Orrego intial hit 141110,
Kennedy Funding LOI Turpin 2pt5MM 190708.pdf
Kennedy Funding WCC Completed
KFF_Executive_Summary_Fillable_Levitt NEW 190529.pdf
Key NYC ibanker reconnect 170821,
King Trade Capital re WMT order thru JBS 170824,
Kofi on Ghana Akoto contact via Yahoo Messenger 170314,
Kolleng JPMorgan prob cutout 210115,
Krapf Bank Tucson Land Financing Inquiry 160213,
Kritser re Lake County OR Organic Finishing Op 220621,
Lantern Capital Advisors Risey re raise financing 111007,
Lease Co Van Tassell 161102,
Liberty EB-5 initial hit 141027,
Liberty Keller Carter mtg thanks 141103,
Liberty EB-5 WinnettOrganics LOI 11-12-14 141112,
Liberty Carter ref request services matrix request 141114,
Liberty re CADC TEA eligibility 150106,
Liberty backout excuse sent to UFIG 150505,
Liberty EB-5 LOI to WP 221105,
Liberty EB-5 Contract Annotated 141112.pdf

Liberty EB-5 LOI .pdf
Liberty EB-5 LOI 141112.pdf
Liberty EB-5 LOI WinnettOrganics LOI 11-5-14.pdf
Liquid Capital AZ Gottesman initial hit 170928,
Liquid Capital AZ Gottesman signed app 171012,
Liquid Capital AZ Gottesman on underwriting info request 171012,
Liquid Capital AZ Gottesman underwriting info complete 171013,
Liquid Capital AZ Gottesman email DLC sample 171017,
Liquid Capital AZ Gottesman 171101 mtg request 171024,
M Gross re Korea contract finanaicn g et al 210119,
Madison Street Capital MSC Agreement-Winnett Cattle Co, Inc. 180405.pdf
Maggard TX re Abdelsayed 200722,
Maggard TX re Abdelsayed start date 200817,
Maggard TX status 201015,
Maggard re Korea Angus pgm etc 210118,
Maggard re 26 Ranch and Abdelsayed 210221,
Maggard on Abdelsayed positive connect 210222,
Maggard re Abdelsayed 210302,
Maggard re Abdelsayed to Egypt 210304,
Maggard on loan docs PFS need 210306,
Maggard re gty and PFS 210307,
Maggard re Big Sandy BAFO 210322,
Maggard re Big Sandy reprise 210505,
Maggard re investors and Big Sandy 210519,
Maggard re Lake County LOI 210701,
Maggard re Lake County 210702,
Maggard re 500k loan 210703,
Maggard enroute Lake County 210707,
Maggard re Lake County enroute 210707,
Maggard re Lake Copunty tour and plus minus issues 210709,
Maggard re Lake County and pers FICo improvement 210715,
Maggard re Lake County 210719,
Maggard Loan to DB improving FICO 210721,
Maggard re Lake County 3559 LOI 210721,
Maggard on Lake County Fin snags 210725,
Maggard on WMT Wagyu comp price and other status 210804,
Maggard re startup sequencing plan 210816,
Maggard re status web dev sales 210816,
Maggard re add subs WeFunder 210817,

Maggard re GAAP fin need 210818,
Maggard re mkt gap 210818,
Maggard 5k GPR loan 210826,
Maggard re 4500 loan recvd 210826,
Maggard Revised GPR Startup Plan 210830,
Maggard re DB overadvance 210901,
Maggard re loan not pursued 210903,
Maggard re 26k loan 210909,
Maggard re ICPO LOI-FM-LZ-210913,
Maggard re Terminating Trader efforts 210916,
Maggard re status 211104,
Maggard re 700 211221,
Manna Tree update WMT organic beef pgm sales progress 210702,
Mbazock Kelvin French Investment firm 140219,
Mbazock Kelvin 140220,
Montminy Les Allan re investors 200724,
Mubadala Capital UAE Investment 140624,
Mubadala Sullivan on FCPA violation 140715,
Multifunding initial hit 141215,
Multifunding Paul Avery initial contact 141215,
Multifunding Sullivan re referral to David Hughes 150130,
Multifunding Dan Krewson initial contact 150915,
MultiFunding referral Shepherd 161018,
MultiFunding referral Shepherd has target 161208,
MultiFunding referral Shepherd refs Lex 170120,
Multifunding re Whitestone Lex Gubsky Phil 170123,
Multifunding Shepherd Whitestone Gubsky email 170125,
Multifunding re eqpt loan 170126,
Multifunding Shepherd Intro Whitestone Lex Gubsky 170127,
Multifunding Whitestone Lex Gubsky term sheet deadline 170130,
Multifunding Conf call fup 170131,
Multifunding Whitestone Lex Gubsky confirms interest 170131,
Multifunding Whitestone Lex Gubsky casting doubt on other deals 170201,
Multifunding Shepherd Whitestone Gubsky update email 170206,
Multifunding re Utica eqpt leasing 170210,
Multifunding re broker fee on Utica eqpt leasing 170222,
Multifunding re Utica eqpt lease LOI 170222,
MultiFunding Shepherd Blackpool progress delay 170309,
Multifunding re Moore defame Whitestone Lex Gubsky

170310,
Multifunding Moore defame Whitestone Lex Gubsky 170311,
MultiFunding re Blackpool fail DD retainer needed 170323,
National Livestock cattle financing 170820,
Natnl Livestock re fin MO organic cattle 200817,
New World FL 170410,
New World FL 170428,
Newman 2014 Master DRF Completed 140424,
Newman AA NDA GNA Signed 140424,
Newman Gerald agreement via Inder Singh 140424,
Newman Gerald Inder Singh re Bridges not confirm orders 140425,
Newman re 2MM proof of concept 140425,
NGEN Grubstein re Organic beef pigs 210521,
NGEN and Correlation VCs 210522,
NGEN update 210604,
NGEN next round 210607,
NHIG Firm Insurance re payment bond 140821,
NHIG Songbird Niles re bond invoice nonpayment 140917,
NHIG Hong Kong Financing Signed 140801.pdf
NorthwestFCS Rayl re Lake County fin 210712,
NY Business Capital App 190730.pdf
NY Business Capital App is digitally signed at the original 190730.pdf
NYC Investor Axial Conf Intro PWP Growth Schectman 151028,
NYC Investor from Axial Formanek 151027,
NYC Investor Seth investors 150818,
NYC Investor Seth re eqpt 150901,
NYC Investor Seth re eqpt detail 150911,
NYC Investor Seth re eqpt losn progress151001,
NYC Investor Seth proposal 151016,
NYC Investor Seth re Jabor and 300mm loan terms 151019,
NYC Investor Seth re fee waiver 151021,
NYC Investor Seth signed MARV capital agreement 151023,
NYC Investor Seth on status 160203,
NYC Investor Seth on equity investor  interest 160208,
NYC Investor Seth on closing 7MM investment 160219,
NY PE Firm Ref by DD OGrady Signed Project Feedlot NDA 170710.PDF

Oppy Vancouver BC broker re financing rqmts 170331,
Paine Schwartz contact 171116,
Painter TX earlier ref from WorldWide Fin 200730,
Painter TX on WCC collapse 200730,
Painter TX wants exclusivity also WWF cc on this email 200803,
Painter re Abdelsayed gty 200811,
Painter re Ibdelsayed gty 200811,
Painter TX re loan fail income 200825,
Painter re Galkin telcon 200831,
Painter re Korea finance 210115,
Painter re Lake County 550K need and WMT progress 210703,
Painter re Lake County 500k loan purpose 210705,
Paris I Bank interest 160712,
PDX Investor cold email on online article 170628,
PDX ref to Haladay 170706,
PE reaction1 to Big Sandy offer 210525,
PE reaction2 to Big Sandy offer 210525,
PE reaction3 to Big Sandy offer 210525,
PE reaction4 to Big Sandy offer 210525,
Perer Super G Funding 151020,
Pitch Deck to RAM WinnettOrganics Notes 160328,
PLM coop fin for beef 200821,
Priority Funding 5point6 MM WCC PFS-Application 180919.pdf
Pruska investor 161128,
Pruska investor 161129,
PWP update 160928,
RaboAg Kemp re Arlon Podzemny Perico 130203,
Rabo on Oliver Direct funding 160721,
Raboag Pitcher re Skaar review 170429,
Raboag Wilson TX 170531,
Rabo on organic fruits and veg mkt outllok 170822,
RAM initial meeting set 160325,
RAM private placement interest 160326,
RAM mtg sked 160330,
RAM Call Summary re financing strategy 160425,
RAM investor progress 160426,
RAM on Olin engagemeent ltr 160427,
RAM Olin update 160430,
RAM re sales POs 160430,
RAM re Maines 160503,
RAM call to update RAM progress 160505,
RAM contract redline draft 160509,

RAM update 160526,
RAM re progress and concerns 160527,
RAM re progress and sales lead 160604,
RAM re sales leads progress 160609,
RAM re accredited investors 160612,
RAM on financing progress 160629,
RAM inital referrer reconnect 160708,
RAM on CS sales mtg 160711,
RAM Olin Termination Notice 160718,
RAM inital referrer reconnect 160720,
RAM Olin Capital Accepts Termination 160722,
RAM re DD Clark Mckenzie 160809,
RAM temriantion no results 160907,
RAM continues work 160911,
RAM Investment Priorities 160911,
RAM connects Arpaio ACTS freedom farms 160913,
RAM on Hinson ACTS Freedom Farms 160914,
RAM re ground lease and beef investor iinterest 160914,
RAM re CS apptmt attempt 161027,
RAM CS reqmts 161028,
RAM CS 161103,
RAM CS stall 161108,
RAM stall family emergency 161109,
RAM conv produce fail 161121,
RAM on conv produce contractual issues 161205,
RAM re conv produce agents sales progress 161215,
RAM failure on conv produce and lack of notice 161221,
RAM litigation threat 170228,
RAM demand notice 170401,
RAM final demand 170401,
RAM on final demand from Sullivan 170406,
Reich Bros $3pt5MM Lease ref Buckingham 190612.pdf
Resorce Land Holdings CO reconnect 180213,
Revolution VC Interest Hughes 160825,
Revolution VC Feedback Hughes 161019,
Revolution VC Feedback Hughes2 161019,
Richards Sarah DB Headhunter 080630,
Riverside re investment opptny 210607,
Riverside founder Kohl re investment opptny 210611,
Riverside Kohl CoCEO re financing turndown 210611,
RJ Capital Flynn re additional capital 200730,
RJ Capital Flynn re Lake County fin and DB prior WMT
China 210714,
RJ Lumba CV 12.2012 121201,
RJ Lumba Starbucks Ramsey following day 121211,

RJ Lumba Ramsy Xmas Deutsche Bank Ibanker fup 121216,
RJ Lumba no response 130208,
Rostra 300K Notes Term Sheet no signature reqd.pdf
Roth on S-1 160124,
Salm Ben Promissory Note 131204,
SeedInvest Winnett Perico, Inc. Engagement Agreement 170509.pdf
Seth MARV Capital xmit of PPM S1 151124,
Sherbrooke re LA organic mkt 140409,
Sherbrooke re sales backlog 140411,
Sole Source cold email hit 171219,
Sole Source feedback 171222,
Sole Source call 171226,
Sole Source NDA Double D feedyard 171227,
Sole Source Turner phenom news HEC etc 180105,
Sole Source TX feedyard options 180105,
Sole Source Turner mtg invite StRegis NYC 180108,
Sole Source Turner re NYC mtg 180108,
Sole Source mtg fup NYC 180109,
Sole Source mtg in NYC 180109, (see also LP Evidentiary Exhibits page 1074V entry 1/9/2018)
Sole Source Turner at mtg StRegis 180109,
Sole Source mtg results to Nickless 180110,
Sole Source 180111,
Sole Source update TX 180119,
Sole Source 180121,
Sole Source Check by outsider 180122,
Sole Source re WMT China added opptntys 180123,
Sole Source on string out 180125,
Sole Source hold cmu to Gearn 180126,
Sole Source repeat decline 180228,
Sole Source Turner on Big Sandy 210507,
Sole Source Turner on feed price sensitivity 210601,
SPAC Early Bird 170626,
SPAC EB Dennis Brewer - $100mm SPAC Illustrations 170626.pdf,
SPAC Chardan 170627,
SPAC Chardan ref Loeb Nussbaum 170629,
SPAC Nussbaum Loeb atty 170629,
SPAC Nussbaum Loeb appt reset to 170711,
SPAC Chardan mtg fup 170712,
SPAC EB mtg fup 170712,
Summit Partners on Skaar 170511,
Summit on CO feedyard 171223,

Summit connects NBH Ag bank 180111,
Summit re distressed deal E-6 feedyard 180215,
Summit on E6 distress sale 180223,
Summit own capital must have 180228,
Signed Tawfeek Chiang standard agreement form filling 140227.pdf
Trinity AZ expression of interest 160930,
Trinity re AltaVista 161014,
Trust Capital re bridge loan 210719,
Turner on Feedyards and Deloitte Earnings review 180111,
Turner re TX feedyards status 180121,
UFIG Loan conf call 141107,
UFIG LOI Adding Eqpt to Loan Amt 150107,
UFIG Fin Inquiry Land for Stock Kingman Rhodes 160216,
US Capital Partners Ritter 150409,
Utica Signed Winnet Proposal 2-21-17 170222.pdf
VC Legendary 210115,
VC in-house fake pitch Blumberg 210817,
VC in-house fake pitch Mayfield 210817,
VC Mayfield 210817,
VC Blumberg 210818,
VC Mayfield feedback 210818,
Vendome Bond re financing interest 130513,
VII Capital reply 210506,
Vision AZ re Lake County fin 210709,
Vision AZ re Lake County fin 210728,
Vision AZ re Lake County fin 210813,
Warren John intial hit 140827,
Warren John London 150403,
Warren John INVESTMENT AGREEMENT New-2 Signed 140829.pdf
WHoyle Fee Agreement Signed 140221,
WHoyle Fee Agreement Signed 20140221150230580 140221.pdf,
Winters Referral from Wyly 111101,
Winters on Earnout 111123,
Winters on Fund Closing 120225,
Winters extends 120601,
Winters re set bridge loan appt time 130104,
WO Status Report Adamson PPM 150917,
WO Team re PPM S-1 processes 150921,
WO Grt Western Bk local takeover visit 151117,
WO Team on Jabor Funded on Time 151117,
WO Team re Jabor snag 151118,

WO Team on financings 151120,
WO Team on 179mm Financings 160101,
WO Status Financings 160121,
WO Financings deal status to team 160208,
WO Status Kingman Startup Financings 160209,
WO Status Report financings 160421,
WO Status re Oliver Term Sheet Verbal 160719,
WO Status Final Oliver Hyder present sked 160804,
WO Status Hyder Oliver rework 160818,
WO Status DD Fin Sales 160929,
WO Status Report on Hyder Oliver new pitch status 161006,
WO on WMT progress 161018,
WO Status financings 161103,
WO Status Financings WMT Kroger 161115,
WO Org Chart 170111,
WO Blitch re Stockton Hill Famr tour w Blackpool 170203,
WO Smith CFO re Revolution VC pass 170203,
WO Team re Blackppol to fund 170301,
WO Team re Blackpool no reply stringout 170309,
WO Team re Blackpool deadline miss 170310,
WO Status Report DD retainer need 170320,
WO also Cardone on Status WMT others 170403,
WO Status Report Skaar Investor Interest 170515,
WO Team on DD Funding Skaar Acq Date 170615,
WO Status Report Skaar nothing from Alberts 170706,
WO Status Report re DD potential investors 170713,
WO Status Report Banco Advisors busted mtg 171101,
WO Status Report re Banco ND Investors Skaar WMT 171116,
WO Status Report new investors Banco ND pass 171118,
WO Status Report re WMT China Sole Source 180104,
Wyly re Winters Delay Response 111114,
Wyly re bridge need Blackpool 120921,
Wyly early contact 130716,
YieldStreet re Lake County fin 210711,
Zayid email cc Hewitt London 121008,
Zayid Hewitt re Investor Zayid 121008,
Zayid email re funds transfer 121014,
Zayid Corp JV Agreement 121018,
Zayid Signed Subscription Agreement Cancelled 121018,
Zayid Inv Banco Santander App 121115,
Zayid FIRST AMENDMENT TO JV 140220,
Zayid on attny funding request 140227,

| | Zayid re BofA checking account number 140228, Zayid Attorney Tawfeek Chaing re fee 140301, Zayid re Malaysian Attny Not Confirmed 140305 Zayid 20MM Cancelled Signed Subscription Agreement Cancelled 121002.pdf Zayid Signed JV Agreement121022.pdf |
|---|---|

**585. RICO-30 Racketeering Violations: Commercial Frauds: Fraudulent Financings and Litigation - Auctus v. Cornhusker, 2019**

A. Defendant Reginald McGaugh, acting as a Defendant agent, officer, or confidential informant, and part of this on-going conspiracy, represents himself and his firm, Defendant Cornhusker Capital, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2019 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. This color of law swindle requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles and pattern of racketeering acts. Lead Plaintiff recollects the $2,500 retainer required by Cornhusker is delivered directly from investor Dean T. Smith to Cornhusker and is counted as a portion of a loan from Smith to Winnett Perico. As frequently occurs in his interactions with Defendants, the Lead Plaintiff signs the agreement first and never receives a fully executed copy of the agreement, though the retainer is represented as received and acts required of Defendant under the agreement are represented as being conducted in good faith through communications between the Lead Plaintiff and the Defendant(s) as counterparty. But there are absolutely no tangible results as usual. See LP Evidentiary Exhibits pages 10119-

10124, 10125, 10158-10164. Relevant emails are currently blocked without warrant by Defendant United States as this Complaint is being prepared.

C. Further, Defendants are ostensibly conducting litigation in Cook County, IL between Defendant Auctus and Defendant Cornhusker for client poaching by Cornhusker of Lead Plaintiff's company, Winnett Perico, from Auctus. This requires extensive efforts to comply with a Cook County, IL court subpoena served on the Lead Plaintiff and his company, to spy upon and consume time and resources in this color of law fraud. See LP Evidentiary Exhibits pages 10126-10131, 10158-10163.

D. This is a variation on the usual direct litigation theme Defendants use frequently when attempting to run up expenses and reduce cash flow to plaintiffs of this class. Defendants also attempted this specific approach in the Tower Books bankruptcy case around 2003, in an effort to arrange the Lead Plaintiff's potential avoidance of a lawful subpoena, which can lead to criminal charges for failure to appear and cooperate. And, of course, color of law discovery in "litigation" is an alternate method of spying without warrant.

E. This is an element of the now quite the familiar pattern of "sources and methods" used by Defendant police powers who violate the Fourth Amendment by alternate means, using pretexted email fraud and wire fraud under color of law to engage in illegal searches, later sanitized as legitimate searches developed through informants and so misrepresented to secure legally require warrants to support criminal prosecutions, which themselves are not necessarily based in reasonable suspicion, but rather on targeting and headhunting specific individuals and entities, as they have repeatedly engaged against the rights and interests of Lead Plaintiff.

G. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5 through 13 |
| Complaint paragraphs: | RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179 |
| LP Evidentiary Exhibits pages: | 10119-10124, 10125, 10126-10131, 10158-10164 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | |

## 586. RICO-31 Racketeering Violations: Fraudulent Financings, Online Platform 2021

A. WeFunder and its officer and employees, through the various entities legally named above, whether acting on its own behalf or as spoofed by other Defendants with police powers representing themselves as WeFunder personnel and as the actual website while acting as a Defendant agent, officer, and as part of this on-going conspiracy, represent themselves, their firm, and their web platform as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role in 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. This series of frauds and swindles requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, and swindles. Among their bad faith acts are the refusal to permit the level of return to individual investors proposed for the offering by the Lead Plaintiff; and their role in knowingly recommending an auditor who, after gathering key financial information

on their behalf from Lead Plaintiff's company, refuses to issue any form of the professional auditor Opinion letter required to complete the financial statements, so the fund raising process could be undertaken as planned in conformance with SEC Regulation A+. This scenario plays out almost identically to Defendants' previous frauds and swindles in subcount RICO-18 undertaken by Defendant Adamson Brothers.

C. This pattern of practice repeats prior fraudulent acts of Defendants and effectively kills any possibility of this public financing, thereby, once again, sustaining control of Lead Plaintiff while interfering in interstate commerce.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | 151, RICO-12 through RICO-30 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | WeFunder Maggard as sponsor 210719, WeFunder Solicitation fup example 1of55 sent 210719, WeFunder Maggard re 2k 210720, WeFunder LaBelle re mandatory signup to vouch 210803, WeFunder GAAP Acctnt Cheng 210902, WeFunder start sequence 210903, WeFunder GAAP Acctnt Cheng Delays 210907, WeFunder re Cheng auditor delay 210908, WeFunder GAAP Acctnt Cheng 210909, WeFunder GAAP Acctnt refuses Opinion 210909 |

**587. RICO-32 Racketeering Violations: Fraudulent Sales Leads 2002-2004**

A. Lead Plaintiff's co-owned consulting company, Allegent LLC dba Performa, funds travel and other expenses in 2002-2004 to call upon and submit consulting services proposals to numerous Defendant Technology Sales Leads fake sales opportunities across the United States from California to New York to Florida and many states in between. These fraudulent sales calls typically occur in otherwise empty offices, plants, and warehouses, and require travel, printing, and mailing expenses to respond to fraudulent and non-existent consulting project opportunities presented by Defendants. Performa spends well over $10,000 for travel, proposal preparation, office overhead expenses, and provides below market compensation to Lead Plaintiff and his "insider" partner using their own and borrowed funds. Unknown to Lead Plaintiff at the time, his "partner" is actually directly associated with Defendants in this "partner" role and his prior roles while employed with Defendant to various predecessor firms (including cover operations).

B. Other evidence is currently inaccessible to Lead Plaintiff but is available on discovery on a computer hard drive image shared with the Defendant known as William Drumm while General Manager of Establish for North America, unless destroyed by Defendants in the meantime to obstruct litigation and justice.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | 175, RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0107, 2-0117, 2-0135, 2-0140 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 125-126; pages 844, 6085, 8290 |

| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Tech Sales Leads Revised TSL List 221007.pdf |
|---|---|

**588. RICO-33 Racketeering Violations: Fraudulent Sales Lead Solicitation Services 2021**

A. Defendants fraudulently fail to or prevent the distribution of email correspondence services purchased from Exact Data, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity. This list and related services are purchased to solicit grocery industry executives or retail customers, and, as usual, accomplishes no legitimate sales solicitations or results due to Defendants' frauds. Other such services were also purchased from various online services and also accomplished no authentic results. This specific $1065 expenditure in interstate commerce is shown at LP Evidentiary Exhibits page 10017.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. Subcount RICO-19 subparagraph E is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 10017 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | SBI Team Startup Sequencing Plan 210808, SBI Team on further web slowness ABT sales 210910 |

**589. RICO-34 Racketeering Violations: Fraudulent Sales Lead Solicitation Services 2021**

A. Defendants fraudulently fail to or prevent the distribution of email correspondence services purchased from EGM, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity which are purchased to solicit grocery industry executives or retail customers, and, as usual, accomplishes no legitimate sales solicitations or results due to Defendants' frauds. Other such services were also purchased from various online services and also accomplished no authentic results. This specific $4342 set of expenditures in interstate commerce is shown at LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; 10000, 10002, 10014, 10015.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 125-126, 129; 10000, 10002, 10014, 10015 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | |

**590. RICO-35 Racketeering Violations: Fraudulent Sales Lead Development Services 2017**

A. Defendant TradeKey, a Pakistan domiciled company, conspires with other Defendants to provide fraudulent contracted sales leads, and submit false sales lead progress reports using wire fraud and contract fraud. This swindle is an element of the pattern of racketeering act

against Lead Plaintiff and his business entities to strip financial resources and authentic

international sales opportunities of the company, perpetuating Defendants' control and human

trafficking of Lead Plaintiff in involuntary servitude, forced labor, and other violations of rights

under law and ratified international treaties having force of law at all levels of government in the

United States. These fraudulent services cost the company $6,000 and nearly two years lost for

legitimate sales opportunities.

      B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by

reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 125-126, 129; 8290, 9219-9222, 9241-9248, 9275-9276, 9300-9306, 9307-9310, 9340-9391, 9406-9534, 9926, 9984, 9989, 9997, 10004, 10007 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Tradekey KYC Form Complete 180313.pdf<br>Tradekey Orbit Winnett Cattle Company VIP Contract #89779 - C.PDF<br>Tradekey Orbit Winnett Cattle Company VIP Contract #89779 180306.pdf<br>Tradekey Orbit Winnett Cattle Company VIP Invioce 180425.pdf<br>Tradekey VIP Contract #89779 180102.pdf<br>Tradekey Winnett Cattle Company VIP Invoice #89779-B 180514.pdf<br>Tradekey Winnett Cattle Company VIP Invoice #89779-C 180726.pdf<br>Tradekey Winnett Cattle Company Working Report 181010.pdf<br>Tradekey Winnett Cattle Company Working Report 181228.pdf<br>Winnett Cattle Company Working Report181106.pdf |

| | Winnett Perico Bill for July 2018 180801.pdf |
|---|---|

**591. RICO-36 Racketeering Violations: Fraudulent Sales Lead Development Services 2018**

A. Weblink, domiciled in India, initiates useless web services development in lieu of the actual sales lead development services requested by Winnett Perico, and $639 is expended before the improperly provided services are cancelled.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 140-189 paragraphs 125-126, 129; 9985, 10023 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | 180501 Weblink Pymt180501.pdf<br>181203 Weblink $500 Wire 181203.pdf<br>181204 Weblink Invoice 181204.pdf |

**592. RICO-37 Racketeering Violations: Fraudulent Sales Opportunities, International 2020-2021**

A. Fake international sales and sourcing opportunities in the Middle East, China, southeast Asia, Australia, South America, Russia, United Kingdom, and various countries throughout Europe, involve several Defendants posing as international traders between 2018 and 2022 including, without limitation Defendants named legally above in the Complaint caption and known here by their common names Assure Group International, ABT Trading, DC International, Todd Craft, Leverstone, Tradeimpex, and Tradimpex. Defendants provide

fraudulent international sales leads and fruadulent sourcing opportunities, using wire fraud and contract fraud. These fraudulent services cost Lead Plaintiff owned and managed business entities extensive time and resources, and result in lost time and business development options for legitimate sales opportunities.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 140-189 paragraph 125-126; 9260, 9547, 9548-9561, 9568-9572, 9840, 9890-9896, 9897-9901 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | ABT ICPO Lan Zhou Utility Beef Qtrs 210913.pdf<br>ABT inquiry 200731,<br>ABT Pork 6 way China 201008,<br>ABT Pork 6 way China Referral Contract 201008,<br>ABT Pork 6 Way Referral 201008,<br>ABT FL Quote 210105,<br>ABT re Korea Angus pgm 210118,<br>ABT FL Quote 210123,<br>ABT re Euro price quote request 210428,<br>ABT China Utility Grade 210610,<br>ABT re deboning labor costs and pricing 210613,<br>ABT quote request for Houston TX delivery 210616,<br>ABT re WhatsApp and Houston 210626,<br>ABT Partner re China quotes 210902,<br>ABT Partner re Freelancer label delay 210907,<br>ABT re Lan Zhou ICPO LOI-FM-210913,<br>ABT re pending contract 210914,<br>ABT sends Lan Zhou ICPO-FB4-LZ-210914,<br>ABT re further deadline extension request 210915,<br>ABT re termination 210915, |

ABT Trader Liu Intl Termination 210916,
ABT quote request 211223,
AGI pork heads 200916,
AGI Uruguay beef sale 210414,
AGI RFQ non-GMO soybeans 210421,
AGI non-GMO Soybeans 210527,
AGI non-GMO soybean supplier quote reply to SBI 210528,
AGI non GMO soybeans 210531,
AGI beef utility wrapped qtrs 210714,
AGI re Q421 pricing 211017,
AGI Trader quote request 211227,
AGI coal handling inquiry 220622,
AGI Quote Request 220701,
AGI SBI unable to reply AGI disappears 220701,
Assure Group AGI signature page 201002.pdf
Bawtry ProForma Invioce from WCC bdproforma 180530.pdf
Bawtry UK Winnett PO 180529.pdf
BR Packer Quote Request FOB Indonesia 210203,
BRF China re contact info for RMC China rep 210125,
BRF Brazil re pymt terms for new customers 210127,
BRF Quote Authentication Request 210127,
BRF_Specification & Price Offer 2020 210127.pdf
Caviness CS Cattle re finishing contrct potential 200901,
Caviness on plant availability for slaughter pending order 210617,
Caviness re salughter availability 210915,
Cho Trader 200911,
Cho Trader re pricing 210104,
Craft sourcing agent and network on pork products 201014,
Craft re bogus chicken part ref photos and doc set 210123,
Craft re bogus chicken part ref photos and doc set2 210123,
Craft re bogus supply network 210127,
Craft re bogus suppliers prev provided 210128,
Craft re quote request 210227,
DC International Daleuski Passport DC Intl 180318.pdf
Est Date of DC International Sales Agreement 190310.pdf
Est Date of DC International Sales Agreement Signed

|  | 190310.pdf |
|  | DC International Daleuski re Kumin intro 200902, |
|  | DC Intl Intro Kumin Galkin 200902, |
|  | DC Intl re export mkt dev 201214, |
|  | DC Intl re export pgm 201214, |
|  | DC International Daleuski re pricing 201221, |
|  | DC Intl re Korea Angus pricing 210118, |
|  | DC Intl Beef Pricing Quote 210203, |
|  | DC Intl beef quote request 210712, |
|  | DC International Daleuski re pricing 211020, |
|  | DC Intl pricing avail ability 211020, |
|  | G3 Vancouver BC Terminal Transit for AGI Quote Request 211130, |
|  | Interbio ICPO Nº IBI-20190321-01 Beef Cuts_ Signed 190411.pdf |
|  | Leverstone LOI Beef 190303.pdf |
|  | Manning Beef CA quote request 210226, |
|  | Manning Beef CA quote request reply 210302, |
|  | Manning re contracts in process 210330, |
|  | Manning China case ready 210405, |
|  | Manning Beef re slaughter avialability 210914, |
|  | Mercaimpex ES initial hit180301, |
|  | Sadia BR re quote request 210124, |
|  | Tradeimpex fup prior Insight Network domicile 180301, |
|  | Tradeimpex re Madrid air frieght 180301, |
|  | Tradeimpex re Madrid air frieght differential 180302, |
|  | Tradekey intro 170825, |
|  | Tradimpex BR re retail prepack 210319, |
|  | Tradimpex BR re quote 210325, |
|  | Tradimpex BR re case ready retail prepack 210406, |
|  | Tradimpex BR re China beef quotes 210423, |
|  | Tradimpex BR soybean availability 210423, |
|  | Tradimpex re prices quotes and competitiveness 210521 |

**593. RICO-38 Racketeering Violations: Fraudulent Sales Opportunities, Domestic 1985-2022**

A. Lead Plaintiff expends company and personal funds to prepare sales materials,

develop sales leads, and secure sales for various entities he owns, controls, and manages as a result of Defendants' fraudulent sales opportunities from 1985-1993, and from 2002-2005, and from 2015 to 2022. While the records documenting this travel, and other direct and overhead expenses, and the related loss of sales revenue and personal income are not currently accessible to Lead Plaintiff, and are controlled or maintained by Defendants, all these instances of interstate travel require expenditures of personal and company funds and are the subject of future discovery in this case.

B. Initial entrepreneurial efforts began in late 1983 with the personal expenditure of hundreds of hours and about $4,000 of Lead Plaintiff's personal funds invested in software development for a hotel industry scheduling system, which is purposefully rejected by an agent of Defendant United States posing as the CFO of Westin Hotels in the Westin Corporate Headquarters in Seattle, WA. This meeting and rejection occur a few months after the Seattle Westin cost reduction project, developed and managed by Lead Plaintiff, is completed. This innovative first of its kind services industry software system, similar to those now broadly used in services industries such as hotels, banks, and retail stores to control labor costs and manage customer service levels, is declined, unknown to Lead Plaintiff at the time, to sustain the human trafficking, involuntary servitude, and forced labor of the Lead Plaintiff by Defendant United States.

C. Defendants collectively engage in contributing to this conspiracy through the use of their facilities, websites, personnel, email addresses, and other means to conspire in and facilitate these extended series' of constructive frauds which are intended to perpetuate, deprive, and entrap Lead Plaintiff while starving his various enterprises of legitimate commercial

opportunities to engage in interstate commerce. These Defendant commercial business entities as legally named elsewhere in this Complaint include, without limitation, the twenty-four named Defendant entities commonly known as Walmart and Walmart China, Bentonville, AR; Kroger, Cincinnati and Blue Vine, OH; Alberts Organics, Los Angeles ,CA; Costco, Issaquah, WA; Vendorco, San Diego, CA; various Defendant Skaar Livestock and related entities, Lewistown, ID; BDO, Salt Lake City, UT; Bay State Milling, Boston, MA; Briggs & Stratton, Wauwatosa, WI; Badger Meter, Milwaukee, WI; Raynor Garage Door, Dixon, IL; First Alert, Aurora, IL; Borg Warner, Muncie, IN; Adtran, Huntsville, AL; Western Digital, San Jose, CA; currently unidentifiable grocery wholesaler in the midwestern states; Orange City Beef, Orange City, IA; Bio-Lab, Lawrenceville, GA; Brightstar, Miami, FL; Rockwell Collins, Cedar Rapids, IA; Rocketdyne, Folsom, CA; Steel and Pipe Supply, Manhattan, KS; Samsonite, Denver, CO; Holland Group, Holland, MI; PPG, Pittsburgh, PA; Clipper Windpower, Cedar Rapids, IA and Carpinteria, CA; various Canadian firms with offices in Vancouver, British Columbia, Canada. Other co-conspirators will be identified through recovery of Lead Plaintiff's own records from Defendants as well as through Defendants' discovery disclosures. These Defendants conspire with and sustain, together with other known and as yet unknown Defendants, the abuses and violations of law and rights in this long-running conspiracy and pattern of racketeering acts and rights violations.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-38 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | 140-189 paragraph 126; pages 427, 430, 463, 518, 616-618, 693, 711-740, 8379, 9068-9078, 9093, 9193, 9194-9206, 9240, 9277, 9278-9279, 9280, 9392-9393, 9538, 9539-9545, 9547, 9573-9591 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Alberts Organics first hit 140115, Alberts buyer re free freight 140218, Alberts Organics Argiros and Pres phone mtg 170516, Alberts Organics as Customer 170516, Alberts Organics as Customer 170517, Alberts Organics as Customer 170619, Alberts Reorg replace Pres 170707, Alberts Organics 201312300955 New Vendor Form Signed 140217.pdf Annies General Mills Cross Marketing Discussion 210818, Bay State Milling RFQ 220328, Bridges re organic produce PNW and Costco sales 140410, Bridges re production update 160922, CalOrganic Price List 201401301259 131021.pdf Costco Padilla on Craves 161110, Costco initial review 170630, Costco Huskey re China ofcs 210130, Costco Huskey re China ofcs 210207, Costco Huskey Update 210604, Costco Huskey on organic beef 210616, Costco Huskey re pricing organics 210617, Costco GC reply to verficiation request 211102, Vendorco Walker SBI Teaser for Costco 190213.pdf Vendorco Wlaker Signed Agreement Costco 190213.pdf CrowdCow organic beef intro 210426, DD re 5 yr plan to WMT 161231, DD Callahan re lending DD name to WMT presentation 170126, Earthbound Kodet re cust commitment and timing 140327, EMN Europe Sales Network 180228, EMN Euro unapproved 180301, England Logistics WCC Signed CCLTL Customer Packet |

(Master) 180723.pdf
General Mills outreach re Annies 210806,
Hive re non-std product line 210914,
Kroger cold email initial hit 161005,
Kroger re mtg plan 161010,
Kroger re coming mtg 161107,
Kroger mtg contact info 161109,
Kroger mtg fup 161109,
Kroger Frys Avg Utilization Jose Merced 161221,
Kroger Demand Projection Merced 161223,
Kroger cust ltr request 170426,
Kroger re organic pork availability 210426,
Liu Markk re ICPO-FB4-LZ-210914,
Natural Grocers New Item Submission 210811,
NYC Ace Produce Hit 150724,
1856_001 SMETA Audit Invoice181011.pdf
Preferred Freezer CA Winnett Cattle 2018 Agreement
Preferred signed 180604.pdf
Pruska investor 161128,
Pruska investor 161129,
PWP update 160928,
RaboAg Kemp re Arlon Podzemny Perico 130203,
Rabo on Oliver Direct funding 160721,
Raboag Pitcher re Skaar review 170429,
Raboag Wilson TX 170531,
Rabo on organic fruits and veg mkt outllok 170822,
RAM initial meeting set 160325,
RAM re sales POs 160430,
RAM re Maines 160503,
RAM call to update RAM progress 160505,
RAM contract redline draft 160509,
RAM update 160526,
RAM re progress and concerns 160527,
RAM re progress and sales lead 160604,
RAM re sales leads progress 160609,
RAM inital referrer reconnect 160708,
RAM on CS sales mtg 160711,
RAM inital referrer reconnect 160720,
RAM Olin Capital Accepts Termination 160722,
RAM re DD Clark Mckenzie 160809,

RAM temrriation no results 160907,
RAM continues work 160911,
RAM re CS apptmt attempt 161027,
RAM CS reqmts 161028,
RAM CS 161103,
RAM CS stall 161108,
RAM conv produce fail 161121,
RAM on conv produce contractual issues 161205,
RAM re conv produce agents sales progress 161215,
RAM failure on conv produce and lack of notice 161221,
RAM C&S WinnettOrganics C&S Presentation 160604.pdf
RAM Reinhart WinnettOrganics Reinhart Food Services
160609.pdf
Safeway Rayburn decline 210614,
SBI Team on WMT mtg plan 210702,
Sirk re selling product 210115,
Smith sales intro call in AZ 160704,
Smith Triple Fresh Contact on Sales Prospects 160907,
Smith Triple Fresh passes setback on sales 160915,
Smith re WMT prior sales agents failures 161011,
Smith re avocdos sales hook and PACA 161102,
Whole Foods Weening organic beef decline 210610,
WMT initial hit on cold email 161002,
WMT fup Baldwin 161010,
WMT McCormick ref from Balwin 161011,
WMT sales news to WO team 161011,
WMT McCormick Webex 161014,
WMT McCormick call tomorrow email 161017,
WMT McCormick call fup 161018,
WMT McCormick call fup production volumes 161020,
WMT McCormick call 161109,
WMT McCormick re DD discussion 161114,
WMT McCormick resked and participant list 161114,
WMT McCormick call fup 161116,
WMT McCormick call fup 161118,
WMT McCormick re investors ibankers 161121,
WMT McCormick on contract outline 170108,
WMT McCormick Bentonville Mtg Attendees 170111,
WMT McCormick 170224 Bentonville mtg Present Draft
170123,

WMT McCormick email Bentonville Mtg Presentation 170123,

WMT McCormick Bentonville Mtg Attendees 170216,

WMT McCormick Bentonville Mtg Invite 170216,

WMT McCormick Bentonville Mtg Location 170216, (see also LP Evidentiary Exhibits page 1074U, entry 2/21/2017)

WMT McCormick Bentonville mtg fup 170222,

WMT McCormick re post Bentonville Mtg Rev 170222,

WMT McCormick nonreply fup 170328,

WMT Baldwin re decision next week 170403,

WMT McCormick re mktg plans 170403,

WMT McCormick on price drop 170412,

WMT McCormick buyer contacts 170425,

WMT China Beef ref from McCormick 170703,

WMT connects China on beef 170703,

WMT China Zheng initial contact 170704,

WMT China Zheng merch support 170707,

WMT China Zheng ROM pricing 170708,

WMT China beef Higaki intro 170718,

WMT China beef Higaki pricing 170811,

WMT China Higaki price quote 170811,

WMT China Hgiaki Quotes Specs 170821,

WMT China Higaki adding WO factory id 170821,

WMT China Higaki request factory number add 170821,

WMT China Higaki quote fup 170822,

WMT China WO Status Report WMT China Beef 680 ton order 170921,

WMT Chna Higaki re WMT contract 170924,

WMT China Higaki re process steps 170926,

WMT China Preferred Freezer initial hit 170926,

WMT China Americold initial hit 170929,

WMT China Cargill contact punt 171002,

WMT China Higaki Executed WMT Contract 171010,

WMT China Update WO Team 171012,

WMT China Higaki China visit and update 171023,

WMT China Higaki re contract signature rqmt 171023,

WMT China Higaki re JBS Specs 171026,

WMT China Higaki on revised order pricing 171208,

WMT McCormick on China status 171220,

WMT China re labeling 180110,

| | |
|---|---|
| | WMT China xmit manually signed contract copies 180112, |
| | WMT China order processing timeline 180115, |
| | WMT China Higaki re sked 180116, |
| | WMT China order timing Apr 180116, |
| | WMT China Higaki re factory flow charts trial shipment 180122, |
| | WMT China Higaki orig signed contracts sent 180123, |
| | WMT China CA OWB Packers delay 180131, |
| | WMT China Higaki intro of SCS process 180201, |
| | WMT China Higaki re OWB approval 180201, |
| | WMT China Higaki SCS 180201, |
| | WMT China Hgiaki re Cargill Tyson on China 180202, |
| | WMT China Higki re OWB SCS audit 180202, |
| | WMT China OWB stringout 180206, |
| | WMT China OWB stringout 180207, |
| | WMT China OWB stringout 180214, |
| | WMT China OWB stall 180223, |
| | WMT China OWB stall continues 180223, |
| | WMT China SamsClub China dragin 180227, |
| | WMT China Higaki email sig page xmit 180228, |
| | WMT China LiqCap AZ update 180228, |
| | WMT China Petersen re signed contract evidence 180301, |
| | WMT China re post OWB to JFO 180301, |
| | WMT China JFO inquiry 180302, |
| | WMT China re retail link 180302, |
| | WMT China status on China 180302, |
| | WMT China re local China ofcs 210130, |
| | WMT China re China ofc and contact history 210202, |
| | WMT China Liao re China ofc details 210204, |
| | WMT China on packaged cuts 210222, |
| | WMT China docs needed 210312, |
| | WMT China Liao re new ofcs in China 210407, |
| | WMT China re beef purchase embargo in China 210415, |
| | WMT China SAmerica Quote 210422, |
| | WMT China rejects BR Tradimpex case ready pricing 210426, |
| | WMT China intro to RMC China rep Jason 210428, |
| | WMT re US organic beef pgm 210605, |
| | WMT Redfield on domestic organic beef 210607, |
| | WMT Lehr Organic Beef Intro 210610, |

| | |
|---|---|
| | WMT re organic beef partner pgm 210615, <br> WMT Lehr video mtg 210616, <br> WMT Lehr re comp organic price premiums on ther products 210617, <br> WMT Redfield cc Lehr video mtg 210617, <br> WMT Lehr alt sales ramp 210618, <br> WMT Lehr Baskin video mtg to come 210702, <br> WMT Hutchins mtg set 210713, <br> WMT Baskin Lehr call fup on pricing 210729, <br> WMT Baskin Lehr video call 210729, <br> WMT Partnering Zoom Call 210729, <br> WMT Baskin on pricing 210810, <br> WMT Baskin status inquiry 210816, <br> WMT Baskin pass 210818, <br> WMT Organic Beef pass 210818, <br> WMT Organic Beef pgm not established 210823, <br> WMT Baskin re pass pricing other issues 210824, <br> Walmart China Retail Link Vendor application 10172-10173 <br> WMT McCormick 170221 Bentonville mtg Revised Presentation Fup 170222.pdf <br> WMT SCS Audit Preferred Frzr 20180517_1005110267Deposit_Invoice 180517.pdf <br> WMT Std Supplier Contract Signature Page image2018-02-09-142033 180207.pdf |

**594. RICO-39 Racketeering Violations: Fraudulent Sales and Marketing Representation 2019-2021**

A. This pattern of sales lead development frauds and fraudulent lead reports repeats yet again in 2019-2021 as conducted by Defendants Vendorco, and Foshan Shunde XinJianHan Trading Co, Ltd (RMC). Vendorco through its principal Susan Walker domiciled in California represented one of Lead Plaintiff's companies to Costco, Perimeter Sales and Marketing is a sales representation firm domiciled in California, and RMC is alleged to be a commercial trading operation domiciled in New York City, with a dedicated agent allegedly operating from

Shanghai, China to solicit customers in China, with progress as reported by that China-based

sales agent. Lead Plaintiff also assigns sustainment of Lead Plaintiff's business entity Sheldon

Beef's relationship with Walmart China so RMC can earn commissions through that

relationship. Defendant RMC provided fraudulent sales leads and reports, facilitated by wire

fraud and contract fraud for the fraudulent purpose of stripping authentic international sales

opportunities of Sheldon Beef. These fraudulent services cost the company nearly two years lost

for legitimate sales opportunities.

B. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by

reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-31 through RICO-39 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0114 |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Manner Influencer Contract 210901, Manner Influencer Status 210909, Manner Influencer re web progress status 210910, Manner Influencer Hold 211101, Perimeter Sales Mktg re brokered LA regional mkt coverage 140408 Perimeter Sales Merchandising Pitch Deck 140408.pdfRMC Lonergan re agent quals 200811, RMC Lonergan Poon mtg 200812, RMC Lonergan re contract 200812, RMC Poon Raymond Signed Contract RMC Signature page 200813.pdf RMC Lonergan contract agreement 200813, RMC Lonergan Poon collaboration agreed 200814, RMC Lonergan re sales activity 200830, RMC Lonergan re co-venture details 200831, RMC Poon coventure orgzn options 200902, |

RMC Lonergan 200903,
RMC Lonergan re pricing 200908,
RMC Lonergan re China Mktg 201207,
RMC Lonergan re Poon mktg direct support 201207,
RMC China direct mktg pgm 201230,
RMC Poon re BRF contact inside China 210126,
RMC re BRF info request 210128,
RMC Lonergan re Costco WMT on China ofc 210130,
RMC Poon on BRF China mtg results 210203,
RMC re China contract mod 210225,
RMC Lonergan on RMC sales strategy doc China 210226,
RMC Lonergan re Berkshire pork 210307,
RMC Lonergan re Berkshire cuts cherry picking 210311,
RMC Lonergan re China sales progress 210311,
RMC Lonergan Berkshire Trial Order Pricing 210312,
RMC Lonergan re Berkshire volumes 210312,
RMC Lonergan 210316,
RMC Lonergan sales prospect report 210316,
RMC Lonergan Yao Quote 210316,
RMC Lonergan China sales quotes 210326,
RMC re signed modified contract 210331,
RMC Lonergan beef sales quote 210413,
RMC China sales report 210430,
RMC Poon on Big Sandy investment potential 210507,
RMC Jason on WMT China Intro mtg 210511,
RMC Poon on status 210518,
RMC China pricing 210520,
RMC Jason on scam beef request 210525,
RMC China sales pgm conversion attempts reqd 210622,
RMC Jason re sales efforts 210628,
RMC Jason Sales Advice 210628,
RMC Jason Omasum No Quote 210703,
RMC Poon re status and future pymt opptnys 210731,
RMC Jason re status 210816,
RMC Poon re status 210816,
RMC re 60 day notice terminating 210902,
RMC Lonergan re repay advances 210903,
RMC payment plan request 210903,
RMC Poon re pricing guidleines 211015,
RMC Raymond re status 211220

| | Costco Walker Vendorco Huskey Costco Final Presentation 190501 (1) (2).pdf |
|---|---|

**595. RICO-40 Racketeering Violations: Dishonest Professional Services, Web 2021-2022**

A. ENVOTEC, a website developer, located by Lead Plaintiff in Pakistan through a Defendant spoofed or otherwise controlled version of Freelancer.com and while acting or posing as its employees and contractors, is paid for web development services. Defendants, (including funding source cover name Michael Maggard, FBI Amarillo) as an element of their on-going pattern of racketeering acts, never intend to allow these web development services to be completed and for this online store to be permitted to offer products for retail sale. This is a repeated instance of this type of fraud against an online store which was previously developed by Lead Plaintiff himself to launch product sales to beef wholesalers and was the subject of a launch meeting with fake employees Jason Waseman, Chris Canchola, and Lori Alvarez in Avondale, AZ, as documented in other subcounts RICO-44 and RICO-47 herein, as well as in email evidence stripped and/or currently inaccessible as this Complaint is being written.

B. This fraud and swindle is an element of Defendants' on-going conspiracy to sustain, among other offenses, involuntary servitude, forced labor, and human trafficking using repeated cycles of delay and financial starvation of Lead Plaintiff's business entities, and used to further their intent to exhaust the personal financial resources of Lead Plaintiff, who regularly invests personal funds and extensive amounts of personal time and professional talent in each of these entities. These expenditures in international commerce are shown at LP Evidentiary Exhibits pages 10093, 10094.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
|---|---|
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 10093, 10094 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | GPR website developer re feeedback 210814, GPR Website stall 210819, GPR Website product load begins 210820, GPR website further delays 210824, GPR Startup Plan Rev 210829, GPR website closer but not functional 210903, GPR website slides again 210907, GPR website added dev fees 210909, GPR web dev re project hold 211026, GPR Web contacts zero response rate note 221117 |

### 596. RICO-41 Racketeering Violations: Dishonest Professional Services, Legal 1986-2005

A. Lead Plaintiff businesses and intertwined personal interests are repeatedly deprived of honest legal services at various law firms. This trail of attorneys who do no legal work for the corporate clients Lead Plaintiff owns or works for between 1986 and 2005 include: Lazersoft - Glen Garrison at Keller Rohrback;  Alliance Environmental Services - Robert Hibbs AT Short Cressman & Burgess; CNA Industrial Engineering - Mike Babcock (also spouse of co-worker Gwen Heathcote at Deloitte Haskins and Sells); Allegent, LLC dba Performa - Michael Larson - Larson Hart & Shepherd, later Pivotal Law Group. Larson is introduced by Jay Conte, a federal commercial cover agent specializing in financial frauds, likely an FBI agent or IRS special agent.

Examples include:

1)   The original bankruptcy case filed by two other individuals (Waters, Tarpley) and Lead Plaintiff against LazerSoft mysteriously results in absolutely no bankruptcy court actions or notices. With the benefit of hindsight, this is likely due to Hibbs' actual fraudulent failure to file this litigation while acting against Lead Plaintiff's personal interest in this matter.

2)   Extensive and expensive subsequent litigation includes a federal court hearing in the US District Court for Western Washington on the standing of Wembley in this matter in 1994 or 1995, in which the Court denies standing. The case is not resolved but yet another matter is allegedly filed, related to Waters' ownership of the software work product, adding more litigation expense. Waters reports a $30,000 overbilling by Short Cressman & Burgess lead attorney Robert Hibbs. Most likely this too is an inside job, with Lead Plaintiff's two remaining co-workers, Tarpley and Waters, actually operating as members of his minder team throughout the entire sequence.

3)   The $150,000 account receivable of a P.A.N. Environmental subsidiary is discounted with a commercial factor in southern California. These funds mysteriously disappear into the factor's bank, First Interstate Bank, after P.A.N.'s CEO promises to pay Lead Plaintiff compensation from that receivable, allegedly seized by the bank to repay an outstanding debt of the factor to the bank. P.A.N. CEO Cornwell declines to take immediate action to legally notify the bank of the actual provenance of the payment within seven days as required under California law to retain its ownership interest in the payment, so the Lead Plaintiff is once again strung out financially as the promise of legally due compensation

being paid after another delay is broken yet again by the purposeful, deliberate, and conspiratorial acts of Defendants.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0056 through 2-0058, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**597. RICO-42 Racketeering Violations: Dishonest Professional Services, Legal 2014-2021**

A. Defendant Raymond Sullivan is introduced to Lead Plaintiff by a former commercial cover "investment banker" known as Charles Jackson. Defendant Sullivan is an international trade attorney and former federal Customs and Border Protection investigator. Defendant Sullivan bills entities owned and controlled by Lead Plaintiff approximately $400,000 for legal services between November 2013 and April 2021. He receives $10,000 paid for legal services from the funds invested by "Dean T. Smith" in August 2015 and continues his services billing at $600 per hour despite Winnett Perico's inability to pay as Winnett Perico and Lead Plaintiff are continually strapped for cash flow and being stripped of resources by Defendants' actions.

B. Upon knowledge and belief, Defendant Sullivan is fundamentally detailed, as are prior attorneys referred by trusted sources to Lead Plaintiff and used by his business entities, for

the actual purpose of spying upon and sustaining functional control of Lead Plaintiff and his

related business enterprises, and to interfere and surveil all contracts and business opportunities.

These acts under color of law are another element of Defendants' overall scheme and pattern of

frauds and racketeering acts used to perpetuate their human trafficking, involuntary servitude,

forced labor, and invasions of human autonomy and rights.

     C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by

reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary

materials related to this specific subcount follow:

| Interline Exhibits: | 5-13 |
|---|---|
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | 383-384, 430-438, 440, 8370, 8371-8373, 8474, 8378, 8411, 9249-9255, 9285, 9311, 9820 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Ray Sullivan ID incl Bar Numbers 140620.pdf<br>Burges Salmon 1 re London Closing 140917,<br>Burges Salmon 1 re London Closing 140918,<br>Collins ref by Sullivan on Bridge Loan 150629,<br>Sullivan re Benibo fake 131202,<br>Sullivan Intro from Jackson 140219,<br>Sullivan on 140225 mtg 140226,<br>Sullivan re Zayid investment 140304,<br>Sullivan re Zayid as former Customs Investigator 140305,<br>Sullivan re Mubadala Commission reqmt and FCPA violation 140715,<br>Sullivan WO sends $10K 150828,<br>Sullivan appointed Corp Counsel 151110,<br>Sullivan on financings 160111,<br>Sullivan on financing lead from Castro 160206,<br>Sullivan on MARV Capital drop 160401,<br>Sullivan re Insight scam Argold, Brereton status 160419,<br>Sullivan re RAM Olin contract 160426,<br>Sullivan on Oliver Term Sheet to Contract 160707, |

|  | Sullivan on Akoto Brewer Fund creation 160710, |
|---|---|
|  | Sullivan on Akoto Brewer Fund creation 160727, |
|  | Sullivan Draft for Oliver Funding 160728, |
|  | Sullivan re Blackpool CAP 161128, |
|  | Sullivan re Arpaio Palmeri Gerlach Black Rock Farms 161220, |
|  | Sullivan Arpaio Palmeri Black Rock Farms Jack Palmeri 161222, |
|  | Sullivan re WMT Bentonville visit Feb 161229, |
|  | Sullivan re Smith 5K loan 170126, |
|  | Sullivan re Whitestone Lex Gubsky Moneywise  170126, |
|  | Sullivan Marvel re Black Rock Gerlach 170301, |
|  | Sullivan re Black Rock Marvel 26 Ranch reappears 170301, |
|  | Sullivan re Marvel Black Rock retainer review 170303, |
|  | Sullivan re pea harvester lease 170303, |
|  | Sullivan re RAM demand notice 170401, |
|  | Sullivan re prospective escrow lenders 170602, |
|  | Sullivan re CFO Smith termination 170608, |
|  | Sullian re FATCO re title for Skaar 170613, |
|  | Sullivan TX HEC feedyard contract 180118, |
|  | Sullivan review of E6 docs okay 180223, |
|  | Sullivan re sales contract review 200804, |
|  | Sullivan re Abdelsayed 2mm loan gty shares grant 200822, |
|  | Sullivan re RMC contract mod 26 Ranch sked 210225 |
|  | Sullivan Billing for Feb 2019 190228.pdf |
|  | Sullivan Billing for Jan 2019 190201.pdf |
|  | Sullivan December 2018 Billing 190102.pdf |
|  | Sullivan Winnett Perico Bill for April 2019 190501.pdf |
|  | Sullivan Winnett Perico Bill for August 2018 180901.pdf |
|  | Sullivan Winnett Perico Bill for June 2018 180701.pdf |
|  | Sullivan Winnett Perico Bill for March 2019 190401.pdf |
|  | Sullivan Winnett Perico Bill for November 2018 181201.pdf |
|  | Sullivan Winnett Perico Bill for October 2018 181101.pdf |
|  | Sullivan Winnett Perico Bill for September 2108 181001.pdf |

**598. RICO-43 Racketeering Violations: Dishonest Professional Services, Maricopa County AZ Sheriff Arpaio as Consultant 2014-2017**

A. Defendant Joseph Arpaio, as Sheriff of Maricopa County, Arizona, and as a private individual after his term in office expires, is instrumental in orchestrating his own introduction to Lead Plaintiff as Greg Crossgrove, an organic produce farming and packing expert with prior organic farming experience. Defendant Arpaio (as Greg Crossgrove) allegedly worked with Captiva Verde, an organic grower in California with a farm in Arizona funded by investors associated with the Vancouver Stock Exchange, in Vancouver, British Columbia, Canada. Mr. Crossgrove (Arpaio) also claims an association with the Nunes family agriculture operations in California through his brother as President of a Nunes family fresh produce enterprise. Notably, Representative Devin Nunes, closely aligned with President Trump and House Minority Leader Kevin McCarthy, chairs the House Intelligence Committee around this time.

B. Mr. Crossgrove (Arpaio) assists Lead Plaintiff with production methods, staffing, and locating investors. He introduces a fellow consultant, Ricky King, Double K Enterprises, who assists the Lead Plaintiff in identifying and touring an abandoned farming property in Hyder, Maricopa County. AZ, then currently leased by Barry Oliver, a wealthy investor. Arpaio (Crossgrove) also allegedly argues about production methods and costs with another Defendant police powers agent or officer, Mike Castro, after Castro is selected to become the VP Operations for WinnettOrganics, a Lead Plaintiff business entity.

C. Lead Plaintiff takes a copy of a signed $52 million investment agreement with a Qatari company with him to an October 2015 organic vegetable packing plant construction

meeting at Willmeng Construction's otherwise empty headquarters building in Maricopa County and shows the signed document to Crossgrove (Defendant Sheriff Joseph Arpaio) sitting to his immediate left as they face the video conference screen at the other end of the conference room. See LP Evidentiary Exhibits pages 8489-8506.

D. Eventually, this fraud and swindle come crashing down, by design as usual, with the Lead Plaintiff having been run through another years-long sequence of false starts, false promises, and failures which begins in 2013 and continues with Arpaio's direct involvement from late 2014 and his periodic outreaches to sustain his involvement with Lead Plaintiff until a final email exchange on August 17, 2017, around the time of his conviction on criminal contempt charges about a week before he is pardoned by President Trump.

E. This years-long sequence includes numerous visits to Arizona by Lead Plaintiff for meetings and tours; for processing plant design meetings in Salinas, CA and Maricopa County, AZ; to meet investors; to gather with fake employees; as well as sales trips to Walmart in Bentonville, AR, and Kroger in Cincinnati, OH; attendance at conferences and referrals by agents or officers posing as investment firms and their officers or employees in New York City; among other events. This elaborate and wildly expensive multi-jurisdiction, multi-level of government fraud and swindle by Defendants is completely fabricated, systematically fraudulent, and involves thousands of emails, phone calls, and expenditures for travel, entertainment, proposals, samples, and mailings. It is a comparable sequence to those previously undertaken by Defendants to control and human traffick the Lead Plaintiff since he began directly engaging as an "independent entrepreneur" in 1986, and it is a markedly similar process to his prior business and career experiences to 2005 and to the subsequent ten month stint in

2007 to 2008, the final employment and earned income permitted by Defendant United States and its co-conspirators. See documentary and disbursements evidence which dates from December 2014 to August 2017 referenced below.

I. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. Subcount RICO-19 subparagraph E is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 10, 5-13 |
| Complaint paragraphs: | 216, RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | 383, 386, 427, 431, 602, 616, 632-635, 8351-8352, 8489-8506, 8813-8854, 8937-8938, 8956, 10132-10137, noting entries for Arizona destinations and locations |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Arpaio Truitt inital hit connects to B Oliver 141108, Arpaio Crossgrove first hit 141212, Arpaio Crossgrove Persist Example 150707, Arpaio from Brewer on startup plan 150810, Arpaio intro Oliver 150902, Arpaio on Project Progress Oliver 150906, Arpaio on Plant Design Rqmts 150916, Arpaio Castro Leases to do forgoteen during telcon 151007, Arpaio availability 151014, Arpaio tours Gerra Plug Power 151018, Arpaio announces Captiva Salome Farm Availability 160210, Arpaio on Oliver Hyder 160321, Arpaio on involvement 160427, Arpaio on greenhouses and financing arranged 160430, Arpaio on lack of investor contact other updates 160505, Arpaio King update 160511, Arpaio on Oliver as poss investor 160513, Arpaio on Oliver and Hyder layout 160520, |

Arpaio on status and prior Captiva Verde involvement 160624,

Arpaio on Brother as Nunes exec 160627,

Arpaio on Oliver proposal 160703,

Arpaio on Oliver Term Sheet Clarification 160707,

Arpaio on Oliver Direct Funding 160721,

Arpaio on Proposed budget Oliver Hyder project 160729,

Arpaio on temp cooler Cowley Kodiak Produce PHX 160730,

Arpaio on Hyder Oliver per acre costs Castro 160801,

Arpaio info request 160805,

Arpaio on grow plan fin projections 160809,

Arpaio on Oliver deal collapse 160809,

Arpaio King re Hyder Oliver 160812,

Arpaio re Hyder Oliver resurrection 160813,

Arpaio on Oliver Hyder structure 160816,

Arpaio on Oliver Hyder 160819,

Arpaio on spring lettuce season 160819,

Arpaio on Oliver Hyder prep and Buckeye 160902,

Arpaio on acre reallocation 160906,

Arpaio on Oliver proposal and conv cropping 160911,

Arpaio connects RAM ACTS Freedom Famrs 160913,

Arpaio intro ACTS Freedom Farms 160913,

Arpaio on Oliver Hyder son objection 160913,

Arpaio ACTS Freedom Farms and Hinson 161005,

Arpaio on brother at Nunes and Sprouts open AZ 161008,

Arpaio CFO Smith re plan for Hyder Oliver presnetation 161026,

Arpaio on Oliver pitch date 161026,

Arpaio on Western Growers Assn Pricing 161027,

Arpaio CFO Smith re plan for Hyder Oliver presnetation 161102,

Arpaio re WMT Kroger 161215,

Arpaio on Gerlach NV 161216,

Arpaio refers Gerlach Black Rock 161216,

Arpaio re Sprouts 161230,

Arpaio re Sprouts Kroger Costco WMT 161230,

Arpaio Sheriff Term Ends 170101,

Arpaio ref grower shipper interest 170115,

Arpaio ref RWood Offer Letter 170115,

Arpaio on new VP Growing referred 170117,

Arpaio on Buckeye Greenhouses 170211,

Arpaio on Freedom Farms reconnect 170211,

Arpaio re phone appt avail 170216,

Arpaio on investor closing and startup 170303,

Arpaio re land avail and deadlines 170303,

Arpaio 170309,

Arpaio VP Grow comments 170309,

Arpaio as land rep announcement 170316,

Arpaio Prader Integrted Ag re Hyder Farms 170526,

Arpaio on status inquiry 170707,

Arpaio 170724,

Arpaio on land and mkt conditions 170724,

Arpaio 170817,

Arpaio Prader IntegratedAG AZ hangs in 180207,

Castro CA VP-Ops Intvw 150825,

Castro CA re Mota Dir Ops add 150901,

Castro introduces Gerlach to DB Arpaio 151106,

Castro re financings 151120,

Castro re Hyder Water Quality 151126,

Castro on Dole Gerlach 160125,

Castro on lettuce production detail 160214,

Castro on Kingman Farms status 160304,

Castro progress report 160427,

Castro re Hinson Lyle proposal via Arpaio 160513,

Castro on Aqua 4D saline water trmt 160608,

Castro re personnel rqmts 160705,

Castro re Aqua 4D Giora bkfst miss and Oliver mtg 160719,

Castro on Aqua4D in Oliver Hyder budget 160731,

Castro on budget format Oliver Hyder 160801,

Castro on resignation 160810,

Castro Separation Agreement 160811,

Castro Separation Agreement to Sullivan 160811,

Castro connection Aqua 4D Giliad email samples 161101

DD on Oliver Term Sheet 160711,

DD Callahan re engement ltr 160714,

DD Callahan re cancelled Oliver mtg 160812,

DD on Oliver Hyder resurrection 160824,

DD Hinson on production volumes 161106,

Indeed re Galkin start 200716,
Indeed Company recruiter Indeed 200828,
Indeed re Kumin Galkin starts 200828,
Indeed recruiter re status 201022,
King AZ Arpaio Ops Connection 150818,
Liberty EB-5 initial hit 141027,
Liberty Keller Carter mtg thanks 141103,
Liberty EB-5 WinnettOrganics LOI 11-12-14 141112,
Liberty Carter ref request services matrix request 141114,
Liberty re CADC TEA eligibility 150106,
Liberty backout excuse sent to UFIG 150505,
Liberty EB-5 LOI to WP 221105,
Liquid Capital AZ Gottesman initial hit 170928,
Liquid Capital AZ Gottesman signed app 171012,
Liquid Capital AZ Gottesman on underwriting info request 171012,
Liquid Capital AZ Gottesman underwriting info complete 171013,
Liquid Capital AZ Gottesman email DLC sample 171017,
Liquid Capital AZ Gottesman 171101 mtg request 171024,
Lyle Hinson re Buckeye Grnhses DC 161218,
Lyle re 350K Buckeye whse cooler 160818,
Oliver AZ mtg contact 150902,
Oliver re Hyder Lease 150928,
Oliver PHX Hyder Lease Sign 151004,
Oliver Hyder Eqpt Lease Dep Status 151215,
Oliver Hyder Funding update 151222,
Oliver on financings outstanding 160111,
Oliver Dole sales update 160123,
Oliver on financings status 160129,
Oliver on financings status 160208,
Oliver on financings status 160217,
Oliver on financings status 160223,
Oliver has poss investor interest 160226,
Oliver on financings status 160226,
Oliver on status 160322,
Oliver re Costamanga invest decsion postponed 160420,
Oliver update 160629,
Oliver Term Sheet Proposal 160705,
Oliver on Term Sheet Clarification 160707,

Oliver PHX mtg proposal 160713,
Oliver re mtg location Arpaio King Castro Smith 160714,
Oliver 160719 mtg preview email 160718,
Oliver Term Sht mtg update to Tarazewich 160719,
Oliver on Hyder Budget Cost Detail 160810,
Oliver on Hyder Deal Fail 160810,
Oliver resurrects Hyder 160812,
Oliver re Hyder Dev collateral 161103,
Oliver re Hyder Dev proposal 161103,
Oliver re Hyder Farm Dev Plan 161103,
Oliver Hyder WO Presentation to Oliver 160719.pdf
Oliver mtg WO ProForma Presentation V1 160719.pdf
RAM connects Arpaio ACTS freedom farms 160913,
RAM on Hinson ACTS Freedom Farms 160914,
Rose Jordan Recruiter Fee Agreement 150824,
Smith re Oliver Term Sheet 160707,
Smith re fine tuning on Oliver financial proposal 160720,
Smith re IT traceability budget add Oliver Hyder 160731,
Smith re Status Report Detail on Hyder Oliver et al
160818,
WMT initial hit on cold email 161002,
WMT fup Baldwin 161010,
WMT McCormick ref from Balwin 161011,
WMT sales news to WO team 161011,
WMT McCormick Webex 161014,
WMT McCormick call tomorrow email 161017,
WMT McCormick call fup 161018,
WMT McCormick call fup production volumes 161020,
WMT McCormick call 161109,
WMT McCormick re DD discussion 161114,
WMT McCormick resked and participant list 161114,
WMT McCormick call fup 161116,
WMT McCormick call fup 161118,
WMT McCormick re investors ibankers 161121,
WMT McCormick on contract outline 170108,
WMT McCormick Bentonville Mtg Attendees 170111,
WMT McCormick 170224 Bentonville mtg Present Draft
170123,
WMT McCormick email Bentonville Mtg Presentation
170123,

WMT McCormick Bentonville Mtg Attendees 170216,
WMT McCormick Bentonville Mtg Invite 170216,
WMT McCormick Bentonville Mtg Location 170216,
WMT McCormick Bentonville mtg fup 170222,
WMT McCormick re post Bentonville Mtg Rev 170222,
WMT McCormick nonreply fup 170328,
WMT Baldwin re decision next week 170403,
WMT McCormick re mktg plans 170403,
WMT McCormick on price drop 170412,
WMT McCormick buyer contacts 170425,
WMT China Beef ref from McCormick 170703,
WMT connects China on beef 170703,
WMT China Zheng initial contact 170704,
WMT China Zheng merch support 170707,
WMT China Zheng ROM pricing 170708,
Willmeng Jarvis Tom Contact Info 150808,
WO Intent to Proceed Brewer corp apt rental inquiry 150809,
WO Team Initial Mtg LAX 150914,
WO Plant Kickoff Salinas Mtg 150916,
WO Plant Willmeng ref from Sayre 150917,
WO Status Report Adamson PPM 150917,
WO Team re PPM S-1 processes 150921,
WO Plant Kickoff Salinas Mtg 150922,
WO Plant Willmeng contract draft 151012,
WO Plant Willmeng kickoff meet Oct 27 151019,
WO Plant Willmeng cost workup status 151021,
WO Status Report Jabor and Sales 151022,
WO Hyder Farm Castro on Oliver 151028,
WO Weekly Status Report reaction Petersen 151029,
WO Hyder Farm Terminal Estimate to Oliver 151030,
WO Sales Fresh Express Smith contact 151104,
WO Grt Western Bk local takeover visit 151117,
WO Team on Jabor Funded on Time 151117,
WO Team re Jabor snag  151118,
WO Team on financings 151120,
WP Paypal Acct Detail Sep-Dec 151231,
WO Team on 179mm Financings 160101,
WO Status Financings 160121,
WO Financings deal status to team 160208,

|  | WO Status Kingman Startup Financings 160209, |
|---|---|
|  | WO Status Report financings 160421, |
|  | WO Status re Oliver Term Sheet Verbal 160719, |
|  | WO Status Final Oliver Hyder present sked 160804, |
|  | WO Status Hyder Oliver rework 160818, |
|  | WO Status DD Fin Sales 160929, |
|  | WO Status Report on Hyder Oliver new pitch status 161006, |
|  | WO on WMT progress 161018, |
|  | WO Status financings 161103, |
|  | WO Status Financings WMT Kroger 161115, |
|  | WO Status Kroger projection incl 161226, |
|  | WP Great Western 2016 DDA Account 161231, |
|  | WO Org Chart 170111, |
|  | WO Blitch re ofc space tour 170118, |
|  | WO Status Report Reed Wood join 170119, |
|  | WO Team re Gerlach soi tests 170201, |
|  | WO Blitch re Stockton Hill Famr tour w Blackpool 170203, |
|  | WO Smith CFO re Revolution VC pass 170203, |
|  | WO Status Rpt Stockton Hill Update 170209, |
|  | WO Status Rpt incl WMT status 170223, |
|  | WO Team re Blackppol to fund 170301, |
|  | WO Team re Blackpool no reply stringout 170309, |
|  | WO Team re Blackpool deadline miss 170310, |
|  | WO Status Report DD retainer need 170320, |
|  | WO also Cardone on Status WMT others 170403, |
|  | WO Team WMT dead Alb on track others 170404, |
|  | WO Status Skaar 170504, |
|  | WP Executive Summary Bus Plan 170507, |
|  | WO Status Report Skaar Investor Interest 170515, |
|  | WO Team Smith CFO Termination Notice 170612, |
|  | WO Team Smith CFO Termination 170613, |
|  | Zaharis re Cowley Kodiak Produce temp cooler space 170206 |

**599. RICO-44 Racketeering Violations: Dishonest Professional Services, Employees, Recruiters, Various Positions 2011-2022**

A. Defendants with police powers hack and manipulate Lead Plaintiff's personal computer and the websites presented to Lead Plaintiff thereon. Defendants engage in repeated blocking of access to legitimate business recruiters, repeatedly substitute their own fraudulent executive recruiters and place fake employees in Lead Plaintiff owned and managed companies to arrange the hiring of Defendants' own screened-in personnel and confidential informants. Defendants also refer other professionals and firms as service providers for design and architectural services, and as suppliers, to supplant legitimate suppliers of plant and equipment which are essential to meeting customer needs of the various businesses which Lead Plaintiff owns, controls, and/or manages.

B. This scenario repeats many times, including, for example, Defendant police powers agents, officers, or confidential informants Rafael Gomez, domiciled in California slated to be Director – Food Safety and Eric Galkin, domiciled in New York State, slated to be Director-Procurement, once permanent financing can be arranged. These and others are recruited through online job postings on spoofed websites, and by an Indeed.com online contract recruiter. These contractors and personnel continue the Defendants' pattern of racketeering acts while interfering in interstate commerce and engaging in on-going entrapment attempts and entangle the Lead Plaintiff in other investigations in local, state, and federal interstate jurisdiction.

C. These online frauds and swindles run from the first instance of Lead Plaintiff's use of a personal computer in the 1980s to the present for personal job hunts and for business recruiting as Lead Plaintiff primarily uses these online tools for this purpose and Defendants use wire fraud

and email fraud, in both in-state and interstate commerce to manage the Lead Plaintiff by controlling his employment and destroy his private enterprises to perpetuate Lead Plaintiff's human trafficking, involuntary servitude, and forced labor; and their violations of the Fourth, Thirteenth, and Fourteenth Amendments, and other civil, Constitutional, and human rights under international law and ratified treaties.

D. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | Not applicable |
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0036, 2-0045, 2-0050, 2-0053, 2-0072, 2-0081 |
| LP Evidentiary Exhibits pages: | 371, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 603, 609-612, 616-765, 770-771, 783, 8479, 9181, 9820, 10179-10186 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Blitch re contract fertilizer packaging 170526<br>BReed email Offer Letter 170115,<br>BReed Offer Letter 170115,<br>BReed on Stockton Hill Farm Kingman 170129,<br>BReed on Stockton Hill Farm offer progress 170131,<br>BReed re Gila Bend lead 170131,<br>BReed re Stockton Hills tour 170209,<br>BReed refs VP Grow candidate 170210,<br>Reed Bill Reed Disclosure Letter Winnett Organics 17.01.2017.pdf<br>Canchola phone number change 200727,<br>Castro CA VP-Ops Intvw 150825,<br>Castro CA re Mota Dir Ops add 150901,<br>Castro introduces Gerlach to DB Arpaio 151106,<br>Castro re financings 151120,<br>Castro re Hyder Water Quality 151126,<br>Castro on Dole Gerlach 160125,<br>Castro on lettuce production detail 160214, |

Castro on Kingman Farms status 160304,
Castro progress report 160427,
Castro re Hinson Lyle proposal via Arpaio 160513,
Castro on Aqua 4D saline water trmt 160608,
Castro re personnel rqmts 160705,
Castro re Aqua 4D Giora bkfst miss and Oliver mtg 160719,
Castro on Aqua4D in Oliver Hyder budget 160731,
Castro on budget format Oliver Hyder 160801,
Castro on resignation 160810,
Castro Separation Agreement 160811,
Castro Separation Agreement to Sullivan 160811,
Castro connection Aqua 4D Giliad email samples 161101
CFO Smith entrap attempt backdating 161016,
Galkin NYCDir Procuremnt 200824,
Galkin is vehicle for procurement contacts dump 200826,
Galkin fishing expedition and leave 200831,
Galkin Kumin on quote requests 200831,
Galkin re termination after source strip via Indeed 200924,
Gomez Dir Food Safety Intvw 150829,
Gomez refers Brereton Hamilton 160407,
Gomez re investor call request 160408,
Gomez re investor interest 160427,
Gomez on Costamanga mtg plan 160429,
Gomez update on CA investor progress 160506,
Gomez Costamanga mtg request 160508,
Gomez re new investor leads 160512,
Gomez investor update 160525,
Gomez re Japanese Inv Lead sales progress 160616,
Gomez update Kevin investor 160704,
Gomez re Costamanga mtg 170203,
Gomez re Brereton has organic cattle in TX 171228,
Hansen AgriPlacment Glandt refers Nickless 170710,
Nickless initial hits re 170803,
Nickless initial hits re Skaar 170803,
Nickless on status 170818,
Nickless sources a TX feedyard 171229,
Nickless re HEC Friona eqpt 180116,
Nickless re HEC price drop 180116,
Nickless re HEC LOI 180117,

Nickless on Rio Bravo fake finls 180213,
Nickless Ops re Galkin Procurement 200811,
Nickless Ops re Galkin Procurement contract 200811,
Nickless re Korea sales pgm 210116,
Nickless re Big Sandy 210217,
Nickless re Big Sandy Housing 210307,
Nickless on Lake County tour 210709,
Nickless re Intl Trader Termination 210917,
Paul Smith Resume 170308,
Smith CFO Stock Option Agreement Signed After
Backdating Request 10176-10178
Poindexter VP Sales intvw Kingman later 150826,
Poindexter Kingman veg crops 151001,
Poindexter Kingman tour Jim Rhodes intro 151007,
Poindexter direct Rhodes re Kingman 151017,
Recruiter Connections Plus DeLeon Recruiter 150903,
Recruiter Connection Plus DeLeon ref Waseman 150911,
Recruiter Connections Plus DeLeon submits Waseman
150915,
Recruiter Connections LeBlond subord searches 150928,
Recruiter Connections Smith CFO subord 151117,
Recruiter Connections DeLeon on Waseman fee160229,
Recruiter Connections JBN  Contingency Fee Agrmt
160414,
Recruiter Connections JBN 160414,
Recruiter Connections DeLeon update Waseman 160513,
Recruiter Connections JBN 160513,
Recruiter Connections Plus DeLeon 160513,
Recruiter Connections DeLeon re Waseman start160627,
Recruiter Connections Plus DeLeon on Waseman fees
170307,
Recruiter Connections Agricareers 170615,
Recruiter Connections Glandt 170630,
Reed VP Ops intvw Lunch Tucson 150831,
Reed re Gerlach 170127,
Reed on Stockton Hill Farm Kingman 221028 170129,
Reed re Stockton Hill Status 170130,
Reed xmits Stockton Hill Rd LOI draft 170209,
Reed re Black Rock visit 170304,
Reed to Gomez on Bacak Rock Farm Maps Gerlach

| |
|---|
| 170305,<br>Reed on Jiim Rhodes ppty 170311,<br>Reed on Rhodes Peacock Highlands 170313,<br>Reed Gerlach assessment 170315,<br>Reed Gerlach Plan B Memo UTAH 170320,<br>Reed re Gerlach Assessment 170320,<br>SBI first accesible email Canchola 200709<br>Task Worksheet – Brewer CEO 10179-10180<br>Task Worksheet – Blitch CIO 10181-10182<br>Task Worksheet – Smith CFO 10183-10184<br>Task Worksheet – Vindiola Dir HR 10185-10186<br>WO Blitch re ofc space tour 170118,<br>WO Status Report Reed Wood join 170119,<br>WO Blitch re Stockton Hill Famr tour w Blackpool 170203,<br>WO Smith CFO re Revolution VC pass 170203 |

**600. RICO-45 Racketeering Violations: Dishonest Professional Services, Employees, Recruiters, Logistics 2015-2021**

A. Numerous Defendants' police powers agents, officers, and confidential informants posed as current or prospective employees of one of the Lead Plaintiff's commerce and interstate commerce business entities. Jason Waseman was the only individual who requested and accepted payroll direct deposits. Two payments are made through the ADP payroll service for payroll amounts and ADP fees deposits directly to Waseman's personal accounts by Lead Plaintiff managed Winnett Perico, headquartered in New Jersey to Waseman, then a resident of Arizona. Other fake employees and potential employees had stock and stock option grants. Note that several of these individuals also had military and/or international employment experiences, including in special operations, a recurrent theme among the individuals who were assigned to employment stints with the Lead Plaintiff by Defendant United States and other Defendants.

C. All paragraphs above are incorporated herein by reference including, without

limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 10 |
| Complaint paragraphs: | 199, RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | 616-765, 9256-9259, 9636-9637, 9639, 9727-9728, 9820, 9987, 9991-9993 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Recruiter Connections Plus DeLeon Recruiter 150903, Recruiter Connection Plus DeLeon ref Waseman 150911, Recruiter Connections Plus DeLeon submits Waseman 150915, Recruiter Connections DeLeon on Waseman fee160229, Recruiter Connections DeLeon update Waseman 160513, Recruiter Connections Plus DeLeon 160513, Recruiter Connections DeLeon re Waseman start160627, Recruiter Connections Plus DeLeon on Waseman fees 170307, Rose Jordan Contingency Agreement-Winnett Organics Signed 150824.pdf Waseman re Tucson ofc tour 160604, Waseman re intvw new VP Ops Bill Reed 170104, Waseman re Stockton Hill Farm 170310, Waseman re WMT China logistics and fulfillment process 170926, Waseman history disappeared new email acct needed 210104, Waseman Nickless re Korea sales pgm 210115, Waseman ref request 210525, Waseman ref request fup 210526, Waseman checkin re WMT organic beef 210616, Waseman re cold chain fulfillment 210830, Waseman re cold chain launch timing 210830 Waseman I-9 scan0010 180315.pdf |

**601. RICO-46 Racketeering Violations: Dishonest Professional Services, Employees, Sales**

A. Peter LeBlond is recruited as Vice President of Sales and Marketing at WinnettOrganics, the organic fresh produce business entity managed by the Lead Plaintiff with planned operations in Maricopa County, AZ. He vociferously requests and accepts two advances totaling $7500 and claims close relationships with senior executives at several large grocery retailers, then leaves before turning these commitments to sales contracts, depriving WinnettOrganics of his honest services while consuming financial resources. Discovery will show the Mr. LeBlond is another in the long series of carefully screened-in police power agents, officers, and confidential informants used to strip company financial resources, interfere with legitimate interstate commerce activities; and contribute to the company's financial destruction using mail fraud, wire fraud, and other frauds and swindles in conspiracy with other WinnettOrganics team members, including Defendant Joseph Arpaio while Maricopa County Sheriff and individually thereafter until about the time of his federal conviction and Presidential pardon in 2017.

B. Two other fraudulent covers candidates introduced by defendants included William Tarazewich, domiciled in the Dallas, TX area slated to be Vice President of Sales and Marketing; and Brad Kumin, domiciled in Houston, TX as a Sales and Marketing contractor also slated to be Vice President, Sales and Marketing.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | 616-765, 8489-8506, 8715-8718, 8813-8854, 9920, 10179-10186 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Kumin Ind Contr TX 200710, <br> Kumin re China Supplier Search 200710, <br> Kumin re China chicken price diff 200721, <br> Kumin sales and fulfillment options 200723, <br> Kumin TX re third party supplier 200724, <br> Kumin re ABT FL sales contract 200728, <br> Kumin re ABT pork 200728, <br> Kumin Craft re rferaal agrmt 200731, <br> Kumin Craft referral agrmt 200629 sent 200731, <br> Kumin re ABT 200801, <br> Kumin ABT 200802, <br> Kumin ABT pork inquiry 200803, <br> Kumin re Thomas Referral Contract and NCNDA 200930, <br> Kumin LOA announcement 201015, <br> Kumin re China mkt dev 201207, <br> Kumin takes LOA 210120, <br> Kumin re his status 210813, <br> LeBlond CA VP Sales Intvw 150825, <br> LeBlond re Kroger connection 150910, <br> LeBlond sales update 150917, <br> LeBlond sales update 150928, <br> LeBlond 5K advance 150930, <br> LeBlond re 2500 advance 151117, <br> LeBlond re status 160525 <br> Leblond Hire Release Signed 160107.pdf <br> Tarazewich TX re VP Sales position 160420, <br> Tarazewich TX re RAM on Maines other progress 160503, <br> Tarazewich TX re Maines fail others in flux 160506, <br> Tarazewich TX refers ibanker 160527, <br> Tarazewich TX re financing progress 160616, <br> Tarazewich accepts alt employ 160706, <br> Tarazewich TX loan 2500 160725, <br> Tarazewich TX loan 2500 demand 170419, |

**602. RICO-47 Racketeering Violations: Dishonest Professional Services, Employees, CFO**

A. Defendant police powers agent, officer, or confidential informant Dean Smith, President of Mountain Pacific Machinery in Portland, Oregon" introduces his brother, "Paul Smith, Boulder, Colorado" as a candidate for CFO of Winnett Perico. Paul is selected by Lead Plaintiff based upon his resume, a phone interview, and emails. Among the Defendants' police powers agents, officers, and confidential informants posing as current or prospective employees of one of the Lead Plaintiff's private interstate commerce business entities, Paul Smith is the only individual who requests back-dated stock options and delays signing the properly dated stock options offered for months. Back-dating is an illegal act and is an example of one more of the vast series of entrapment attempts by Defendants acting under the color of law without reasonable suspicion or any sound legal basis for their actions.

B. Defendants also introduced Dennis Merck from Oregon; Michael Dooly from Colorado; and through a fraudulent cover operation CFO Search, Inc. and executive recruiter Michael Maggard introduced Ibrahim Abdelsayed in 2021 as another CFO candidate, all under false pretenses to sustain their involuntary servitude campaign against Lead Plaintiff and his numerous attempts to engage in interstate commerce.

C. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-14, RICO-37, RICO-39 through RICO-47. |
| Table 1 paragraphs: | Not applicable |

| Table 2 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
|---|---|
| LP Evidentiary Exhibits pages: | 616-765, 10176-10178, 10179-10186 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Abdelsayed on market 200710, Abdelsayed re status 200724, Abdelsayed Painter re loan gty 200730, Abdelsayed on est start dates team 200821, Abdelsayed re loan gty 200821, Abdelsayed signs loan form 200822, Abdelsayed 201123, Abdelsayed and Waseman Covid DB no vax appt Bergen 210120, Abdelsayed re 26 Ranch 210219, Abdelsayed re status 210302, Abdelsayed pg decline 210716, Abdelsayed inquiry on status 211202, Abdelsayed re cancel email address 220114, D Merck Stock Cert 3 121202, Dooley Hook to EB-5 110922, Maggard TX re Abdelsayed 200722, Maggard TX re Abdelsayed start date 200817, Maggard TX re Abdelsayed 200722, Maggard TX re Abdelsayed start date 200817, Maggard TX status 201015, Maggard re Korea Angus pgm etc 210118, Maggard re 26 Ranch and Abdelsayed 210221, Maggard on Abdelsayed positive connect 210222, Maggard re Abdelsayed 210302, Maggard re Abdelsayed to Egypt 210304, Maggard on loan docs PFS need 210306, Maggard re gty and PFS 210307, Maggard re Big Sandy BAFO 210322, Maggard re Big Sandy reprise 210505, Maggard re investors and Big Sandy 210519, Maggard re Lake County LOI 210701, Maggard re Lake County 210702, Maggard re 500k loan 210703, Maggard enroute Lake County 210707, Maggard re Lake County enroute 210707, Maggard re Lake Copunty tour and plus minus issues 210709, |

|  | Maggard re Lake County and pers FICo improvement 210715, |
|  | Maggard re Lake County 210719, |
|  | Maggard Loan to DB improving FICO 210721, |
|  | Maggard re Lake County 3559 LOI 210721, |
|  | Maggard on Lake County Fin snags 210725, |
|  | Maggard on WMT Wagyu comp price and other status 210804, |
|  | Maggard re startup sequencing plan 210816, |
|  | Maggard re status web dev sales 210816, |
|  | Maggard re add subs WeFunder 210817, |
|  | Maggard re GAAP fin need 210818, |
|  | Maggard re mkt gap 210818, |
|  | Maggard 5k GPR loan 210826, |
|  | Maggard re 4500 loan recvd 210826, |
|  | Maggard Revised GPR Startup Plan 210830, |
|  | Maggard re DB overadvance 210901, |
|  | Maggard re loan not pursued 210903, |
|  | Maggard re 26k loan 210909, |
|  | Maggard re ICPO LOI-FM-LZ-210913, |
|  | Maggard re Terminating Trader efforts 210916, |
|  | Maggard re status 211104, |
|  | Maggard re 700 211221, |
|  | CFO Smith entrap attempt backdating 161016, |
|  | Smith CFO Stock Option Agreement Signed After Backdating Request 10176-10178 |
|  | Smith CFO re Belli invoices 151105, |
|  | Smith CFO re Jabor confirms xfr BkTucson rejects 151113, |
|  | Smith CFO on avoiding expenditures 151119, |
|  | Smith CFO reports Castro determines Jabor is scam 151119, |
|  | Smith CFO Keiser re PPM wire xfr 151123, |
|  | Smith CFO re PPM Expert Fees Paid160103, |
|  | WO Smith CFO re Revolution VC pass 170203, |
|  | WO Team Smith CFO Termination Notice 170612, |
|  | WO Team Smith CFO Termination 170613 |

**603. RICO-48 Racketeering Violations: Dishonest Professional Services, Employees, Controller 2018**

A. Lori Alvarez, an agent, officer, or confidential informant of Defendants posing as an accountant contractor and prospective employee of a Lead Plaintiff business entity is paid to attend an online store kickoff meeting in Avondale, Maricopa County, Arizona, for a web-based wholesale beef supply store, along with Chris Canchola and Jason Waseman, also scheduled to become business entity team members. Other Defendants will block access to the online store and block or fail to deliver email business solicitations for this store around this same time. See this $854 interstate payment to Alvarez, an Arizona resident by the Colorado organized and New Jersey domiciled business entity below.

B. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| | |
|---|---|
| Interline Exhibits: | 10 |
| Complaint paragraphs: | RICO-39 through RICO-48 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177 |
| LP Evidentiary Exhibits pages: | 616-765, 9649, 9651, 10013 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Not applicable |

**604. RICO-49 Racketeering Violations: Fake Production Asset Purchase Options, Professional Services 2015-2021**

A. Defendant United States and co-conspirator Defendants' frauds against the Lead Plaintiff repeatedly cause extensive time, effort, and expenses to be incurred for travel, office products, overhead, and staff expenses for professional services. These services are used to develop concepts, process designs, and conduct plant location analysis, equipment selection and design analyses, and architectural design requiring services, travel, and other expenses by Lead Plaintiff's companies and, at times, by legitimate prospective suppliers engaged in in-state and interstate commerce.

B. An additional 10,000 or more pages of documents, emails, business plans, proposals, studies, and other relevant materials dating to 2002 or earlier may be produced upon request.

C. This pattern continually repeats across time through Lead Plaintiff's last gainful employment allowed by Defendants for ten months from August 2007 to June 2008, after Lead Plaintiff is human trafficked by Defendant United States and co-conspirators from Seattle, WA via 21 months of homelessness in Boston, MA, including seventeen months in a publicly funded homeless shelter (with unknown rotating minders living alongside), to Fort Lee, NJ for this fake ten month stint of employment.

D. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and

continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-49 through RICO-51 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | See disbursements and travel at LETHL-1 and compendium 2015-2021 |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | 26 Ranch Clark re PPM stock swap 151016, 26 Ranch Terms Marvel 160107, Artuso re plant design 200722, Artuso on plant progression 200901, Artuso update 210409, BDO SLC initial contact 170727, BDO SLC to DD NYC connection 170807, Belli intital hit 141217, Belli on payment 160304, Belli on investor sales progress 160608, Belli on status 160811, Belli on organic mkt conditions 170802, Belli on progress lack of 180117, Big Sandy Ranch sub debt RFQ 210314, Bretz Hutchins on HEC E6 Double D feedyards 180120, Bretz re E6 proof of funds conflict w investor 180208, Burges Salmon 1 re London Closing 140917, Burges Salmon 1 re London Closing 140918, Caviness CS Cattle re finishing contrct potential 200901, Caviness on plant availability for slaughter pending order 210617, Caviness re salughter availability 210915, CCW Artuso on plant design 200722, CCW Artuso Case Ready Plant email to 3rd party 200807, |

| | |
|---|---|
| | CCW Atruso re engrng recommendation 200811, |
| | CCW Artuso on plant progression 200901, |
| | CCW Artuso on plant Dematic study 210114, |
| | CCW Artruso update 210409, |
| | CCW Artruso on Dematic study 211014, |
| | Colliers re Dev prtnr IN plant 200819, |
| | Colliers Powers check in 220118, |
| | Cresa Realty Advisors AZ Office Search 180904, |
| | Dallam Cty LOI Farm HULL LOI 0001 120809, |
| | DD on WMT Swisslog 161230, |
| | DD re 5 yr plan to WMT 161231, |
| | DD Callahan re 170124 Swisslog mtg 170109, |
| | DD Callahan re Swisslog mtg 170109, |
| | DD Callahan re lending DD name to WMT presentation 170126, |
| | DD Callahan re Swisslog mtg fup 170126, |
| | DD re Rabo ID Skaar 170503, |
| | DD Skaar Site Plan Barns Winnet  Site Opt 8 170509, |
| | DD Transom re Skaar 170512, |
| | DD on Skaar fert option 170513, |
| | DD Skaar Barns Detail Site Opt 8 170523, |
| | DD Fleming on DD Finl Model 170526, |
| | DD Callahan re PE dilutive 170531, |
| | DD on Skaar Organic Fertilizer Mkt Size 170531, |
| | DD on Skaar Organic Fertilizer Plant Ops 170531, |
| | DD on Skaar Organic Fertilizer Plant Concept Plan 170601, |
| | DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604, |
| | DD Skaar Site Plan 170605, |
| | DD Skaar Site Plan Ammonia Recovery Manure 170605, |
| | DD Skaar Organic Fertilizer Effectiveness 170607, |
| | DD Skaar Organic Fertilizer Pricing 170607, |
| | DD Skaar PE Investor Bid email 170607, |
| | DD Skaar PE Investor Bid form 170607, |
| | DD re Centerboard Housing Solution WO 170608, |
| | DD WCC teaser draft 170608, |
| | DD Skaar Organic Fertilizer Production Cost 170609, |
| | DD Callahan re funding sked 170612, |
| | DD Skaar Organic Fertilizer Advantages 170614, |

DD WCC Pitch Deck Skaar etal 170614,
DD Callahan on DeSai 170616,
DD Skaar Biiding Process to Sanders 170616,
DD Callahan on Axial lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,
DD NYC Van Brakel 170622,
DD Callahan re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan re Skaaar visit sked 170726,
DD on HIG Capital Miami 170728,
DD Skaar site visit Sander 170728,
DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan connects to BDO SLC 170808,
DD Skaar Callahan Update 170809,
DD LaBelle Teton County 240 Tour Pass 170810,
DD Skaar Cost per pound gain 170811,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan re no progress 170906,
DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,
DD Transom re Skaar 170512,
DD on Skaar fert option 170513,
DD Skaar Barns Detail Site Opt 8 170523,
DD Fleming on DD Finl Model 170526,
DD Callahan re PE dilutive 170531,
DD on Skaar Organic Fertilizer Mkt Size 170531,
DD on Skaar Organic Fertilizer Plant Ops 170531,
DD on Skaar Organic Fertilizer Plant Concept Plan
170601,
DD Skaar Royal Chem CAS numbers Contract Fert Pkg
170604,

DD Skaar Site Plan 170605,
DD Skaar Site Plan Ammonia Recovery Manure 170605,
DD Skaar Organic Fertilizer Effectiveness 170607,
DD Skaar Organic Fertilizer Pricing 170607,
DD Skaar PE Investor Bid email 170607,
DD Skaar PE Investor Bid form 170607,
DD re Centerboard Housing Solution WO 170608,
DD WCC teaser draft 170608,
DD Skaar Organic Fertilizer Production Cost 170609,
DD Callahan re funding sked 170612,
DD Skaar Organic Fertilizer Advantages 170614,
DD WCC Pitch Deck Skaar etal 170614,
DD Callahan on DeSai 170616,
DD Skaar Biiding Process to Sanders 170616,
DD Callahan on Axial lead Chatham 170619,
DD Skaar Site Plan Mods 170619,
DD NGEN fake NYC investor 170622,
DD NYC Van Brakel 170622,
DD Callahan re AGIS NDA cmu not credible 170628,
DD Skaaar AgIS Boston 170628,
DD Skaar Advantage NDA 170628,
DD Skaar AgIS Boston 170628,
DD Callahan re Skaaar visit sked 170726,
DD on HIG Capital Miami 170728,
DD Skaar site visit Sander 170728,
DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,
DD Skaar BDO Auditor SLC Gordon 170804,
DD Skaar BDO Auditor SLC Gordon 170807,
DD NYC Callahan connects to BDO SLC 170808,
DD Skaar Callahan Update 170809,
DD LaBelle Teton County 240 Tour Pass 170810,
DD Skaar Cost per pound gain 170811,
DD Skaar LOI xmit 170811,
DD Skaar LOI signing 170821,
DD Skaar past contacts 170821,
DD Skaar Teton River Farm Feeney email 170822,
DD Skaar rcv Alt Offer 170828,
DD Skaar Teaser 170905,
DD Callahan re no progress 170906,
DD Skaar Sanders tours Frank Maughan BDO 170913,

DD Skaar Sander re Kritser 170921,

DD Skaar Sanders on revised structure 170929,

DD Skaar Sanders Update 171013,

DD Skaar Sanders re Kritser Friona Ind ExCEO call 171022,

DD Skaar WMT China ND Rep Sr Legislator Banco Advisors 171024,

DD Skaar Revised Buyout 171112,

Dematic Proposal to Waseman 161228,

Dematic 200720,

Dematic 200806,

Dematic2 200806,

Digested Organics WO Proposal 1 page DD 170531,

Digested Organic 1 pager 170601,

Digested Organic on processing cost per gallon 170609,

Digested Organic liq fert offering 171107,

Digested Organic liq fert offering referrals 171116,

Euro pig trailers 210427,

Feedex UAE Export Quotes ref from Phillips 201209,

Feedex Phillips update 210224,

Feeedex re their catalog our volumes 210312,

Feedex update 210420,

Feedex re organic dairy in Earth TX 210604,

Freelancer disappearance on Chinese beef label 210907,

Full Circle Compost Cody Witt Invoice 170331,

G3 Vancouver BC Terminal Transit for AGI Quote Request 211130,

Gearn Ibach on HEC feedyard 171231,

Gearn Ibach on state of HEC feedyard 180104,

Gearn Ibach Nickless re HEC design reconfig 180118,

Gearn Ibach HEC design discusssion 180119,

Gearn Ibach re halt work as HEC gone 180126,

Google Ads circular response to initial ban info request 210805,

Hartman re Gross organic mkt research inquiry 210520,

Hartman re refs and experience 210525,

Hartman Group re Organic Mktg Study for Gross Mark 210603,

Heuer MO on timing 200720,

JBS Williams Organic Beef 170523,

JBS on Natural Cattle Production Projection 170530,
JBS re natural program for customer 170818,
JBS WMT is customer for JBS program inquiry 170818,
JBS Stevens re WMT China natural cattle processing Hyrum 171002,
JBS Hyrum Rawlings 171108,
JBS Rust re plant slaughter capacity 210116,
JBS Bradbury re slaughter pgm 210119,
JBS chicken pork quote requests 210126,
JLL Sayre AZ check in 170926,
Lonergan re BRF China 210125,
Luckhart pig trlr quote request 210428,
Luckhart pig trlrs and transport 210428,
Lux re virtual ofc svcs 161021,
Lux ofc switch Waseman 161022,
Lux 1 of many credit card decline 170301,
Lux DB advances rent Indian School Rd 180206,
Lux AZ re rent Indian School Rd 180301,
Marchal Semple CPA AZ 160125,
Mijajlovic acctnt re billing 200804,
Mijajlovic re deferral of billing 210325,
Mijajlovic re no response email acct delete and status 210831,
Mijajlovic checkin 220222,
MO Contract Farmer Heuer 200921,
OWB Brandt intro to Summers 180123,
OWB Summers Korea Angus pgm 201214,
OWB Korea suspension reply 201223,
OWB Korea beef pgm 201226,
OWB Summers slaughter availability 210116,
OWB Summers Quote Request 210321,
OWB re Utility Cattle for China 210609,
OWB Summers  Req 6 for deboning cost 210620,
OWB Summers apology re telcon 210621,
Oxbo Eqpt PO 1004_from_Winnett_Perico_Inc 170303,
Oxbo Eqpt WP PO 170303,
Oxbo Smith PO for 170306,
Portable Vac Coolers Inquiry 160216,
Royal Chem re organic liq fert 170530,
Royal Chemical email price quote 170721,

Royal Chemical drop on True misinformation 170723,
Ryder re financing plan 160317,
Ryder Nichols VP Sales Ramsey mtg 161201,
Ryder Aquilino re startup sequence fin 161208,
Sayre Belli re Jabor scam 151119,
Sayre AZ check in 170926,
Southern Vacuum Coolers Inquiry 160216,
Stampede Meats delay sales reply 4MM pound opptny 210317,
Stampede Meats retail prepack RFQ 210317,
Stampede Meats retail prepack RFQ questions 210319,
Stampede re WMT China pricing reaction 210426,
Sterling re further process beef 201226,
Sure Fresh re bean processing 170309,
Swisslog automation Jennings NYC in house 161101,
Swisslog automation Jennings NYC in house 161107,
Swisslog automation Jennings NYC in house 161205,
Swisslog to Waseman re automation 161228,
Swisslog Jennings re DD mtg and progress 170113,
Swisslog re NYC meeting notes and fup 170126,
Swisslog Deck DD mtg to WO team members 170128,
Swisslog developer search 170316,
Swisslog referral developer 170331,
Swisslog ref Developer on PPDC costs 170402,
Swisslog Dev Chain Berger 170405,
Swisslog re ASRS investment 170515,
Symbrosia Etzioni re methane reduction cattle trial 210731,
Symbrosia re LITIGATION transition 210928,
True Fert re org fert samples 170719,
Tucson Intel Ofc re temrination 161020,
Tyson chicken re China no availability, alt pork contact 210201,
Tyson re China mkt 180205,
Uddermatic Martin re Uddermatic 180202,
Uddermatic cutout 180206,
Uddermatic feeding rates 180217,
WestCoastPrime reatil prepack quote request 210313,
Willmeng Jarvis Tom Contact Info 150808,
Winnett Initial Property Search Email to Espy 110627

**605. RICO-50 Racketeering Violations: Fake Production Asset Purchase Options, AZ 2015-2017**

A. Defendants initiate their Kingman Stockton Farms fake sales and financing frauds in 2015 as Lead Plaintiff discovers the agricultural production asset acquisition opportunity they plant online to acquire around 8,000 acres of irrigated farmland near Kingman, Arizona. This land would support Lead plaintiff's planned organic produce production operation, a project then in negotiation with Defendant Walmart. This elaborate fraud engages several Defendant agents, likely FBI, across Las Vegas, NV, Kingman, AZ, and Phoenix, AZ who serve as fake Winnett Perico employees, realtors; and a Las Vegas real estate developer, likely then suspected of bank fraud, financial fraud, and a tangentially related drug trafficking investigation involving employees of the farm's lessee operator.

B. This is one illustration of the abusive involvement and enmeshment by Defendants in long-running, highly prejudicial actions against Lead Plaintiff as they continue their myriad attempts to entrap and incriminate, or at least perpetuate fraudulent color of law suspicion by Lead Plaintiff's mere presence in the vicinity of persons of interest and suspects in other investigations.

C. As usual, the Defendants' entrapment attempt fails in 2017. The financing allegedly available through Defendant Jonathan Cross related entities commonly known as Blackpool and Shefford, and allegedly with the participation of TIAA/CREF, a large scale pension and retirement funds manager, fails. The Kingman Stockton Hill Farm deal collapses after a series of delays, twists, turns, and more lies are piled upon the Defendants' now vast pile of lies. This

complex sequence involves New York based Defendant entities Blackpool/Shefford and Dominick and Dickerman, an Arizona and Nevada based realtor team, the Nevada based real estate developer, and a Massachusetts based investor and former investment partner and land co-owner with the Las Vegas developer. Wire fraud, fraudulent offers of financing, and travel expenses paid by Winnett Perico are used to perpetuate this sequence of human trafficking, involuntary servitude, and forced labor, while asset stripping and entrapment efforts continue.

D. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-49 through RICO-51 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | Not applicable |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | Broadway AZ 16K acres Hyder 161005, Broadway AZ likely cutout msg 161006, Broadway Kingman Red Lake info 161020, Broadway KJV re Blackpool Cross sked arrival 170203, Broadway KJV re Saul and Barings availability 170209, |

Broadway KJV re Stockton Hill Loans 170212,

Broadway KJV re well drill sub Stockton Hill Loans 170213,

Broadway KJV xmit NDA dataroom access 170214,

Broadway KJV escrow and psa to be drafted 170301,

D Brewer Air Itenerary EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer Car Rental Itenerary EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer FS for SBI Surety Bond 413-NEW-as-of-7-30-2018 180730 .pdf

D Brewer Hotel EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer Hotel Tucson EWR PHX Hold for Anglade EWR 150830.pdf

D Brewer US Airways EWR PHX EWR 150830.pdf

Kingman Land Swap status inquiry 160219,

Kingman land legal des request 160223,

Kingman Farm land swap 160224,

Kingman Land Swap status 160224,

Kingman Farms deal structure revision 160229,

Kingman Farms Rhodes discussion confirm 160229,

Kingman status to team 160303,

Kingman Farms deal structure revision 160304,

Poindexter VP Sales intvw Kingman later 150826,

Poindexter Kingman veg crops 151001,

Poindexter Kingman tour Jim Rhodes intro 151007,

Poindexter direct Rhodes re Kingman 151017,

Oxbo Dump Carts WP PO 1008 170306.pdf

Oxbo Eqpt email
Purchase_Order_1004_from_Winnett_Perico_Inc 170303.pdf

Oxbo Quote Winnett Organics 2475 x3 rev. 03.02.17 (2) 170306.pdf

Saul Barings Stockton Hill WO LOI RLV 170215,

Saul Stockton Hill WinnettOrganics LOI RLV 170215,

Saul re Stockton Hill Farms Structure 170217,

Saul Barings revise Stockton Hill WO LOI RLV 170218,

Saul Barings re LOI rev plans 170220,

Saul Barings status on Blackpool financing 170224,

Saul Barings moving ahead Blackpool financing 170301,

Saul Barings re sked pressure on fin 170303,

| | Saul to Fiera Comox 170804, |
| | Saul JV Structure incl Teton Valley Farm 170929, |
| | Saul re Skaar Purchase Leaseback 170929, |
| | Saul Barings WO Revised LOI Stockton Hill Farm 170218.pdf |
| | Zaharis re Cowley Kodiak Produce temp cooler space 170206 |

**606. RICO-51 Racketeering Violations: Fake Production Asset Purchase Options, OR, ID, TX 2015-2021**

A. Defendants repeatedly misrepresent farms and ranches as available properties for purchase by Lead Plaintiff business entities as part of their scheme to keep Lead Plaintiff engaged in expending time and financial resources to develop the productive capacity of his planned organic agriculture businesses. Among other elements, this includes presenting actually unavailable properties as available for purchase. One of these fake sales is a 3559 acre ranch in Lake County, Oregon, presented by Defendants. Lead Plaintiff spent more than $700 to travel to and inspect this property. The specific emails and travel records related to this trip are currently blocked by an unknown party, likely a police powers entity, but a signed Letter of Intent is included in the evidence presented.

B. The outbound trip to Lake County, Oregon via Kennedy Airport, NYC to Seattle-Tacoma Airport near Seattle, WA, then to Redmond Airport, Redmond, OR for ground transportation to Lake County, OR by Defendants' agent or officer (operating undercover, unknown to Lead Plaintiff at that time) includes a thunderstorm delay and missed connection, forcing a late arrival and very brief overnight stay near Sea-Tac. See LP Evidentiary Exhibits page 10095, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25.

C. Other email and wire predicate frauds of agriculture real estate and production facilities and related financing options include, for example, Julian Bros Sheep Ranch, Boulder, WY fraudulent ranch sale listing as Big Sandy Ranch, in 2021 sale brochure and 2023 New York Times article at LP Evidentiary Exhibits pages 10750-10771, and "LaBelle" emails listed below.

D. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. All paragraphs above are incorporated herein by reference including, without limitation, paragraph 504. Subcount RICO-2 subparagraph C is incorporated herein by reference. RGTS-3 subparagraphs A through C are incorporated herein by reference. Evidentiary materials related to this specific subcount follow:

| Interline Exhibits: | Not applicable |
|---|---|
| Complaint paragraphs: | RICO-49 through RICO-51 |
| Table 1 paragraphs: | Not applicable |
| Table 2 paragraphs: | Not applicable |
| LP Evidentiary Exhibits pages: | 10750-10771, 10095, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707 JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA $9.25. |
| Emails and documents by topic and date, also located in LP Evidentiary Exhibits: | 26 Ranch Clark re PPM stock swap 151016, 26 Ranch Terms Marvel 160107, Broussard re Lake County fin 210710, Colliers re Dev prtnr IN plant 200819, Colliers Powers check in 220118, Cresa Realty Advisors AZ Office Search 180904, |

Dallam Cty LOI Farm HULL LOI 0001 120809,
Eslabon Bretz Executed Winnett Cattle CA 12-22-17
171221.pdf
Grasse Long Realty 160601,
Grasse re properties search 160630,
Guitierrez Ranch LOI Signed140130,
HEC feedyard email contract 180118,
HEC feedyard NBH cattle loan 180119,
HEC Feedyard NBH re loans 180119,
HEC water lease contact 180119,
HEC Bretz re Double D issues 180120,
HEC Rio Bravo agrres to share fin data 3yr 180123,
HEC contract redraft fm Sullivan 180124,
HEC returns to mkt per Nickless 180212,
HEC and E6 Blitch re workflow 180218,
HEC E6 calf barns quote 180219,
HEC E6 calf barn eqpt 180221,
HEC E6 calf milk pasteurizing plant 180222,
HEC E6 note sale to Summit 180222,
HEC E6 Calf hutch housing option 180223,
HEC E6 Calf barn floors 180228,
HEC feedyard contract SKMBT_C654e18011814500
180118.pdf
IntegratedAg initial web hit Prader 170516,
LaBelle MJ hold add Big Sandy 210216,
LaBelle re Big Sandy cmsn split w Theo list agt 210218,
LaBelle on Big Sandy Rejects First Offer 210222,
LaBelle re contract for deed 210224,
LaBelle on Big Sandy deal structure 210226,
LaBelle re Big Sandy botton line from Theo 210301,
LaBelle Big Sandy basic title info 210304,
LaBelle on Big Sandy Ranch Maggard gty 210305,
LaBelle re Big Sandy 210310,
LaBelle re New Mexico comp AU pricing 210310,
LaBelle Big Sandy BAFO 210317,
LaBelle on Big Sandy BAFO DB reaction to rejection
210324,
LaBelle re Big Sandy BAFO response to Theo comments
210324,
LaBelle on Theo ping Big Sandy 210415,
LaBelle re Theo and Big Sandy new interest 210506,
LaBelle on Big Sandy structure and deal quantitties
210508,
LaBelle re Theo Pearson Big Sandy behavior 210510,
LaBelle on broker comments and Big Sandy 210514,
LaBelle Big Sandy delay and deficient reply pattern

210517,
LaBelle Pearson re Big Sandy deficient communications 210517,
LaBelle Big Sandy drop 210617,
Lake County 3559 Appraisal 210322,
Lake County Appraisal 210322,
Lake County OR Brandon 210627,
Lake County Gannett Peak Ranch Mid-Case Business Plan 210628,
Lake County OR Offer Mod 210629,
Lake County Opptny Zone Investments cold email 210630,
Lake County LOI 210702,
Lake County Due Diligence folder link 210703,
Lake County tour fup 210708,
Lake County Creek Fishway project 210709,
Lake County plant siting opptny zone 210710,
Lake County 3559 Mike Maggard PFS 210712,
Lake County Opptny Zone seller options 210712,
Lake County seller re stock v loan 210713,
Lake County Binding PurchSale Agrmt 210714,
Lake County Prelim title report request 210719,
Lake County Loan Options Disappear Ex 1of11 210725
Lake County 3559 AC MOL Signed LOI 210701.pdf
Lake County 3559.45 Brochure.pdf
LOI Farm Dickson Final 121211.pdf
Marvel 26 Ranch rejects structure 160122,
Marvel re Black Rock Famrs deal 170303,
Nelson on dropping Yreka CA ranch no water 210614,
Oppliger via Abacherli 180130,
Oppliger Abacherli drops out 180209,
Oppliger Abacherli ref to McDowel 180228,
Renfrew CA Ashurst Ranch into escrow 210312,
Royal Chemical Price Qte Org Fert Pkg 170721.pdf
SBI team on Big Sandy BAFO deal fail 210324,
SBI Team on Lake County 210701,
SBI team on Lake County fin WMT mtg 210715,
Skaar Sanders Swan 170419,
Skaar Winnett Cattle Company LOI Skaar 170429,
Skaar Pitch Deck 170512,
Skaar Sales Brochure 170512,
Skaar JBS Williams on Organic Beef 170523,
Skaar Teton River Ranch Broker ref Rumsfeld ref 170523,
Skaar Barns 170530,
Skaar Steam Flake Plant Cost Est Gearn170530,
Skaar Jeffereon Cty ID on Skaar Expansion 170731,
Skaar Poulsen CPA appt 170731,

| | |
|---|---|
| | Skaar WF Id Falls Kay Burke and Sanders 170809, |
| | Skaar ID Dept of Ag rqmts 170810, |
| | Skaar outreach - US Bank reply delay arrange cutout 170817, |
| | Skaar Sander re US Bank established relationship 170817, |
| | Skaar Teton River Ranch Broker Feeney 170822, |
| | Skaar AGR interest initial hit 170828, |
| | Skaar Kritser Ranch Creek WA initial hit 170829, |
| | Skaar ClearLight initial hit 170905, |
| | Skaar Harris Williams re AGR 170906, |
| | Skaar Sanders on strong interest Kritser Ranch Creek 170907, |
| | Skaar WF Id Falls Luke on sub debt 170915, |
| | Skaar Teton River Ranch Broker sale fail price drop Feeney 170925, |
| | Skaar Teton River Ranch Broker Feeney connects RL Holdings 170929, |
| | Skaar Teton River Ranch Broker Halgerson 171002, |
| | Skaar Kritser WA advisor John Herring Friona Ind 171030, (see also LP Evidentiary Exhibits page 1074V, entries 9/7/2017 and 10/30/2017) |
| | Skaar deal dead Gerra 171208, |
| | Skaar Sanders on alt buyer LOI 180124, |
| | Turpin Feedyard Purch Agrmt144454 190703.pdf |
| | Williams LOI Dallam Cnty 800ac Farm HULL LOI 0001.pdf |
| | Zeman Ranch 2 NE on famr sales process and investors 210605, |
| | Zeman Ranch broker discussion re investors 210605. |

607. Paragraphs 607 through 697 are reserved.

**END OF FACTS – BRMT AND RACKETEERING PATTERNS - SUBCOUNTS**

## CLAIMS FOR RELIEF

698. In accordance with 18 USC § 1962(d) and relevant case law, all defendants share total liability for each and every claim and injury in this Complaint. Defendant United States is the originating perpetrator of all injuries incurred by these plaintiffs and has primary original responsibility for the associated-in-fact enterprise it initiated and has perpetuated for over fifty years. All defendants are culpable for the entire enterprise under law, and no defendant is released from any liability for any claim as members of this associated-in-fact enterprise. Institutional defendants' specific responsibilities for each of the 43 specific sets of claims for relief herein are difficult for plaintiffs to establish except at trial due to the institutional and legal strictures which relate to undercover police powers operations and the willingness of various police powers agencies to violate even those extremely advantageous strictures. See Interline Exhibits 14-17 for relatively simple examples of this type of abuse by these defendants in their continuing pattern of fraudulent concealment.

699. Assignment of responsibility to entity and individual person defendants acting outside the law, and acting outside the scope of their agency in the case of those who are police powers officers and agents, is also extremely difficult given (i) the long-running pattern abuses of civil rights by these agencies which are well documented in the public record, (ii) by the systematic abuses by electronic means using both ordinary electronic devices and (iii) the illegal development and deployment of the BRMT bioweapon and bioweapon system in deep cover against US persons, just as CIA did for over twenty years in MKUltra. This is further complicated by the police powers and intelligence agency abuses of legends and identities across time among deep cover police powers and intelligence officials who have acted within and without their scope of agency. Examples of this pattern of practice by high-ranking current and

former Defendant United States agency personnel are presented herein at paragraphs 9C through 9O.

700. Finally, Defendant United States has co-opted private companies and organizations to perform acts against those entities and against the Lead Plaintiff and other plaintiffs, as backed by both the direct experience of the Lead Plaintiff at paragraphs 9C through 9O, and by the historical record included at LP Evidentiary Exhibits pages 237-367, 6885-7466. All defendants are culpable as to all claims herein.

### 701. CLAIMS FOR RELIEF - COUNT 1

### AA. Physical and Emotional Injuries

### Racketeering Influenced and Corrupt Organizations Act

### (18 USC §§ 956, 1113, 1119, 1962; RCW 9A.28.020; NJ Rev Stat § 2C:5-1;

### New York Penal L § 110; Cal. Penal Code § 245(a)(1))

### Attempted Murder

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 956, 1113, 1119, 1962; RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code § 245(a)(1), in their series of attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Claims For Relief both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" and "Bioweapons Treaty" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

     D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Complaint.

     E. The criminal and civil offenses underlying this entire conspiracy, as alleged herein and

as will be further developed and affirmed through discovery are, are in part related to, and are in

part motivated by, Defendant United States' illegal development and deployment of Brain

Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon

delivery system, has been and is used by Defendant United States acting alone, and in conspiracy

with others, to assault US persons and other innocents in its criminal color of law abuse and

"state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United

States has and does engage in an on-going conspiracy to fraudulently conceal, cover up, and

sustain this five decade long willful and knowing violations of the treaty, of the US Constitution,

and of its violations of its legal obligations to US persons and other innocents. Defendant United

States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly

develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent,

toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program at the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through (i) its own myriad departments and agencies loosely coordinated engaging in patterns of racketeering acts (as they are known under law since 1972) and (ii) by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as against the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of

injured Plaintiffs. This class of plaintiff victims includes those who are, without limitation, heirs

of deceased persons, permanently disabled persons, and others who have had their properties,

businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts,

and have and are otherwise directly or indirectly injured by these willful and knowing acts and

the on-going violations of this associated-in-fact enterprise, which has over time grown to

encompass a wide variety of domestic and international police powers and intelligence

operations, as well as other entities and individuals.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Claims For Relief. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

section."

H. The facts, actions, and circumstances alleged in this Complaint, and as are likely to be

further developed through discovery, demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and

informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a)

persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and/or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has existed and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each subcount further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To fraudulently conceal and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 18 USC §§1961 and 1962 by themselves and/or with and through their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each subcount.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

      i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

      ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the subcounts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961, 1962, 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to loss of balance. Lead Plaintiff has regular medical examinations and tests,

including neurological examinations, which disclose no known injury or disability which would lead to loss of balance or mental reasoning ability absent the purposeful external manipulations of BRMT, a prohibited bioweapon and bioweapon delivery system funded by Defendant United States; developed by and/or with contracted services, entities, and persons acting with Defendant United States; and deployed by Defendant United States against US persons and other innocent victims in violation of the Constitution, laws, and ratified international treaties of the United States of America.

U. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-524, 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-4, 17 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

## 702. CLAIMS FOR RELIEF - COUNT 2

## AA. Physical and Emotional Injuries

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1113, 1119, 1962; RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code §§ 192(a), 245(a)(1))**

## Attempted Manslaughter

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1113, 1119, 1962; RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code §§ 192(a), 245(a)(1) in their series of attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-524, 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-4, 17 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

## 703. CLAIMS FOR RELIEF - COUNT 3

### AA. Physical and Emotional Injuries

### Racketeering Influenced Corrupt Organizations Act (18 USC §§ 1117, 1962; New York Penal L § 110; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 182(a)(1))

### Conspiracy to Murder

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1117, 1962; New York Penal L § 110; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 182(a)(1) their series of conspiracies to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the

territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-524, 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-4, 17 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

## 704. CLAIMS FOR RELIEF - COUNT 4

### AA. Physical and Emotional Injuries

### Racketeering Influenced Corrupt Organizations Act (18 USC §§ 373, 1962; New York Penal L § 100; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 653f)

### Soliciting Crime of Violence

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 373, 1962; New York Penal L § 100; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 653f in their series of solicitations to commit a crime of violence and related conspiracies to cause and create injury, death, assault, aggravated assault, and other crimes of violence to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 533 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 13 |
| | NSEC National Security Pretexting and Entanglement | |
| 545, 546 | RGTS – Individual Rights Violations and Conspiracies | 3, 4 |
| | RICO - Racketeering | |

## 705. CLAIMS FOR RELIEF - COUNT 5

### AA. Physical and Emotional Injuries

### Racketeering Influenced Corrupt Organizations Act (18 USC §§ 175, 1962; New York Penal L § 490; NJ Stat 2C:38-3, 2C:39-3, 2C:39-4; Assault, Aggravated Assault - RCW 9A.36; Mayhem, Aggravated Mayhem - Cal. Penal Code § 203, 205, 206

### Bioweapons and Bioweapons Delivery Systems Prohibited

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has and does act in violation of federal and state statutes 18 USC § 175, 1962; New York Penal L § 490; NJ Stat 2C:38-3, 2C:39-3, 2C:39-4; Assault, Aggravated Assault - RCW 9A.36; Mayhem, Aggravated Mayhem - Cal. Penal Code § 203, 205, 206; and Article 1 of that certain Senate ratified international treaty "Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction" in its long history of violations against Lead Plaintiff and other plaintiffs of this class and its prior and on-going operation, management, and collaboration with other Defendants in their pattern of racketeering acts, conspiracies, violations of rights, interference with interstate commerce, and other crimes and rights violations to cause

and create injuries to the Lead Plaintiff and other plaintiffs of this class, including, without limitation, those specifically cited and described in the subcounts in this Complaint, both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-536 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-16 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 545, 546 | RGTS – Individual Rights Violations and Conspiracies | 3, 4 |
| | RICO - Racketeering | |

## 706. CLAIMS FOR RELIEF - COUNT 6

### AA. Physical and Emotional Injuries

### Federally Protected Activities 18 USC § 245(b)5

### Posse Comitatus - Use of Military To Violate Constitutional Rights –

### Third and Ninth Amendments

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has and does violate the human, Constitutional, and civil rights of Lead Plaintiff and similarly situated plaintiffs, including without limitation the Ninth Amendment, and by virtual means, the Third Amendment. Defendant United States has and does use members and facilities of the US Army, US Navy, US Air Force, and specific infrastructure of the US Air Force, US Space Force, National Reconnaissance Office, National Security Agency, and other unknown departments and agencies, in its violation of 18 USC § 1385:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws….," to engage in color of law criminal pretexting, to aid and abet its operation of BRMT for decades, and to conspire with other Defendants, known and unknown, for these corrupt purposes, and to violate human, Constitutional, and civil rights. Within and without the territory of the United States, Defendant United States has and does violate the Third Amendment, illegally forcing the virtual quartering of soldiers in the private residence of the Lead Plaintiff. Defendant United States has and does violate the Ninth Amendment unenumerated right to "Liberty for ourselves and our posterity" as paraphrased in terms the Founders would recognize – by its general searches, and through its oppressive and tyrannical direct daily interference in the private affairs, personal business, and property of the Lead Plaintiff and others of this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

    C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538, 541 | NSEC National Security Pretexting and Entanglement | 1, 4 |
| 545, 546, 548-552 | RGTS – Individual Rights Violations and Conspiracies | 3, 4, 6-10 |
| | RICO - Racketeering | |

### 707. CLAIMS FOR RELIEF - COUNT 7

### AA. Physical and Emotional Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### (18 USC §§ 1962, 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060;

### Mass. Gen. Laws ch. 265 § 29, 274 § 7; NJ Stat 2C:5-2 2C:11-6, 2C:12-1, 2C:13-5))

### Conspiracy to Torture

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Torture is defined at 18 USC §§ 2340 as:

**(1)**

"torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

**(2)** "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—

**(A)** the intentional infliction or threatened infliction of severe physical pain or suffering;

**(B)** the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

**(C)** the threat of imminent death; or

**(D)** the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering

substances or other procedures calculated to disrupt profoundly the senses or personality; and

(3) "United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

C. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1962, 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060; Mass. Gen. Laws ch. 265 § 29, 274, § 7; NJ Stat 2C:5-2, 2C:11-6, 2C:12-1, 2C:13-5 in their series of conspiracies and their willful engagement in torturous acts (both violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead Plaintiff as specifically cited and described in the subcounts in this Claims For Relief both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

D. Defendant United States and other defendants known and currently unknown, and their officers, agents, confidential informants, contractors, assigns, or others, associated with any or all of these torturous acts, are prohibited from asserting any waiver of liability or immunity for their conspiracies and for their injuries to Lead Plaintiff and other members of this class of plaintiffs under 18 USC § 2340B and under *Harlow* and other prevailing case law as discussed at paragraphs 47-70. The *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the Senate requires demands recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including

the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation."

E. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 549 | RGTS – Individual Rights Violations and Conspiracies | 7 |
| 556-606 | RICO - Racketeering | 1-51 |

## 708. CLAIMS FOR RELIEF - COUNT 8

### AA. Physical and Emotional Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### (18 USC §§ 1962, 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060;

### Mass. Gen. Laws ch. 265 § 29, 274 § 7; NJ Stat 2C:5-2, 2C:11-6, 2C:12-1, 2C:13-5))

### Torture – Mental and Physical Abuse

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 549 | RGTS – Individual Rights Violations and Conspiracies | 7 |
| 556-606 | RICO - Racketeering | 1-51 |

## 709. CLAIMS FOR RELIEF - COUNT 9

### AA. Physical and Emotional Injuries

**War Crimes, 18 USC §§ 2441(d) Violations of Common Article 3, Encompassing Torture**

**- Racketeering Influenced and Corrupt Organizations Act**

**(18 USC §§ 1962, 2340, 2340A)**

### War Crimes Against Civilians - Torture

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States substantially increased the intensity of national security pretexting against Lead Plaintiff beginning in 1996 as described here and in considerably more detail at subcount NSEC-4. Lead Plaintiff's employer was requested to conduct an engineering study at the US Navy's Puget Sound Naval Shipyard (PSNS) in Summer 2001, a few months prior to the 9/11/2001 terrorist attacks. PSNS is a strategically important heavy maintenance facility located in Puget Sound, west of Seattle, Washington, servicing nuclear submarines, aircraft carriers, and other Navy ships.

C. The pace, intensity, and frequency of violations against Lead Plaintiff accelerated still further in the aftermath of the 9/11/2001 attacks and the 2001 Authorization For Use of Military Force (AUMF) in Afghanistan. Pub. L. 107–40.

S J Res 23

# One Hundred Seventh Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Wednesday,*
*the third day of January, two thousand and one*

## Joint Resolution

*To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States*

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1 SHORT TITLE**

This joint resolution may be cited as the "Authorization for Use of Military Force".

**SEC 2 AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES**

(a) IN GENERAL.—That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

## SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) IN GENERAL.—That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

S. J. Res. 23—2

(2) APPLICABILITY OF OTHER REQUIREMENTS.—Nothing in this resolution supercedes any requirement of the War Powers Resolution.

D. In Spring 2002, months after the 9/11/2001 attacks and the AUMF, the Lead Plaintiff toured PSNS with an escort team, to kick off the engineering project which had been brought to the Lead Plaintiff as the Managing Director of C.N.A. Industrial Engineering by a shipyard contractor. Lead Plaintiff was led to and left standing unescorted for about 15 minutes by an out of place object on a shipping pallet loosely covered by a secured green tarp. The escort team described this as a nuclear submarine cooling pump. This is known to the Lead Plaintiff to be a highly classified piece of technology, so leaving an uncleared visitor standing there was a deliberate and major national security breach, and breach of shipyard security protocol, by the escort team. The team returned with no explanation for their absence and continued the tour of the virtually empty shipyard. The tour occurred on a regular workday when the 1.4 mile long dock area should have been filled with many of its 15,000 employees. The Lead Plaintiff

witnessed about two dozen employees, including his 5 to 6 person escort team in the entire shipyard.

E. Lead Plaintiff traveled to a national trade association Board meeting in DC in Spring 2002, was invited to a 90 minute Capitol Hill television studio live screening conducted by Jennifer Dunn, a member of Congress close to the then President Bush, received unsolicited federal Executive branch expressions of interest demonstrated by both tradecraft and, a few weeks later, the interest of the then President of the United States in visiting Lead Plaintiff's business in Washington state. This sequence was followed by a highly intensive repetition of prior patterns of racketeering activity, including aggressive field operations leading to destruction of Lead Plaintiff's business enterprise Performa, his sole source of income, and to marital dissolution from his spouse of fifteen years; followed by torturous BRMT and psychological operations leading to suicide ideation; to forced forfeiture of real, financial, and personal property; and to eventual homelessness and human trafficking by Defendants, including, without limitation, Rosenberg and Summers, by the end of 2005.

F. The *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the Senate requires the United States of America to permit recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to

compensation which may exist under national law."

G. Under the global scope of the 2001 Afghanistan AUMF at subparagraph C. above, and

(i) the demonstrated acts by Defendant United States in its clear pattern of military facilities and

sensitive technologies pretexting; (ii) its accelerated and more extreme pattern of racketeering

acts against him from that time hence; and (iii) his confirmed abusive pretexting by defendants

including, without limitation, Rosenberg, as a terror investigation subject at Interline Exhibit 15,

paragraph 331 and subsequent; Defendant United States was and is obligated, as are all State and

Local government Defendants to treat Lead Plaintiff in accordance with all international

conventions regarding civilians in hostilities including, without limitation, Article 75 of the

Geneva Conventions below:

**Article 75.-Fundamental guarantees**

1. In so far as they are affected by a situation referred to in Article 1 of this Protocol, persons who are in the power of a Party to the conflict and who do not benefit from more favourable treatment under the Conventions or under this Protocol shall be treated humanely in all circumstances and shall enjoy, as a minimum, the protection provided by this Article without any adverse distinction based upon race, colour, sex, language, religion or belief, political or other opinion, national or social origin, wealth, birth or other status, or on any other similar criteria. Each Party shall respect the person, honour, convictions and religious practices of all such persons.

2. **The following acts are and shall remain prohibited at any time and in any place whatsoever, whether committed by civilian or by military agents:**

(a) Violence to the life, health, or physical or mental well-being of persons, in particular

(i) Murder,

(ii) Torture of all kinds, whether physical or mental,

(iii) Corporal punishment; and

(iv) Mutilation;

(b) Outrages upon personal dignity, in particular humiliating and degrading treatment, enforced prostitution and any form of indecent assault;

(c) The taking of hostages;

(d) Collective punishments; and

(e) Threats to commit any of the foregoing acts.

H. As demonstrated throughout this Complaint and more particularly at subparagraph C. above, Defendants United States, State and Local Defendants, known and unknown, have and do act in violation of Common Article 3 as defined at 18 USC §§ 2441(d), including 2441(d)(1)(a) Torture, 2441(d)(1)(b) Cruel or inhuman treatment, 2441(d)(1)(c) Performing biological experiments, 2441(d)(1)(d) Attempted murder, 2441(d)(1)(f) Intentionally causing serious bodily injury, 2441(d)(1)(f) Sexual assault or abuse, in their series of acts against the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States.

I. The totality of war crimes violations of Defendant United States, and of State and Local Defendants, as known, yet unknown, and as to be developed through discovery; and by

their officers, agents, confidential informants, contractors, assigns, or others, acting within and

without their scope of agency; against Lead Plaintiff encompass each and all of the following

violations of Senate ratified treaties:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

J. In accordance with the 2001 AUMF then and currently in force, and under the Senate

ratified treaties having force of law throughout the United States without exception, as cited at

paragraph F. and G. above, neither Defendant United States nor any State and Local Defendant,

as known and defined at the caption or as yet unknown, nor their officers, agents, employees,

confidential informants, contractors, assigns, or others, associated with any or all of these acts

and offenses, are permitted to assert any waiver of liability or immunity under law for any act

against Lead Plaintiff or any other effected member of this class of plaintiffs after the September

18, 2001 AUMF as their actions are subject to the aforementioned treaties at all times while the

2001 AUMF is in force and our nation is officially at war.

K. Lead Plaintiff has been, is, and continues to be constrained and restrained, denied

liberty, by the totality of the pattern of acts and injuries undertaken by and in conspiracy with,

the acts of Defendant United States since that time, including its torturous treatment of the Lead

Plaintiff. It is currently unknown if other plaintiffs of this class are subject to the same totality of

limits and constraints as the Lead Plaintiff. No action has ever been taken by Defendant United

States which formally or informally indicate it has or ever intends to remove these limitations,

constraints, threats, and torturous acts toward Lead Plaintiff which it continues to undertake, and

which continue to daily imperil the liberty, free exercise of will, of movement, of bodily control,

of and by Lead Plaintiff as imposed extra-legally by Defendant United States.

L. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 2-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 4, 5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 2-7 |
| 556-606 | RICO - Racketeering | 1-11, 13-51 |

## 710. CLAIMS FOR RELIEF - COUNT 10

### AA. Physical and Emotional Injuries

### Assault

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendant United States using BRMT and its officers, agents, confidential informants, both separately and together with other known and unknown Defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked, both physically and by their coercive psychological operations, Lead Plaintiff and other plaintiffs from time to time from the 1970s to the present, as described by a very small set of example incidents described herein, and in so doing attempted or threatened by their words and/or acts to do physical harm to Plaintiffs. Plaintiffs each reasonably suffered apprehension of imminent harmful or offensive contact on a daily or near daily basis throughout much of this 53 year period both within and without the territory of the United States as a result. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 543 | RGTS – Individual Rights Violations and Conspiracies | 1 |
| | RICO - Racketeering | |

## 711. CLAIMS FOR RELIEF - COUNT 11

### AA. Physical and Emotional Injuries

### Aggravated Battery

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States using BRMT and its officers, agents, confidential informants, both separately and together with other known and unknown Defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked Lead Plaintiff and other plaintiffs from time to time from the early 1980s to the present, on a daily basis for approximately 43 years, as depicted by a very small subset of examples described herein, and in so doing acted to do physical harm to Plaintiffs. Defendant United States using BRMT and, at times other Defendants intentionally and unlawfully attacked Plaintiffs as described in subcounts below, causing harmful or offensive bodily contact to Lead Plaintiff and others of the class of plaintiffs throughout this 43 year period both within and without the territory of the United States as a result. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 543 | RGTS – Individual Rights Violations and Conspiracies | 1 |
| | RICO - Racketeering | |

## 712. CLAIMS FOR RELIEF - COUNT 12

### AA. Physical and Emotional Injuries

### Terrorism - Racketeering Influenced and Corrupt Organizations Act

### (18 USC §§ 1961(1)(G), 1962, 1992(b)(3))

### Violent Crimes in Aid of Racketeering Enterprises – Terrorism

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have acted in violation of (18 USC §§ 1961(1)(G), 1962, 1992(b)(3)) by committing, among other violent and threatening acts, an act of violence on a rail mass transit express train operating on the Metropolitan Transportation Authority Hudson River Line north of New York City on September 11, 2022 as described in subcount LETHL-14. This event occurred in a sequence of threatening and violent threats and acts occurring in the four months between mid-July 2022 and November 2022, which are further described at Complaint Interline Exhibit 2: Indirect Verbal Threat and Subsequent Lethality Events. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

### 713. CLAIMS FOR RELIEF - COUNT 13

### AA. Physical and Emotional Injuries

### Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 175, 1512, 1513, 1951, 1192, 1961(1)(A), 1961(1)(G), 1962, 1992(b)(3), 2332, 2340A

### Interference With Interstate Commerce By Threats or Violence

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have acted in violation of 18 USC §§ 175, 1512, 1513, 1951, 1192, 1961(1)(A), 1961(1)(G), 1962, 1992(b)(3), 2332, 2340A to interfere in interstate commerce by making and by acting upon threats with violence. Within one four month period in 2022, Defendants (i) made an indirect verbal threat on the Lead Plaintiff in a New York City performance space on July 17, 2022 as described at Interline Exhibit 2A; (ii) a derailment attempt at speed on a rail mass transit express train operating on the Metropolitan Transportation Authority Hudson River Line on September 11, 2022 with the Lead Plaintiff a passenger as described in subcount LETHL-14, (iii) upon the Lead Plaintiff in a Defendant City of New York park on September 16, 2022 as described at subcount LETHL-15, and (iv) on New York City streets with their streetlights deliberately extinguished and by a rapidly accelerating vehicle in a Bergen County, New Jersey shopping center parking lot on November 19, 2022 as described at LETHL-16. These threats and violence, including physical injury in LETHL-15, the City of New York park incident, are further described at Complaint Interline Exhibit 2: Indirect Verbal Threat and Subsequent Lethality Events. Other example incidents are noted in the subcounts. Discovery will provide further specific evidence relevant to each noted incident and more incidents of such acts, both survived and likely not survived, by members of this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 518, 519 | LTHL Lethality Attempts | 15-16 |
| 521-524 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-4 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

## 714. CLAIMS FOR RELIEF - COUNT 14

### AA. Physical and Emotional Injuries

### Federal Food Drug and Cosmetic Act (18 USC § 1365(a); NJ Stat 2C:40-17.2.a.)

### Tampering With Consumer Products

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 1365(a), NJ Stat 2C:40-17.2.a. in their series of schemes, conspiracies, and deprivations of uncontaminated and spoiled refrigerated foods placed upon grocery store shelves at Acme Market, Edgewater, NJ in 2021 and 2022 for sale on more than one dozen occasions to the Lead Plaintiff as specifically cited and described in the subcount in this Complaint. Defendants have and do create injuries and construct thereby a risk of death or severe injury by listeria, salmonella, and other harmful biological agents specifically directed at Lead Plaintiff through their purposeful stocking to shelves at the time of his arrival of uncontaminated and/or spoiled foods and of permitting access to same by the Lead Plaintiff and the general public. This is further evidenced by the notable absence of certain specific products normally carried by this store and on his shopping list for that specific trip which shelf locations completely disappear

and later reappear in the same location as before. Detailed examples of this element of the long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are currently blocked and inaccessible in email accounts as noted elsewhere in this Complaint, and are representative of these types of violations, acts, injuries, and deprivations also experienced by Lead Plaintiff from 2008 to 2010 at this same location, and by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
|  | LTHL Lethality Attempts |  |
| 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 17 |
|  | NSEC National Security Pretexting and Entanglement |  |
|  | RGTS – Individual Rights Violations and Conspiracies |  |
|  | RICO - Racketeering |  |

## 715. CLAIMS FOR RELIEF - COUNT 15

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced Corrupt Organizations Act (18 USC §§ 1581, 1962, RCW 9A.40.110(3), NJ Stat 2C:13-5a(7) )

### Peonage

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1581, 1962, RCW 9A.40.110(3), NJ Stat 2C:13-5a(7) to engage in a lifetime of peonage in their assigned and dictated compensation employment periods, unemployment periods, enterprise

wreckings, and deprivation of both personal and commercial benefits legally entitled, destruction of marital communities and families, entrapment attempts, physical and emotional injuries approaching death, by illness, deep vein thrombosis, and direct BRMT hijacking to drive their dozens of attempts to inflict lethality remotely. This pattern of peonage is part of the Defendants' pattern of racketeering acts directed at the Lead Plaintiff as specifically cited in this Complaint both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 716. CLAIMS FOR RELIEF - COUNT 16

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1584, 1962, RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7))

### Involuntary Servitude – Thirteenth Amendment

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1584, 1962, RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7) in their management and

operation of an enterprise-in-fact system of involuntary servitude in all matters of life through a

system of fraud-based virtual restraints and assigned and designated circumstances to the Lead

Plaintiff as specifically cited and described in the subcounts in this Complaint both within and

without the territory of these states and of the United States. Detailed examples of this long-

running, comprehensive, and systematic pattern of racketeering acts series are found in the

subcounts below. These acts and injuries are representative of those inflicted by Defendants on

this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

**717. CLAIMS FOR RELIEF - COUNT 17**

**BB. Income, Property, and Reputation Injuries**

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1589, 1962, RCW**

**9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7))**

**Forced Labor**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1584,

1962, RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7) in their management and

operation of an enterprise-in-fact system of forced labor by using virtual restraints and assigned

and designated circumstances to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1, 8-10 |
| 556-606 | RICO - Racketeering | 1-51 |

## 718. CLAIMS FOR RELIEF - COUNT 18

### BB. Income, Property, and Reputation Injuries

### Klu Klux Klan Act, (18 USC § 250, RCW 9A.44.115, NJ Stat 2C:30-6, 2C:30-7)

### Civil Rights - Sexual Abuse

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 250, RCW 9A.44.115, NJ Stat 2C:30-6, 2C:30-7 in their series of acts to screeNSEC-in and screeNSEC-out potential sexual partners to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint within the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of sexual abuse, sexual assault and attempted psychological humiliation by BRMT, elements of their pattern of

racketeering acts and involuntary servitude are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | LTHL Lethality Attempts | |
| 527-532 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 7-12 |
| | NSEC National Security Pretexting and Entanglement | |
| | RGTS – Individual Rights Violations and Conspiracies | |
| | RICO - Racketeering | |

## 719. CLAIMS FOR RELIEF - COUNT 19

## BB. Income, Property, and Reputation Injuries

## Racketeering Influenced and Corrupt Organizations Act

## (18 USC §§ 1341, 1962)

## Frauds - Mail

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1341, 1962 as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of fraudulent checks and other documents mailed to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | LTHL Lethality Attempts | |
| | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | |
| 538 | NSEC National Security Pretexting and Entanglement | 1 |
| 545-547 | RGTS – Individual Rights Violations and Conspiracies | 3, 4, 5 |
| 556-558, 561-563, 570 | RICO - Racketeering | 1-3, 6-8, 15 |

## 720. CLAIMS FOR RELIEF - COUNT 20

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations (18 USC § 1037, 1962)

### Frauds – Electronic Mail

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1037, 1962)as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of emails which contain false and misleading content and/or personation to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 512, 516-520 | LTHL Lethality Attempts | 9, 13-17 |
| 528-530, 532, 535-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 8-10, 12, 15-17 |
| 538, 541, 542 | NSEC National Security Pretexting and Entanglement | 1, 4, 5 |
| 545-547, 549 | RGTS – Individual Rights Violations and Conspiracies | 3-5, 7 |
| 556-606 | RICO - Racketeering | 1-51 |

## 721. CLAIMS FOR RELIEF - COUNT 21

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations Act (18 USC § 1343, 1962)

### Frauds - Wire

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1343, 1962) as well as state statutes in other originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of fraudulent bank and other payment system wires by and between those Defendants and the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 514, 520 | LTHL Lethality Attempts | 11, 17 |
| 527-530, 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 7-10, 17 |
| 538, 540-542 | NSEC National Security Pretexting and Entanglement | 1, 3-5 |
| 544, 550-555 | RGTS – Individual Rights Violations and Conspiracies | 2, 8-13 |

## 722. CLAIMS FOR RELIEF - COUNT 22

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations (18 USC § 1030, 1962)

### Frauds - Computers

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1030, 1962) as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of fraudulent transactions, website hacking and spoofing for financial frauds, transactions, communications, and other purposes to the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 507, 510, 514, 516-520 | LTHL Lethality Attempts | 4, 7, 11, 13-17 |
| 528-530 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 8-10 |
| 538, 541, 542 | NSEC National Security Pretexting and Entanglement | 1, 4, 5 |
| 544-555 | RGTS – Individual Rights Violations and Conspiracies | 2-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 723. CLAIMS FOR RELIEF - COUNT 23

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations, (18 USC §§ 1349, 1962)

### Attempts and Conspiracy - Mail Fraud

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1349, 1962) as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | LTHL Lethality Attempts | |
| | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | |
| 538 | NSEC National Security Pretexting and Entanglement | 1 |
| 545-547 | RGTS – Individual Rights Violations and Conspiracies | 3-5 |
| 556-558, 561-563, 570 | RICO - Racketeering | 1-3, 6-8, 15 |

## 724. CLAIMS FOR RELIEF - COUNT 24

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations (18 USC §§ 1346, 1962)

### Attempts and Conspiracy – Scheme to Defraud of Honest Services - Mail, Wire, Email

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1346, 1962 in their series of schemes, conspiracies, and deprivations of honest services to the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do actively create injuries by depriving the Lead Plaintiff of honest services and of access to honest services in Washington, California, Arizona, New York, New Jersey, Illinois, Iowa, Texas, Maryland, Massachusetts, and relevant state statutes in all originating locations, many of which locations and particular details are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 514, 516 | LTHL Lethality Attempts | 11, 13 |
| 529, 530, 537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking | 9, 10, 17 |

| | Abuses | |
|---|---|---|
| 541, 542 | NSEC National Security Pretexting and Entanglement | 4, 5 |
| 544-546, 549, 553-555 | RGTS – Individual Rights Violations and Conspiracies | 2-4, 7, 11-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 725. CLAIMS FOR RELIEF - COUNT 25

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations Act (18 USC § 1952, 1962)

### Interstate and Foreign Travel or Transportation For Racketeering Purposes

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1952, 1962 in their series of frauds, schemes, conspiracies, injuries, and deprivations of rights using interstate and international travel, federally funded public transportation modes and facilities in interstate and international commerce to deprive the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do deprive the Lead Plaintiff of the free right to travel absent interference with civil rights and of fair, free, non-discriminatory access to and respect for personal privacy on and in these transportation modes and facilities in the absence of any reasonable suspicion for police powers operations against Lead Plaintiff, and by targeting his person rather than any reasonably known or suspected behavior, many of which locations and particular details are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are

representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504, 510, 512, 517, 519 | LTHL Lethality Attempts | 1, 7, 9, 14, 16 |
| 522, 524, 525, 528, 530, 535, 536 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 2, 4, 5, 8, 10, 15, 16 |
| 541, 542 | NSEC National Security Pretexting and Entanglement | 4, 5 |
| 544-546, 550-552 | RGTS – Individual Rights Violations and Conspiracies | 2-4, 8-10 |
| 556-606 | RICO - Racketeering | 1-51 |

## 726. CLAIMS FOR RELIEF - COUNT 26

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### (18 USC §§ 241, 242, 245, 1962; 42 U.S.C. § 1982)

### Property Rights and Illegal Takings - Fifth Amendment

### Civil Rights - Deprivation of Rights

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC § 241, 242, 245, 1962; 42 U.S.C. § 1982, and create and sustain injuries and deprivations under the state laws of Washington and New Jersey, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff,

and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, including, without limitation, Lead Plaintiffs rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and including such rights as they relate to interstate commerce and to closely held business entities, as specifically cited and described in the subcounts in this Complaint in these states and the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

      C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
|  | LTHL Lethality Attempts |  |
| 526, 527 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 6, 7 |
| 538, 540-542 | NSEC National Security Pretexting and Entanglement | 1, 3-5 |
| 545, 546, 548-552 | RGTS – Individual Rights Violations and Conspiracies | 3, 4, 6, 8-10 |

## 727. CLAIMS FOR RELIEF - COUNT 27

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### (18 USC §§ 1905, 1957, 1962; 42 U.S.C. § 1982)

### Racketeering - Monetary Benefit From Unlawful Activity;

### Civil Rights - Deprivation of Rights,

### Fifth Amendment – Property Rights and Illegal Takings

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1905, 1957, 1962; 42 U.S.C. § 1982 in their series of schemes, conspiracies, and deprivations of real, financial, and personal property to the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendant United States used oxytocin against Lead Plaintiff's spouse and her presence in the workplace with a known serial adulterer to cause and create divorce in 1988, forcing the rapid bargain sale of their residence shortly after Lead Plaintiff completed extensive landscaping improvements to the property at considerable time and expense. Defendant United States deprived Lead Plaintiff's business Alliance Environmental Services of Small Business Administration bid and performance bonding services from 1990 to 1993, provided a fraudulent performance bond for a federally funded project using a previously seized Utah insurance company as cover for this fraudulent issuance, then cancelled the performance bond they had fraudulently issued in the seized company's name, and arranged the

acceleration of the project's performance requirements, all to create financial distress for the company and for the Lead Plaintiff, then again deprived the company of performance bonding to deprive Alliance of a federally funded air route traffic control center project for about $1.2 million, forcing a personal bankruptcy which deprived Lead Plaintiff of financial assets and severely damaged his access to credit. This scheme was repeated and accelerated in 2002 to 2005 using a combination of check fraud and false sales opportunities requiring extensive travel throughout the United States to starve another Lead Plaintiff company, Allegent LLC dba Performa, of legitimate sales opportunities, and to again force the rapid bargain sale, this time to avoid foreclosure, of Lead Plaintiff's residence improved at considerable out of pocket and borrowed funds.

C. Defendants repeated this same process again at his residences in Cliffside Park, NJ in 2010 and Ramsey, NJ, in 2018. Each and every time, Defendants conspired and acted to deprive him of (i) the benefit of his financial investments, (ii) adequate compensation for his labor, materials, and other expenses, and (iii) of any enjoyment of those improvements, and (iv) each time this occurred very soon after (never during) the time these investments, expenses, and labor were completed.

D. In each of these four sequences, the two forced removals from his owned real properties, and the two removals from his rented residences, the removal occurred soon after the improvements were completed and before financial reserves could be reaccumulated. This is the very same pattern of acts these Defendants also used to orchestrate periods of employment, unemployment, and setbacks in his pay rate while he had little or no bargaining power and his paths to alternative employment were blocked by mail frauds and wire frauds during his employment searches. Thereafter, Defendants completely eliminated all the Lead Plaintiff's

employment options, including all professional employment, and even including hourly part-time employment at a local supermarket in Ramsey, NJ while he lived there between 2011 and 2018.

E. All these acts were and are part of their conspiracy and scheme to deprive Lead Plaintiff of the benefits of real property appreciation and the accumulation of financial resources so as to sustain his involuntary servitude to Defendant United States' BRMT brain hijacking program and its cover up in plain sight. These Defendants used their official knowledge and their color of law "investigations" to individually and personally to directly benefit themselves or others by exploit this insider conspiracy and knowledge of each of these schemes in sequence over a thirty year period, from 1988 to 2018.

F. Particular details of those directly benefiting or steering benefits of these property improvements and subsequent appreciation of real properties Lead Plaintiff improved (from $189,340 in 1984 to $1,829,013 in 2023 per Redfin.com for his first residence in Redmond, WA) are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, and injuries, and deprivations experienced by other plaintiff members of this class.

G. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 728. CLAIMS FOR RELIEF - COUNT 28

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### 18 USC §§ 241, 1962; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994

### Civil Rights - Conspiracy Against Rights

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 241, 1962 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 729. CLAIMS FOR RELIEF - COUNT 29

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### 18 USC §§ 242, 1962; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994

### Civil Rights Generally - Deprivation of Rights Under Color of Law

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 242, 1962, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and by enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both

within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 730. CLAIMS FOR RELIEF - COUNT 30

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### 18 USC §§ 245(b), 1962, 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994;

### Civil Rights Generally - Federally Protected Activities

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence

powers under law, have and do act in violation of federal statutes 18 USC §§ 245(b), 1962, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

      C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 730. CLAIMS FOR RELIEF - COUNT 31

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### 18 USC §§ 245(b), 1962, 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994;

### Civil Rights - Federally Protected Activities, Thirteenth Amendment –

### Involuntary Servitude, Intentional Discrimination in Employment

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC §§ 245(b), 1962, 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994; and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, including, without limitation, his rights to free, equal, and non-discriminatory access to employment, to contract, and to engage in the earning of an income by whatsoever legal means he chooses, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do

injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

T. Applicable subcount violations related to this Complaint are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 732. CLAIMS FOR RELIEF - COUNT 32

## CC. Personal and Constitutional Rights Injuries

## Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

## (18 USC §§ 245, 1962; 42 U.S.C. § 1981)

## Civil Rights - Deprivation of Rights, Fourteenth Amendment – Equal Protection

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC § 245, 1962; 42 U.S.C.

§ 1981 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in

violation of international laws and treaties through Defendant United States and its domestic

defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling

foreign scammers electronically screened in by those Defendants, and foreign intelligence

services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted

regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in

their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and

Immunities, including, without limitation, Lead Plaintiffs rights to free, equal, and non-

discriminatory access to all human, Constitutional, and civil rights, including those guaranteed

under ratified international treaties, and including such rights as they relate to interstate

commerce and to closely held business entities, as specifically cited and described in the

subcounts in this Complaint both within and without the territory of these states and of the

United States. Defendants have and do injure the Lead Plaintiff and other members of the class

by such deprivations directed at or to those plaintiffs. Locations and particular details of many

of these acts, violations, and injuries are unknown at the time of this Complaint and will be

available to be introduced upon proper discovery. Detailed examples of this long-running,

comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations,

acts, deprivations, and injuries are found in the subcounts, and are representative of these types

of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

    C. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |

| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
|---------|------------------------------------------------------|------|
| 556-606 | RICO - Racketeering                                   | 1-51 |

## 733. CLAIMS FOR RELIEF - COUNT 33

### CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act,  Klu Klux Klan Act

### 18 USC §§ 242, 1962; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994

### Civil Rights - Deprivation of Rights Under Color of Law

### Fourth Amendment - Searches and Warrants

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. As to the Fourth Amendment right to be free of searches and seizures absent a lawfully obtained warrant, Defendant United States and other defendants named in the caption as federal, state, and local Defendants possessing police and intelligence powers have and do act in systematic violations of federal statutes 18 USC §§ 242, 1962, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, to engage in a pattern of racketeering acts and Fourth Amendment searches and seizures violations through their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of

these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 734. CLAIMS FOR RELIEF - COUNT 34

## CC. Personal and Constitutional Rights Injuries

### Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act

### 18 USC §§ 242, 1962, 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994;

### Civil Rights - Deprivation of Rights Under Color of Law

### Fourth Amendment - Searches and Warrants:

### Searches Exceeding Authority, Malicious Procurement, Searches Without Warrant

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. As to the Fourth Amendment right to be free of searches and seizures absent a lawfully obtained warrant, Defendant United States and other defendants named in the caption as federal, state, and local Defendants possessing police and intelligence powers have and do act in systematic violations of federal statutes 18 USC §§ 242, 1962, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, to engage in a pattern of racketeering acts and Fourth Amendment searches and seizures violations through their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking | 1-17 |

| | Abuses | |
|---|---|---|
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 735. CLAIMS FOR RELIEF - COUNT 35

### CC. Personal and Constitutional Rights Injuries

### Klu Klux Klan Act, (42 U.S.C. § 1985(1), 18 USC § 987)

### Civil Rights - Deprivation of Rights Under Color of Law,

### Anti-Terrorist Forfeiture Protection

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have engaged in a color of law terrorist investigation against Lead Plaintiff, beginning from their initial pretexting in the 1980s and proceeding to a formally designated investigation, as officially acknowledged by Defendant NYPD on September 3, 2021, (see Complaint Interline Exhibit 15) which was based upon Defendant United States' fraudulent pretexting beginning in 1996 and accelerating after their failure to interdict the September 11, 2001 terror attack. This pretexting and related color of law injuries to Lead Plaintiff are explained in detail at subcounts NSEC-1 through NSEC-5 and referenced at subparagraph T below.

C. The BRMT bioweapon brain hijacking program is not defensible either as a "state secret" nor in the interests of "national security," as it systematically (i) violates the Article II limits on the federal executive established in the Constitution, (ii) vastly exceeds the Article I authorities of Congress to constitutionally approve or appropriate to support tor sustain such a program, (iii) can and does directly injure US persons rights and (iv) even their physical well-being to and including torturous injury and death with due process, and (v) systematically

violates their human, Constitutional, legal, and civil rights, including (vi) those guaranteed to all humans under ratified international treaties having force of law in the United States of America, while (vii) posing a direct, immediate, and continuing threat to any and all US persons.

D. Any argument by Defendant United States or any other party that the Lead Plaintiff ever presented or currently presents any such threat is based solely upon the Defendants' own conspiracies, acts, and actions against the Lead Plaintiff. All available evidence, including the manipulated words of the Lead Plaintiff derived by Defendant United States' abuse of BRMT against Lead Plaintiff, points directly and immediately at Defendant United States and its co-conspirators as this source of this threat. So, there is no legal basis for any argument by Defendants that there is any foundation in law for any forced forfeiture of property by Lead Plaintiff, nor have they ever indicated, much less undertaken, any proceeding to even assert such a claim as required under 18 USC § 983. Nonetheless, Defendants have illegally conspired, schemed, and acted to effect such a scheme, upon which this Court must act and order to reverse, both to restore to equity the Lead Plaintiff and to order Defendants to disgorge all relevant and to immediately undertake to reconstruct and identify those injured as part of this class of plaintiffs since BRMT program initiation in the 1970s, so they may receive justice under our Constitution and laws.

E. Neither the federal executive acting through Defendant Department of Justice nor Congress has previously taken up or pursued, much less implemented, such an action to restore equity, as demonstrated by their complete neglect of the victims of Cointelpro and MKUltra, both deceased and living, in the aftermath of those programs. These extreme excursions from Constitutional limits by federal excess are systematically denied by both Article I and Article II failures to act, and it is the Article III Courts constitutional responsibility to act against such egregious injuries and to restore equity.

F. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| | LTHL Lethality Attempts | |
| | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | |
| 541, 542 | NSEC National Security Pretexting and Entanglement | 4, 5 |
| 544-549 | RGTS – Individual Rights Violations and Conspiracies | 2-7 |
| 556-565, 567-606 | RICO - Racketeering | 1-11, 13-51 |

## 736. CLAIMS FOR RELIEF - COUNT 36

### CC. Personal and Constitutional Rights Injuries

### (18 USC § 1038)

### False Information and Hoaxes In Furtherance of BRMT Torture and Theft

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has at all times since 1972 acted in knowing and willful violation of 18 USC §§ 1038 to injure Lead Plaintiff and all members of this class of plaintiffs by using and spreading false information and hoaxes in furtherance of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations, all of which are based in the false information and hoaxes of Defendants acting or intending for others to act on their behalf to harm the Lead Plaintiff and other similarly situated plaintiffs with such

injuries as the following examples which together comprise a representative sampling of the full

scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 514, 520 | LTHL Lethality Attempts | 11, 17 |
| 527-530, 554, 555 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 7-10, 12, 13 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 544-546, 551-555 | RGTS – Individual Rights Violations and Conspiracies | 2-4, 9-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 737. CLAIMS FOR RELIEF - COUNT 37

## DD. Threats, Retaliation, and Negligence Injuries

## Negligence - Failure to Protect

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all

times since approximately 1972 acted in a knowing and willfully negligent manner to fail to

protect and, in fact, acted jointly and severally to align their various teams, details, and

organizations to injure Lead Plaintiff and all members of this class of plaintiffs by failing to

comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow

citizens, the rights and properties of those citizens, and the personal relationships, homes, and

families of those citizens. This purposeful and willful negligence actively furthered of their series

of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families,

personal relations and relationships, their careers, reputations, fortunes, and business interests,

including closely held business entities as specifically cited and described in the subcounts in this

Complaint both within and without the territory of these states and of the United States.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to protect) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 738. CLAIMS FOR RELIEF - COUNT 38

### DD. Threats, Retaliation, and Negligence Injuries

### Negligence – Failure to Properly Supervise

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all times since approximately 1972 acted in a knowing and willfully negligent manner to fail to properly supervise their forces, officers, agents, confidential informants, contractors, and others. They have, in fact, acted to supervise those persons and align their various teams, details, and organizations to both jointly and severally injure and to encourage and support injuries, and acted to injure Lead Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes,

conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations

and relationships, their careers, reputations, fortunes, and business interests, including closely

held business entities as specifically cited and described in the subcounts in this Complaint both

within and without the territory of these states and of the United States.

C. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations, which are

representative examples of both the negligence (failure to supervise) and of the false information

and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to

harm the Lead Plaintiff and other similarly situated plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 739. CLAIMS FOR RELIEF - COUNT 39

### DD. Threats, Retaliation, and Negligence Injuries

### Negligence – Failure to Properly Train

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all

times since approximately 1972 acted in a knowing and willfully negligent manner to fail to

properly train their forces, officers, agents, confidential informants, contractors, and others and,

in fact, acted to train those persons and align their various teams, details, and organizations to

jointly and severally injure and encourage and support injuries to Lead Plaintiff and all members

of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States.

    C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to train) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

### 740. CLAIMS FOR RELIEF - COUNT 40

### DD. Threats, Retaliation, and Negligence Injuries

### 18 USC §§ 2, 3, 4 and State Statutes in an Unknown Number of States

### Negligence - Failure to Report, Acting as Accessory, Acting as Accomplice, Aiding and Abetting, Misprison of Felony

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have at all times since approximately 1972 acted knowingly and willfully negligent manner to fail in their duties as departments, agencies, organizations, groups, and individual citizens and have, in fact, acted negligently and willfully as principals (18 USC § 2), accomplices and accessories (18 USC § 3) in their (i) failure to report illegal acts; (ii) failure to report violations of rules and regulations essential to good order and discipline within departments and agencies; (iii) have acted as accessories to criminal acts and civil violations; (iv) have acted as accomplice to criminal acts and civil violations; (v) have aided and abetted others and each other in acts, violations, and injuries; and (vi) have engaged in knowing misprison of felonies (18 USC § 4) which directly injured Lead Plaintiff and other plaintiffs of this class including their persons, businesses, and properties, in both in-state and interstate commerce.

C. Defendants with police powers have so engaged to improperly implement their forces, officers, agents, confidential informants, contractors, and others in these acts, injuries, and violations, and acted to train those persons and align their various teams, details, and organizations to jointly and severally injure and encourage and support injuries to Lead Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful

and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Complaint both within and without the territory of these states and of the United States.

D. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to protect) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

## 741. CLAIMS FOR RELIEF - COUNT 41

### DD. Threats, Retaliation, and Negligence Injuries

### Racketeering Influenced and Corrupt Organizations

### 18 USC § 1512, 1962; New York Penal Law §§ 215; NJ Stat 2C:28-5

### Tampering With Witness

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 1512, 1962; New York Penal Law §§ 215; NJ Stat 2C:28-5 in their series of schemes, conspiracies,

acts, injuries, and deprivations to tamper with, interfere with, and attempt to intimidate the Lead

Plaintiff from contacting the US District Court for the district of Eastern California, the US

district Court for the District of Columbia, the office of the US Attorney for the Southern District

of New York, the Department of Justice, and the Public Integrity section of the Attorney General

of New Jersey, as specifically cited and described in the subcounts in this Complaint and are

representative of these types of violations, acts, and injuries, and deprivations experienced by

other plaintiff members of this class.

     B. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 515-520 | LTHL Lethality Attempts | 12-17 |
| 524, 532, 535-537 | HEXP Illegal Human Experimentation -- BRMT Brain Hijacking Abuses | 4, 12, 15-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 545-549, 553, 554 | RGTS -- Individual Rights Violations and Conspiracies | 3-7, 11, 12 |
| 562-565 | RICO - Racketeering | 7-10 |

## 742. CLAIMS FOR RELIEF - COUNT 42

### DD. Threats, Retaliation, and Negligence Injuries

**Racketeering Influenced and Corrupt Organizations**

**18 USC § 1513, 1962; New York Penal Law §§ 215; NJ Stat 2C:28-5**

### Retaliating Against Witness

    A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

    B. Defendants have and do act in violation of federal and state statutes 18 USC § 1512,

1962; New York Penal Law §§ 215; NJ Stat 2C:28-5 in their series of schemes, conspiracies,

acts, injuries, and deprivations to retaliate against, interfere with, and attempt to intimidate the

Lead Plaintiff from contacting the US District Court for the district of Eastern California, the US

District Court for the District of Columbia, the office of the US Attorney for the Southern

District of New York, the Department of Justice, and the Public Integrity section of the Attorney

General of New Jersey, as specifically cited and described in the subcounts in this Complaint and

are representative of these types of violations, acts, and injuries, and deprivations experienced by

other plaintiff members of this class.

    C. Applicable subcount violations related to this Claim For Relief are the following,

which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 515-520 | LTHL Lethality Attempts | 12-17 |
| 524, 532, 535-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 4, 12, 15-17 |
| | NSEC National Security Pretexting and Entanglement | |
| 545-549, 553, 554 | RGTS – Individual Rights Violations and Conspiracies | 3-7, 11, 12 |
| 562-565 | RICO - Racketeering | 7-10 |

### 743. CLAIMS FOR RELIEF - COUNT 43

### DD. Threats, Tampering, Retaliation, and Negligence Injuries

### Racketeering Influenced and Corrupt Organizations Act

### (18 USC §§ 1962)

### Prohibited Activities - Pattern of Racketeering Acts

    A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

    B. Defendants have and do act in violation of federal and state statutes 18 USC § 1962 in

their series of schemes, conspiracies, deprivations, blocking, screening and other related acts,

violations, and injuries targeting, directed to, and directed at the Lead Plaintiff and closely held

business entities as specifically cited and described in the subcounts in this Complaint both

within and without the territory of these states and of the United States. Defendants have and do violate human, Constitutional, civil rights and laws by engaging in a continuous pattern of racketeering activity against the Lead Plaintiff and other members of this class of plaintiffs at least since the Lead Plaintiff was a minor child. Additional particular details are both unknown and unrecollected at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Applicable subcount violations related to this Claim For Relief are the following, which together comprise a representative sampling of the full scope of such violations:

| Paragraph(s) | Facts - Subcount Series | Subcount(s) |
|---|---|---|
| 504-520 | LTHL Lethality Attempts | 1-17 |
| 521-537 | HEXP Illegal Human Experimentation – BRMT Brain Hijacking Abuses | 1-17 |
| 538-542 | NSEC National Security Pretexting and Entanglement | 1-5 |
| 543-555 | RGTS – Individual Rights Violations and Conspiracies | 1-13 |
| 556-606 | RICO - Racketeering | 1-51 |

744. Paragraphs 744 through 798 are reserved.

**END OF CLAIMS FOR RELIEF**

\*            \*            \*

799. For each count asserted in this Complaint, each Plaintiff is entitled to injunctive relief, compensatory and statutory damages, and punitive damages, in addition to reasonable attorneys' fees and costs, from each of these Defendants for physical and emotional injuries, loss of income, assets, and property, and other injuries incurred as direct and indirect causal effect of the actions of Defendants.

## PRAYER FOR RELIEF

800. Lead Plaintiff, as representative of and behalf of the class of injured Plaintiffs, respectfully requests an award of the following relief:

801. **Declaratory Judgment** that the actions described herein constitute violations of all federal and state statutes cited in this Complaint.

802. **Order** reversing conflict of law that (i) the language in 18 USC 2340B "…nor shall anything in this chapter be construed as creating any substantive or procedural right enforceable by law by any party in any civil proceeding" violates the ratified and adopted *Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,* Article 14.1. "Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation," and that (ii) 18 USC § 2340B is null and void as to that specific clause as from October 27, 1990, and may not be enforced from that date under the Constitution and laws of the United States, and that (iii) the Constitution and laws of the United States and the common law interests of equity require all such deprived Plaintiffs in whatever action be so notified by Defendant United States, and that (iv) the entire class of plaintiffs as parties to this litigation be restored as near as possible for all injuries suffered throughout the development, deployment, and operation of Defendant United States' illegal

BRMT bioweapon and bioweapon system in violation of the Constitution, ratified international treaty, and law.

803. **Emergency Order** providing immediate injunctive relief under (i) 42 USC § 1983 deprivation of rights, and under (ii) 18 USC § 1964 as it relate to Defendant United States' 18 USC § 175 prohibited use of BRMT bioweapon and bioweapon delivery system per 18 USC 1961(1)(B), and (iii) for any and all other injuries as further defined at 19 USC § 1961, which Emergency Order thereby prohibits Defendant United States and any and all other known and unknown Defendants who may possess or be able to access the BRMT bioweapon, bioweapon system, and any variant thereof, and including, without limitation, all their officers, agents, employees, contractors, and assigns, from engaging in all and every use of the prohibited BRMT bioweapon and bioweapon delivery system technology, and which Emergency Order declares the prohibited BRMT (Brain Remote Management Technology) bioweapon, bioweapon delivery system, and any variant(s) thereof, as an immediate and continuing threat to the life and health, and to the human, civil, and Constitutional rights, of each and every Plaintiff as a member of this class, to their families and communities, and to the general public, including any and all US persons wherever they may be.

804. The Court is reminded that absent such an Emergency Order, the harms and injuries to the entire class of Plaintiffs, to others as indirect victims, and to the public at large will continue, may very well escalate, and will lead to further injuries, including reasonably foreseeable deaths, disabilities, injuries, incarceration, and other readily foreseeable injuries and adverse consequences. Such consequences have already been experienced by Lead Plaintiff and other members of the class of plaintiffs for approximately fifty years as Defendant United States'

continuing and unaltered continuing practice from prior illegal operations of Defendant United States in predecessor programs such as MKUltra and Cointelpro.

805. **Permanent Injunctive Order** prohibiting and any and all other known and unknown Defendants who may possess or be able to access the BRMT bioweapon, bioweapon delivery system, and any variant thereof, and including, without limitation, all their officers, agents, contractors, and assigns, Defendant United States, and any other person, from owning, possessing, operating, developing, using, licensing, or permitting any use of the BRMT bioweapon and bioweapon delivery system, in any form or variant, for any purpose, against any US person or other innocent at any time and place. Further, that such Order:

(a) declare the BRMT (Brain Remote Management Technology) bioweapon, bioweapon delivery system, and any variant(s) thereof has, does, and will pose an immediate and continuing threat to the life and health; and to the human, civil, and Constitutional rights;

(b) that the BRMT bioweapon and bioweapon delivery system have and do violate that certain ratified international treaty having force of law in the United States of America, *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,*

(c) that the BRMT bioweapon and bioweapon delivery system and is an instrument of domestic terrorism in violation of US law as defined at 18 USC § 2331(5), and is therefore subject to penalties under 18 USC 2339(a) relating to illegal use under 18 USC §175,

(d) require Defendant United States to use all feasible, ordinary, and extraordinary means and resources to protect and defend all US persons and other innocents from any such device, equipment, system, or operation, at any time and for all time,

(e) declare that the BRMT bioweapon and bioweapon delivery system has been and is used as an instrument of torture by Defendant United States in violation of that certain treaty *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*

(f) to facilitate violations of 18 USC 1962, and that

(g) all future appropriations, funding, contracting, research, development, deployment and uses by Defendant United States and/or any other party, including any sovereign, are prohibited for all time.

806. The Court is reminded that absent such a permanent Order, Defendant United States will continue its historical pattern of serial violations in which it has continuously engaged since at least 1945, that is has does harm and injure the entire class of Plaintiffs, others as indirect victims, and the public at large, and that together with its co-conspirator Defendants it may very well escalate these violations, injuries, and abuses, and cause and create further injuries, such as death, disability, incarceration, racketeering acts, and other readily foreseeable adverse consequences, as such consequences have been experienced by Lead Plaintiff and other members of the class of plaintiffs for more than fifty years as relate to the prohibited BRMT bioweapon and bioweapon delivery, and to the immediate predecessor programs of Defendant United States, CIA's MKUltra and FBI's Cointelpro, and their predecessor programs from at least the 1940s.

807. **Order of Forfeiture** commanding Defendant United States to promptly and swiftly identify to the Court all direct and indirect victims of the BRMT bioweapon system, and to immediately restore any real, personal, or intangible property of any plaintiff, or if unavailable through intervening operation of law, to restore in equity and/or fairly compensate, all which was proximately caused to be lost to these plaintiffs and/or to their business, estate, or kin as a result of the use of the BRMT bioweapon and bioweapon system, and/or the pattern of racketeering

acts of Defendants, whether or not directly or indirectly caused and created by Defendant United

States, from the date of the commencement of the prohibited BRMT bioweapon and bioweapon

delivery system brain hijacking program to the present, in accordance with procedure 18 USC §§

981 through 987, with 18 USC § 1964, and with 18 USC §2333 as the prohibitions on such

litigation at 18 USC § 2337 have and do violate those certain ratified international treaties having

force of law in the United States of America, *Convention Against Torture and Other Cruel,*

*Inhuman or Degrading Treatment or Punishment,* and *Convention on the Prohibition of the*

*Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons*

*and on Their Destruction,* 42 USC 1983, and other applicable federal, state, and common law.

808. **Monetary Damages** award in an amount to be determined by the jury, which

amount cannot be properly identified at this time, which will fully compensate the plaintiff

victims for injuries resulting directly and indirectly from the use of the BRMT bioweapon

system, system technology, and the related pattern of racketeering acts throughout the

Defendants' approximately five decade long pattern of color of law and other criminal violations,

acts, misconduct, prejudicial operations, and injuries against the Lead Plaintiff and other

plaintiffs of the class. Lead Plaintiff is currently unable to identify and describe each and every

specific violation and injury sustained over the past approximately five decades, and has

provided a sampling of 92 forms of criminal, civil, and treaty guaranteed compensable injuries as

representative, but not fully encompassing of, the extent and types of injuries to plaintiff victims.

Members of this class of plaintiffs, victimized by Defendants' patterns' of racketeering acts,

criminal acts, civil rights violations, treaty violations, manipulations, and injuries, likely

experienced from perhaps a few hours of BRMT bioweapon and bioweapon system operations

with unknown injuries ranging to death at some point in their lives, to more than five decades of

continuously torturous injury including numerous attempted lethality events, such as the injuries experienced by the Lead Plaintiff to date. Some plaintiffs of this class are doubtless heirs to deceased victims, and/or permanently disabled, or incarcerated as a result of undiscovered remotely manipulated criminal act(s) perpetrated by Defendant United States' use of the BRMT bioweapon and bioweapon delivery system against that plaintiff or to provoke that plaintiff to involuntarily, without so knowing, undertake a harmful act against a third party they would not otherwise have undertaken. All members of this class and their kin are entitled to full discovery of these crimes and injuries, and to justice, including, without limitation, monetary damages. The monetary damages to be awarded will include some or all of the following:

809. **Compensatory damages for individual injuries** - human, constitutional, civil, statutory, and ratified treaty rights having force of law injuries in amounts to be determined by the jury at trial for:

  i.  Torture, for each and every day of (a) torture and torture enhancement imposed by Defendant United States' operation of the BRMT bioweapon and bioweapon system, and (b) torture and torture enhancement by the psychological operations of all Defendants, whether imposed each on their own, or enhanced by joint operation, such as:

  ii.  Daily suffering from torturous injury such as the approximately 19,000 days experienced by Lead Plaintiff, and unknown numbers of days and injuries to other plaintiffs of this class, from (a) physical, mental, and psychological manipulations; from (b) public humiliations and threats; from (c) extreme fear, anxiety, and panic inducing damaging hyper-vigilance and other phobias and stress, and including post-traumatic stress disorder;

iii.  Repeated induced mental illnesses, imposed by Defendant United States and its

co-conspirator Defendants, such as (a) chronic anxiety, depression, phobias, and

suicide ideations from short cycle and long cycle psychological manipulations,

provocations and fears, and (b) inducing both temporary and permanent

biochemical damage to the brain, gut, and immune systems;

iv.  Repeated physical illnesses imposed by Defendants such as manifested symptoms

of physical illness and disease, such as (a) repeated and extreme headaches of

long duration; (b) heart irregularities, (c) breathing irregularities, (d) vision

irregularities, all with physical symptoms such as pain to extreme levels, and

inducing fears and phobias; (e) extreme physical pain in the torso, arms, legs, and

head; (f) loss of control of bodily functions such as life threatening acts against

the Lead Plaintiff's own proper colon function in 2023; and (g) induced allergic

symptoms, requiring cost, expense of treatment, and (h) inducing needless

emotional distress, to and including post-traumatic stress disorder;

v.  Repeated daily coercion of psychological operations by Defendants such as those

conducted using (a) hacked and spoofed websites, hacked home appliances,

computers, printers, cell phones, and other electronic devices to induce and

amplify stress, anxiety, anger, fear, and panic; (b) to engage in repeated cycles of

hope, despair, fear, anger and reversal of those cycles, magnifying physical and

biochemical changes, and (c) causing permanent irreparable damage to brain, gut,

and immune system biochemistry, and (d) to cause the necessity, inconvenience,

and expense of contacting fraudulently delivered and stressful customer support

by Defendants as a further provocation; and (e) the necessity, cost, inconvenience and expense of repairs, returns, loss of use, and replacements;

vi.    Permanent health damage and disability imposed by Defendants such as those resulting from (a) medical misdiagnosis or malpractice by wrongfully modified biomedical test results and malfunction through hacking of medical test and diagnostic equipment; (b) appetite suppression and magnification to induce rapid weight and physical health changes; (c) organ malfunctions and simulated symptoms of organ malfunctions; and (d) short term memory blocking and loss; among others;

vii.   Repeated physical and mental injury and lethality attempts and incidents, directed, orchestrated, and executed by Defendants such as (a) all forms of visual and verbal violent threats, (b) a wide variety of natural and accidental injury and lethality attempts and cycles, such as choking, tripping, falling, loss of balance, loss of consciousness; (c) purposeful distraction by color choices and other psychological tricks, and by BRMT bioweapon operations by Defendants leading to loss of concentration on points of risk and injury; (c) induced dangerous movements of plaintiff victims, (d) plaintiff victim operation of vehicles and equipment under dangerous induced conditions, such as BRMT bioweapon brain hijacking for momentary and longer periods of extreme sleepiness, extreme eye watering and other allergic reactions, rapidly induced vision distortions and headaches;

viii.  All these torturous injuries above were and are aggravated by Defendant United States' prohibited BRMT bioweapon and bioweapon delivery system brain

hijacking to (a) magnify the adverse physical and psychological experience and injury to the plaintiff victim, and (b) to engage the plaintiff victim in high risk activities and conditions, and (c) in environments where their action may result in injury, incarceration, or death from their own involuntary acts, or (d) from the acts of others who wrongly interpret their acts as voluntary and threatening, such as an armed agent or officer perceiving a lethal threat to themselves from a body movement or words which are in fact induced through BRMT bioweapon brain hijacking;

ix. Involuntary servitude imposed by Defendants such as (a) partially compensated and uncompensated, unwitting, and involuntary injury imposed upon plaintiff and/or aggravated or perpetuated by Defendant United States' through its conspiracy with another Defendant, (b) various frauds, and/or (c) use the BRMT bioweapon and bioweapon delivery system. Plaintiff injuries have been, are, and will be experienced such as partial and total loss of income, due to (d) purposeful below-market compensation and (e) periods of unemployment; (f) failure to fully compensate for materials, equipment, and services rendered; (g) deprivation of access to equal employment and career opportunities available to all other persons; (h) limits on and/or total elimination of business and entrepreneurship options, including (i) deprivation of rights to start, acquire, operate, and innovate freely and fairly in in-state, interstate, and international commerce. Involuntary servitude is a condition imposed by Defendants, and is not dependent upon the existence or lack of compensation or its specific amounts, it exists if any

conditions are imposed, such as threat, act, or destitution of the plaintiff and/or other family or household members;

x. Forced labor and peonage injuries imposed by Defendants such as lack of fair market determined and fully paid compensation from Defendants' deprivation of fair and equal access to private and governmental employment opportunities and market established compensation, including by Defendant network capture, entrapment, and retention for (a) plaintiff victim labor, services, and planned subsequent adverse termination and/or failure to fully compensate thefts; network capture for (b) enhanced entrapment, incarceration and lethality risks; network capture for (c) loss of income, dividends, property and financial assets appreciation, and compound interest due to forced and contrived forfeitures; network capture leading to (d) adverse income and employment outcomes and to (e) programmed imposition of loss of creditworthiness and of access to non-usurious credit facilities; network capture for (f) adverse imposition of and upon family, relationship, and financial choices and distress; (g) network capture, frauds, and entrapment for adverse imposition of peonage; (h) network capture for imposition of tax liabilities and penalties; (i) network capture for color of law pretexting to falsely create suspicion, and imagined risks to state secrets and national security; (j) network capture for the false imposition of international subject and terror classification designations, for (k) network retention and human trafficking; (l) network retention and human trafficking for purposeful exposure to high risk and lethal domestic and international police powers environments; (m) network retention for threat of destitution, (n) realized destitution, (o)

homelessness, (p) imposition of extreme risks and hardships on plaintiff victim and/or (q) members of their families, such as loss of liberty, health, and life, all at the direction, manipulation, and/or hands and color of law acts of these Defendants;

xi.    Loss of individual income and property for each and every instance of injury, such as predicate acts by Defendants to force (a) disposal of personal, real, intangible property including real estate and financial assets and force the forfeiture of appreciation of those assets, such as by  (b) the use of prohibited BRMT bioweapon hijacking and biomanipulation to create the circumstances of marital dissolution; (c) force litigation expanse and compromise of financial assets by screening-in bad faith actors and screening out reliable service asset purchasers, service providers, vendors, and relationships; (d) providing or screening-in dishonest services and service providers; using coerced service providers who act in their own self-interest to avoid personal consequences and penalties by functionally transferring those consequences to the plaintiff through their actions and failures to act, such as legal counsel in criminal and/or civil difficulties begin manipulated into adverse actions or advice to a target Defendants are head hunting; (e) Defendant injury to plaintiff victim under color of law to evade accountability for prior or planned self-inculpatory acts and/or (f) to evade accountability for self-inculpatory acts and injuries to plaintiff victim by using color of law abuses of other third parties; (g) Defendant computer, appliance, and electronic hacking and harassment, (h) forcing loss of opportunity, driving individuals into circumstances useful for incrimination and pretexting;

creating financial, economic, relationship, and other personal difficulties, and (i) integrating BRMT bioweapon hijackings and manipulations to add stress and to create conditions where the injured plaintiff victim is more likely to act out to discredit plaintiff, and thereby evade Defendant responsibility, liability, and loss of reputation when their patterns of acts, actions, injuries, and racketeering are publicly exposed; (j) manipulation and loss of marital community and benefits therefrom such as emotional, real, personal, and intangible property injuries; (k) purposeful exhaustion of benefits through frauds and deprivations to orchestrate forfeitures, destitution, and homelessness; (l) deprivations of benefits, programs, loans, and loan guarantees from federal, state, local, and private sector organizations; (m) forced litigation and compromise of bad debts and dishonest services of and by those Defendants exploiting police powers under color of law both through direct injury, and through the screening-in and screening-out of persons and entities to manipulate particular outcomes; (n) negotiation of contractual penalties to reduce profits on future forced sales when a Defendant planned and contrived forced forfeiture occurs at a future point;

xii.  Virtual and physical incarceration of plaintiffs by Defendants such as each and every day of (o) network capture and entrapment by Defendants for their own corrupt and self-interested purposes; (p) continuous subjugation to the prohibited BRMT bioweapon system for brain hijacking by Defendant United States; (q) subjugation to other manipulative virtual restraints on liberty and rights in choices of activities and movements at all times day and night; (r) all as aggravated by ongoing BRMT bioweapon system induced torture, and by on-going

psychological operations; (s) six months of de facto involuntary color of law psychiatric confinement and color of law abuse of state legal constraints to Lead Plaintiff for duress in forcing the alleged voluntary of federal civil rights and racketeering litigation to sustain continued fraudulent concealment;

xiii.   Life and health injuries by Defendants such as those to (a) personal relationships, (b) mental and physical health, (c) freedom from fear of injury to health, well-being from Defendants' police powers operations and interferences, (d) public notoriety, discrediting, humiliation, harm to reputation, and risks from public vigilantism, (e) manifested symptoms of physical disease and sicknesses, such as mental illness, depression, anxiety, physical illness, extreme headaches, heart irregularities, breathing irregularities, vision irregularities, extreme pain in the torso, arms, legs, head; lethal threats, loss of control of bodily functions;

xiv.   Liberty and free exercise of rights injuries by Defendants such as (a) free pursuit of personal interests, activities, and avocations; (b) freedom of movement and travel; (c) unimpeded access to professional and career choices; (d) freedom from induced anxiety, stress, fear, and panic related to Defendants' entrapment attempts and threats attempts on life, business, career, and property; (e) freedom from fear, pain, anxiety, panic, and suffering from Defendants' repeated forced forfeitures leading to homelessness, destitution, loss of personal relationships, (f) imposed threats on life from public vigilantism, loss of privacy and personal space, (g) loss of liberty to form relationships freely and without fear of disruption and injury caused and created by Defendants' ulterior motives related to prejudicial police powers operations and/or political agendas;

xv.     Pursuit of happiness injuries by Defendants, such as (a) feelings and reality of imposed isolation, (b) loss of companionship, community, and (c) trusted close emotional relationships and friendships imposed by Defendants such as the freedom to (d) enjoy family, leisure, hobbies, and interests; to (e) emotionally benefit from stable relationships and family, free of manipulations of the plaintiff victim and/or other family members by BRMT bioweapon hijackings, manipulations, and brain, gut, and immune system disruptions and ill health; (f) to travel and experience events, activities, culture, and the natural environment free from fear, concern, and vigilance for contrived accidents, adverse encounters, and entrapment attempts;

xvi.    Civic participation rights and benefits lost to injuries by Defendants such as (a) free and private expression absent harassment and entrapment for personal religious and political beliefs, political speech, participation in civic life and organizations, as well as (b) trade and business organizations for personal and social enrichment and benefit;

xvii.   All the torturous injuries above were and are aggravated by prohibited BRMT bioweapon and bioweapon delivery system brain hijacking used by Defendants United States and its co-conspirators to (a) magnify these and other injuries and adverse emotional experiences of the plaintiff victim and to (b) further emotionally engage the plaintiff victim while in high risk conditions and environments where their actions are (c) more likely to result in injury, incarceration, or death from their own emotional state, (d) from BRMT bioweapon hijacked involuntary acts, or (e) the acts of others who wrongly

interpret the plaintiff victims' acts as voluntarily hostile and use force to injure or kill the plaintiff victim, such as (f) an agent or officer perceiving a lethal threat to themselves from an involuntary body movement or from words induced using BRMT bioweapon brain hijacking to manipulate and control the plaintiff victim in that moment.

810. **Compensatory damages for Defendants' business, commercial, and entrepreneurial injuries** such as a wide variety of (a) malign acts, (b) failures to act despite a sworn duty to do so, and (c) other adverse acts which have and do injure in-state, interstate, and international business and entrepreneurship opportunities, and (d) injure business income and prospects such as loss of business and commercial reputation; (e) attempts on plaintiff victims' life which dampen the ability to freely travel and develop business and commercial interests; (f) harassing plaintiff and commercial interests to develop and enhance plaintiffs' personal feelings of vulnerability and loss of freedom of movement and choice, thereby constraining their business, commercial, and entrepreneurial activities and (g) their attractiveness to investors and other equity and debt resources; (h) forcing litigation expenses and loss or compromise of legally due amounts and assets; (h) providing dishonest services directly or through screened-in bad actors or compromised companies, persons, and services; (i) sabotaging company operations and equipment using undercover police powers agents and operators; (j) posing as interested third parties to prejudice potential customers to the plaintiff by engaging the customer in their entrapment efforts; (k) engaging, screening-in and promoting known third party bad actors; (l) loss of financial assets and appreciation of same; (m) forcing litigation and providing dishonest services by exploiting police powers under color of law both directly and through the screening-in and screening-out of persons and entities to manipulate particular outcomes; (n) hacking and

harassing to damage the business' ability to provide prompt services and products to customers; (o) anonymously disparaging business reputation; (p) engaging directly and through others in thefts of services; (q) creating and engaging directly and through others in business frauds such as receivables thefts, bad check losses, forced asset compromises, defalcations and thefts to reduce revenue, profits, and cash flow; (r) failing to provide, intervening to prevent, and/or providing fraudulent bid, performance, and loan guarantees; (s) failing to provide, intervening to prevent, and/or providing fraudulent insurance and other financial products and services; (t) using fraudulent services and/or their intervention preventing or discouraging legitimate service providers to sustain their control of plaintiff and business cash flow, profits, sales opportunities and prospects and (u) to cause and create adverse financial outcomes to the plaintiff victim's business and personal income and future prospects; (v) eliminating through screening, hacking, spoofing, and other frauds the ability of the plaintiff victim and their business to form relationships freely and (w) without fear of ulterior motives related to prejudicial police powers operations, sabotage and entrapments; (x) deliberate overstaffing and costs by departments, agencies, and persons acting in bad faith and under color of law; (y) project delays, stoppages, and accelerations to increase labor and materials costs under color of law or coercion; (z) negotiation of contractual penalties which are normally rarely experienced as part of Defendants' conspiracy to reduce profits on future forced sales when a Defendant planned and contrived forced forfeiture by plaintiff victim or their business occurs at a future point.

811. **Compensatory damages for Defendants' business, commercial, and entrepreneurial civic participation rights and benefits injuries** by Defendants' predatory acts against freedom, such as harassment and entrapment of plaintiff victim while participating in and benefiting from civic life and organizations, such as trade and business organizations, to develop

(a) business growth and expansion options, (b) projects, (c) partnerships, (d) acquisitions, (e) credit relationships, and (f) other civic business and reputational benefits;

Civic participation in organizations such as (a) religious, (b) political, (c) speech, (d) civic organizations, (d) trade and business organizations benefitting trade, business and commercial opportunities in-state, interstate, and/or international commerce;

All the injuries above were and are aggravated by the prohibited BRMT bioweapon and bioweapon delivery system brain hijacking used by Defendants United States and its Defendant co-conspirators to magnify the emotional experience of the plaintiff victim and to further emotionally engage the plaintiff victim while in high risk conditions and environments where their actions are more likely to result in (a) injury, (b) incarceration, or (c) death from their own involuntary acts or (d) the acts of others who wrongly interpret their acts as voluntary, such as (e) another individual, such as a police powers officer or agent, or an individual in a weapons opeNSEC-carry environment, perceiving a lethal threat to themselves from a body movement or words induced through BRMT bioweapon brain hijacking.

812. **Additional statutory damages and remedies** as available to affected members of the class of plaintiffs, including, without limitation, those to be awarded in accordance with 18 USC §§ 981 through 987, 1514, 1514A, 1962(a) through 1962(d), 1964, 1595, 2333, 2441, 2520; 42 USC Chapter 21 generally including §§ 1981 through 2000h-6, and particularly 42 USC §§ 1983, 1986, 2000a, 2000b-2, 2000d, 2000d-1 through 2000d-7, 2000-e2(a)(2); and all other federal, state, and local statutory program protections, relief, and civil and criminal recoveries afforded to any or all plaintiff victims of the class so injured.

813. **Costs and damages** from loss of use, value, and appreciation of value due to forced sale; any and all transaction costs, fees, and expenses; accumulated appreciation; accumulated

interest; all from the date of the injury, for all injuries sustained in this section entitled Prayer For Relief.

814. **Punitive damages** against Defendant United States and against all governmental Defendants, including, their agents, officers, employees, confidential informants, and any and all other acting at their behest, for (i) abuses of the "state secret" privilege under *United States v Reynolds,* 345 U. S. 1, 12 (1953), which Defendants forfeited from the first day of these violations and injuries as derived under the principle of stare decisis from the precedent Opinion cited at Footnote 4: 5 U.S.C. 22: "… not inconsistent with law…" due to inconsistencies with existing US law and with ratified international treaties; for (ii) bad faith abuses of "qualified immunity" under *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) and related case law cited herein whereby they forfeited any legally valid claim to such defense; for (iii) under 18 USC §§ 1962, 2340, and other relevant statues and treaties, for compensable war crimes, including for the grave Common Article 3 injuries as defined at 18 USC §§ 2441(d), including 2441(d)(1)(a) Torture, 2441(d)(1)(b) Cruel or inhuman treatment, 2441(d)(1)(c) Performing biological experiments, 2441(d)(1)(d) Attempted murder, 2441(d)(1)(f) Intentionally causing serious bodily injury, 2441(d)(1)(f) Sexual assault or abuse; all as committed under the 2001 AUMF in violation of ratified international treaties as cited at paragraph 7, pages 55-56 herein, and for (iv) other such punitive damages as the Court may instruct, all in amounts to be determined by the jury at trial.

815. **Reasonable costs, expenses, and fees** including an award of reasonable attorneys' and experts' fees, and for expenses.

815. **Such other relief** as the Court deems necessary and just.

## JURY DEMAND

816. Plaintiffs demand a jury trial on all issues so triable.

## REQUEST FOR APPOINTMENT OF COUNSEL

817. Lead Plaintiff respectfully requests the appointment of counsel on behalf of the entire class of plaintiffs.

*            *            *

Dated: 10/25/2023
Respectfully submitted,

Dennis Sheldon Brewer, Lead Plaintiff and Pro Se Attorney

1210 City Place

Edgewater, NJ 07020

dbrewer@dennisbrewer.us